# EXHIBIT 2



**National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units**

**Review of the Residual Risk and Technology Review**

**Summary of Public Comments and Responses on Proposed Rule (88 FR 24854 April 24, 2023)**

**April 2024**

## FOREWORD

This document provides the Environmental Protection Agency's (EPA's) responses to public comments on the EPA's proposed National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units - Review of the Residual Risk and Technology Review. The EPA published the proposal in the Federal Register on April 24, 2023, at 88 FR 24854 (2023 Proposal). A virtual public hearing was held on May 9, 2023. Public comments and the transcript for the public hearing are available electronically through https://www.regulations.gov by searching Docket ID No. EPA-HQ-OAR-2018-0794. Copies of all public comments and the transcript for the public hearing are also available at the EPA Docket Center Public Reading Room.

More than 120,000 public comments were collectively received on the proposed rule. The EPA Docket Center consolidated mass mail campaigns and petitions into single document control numbers, resulting in over 945 unique comments. Each of these comments was reviewed and all significant comments relevant to this action and submitted within the comment period have been summarized and included in this document. In some cases, comments with similar themes have been aggregated together. This document includes responses to the comments received on the proposed rule that are not addressed in the final rule preamble.

## TABLE OF CONTENTS

CHAPTER 1 ......................................................................................................................... 7

1. The EPA's Authority ....................................................................................................... 7

CHAPTER 2 ......................................................................................................................... 19

2. Filterable Particulate Matter Emission Limit (as a Surrogate for Non- Hg HAP Metals)........ 19

2.1 General........................................................................................................................ 19

2.2 Use of fPM as a surrogate ........................................................................................... 20

2.3 Data & Analysis Concerns........................................................................................... 22

2.3.1 Data ....................................................................................................................... 22

2.3.2 Merging PM CEMS and Stack Test Data .............................................................. 27

2.3.3 PM Control Assumptions....................................................................................... 29

2.4 Compliance Demonstration ......................................................................................... 31

2.4.1 Removal of PM LEE............................................................................................... 31

2.4.2 Use of PM CEMS .................................................................................................. 33

2.5 Technical feasibility..................................................................................................... 34

2.5.1 General .................................................................................................................. 34

2.5.2 Intersection with Other Power Sector Rules .......................................................... 37

2.6 Costs............................................................................................................................ 38

2.6.1 General .................................................................................................................. 38

2.6.2 Cost-Effectiveness Comparisons .......................................................................... 43

2.6.3 Compliance Margin ............................................................................................... 47

2.7 Alternatives to Proposed 0.010 lb/MMBtu Limit ...................................................... 49

CHAPTER 3 ......................................................................................................................... 54

3. PM Emission Monitoring................................................................................................ 54

CHAPTER 4 ......................................................................................................................... 68

4. Review of the Hg Emission Standards............................................................................ 68

4.1 Overview of Hg Emissions from Combustion of Coal.................................................. 68

4.2 Hg Emission Reductions Since Promulgation of the 2012 MATS Final Rule.............. 69

4.3 CAA Section 112(d)(6) Technology Review of the Hg Standards................................. 74

4.4 Proposed Revision of the Hg Emission Standard for Lignite-Fired EGUs .................... 85

CHAPTER 5 ......................................................................................................................... 104

5. Other proposed actions - technology review ................................................................... 104

5.1 No Revisions to Work Practice Standards for Organic HAP ....................................... 104

5.2 No Proposed Revisions to the Acid Gas Standards for Coal-Fired EGUs .................. 106

5.3 No Proposed Revisions to Standards for Continental Liquid Oil-Fired EGUs ............ 109

5.4 No Proposed Revisions to Standards for Non-Continental Liquid Oil-Fired EGUs .... 109

5.5 No Proposed Revisions to Standards for IGCC EGUs ................................................. 111

CHAPTER 6 ............................................................................................................................ 112

6. Other proposed actions ...................................................................................................... 112

6.1 Startup Requirements..................................................................................................... 113

6.2 Removing Non-Hg Metals Limits ................................................................................. 117

6.3 Removing Use of PM CPMS for Compliance Determinations ..................................... 121

CHAPTER 7 ............................................................................................................................ 123

7. What compliance dates are we proposing, and what is the rationale for the proposed compliance dates? ................................................................................................................... 123

CHAPTER 8 ............................................................................................................................ 126

8. Cost, Environmental, and Economic Impacts.................................................................... 126

8.1 What are the air quality impacts?.................................................................................. 126

8.2 What are the cost impacts? ........................................................................................... 128

8.3 What are the economic impacts? .................................................................................. 130

8.4 What are the benefits?.................................................................................................... 140

8.5 What analysis of environmental justice did we conduct? (Executive Order 12898).... 147

CHAPTER 9 ............................................................................................................................ 156

9. Statutory and Executive Order Reviews ............................................................................ 156

9.1 Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review ................................................................... 156

CHAPTER 10 .......................................................................................................................... 158

10. CAA Section 112(f) Residual Risk, 2020 petition for reconsideration ........................... 158

10.1 Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use.................................................................................... 162

CHAPTER 11 .......................................................................................................................... 163

11. Other Topics...................................................................................................................... 163

CHAPTER 12 .......................................................................................................................... 175

12. General .............................................................................................................................. 175

## ACRONYMS AND ABBREVIATIONS

While this list may not be exhaustive, to ease the reading of this document and for reference purposes, the EPA defines the following terms and acronyms here:

| | |
|---|---|
| A&N | appropriate and necessary |
| APA | Adminstrative Procedure Act |
| Btu | British Thermal Units |
| CAA | Clean Air Act |
| CEMS | continuous emissions monitoring systems |
| CFR | Code of Federal Regulations |
| $CO_2$ | carbon dioxide |
| CPMS | continuous parameter monitoring system |
| DOE | Department of Energy |
| DSI | dry sorbent injection |
| EBCR | Eastern Bituminous Coal Refuse |
| EGU | electric utility steam generating unit |
| EIA | Energy Information Administration |
| EPA | Environmental Protection Agency |
| ESP | electrostatic precipitator |
| FF | fabric filter |
| FGD | flue gas desulfurization |
| fPM | filterable particulate matter |
| GHG | greenhouse gas |
| HAP | hazardous air pollutant(s) |
| HCl | hydrogen chloride |
| HF | hydrogen fluoride |
| Hg | mercury |
| $Hg^0$ | elemental Hg vapor |
| ICR | Information Collection Request |
| IGCC | integrated gasification combined cycle |
| IPM | Integrated Planning Model |
| IRIS | Integrated Risk Information System |
| lb | Pounds |
| LEE | low emitting EGU |
| MACT | maximum achievable control technology |
| MATS | Mercury and Air Toxics Standards |
| MMBtu | million British thermal units of heat input |
| MW | megawatt |
| NAAQS | National Ambient Air Quality Standards |
| NEEDS | National Electric Energy Data System |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| $NO_x$ | nitrogen oxides |
| OAQPS | Office of Air Quality Planning and Standards |
| OMB | Office of Management and Budget |

5

| PDF | Portable Document Format |
| PM | particulate matter |
| $PM_{2.5}$ | fine particulate matter |
| ppm | parts per million |
| QA | Quality Assurance |
| QC | Qualtiy Control |
| RCA | Relative Correlation Audit |
| RIA | Regulatory Impact Analysis |
| RRA | Relative Response Audit |
| RTR | residual risk and technology review |
| $SC-CO_2$ | social cost of carbon |
| SCR | Selective Catalytic Reduction |
| $SO_2$ | sulfur dioxide |
| $SO_3$ | sulfur trioxide |
| SDA | spray dry adsorption |
| TBtu | trillion British thermal units of heat input |
| tpy | tons per year |
| WebFIRE | Web Factor Information Retrieval System |

# CHAPTER 1

## 1. The EPA's Authority

**Comment 1:** Commenters acknowledged that the EPA has the statutory authority to review and possibly revise MATS limits for Hg and non-Hg HAP but said the state agency opposed the process that the EPA has taken on the proposal. Commenters cited Clean Air Act (CAA) section 101(a)(3) finding that air pollution prevention and control are the primary responsibilities of States and local governments and said that the EPA should have worked cooperatively with the state agency to gather accurate information considering the state agency oversees more lignite-fired units than any other state agency. Commenters said the proposal was inconsistent with the EPA's Strategic Plan goal to foster state partnerships.

**Response 1:** Under section 112 of the CAA, the EPA has primary authority for setting standards for HAP. While the EPA is always interested in working with states and appreciates input from state commenters in the rulemaking process, the CAA is clear that establishing HAP standards is primarily the responsibility of EPA, which the EPA implements in coordination with state and local air permitting offices.

**Comment 2:** Commenters said the EPA's recission of the lignite subcategory does not comply with the APA because since 2005, the EPA has subcategorized EGUs based on the type of coal they combust as determined from facts in the administrative record. Commenters said the proposal effectively eliminates the lignite subcategory and said the proposal does not provide a "reasoned analysis" for doing so, as required by the APA. Commenters cited from the record, prior justifications for the "low rank virgin coal" subcategory and said that the EPA must provide its reasoning for the proposed decision to change their existing policy, citing *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 6 (D.D.C. 2020). Commenters said the proposed rule and 2023 RTR takes the same practices, standards, and control technologies examined in the 2020 Final Action (85 FR 31286) and reaches a different determination, and commenters concluded that there is a significant likelihood that the proposal, if finalized, would be considered "arbitrary and capricious" and be invalidated under the APA.

Commenters cited *Ass'n of Battery Recyclers, Inc. v. E.P.A.*, 716 F.3d 667, 673 (D.C. Cir. 2013) and said that when determining if changes are "necessary" under CAA section 112(d)(6), the EPA is statutorily required to account for cost. Commenters said that courts have upheld the EPA's past practice of further considering "feasibility, utility, cost-effectiveness, and adverse … environmental impacts …" when assessing whether to require additional limits under CAA section 112(d)(6). Commenters said that because the EPA has relied on such factors in the past, it would be unlawfully arbitrary for the EPA to fail to consider such factors without providing a rationale for the reversal in policy and cited *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

**Response 2:** The removal of the lignite subcategory complies with APA requirements. Contrary to some commenter's assertions, the EPA provided a "reasoned analysis" of the proposed change in the 2023 Proposal (88 FR 24875-82), which detailed the ability for lignite-fired units to meet Hg emission rates for other source categories. The EPA further disagrees with commenters that

the EPA considered the same information as the 2020 Technology Review but arbitrarily and capriciously reached a different conclusion. As the EPA explained in the Proposed Rule, the EPA's review of the 2020 Technology Review found cost-effective developments in control technologies and methods of operation that demonstrated lignite-fired EGUs can achieve an Hg emission rate that is consistent with those for EGUs firing other types of coal. This finding was consistent with prior technology reviews, which often include obtaining better information about control technology performance than the Agency had available when first setting standards.[1] The 2020 Technology Review, on the other hand, did not consider developments in cost and effectiveness of demonstrated technologies, nor did it evaluate the current performance of emission reduction control equipment and strategies.

Additionally, the EPA has inherent authority to reconsider past decisions and to revise, replace or repeal a decision to the extent permitted by law and supported by a reasoned explanation. *See, e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). In this instance, the EPA gathered additional information that was not considered in the 2020 Technology Review, and based on a reasoned analysis of that information determined that a more stringent Hg emission limit for lignite-fired EGUs is achievable. This was a reasoned decision by the EPA to change position from the 2020 Technology Review that was supported by evidence in the Proposed Rule. *See e.g.*, *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 11 (D.C. Cir. 2015) (finding a "shift in EPA's position . . . was reasonable because the agency received intervening information relevant to its decision.").

Under CAA section 112(d)(6), EPA is required to review and revise emission standards "as necessary" to account for technology developments or various changes in industry practices. In so doing, the D.C. Circuit has determined that the EPA may consider costs. *Association of Battery Recyclers, Inc. v EPA*, 716 F.3d 667, 673-74 (D.C. Cir. 2013); *see also Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 11 (D.C. Cir. 2015). In *Association of Battery Recyclers*, the court found that CAA section 112(d)(2) expressly authorizes cost consideration in other aspects of the standard-setting process, such as 112(d)(6). 716 F.3d at 673-74.

As the EPA explained in the 2023 Proposal, in conducting technology reviews under CAA section 112 the EPA considers costs in various ways, depending on the rule and affected sector. For example, the EPA has considered, in previous CAA section 112 rulemakings, cost-effectiveness, the total capital costs of proposed measures, annual costs, and costs compared to total revenues (*e.g.*, cost to revenue ratios). Further discussion regarding the EPA's assessment of costs and cost-effectiveness for the fPM standard are discussed in section IV.D.1 of the preamble.

---

[1] *National Emission Standards for Hazardous Air Pollutants: Site Remediation Residual Risk and Technology Review*, 85 FR 41680, 41690 (July 10, 2020); *National Emissions Standards for Mineral Wool Production and Fiberglass Manufacturing*, 80 FR 45280, 45284-45285 (July 29, 2015); *Petroleum Refinery Sector Risk and Technology Review and New Source Performance Standards*, 80 FR 75178, 75201-75202 (December 1, 2015); *National Emission Standards for Coke Oven Batteries*, 69 FR 48338, 48351 (August 9, 2004).

**Comment 3:** Commenters stated that the EPA has no authority to revise the EGU standards under CAA section 112(d)(6) based on the information in the proposal and said the "as necessary" language of the statute limits the EPA's authority.

Commenters stated that the EPA's authority under CAA section 112(d)(6) is linked to finding developments in practices, processes, and technologies. Commenters said that the EPA found no new developments in practices, processes, and control technologies for this source category in its 2020 Final Action (85 FR 31286) and cited the EPA's review of fPM controls in the 2023 Proposal (88 FR 24854) at 88 FR 24865. Commenters said the EPA exceeded its authority under CAA section 112 by failing to identify a "development" to justify reducing the fPM standard.

Commenters said that Congress did not create the RTR process as an open-ended authority to redefine MACT standards and said CAA section 112 does not require the EPA to recalculate MACT floors under CAA section 112(d)(6). Commenters cited *National Association for Surface Finishing v. EPA*, 795 F.3d 1, 11 (D.C. Cir. 2015) and said the EPA went beyond its statutory authority by determining that "developments" under CAA section 112(d)(6) include changes in emissions data, costs, and monitoring devices. Other commenters cited *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) and said the EPA must show a reasoned explanation for disregarding facts that underlay the prior policy.

Commenters said the record for the proposal does not present information sufficient to support a different conclusion since the 2020 Final Action. Commenters said that the technologies underlying the EPA's cost position have not changed since 2012 and concluded that costs are not a valid new "development" under CAA section 112(d)(6). Some commenters acknowledged that the EPA's reliance on improved fPM and Hg emissions data may be indicative of new practices, processes, or control technologies, but said the proposal does not identify the root cause of these emission reductions. Other commenters said the two "developments" identified in the proposal (related to the low levels of emissions and costs of controls) do not warrant a more stringent fPM standard under CAA section 112(d)(6) authority and said the proposal's consideration of actual emissions and costs as "developments" was inconsistent with prior EPA determinations under CAA section 112(d)(6) for coke oven batteries, ferroalloy production, and wool fiberglass manufacturing.

Commenters opposed the proposal's rationale for rejecting a fPM limit of 0.015 lb/MMBtu because "it would largely leave in place the status quo[,]" and commenters said this rationale was inconsistent with the EPA's statutory authority under CAA section 112(d)(6). Commenters said that under CAA section 112(d)(6) authority, the EPA initially determined that there are "no new practices, processes, or control technologies for non-Hg HAP." Commenters said that subsequently, the EPA moved beyond CAA section 112(d)(6) authority and re-examined changes in emissions, costs, and monitoring. Commenters said that emissions changes are outside of CAA section 112(d)(6) authority. Commenters said that the proposal relies on authorities under CAA section 112(d)(2) and (3) but said the EPA's authorities for this proposal are limited to those delineated under CAA section 112(d)(6). Commenters said the proposal does not uncover what new practices, processes, or control technologies occurred since the development of the MATS Rule in 2012 or since the reconsideration in 2020.

Commenters said the proposal relies on the same control technologies considered in 2012 (fPM: ESP and FF; Hg: combination of sorbent injection and activated carbon injection) [*NASF*, 795 F.3d at 11 ("developments" must happen after the issuance of the original rule)].

Commenters said that the EPA did present new fPM data from the Agency's WebFIRE database and collected limited information from lignite units under CAA section 114 requests, but commenters said the EPA's analysis does not present information sufficient to show any actual change in practice since the original rule. Commenters said the proposal does not include a reasonable basis for coming to a different conclusion with respect to fPM and Hg emissions from lignite units in only three years since the 2020 Final Action. Commenters also stated that the RTR process does not allow the Agency to simply revisit a standard and change its mind without sufficient scientific and technical bases. They argued that the record must support this shift in outcome [NASF, 795 F.3d at 11-12].

Commenters cited *National Association for Surface Finishing v. EPA*, 795 F.3d 1, 11 (2015) (*NASF v. EPA*) and said the Court determined that the EPA does not have the authority to revise a MACT standard in the RTR process unless developments happened after the issuance of the original rule. Commenters said that the proposal does not uncover new practices, processes, or control technologies since MATS was promulgated in 2012. Commenters said the RTR process does not allow the EPA to take the proposed actions without sufficient scientific and technical support. They argued that the proposal improperly uses the initial MACT floor authorities under CAA section 112(d)(3) when the proposal should be limited to the technology review authorities under CAA section 112(d)(6). Commenters said CAA section 112(d)(6) requires the EPA to consider "developments in practices, processes, and control technologies." Commenters said that the proposal concludes, with respect to fPM, that there are "no new practices, processes, or control technologies for non-Hg HAP" [88 FR 24868]. Commenters said that this finding should have signaled the end of the EPA's statutory inquiry for fPM. Commenters stated that the proposal then moves beyond CAA section 112(d)(6) authority and re-examines changes in emissions data, costs, and monitoring devices. Commenters said that the proposal inappropriately labels these changes as "developments" and said that emissions changes alone are outside of the statutory technology analysis. Commenters said that in *NASF v. EPA*, the EPA identified several pre-existing technologies in its analysis (control devices, HEPA filters, tank hoods, fume suppressants) and discussed improvements in the control performance resulting in emission reductions. Commenters said that the *NASF* court found this was a sufficient development because the EPA discussed the impact of the developments and examined what emissions levels could be achieved. Commenters said the key inquiry was whether the record supports a shift in analysis over time.

Commenters stated that the EPA has recalculated the fPM costs of MATS technologies and monitoring devices. They said the costs may be a valid development if technologies were originally eliminated due to cost in 2012 but are now cost-effective in 2023 – however, this is not the case here. The commenters said that the fPM technologies applied in this proposal – ESPs and FF and Hg reduction technologies were not previously eliminated due to cost. They concluded therefore, for this rulemaking, costs are not a "development." Commenters concluded that the previous record and the current proposal do not support the determination that changes in costs should be considered a "development" under CAA section 112(d)(6). Commenters also

said that improved fPM and Hg emissions data are not necessarily indicative of new practices, processes, or control technologies and said observing improvements in emissions data does not end the investigation. They said the proposal must provide evidence of the actual cause(s) of emission reductions and said the proposal does not provide the root cause of reductions.

Commenters said that CAA section 112(d)(6) does not require limits to be revised when they are "achievable" as discussed in the proposal, but said the statute requires revisions "as necessary" and contingent on new developments. Commenters said that in a case such as the proposed rule, when the residual risk is acceptable with an ample margin of safety, the EPA should not issue new standards.

Commenters said that the EPA has the discretion to evaluate a range of relevant factors under CAA section 112(d)(6) and said the Agency is justified in reconsidering the 2020 Technology Review. Commenters cited the statutory text and cited *Louisiana Env't Action Network v. EPA*, 955 F.3d 1088, 1093 (D.C. Cir. 2020) ("LEAN") and said the terms "revise as necessary" and "developments" are both interpreted broadly, with reference to CAA section 112(d)(2)'s focus on "maximum" emission reductions that are "achievable." Commenters said the *LEAN* decision indicates the EPA may consider factors beyond the kinds of "practical and technological advances" specifically listed in CAA section 112(d)(6). Commenters said the 2020 Technology Review did not evaluate developments in costs or performance of controls and agreed that the proposal appropriately reconsidered the 2020 Technology Review. Commenters said the proposal's approach for evaluating cost effectiveness relative to total revenues is appropriate and said that the determination of whether it is "necessary" to revise standards under CAA section 112(d)(6) must be made with reference to the CAA section 112(d)(2) mandate. Commenters said the CAA section 112(d)(2) mandate does not suggest that the standard must provide the lowest cost.

Commenters stated that the EPA has the authority to consider new information on the impacts of coal- and oil-fired HAP emissions and cited *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 16-17 (D.C. Cir. 2015). Commenters said this case indicates the EPA has authority to determine that "developments" include "not only wholly new methods, but also technological improvements … that could result in significant additional emission reduction."

Commenters said CEMS lead to reductions in emissions as operators detect and correct problems and said such reductions constitute a "development" that requires revisions to standards under CAA section 112(d)(6) authority.

**Response 3:** The EPA disagrees with commenters that allege the EPA lacks the authority to revise EGU standards under CAA section 112(d)(6) or review past decisions, as discussed in Response 2 above. The EPA further disagrees with commenters that it did not identify a "development" sufficient to justify reducing the fPM standard used as a surrogate for non-Hg metal HAP. The EPA's review revealed two important changes in the coal-fired EGU industry related fPM (used as a surrogate for non-Hg metal HAP) that occurred since the EPA initially promulgated MATS in 2012. First, the large majority of units are reporting fPM emissions significantly below the current emission limit; and second, the fleet is achieving these lower emission levels at lower costs than the EPA assumed in promulgating the original MATS fPM

emission limit. The EPA finds these are cognizable developments, which are clearly illustrated elsewhere in this record. As other commenters noted, in *National Association for Surface Finishing v. EPA*, the D.C. Circuit found the EPA "permissibly identified and took into account cognizable developments" based on the EPA's interpretation of the term as "not only wholly new methods, but also technological improvements." 795 F.3d at 11 (D.C. Cir. 2015). Similarly here, the EPA identified a clear trend in control efficiency, costs, and technological improvements, which the EPA is accounting for in this action.

The EPA's interpretation of "developments" under CAA section 112(d)(6) to include the changes the EPA identified for non-Hg metal HAP controls is also consistent with its statutory authority. CAA section 112(d)(6) broadly requires the EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards[.]" Nothing in the language of the statute suggests "developments" should be limited to only wholly new developments as some commenters suggest. This is consistent with the EPA's interpretation of "developments" discussed in technology reviews for coke over batteries,[2] ferroalloy production,[3] and wool fiberglass manufacturing,[4] all of which considered improved control efficiency a "development" under the CAA section 112(d)(6) technology review. Based on the EPA's authority under this provision, it is the EPA's responsibility to if determine if such developments, in consideration of costs and other factors, warrant updates to emissions standards. But that requirement in no way means that in every instance the EPA identifies a "development" under a CAA section 112(d)(6) technology review, that the EPA must necessarily revise standards.

The EPA is also acting consistently with the Supreme Court's direction when it stated, "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). As demonstrated throughout this record, the EPA provided a through explanation of the reasons for this action that took account of facts and circumstances underlying prior decisions, and then built upon those decisions based on new information. As other commenters point out, CAA section 112(d)(2) focuses on the EPA determining "maximum" emission reductions that are "achievable." In this action, under the EPA's technology review authority it considered developments in practices, processes, and control technologies to determine if more stringent standards are achievable than those initially set by the EPA in establishing MACT floors, based on developments that occurred in the interim. *See LEAN v. EPA*, 955 F.3d 1088, 1097-98 (D.C. Cir. 2020). Based on a consideration of costs and other factors, the EPA finds that the revised standards are achievable.

The EPA agrees with commenters that CAA section 112 does not require the EPA to recalculate MACT floors under the CAA section 112(d)(6) technology review. Further discussion regarding the EPA's rationale for adopting the final fPM standard and assessment of costs and cost-effectiveness for the fPM standard are discussed in section IV.D.1 of the preamble.

---

[2] 69 FR 48338 (proposed Aug. 9, 2004).

[3] 79 FR 60238 (Oct. 6, 2014).

[4] 82 FR 40970 (Aug. 29, 2017).

**Comment 4:** Commenters cited significant emission reductions from EGUs since 2010 and stated that further HAP reductions are not warranted under CAA section 112(f)(2) authority. Commenters said the results from this residual risk assessment provide a strong scientific foundation for the EPA to conclude that the current MATS limitations provide an ample margin of safety to protect public health in accordance with the requirements of CAA section 112(f)(2). Commenters cited risk metrics in the RIA and said that the EPA has not demonstrated an unacceptable risk for lignite-fired EGUs under CAA section 112(f)(2), and said the EPA has no authority to issue RTR in the absence of unacceptable risk.

Commenters disagreed with the proposal's reliance on the Court's decision in *La. Envtl. Action Network v. Envtl. Prot. Agency*, 955 F.3d 1088 (D.C. Cir. 2020) (*LEAN*), as support for the position that MACT standards may be revised even when the review under CAA section 112(f)(2) finds an ample margin of safety. Commenters said that *LEAN*'s only proposition for an RTR is that the EPA is obligated to include listed HAP that were not included under the original CAA section 112(d)(3) standards. Commenters said that the *LEAN* decision cites *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 4 (D.C. Cir. 2015) which allows for strengthening of standards when "developments" occur but does not require it.

Commenters said that the proposal's consideration of cost under CAA section 112(d)(6) is beyond the authority granted to the EPA in the statute. Commenters said that the EPA's authority under CAA section 112(d)(6) is not an opportunity to re-apply the MACT floor requirements under CAA section 112(d)(3) to units that are already subject to MACT standards.

Commenters from a coal-producing state said the proposal was unjustified and conflicts with technical data and the record assembled by the agency itself, citing the EPA's 2020 determinations related to "ample margin of safety" and related to "no new practices, processes, or control technologies…."

Commenters said that under CAA section 112(c)(9), the EPA has the authority to remove the EGU source category because the risk estimates are one-tenth of the acceptable level. Commenters said that the EPA must factor its findings under CAA section 112(f)(2) into its technology cost analysis and said that the EPA's modeling demonstration indicates that it is unreasonable under CAA section 112 authority to impose additional regulatory burden on lignite plants.

Commenters agreed with the EPA's "two-pronged" interpretation that CAA section 112(d)(6) provides authorities to the EPA that are distinct from the EPA's risk-based authorities under CAA section 112(f)(2). Commenters said that if the criteria under CAA section 112(d)(6) are met, the EPA must update the standards to reflect new developments, without regard for risk assessments under CAA section 112(f)(2). Commenters said the technology-based review conducted under CAA section 112(d)(6) need not account for any information learned during the residual risk review under CAA section 112(f)(2), unless that information pertains to statutory factors under CAA section 112(d)(6), such as costs. Commenters concluded that CAA section 112(d)(6) requires that EPA promulgate the maximum HAP reductions possible where achievable at reasonable cost without regard for health or environmental impacts.

**Response 4:** As discussed throughout this record, updating fPM standards to bring the worst performing units up to a level where the majority of units are performing serves Congress's mandate to the EPA to continually consider developments and to ensure that standards account for developments "that create opportunities to do even better." *Louisiana Environmental Action Network (LEAN) v. EPA*, 955 F.3d 1088, 1093 (D.C. Cir. 2020). Discussion regarding the EPA's authority to conduct the CAA section 112(d)(6) technology reviews independent of the Agency's residual risk review is in section IV.C.1 of the preamble.

**Comment 5:** Commenters said the EPA does not have the statutory authority to revise monitoring requirements in an RTR.

Commenters said that the EPA has authority to require CEMS for PM, HCl and any other pollutants regulated by MATS to ensure EGUs are complying with standards and cited CAA sections 112(b)(5), 114(a)(1)(C), and 114(a)(3). Commenters said that none of these CAA provisions explicitly requires the EPA to consider cost and cited *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 561 (D.C. Cir. 2015) as supporting case law that indicates certain monitoring requirements do not amount to "beyond the floor" standards under the EPA's CAA section 112(d)(2) authority.

**Response 5:** The EPA disagrees with commenters that it lacks authority to update compliance demonstration requirements to require PM CEMS under CAA section 112(d)(6). As discussed further in section IV.D.2 of the final preamble, the EPA finds that the benefits of PM CEMS to provide real-time information to owners and operators (who can promptly address any problems with emissions control equipment), to regulators, to adjacent communities, and to the general public, further Congress's goal to ensure that emission reductions are consistently maintained.

**Comment 6:** Commenters cited CAA section 112(d)(1) and said the proposal exceeds the EPA's statutory authority by removing the non-Hg, individual metal HAP standards and replacing them with fPM as a surrogate. Commenters said the EPA has no authority under CAA section 112 to regulate only PM. Commenters said there must be a compliance option based on the target HAP. Commenters said CAA section 112(d)(6) does not provide the EPA authority to revise compliance methods and cited the statutory references to reviewing and revising "emissions standards." Commenters cited *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 637 (D.C. Cir. 2000) and said that the EPA may use a surrogate if it is reasonable but said eliminating the actual non-Hg limits is not within the EPA's authority to establish surrogates. Commenters said that the EPA's justification that few sources use the HAP-metals compliance option does not support elimination of the option. Commenters also said that the Executive Order 13990 did not instruct the EPA to analyze monitoring. Commenters said that if the EPA removes the non-Hg, HAP-metals limits then the EPA must also remove the surrogate limit.

**Response 6:** In *National Lime Ass'n v. EPA*, the D.C. Circuit found "[t]he EPA may use a surrogate to regulate hazardous pollutants if it is 'reasonable' to do so."233 F.3d 625, 637 (D.C. Cir. 2000). In that case, the court found "the use of PM as a surrogate for HAP metals is not contrary to law." *Id.* at 639. Specific to the Portland Cement Kilns at issue in that case, the court also found PM is a reasonable surrogate for HAP metals. *Id.* While the court instructed the EPA that it "may need to reconsider whether PM is an appropriate surrogate for HAP metals" when

14

the EPA updated standards, *id.*, the court said nothing to suggest the EPA cannot use a surrogate as the sole emissions limit for a particular type or class of HAP. For further information regarding the EPA's technical justification to use fPM as a surrogate see Chapter 2.2, below.

**Comment 7:** Commenters said that the EPA's authority under CAA section 112(d)(6) only allows revisions to MACT standards if revisions are "necessary." Commenters said that the proposal is imposing beyond-the-floor standards without adequately considering cost and cited *Michigan v. EPA*.

Commenters cited *NRDC v. EPA*, 529 F.3d 1077, 1083 (D.C. 2008) and said that CAA section 112(d)(6) does not require the EPA to recalculate the MACT floor. Commenters said that the review process is more limited and defined by statute as the one-time residual risk review and the octennial technology review. Commenters cited *Association of Battery Recyclers Inc. v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013) and said costs are implied as a component of the RTR analysis.

Commenters cited *Sierra Club v. Costle*, 657 F.2d 298, 330 (D.C. Cir. 1981) and said the case grants the EPA discretion in weighing cost, energy, and environmental impacts, recognizing the Agency's authority to take these factors into account "in the broadest sense at the national and regional levels and over time as opposed to simply at the plant level in the immediate present." Commenters said that the EPA has authority to set costs that are reasonable for the industry even if they are not reasonable for every facility.

Commenters acknowledged that the EPA has discretion to consider cost effectiveness under CAA section 112(d)(2) and cited *NRDC v. EPA*, 749 F.3d 1055, 1060-61 (D.C. Cir. 2014) but also said that the dollar-per-ton metric is less relevant under CAA section 112 than under other CAA provisions because the Agency is not charged with equitably distributing the costs of emission reductions through a uniform compliance strategy, as the EPA has done in its transport rules (citing *NRDC v. EPA*, 749 F.3d 1055, 1060-61 (D.C. Cir. 2014)). Commenters said that the Agency must require maximum reductions of HAP emissions from each regulated source category and has no authority to balance cost effectiveness across industries.

**Response 7:** In this action, the EPA is acting under its authority in CAA section 112(d)(6) to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards" promulgated under CAA section 112. As the EPA explained in the proposal, this technology review is separate and distinct from other standard setting provisions under CAA section 112, such as establishing MACT floors, conducting the beyond-the-floor analysis, and reviewing residual risk. Comments regarding costs considerations following from the *Michigan v. EPA* decision are discussed in section 8.4 of this document.

Comments regarding the EPA's assessment of costs and cost-effectiveness for the fPM standard are discussed in section IV.C.1 of the preamble.

**Comment 8:** Commenters said that the EPA does not have the authority to wait to address the lack of standards for dioxins, benzene, carbon disulfide, dichloromethane, and toluene. Commenters said that the EPA must develop standards for these HAP in the RTR because CAA

15

section 112 requires emission limits for each HAP emitted by a source category and cited 42 U.S.C. § 7412(d); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 633-634 (D.C. Cir. 2000); *Sierra Club v. EPA*, 479 F.3d 875, 883 (D.C. Cir. 2007).

**Response 8:** As explained in the 2023 Proposal, the EPA's review of new technology and methods of operation conducted as part of this technology review found no developments that would result in cost-effective emission reductions of organic HAP. Further, as explained in Chapter 5.1 of this document, the EPA plans to continue to review a petition for reconsideration from environmental organizations that sought the EPA's reconsideration of organic HAP work practice standards and will respond to the petition in a separate action.

**Comment 9:** Commenters opposed the proposed changes to the fPM standard and the proposal to eliminate the quarterly testing compliance option. Commenters said the proposal exceeds the EPA's statutory authority under CAA section 112(d)(6) and that the proposed rule would impact facilities owned or operated by the municipal power agency. Commenters said that the Act's RTR process is not intended to continually revise standards but is to address residual risk that becomes addressable through new technologies and processes. Commenters said revisions should be precipitated by new developments, not changes in analysis.

**Response 9:** Discussion about the EPA's authority under CAA section 112(d)(6) is discussed above in response to comments 3 and 4 in this section and in section II.A of the preamble. The EPA responded to comments about the distinction between the technology review and residual risk review in section IV.C.1 of the preamble. As the EPA explained in sections II.A and II.E of the preamble, this action is a result of the EPA's review of the 2020 Technology Review.

**Comment 10:** Commenters cited the omission of monetized benefits for HAP reductions on page 26 of the *NAAQS PM RIA* published in December of 2022 and said that the EPA has not justified the proposal's claim that revisions to HAP standards balance CAA section 112's direction to achieve maximum reductions with the statutory factor of cost. Commenters also said the CAA does not authorize the EPA to promulgate a rule based completely on co-benefits as proposed and said that the EPA has not economically justified the proposed rule based on CAA section 112 mandates for HAP reductions. Commenters were opposed to the proposal's reliance on criteria pollutant co-benefits and cited the process delineated in CAA section 110 of the Act for attainment of NAAQS. Commenters said the proposal is inconsistent with CAA section 110 because it uses CAA section 112 to reduce $PM_{2.5}$ emissions. Commenters also said that the Act does not authorize the EPA to assign benefits to a PM rule that include benefits in areas attaining the PM or ozone NAAQS, citing CAA section 109(b)(1).

Commenters said the proposal considers co-benefits associated with $CO_2$ emission reductions and said that the EPA does not have the authority to consider shifting generation from units that emit $CO_2$ to units that do not emit $CO_2$ and cited *West Virginia v. EPA*, 142 S.Ct. 2587, 2614 (2022).

**Response 10:** It is well established that the EPA may use a surrogate emission standard under CAA section 112,[5] such as it has here by using fPM emissions as a surrogate for non-Hg metal HAPs. Accordingly, the EPA is acting under its authority under section 112 of the CAA and not section 110, as commenters suggest.

**Comment 11:** Commenters said the proposal would amount to a regulatory taking from lignite surface mine owners because lignite mine owners have made significant investments based on current standards for HAP emissions, and commenters said lignite mine owners are entitled to just compensation for any regulatory taking.

**Response 11:** The EPA disagrees with commenters that this rule constitutes a taking within the meaning of the Fifth Amendment.

**Comment 12:** Commenters said that the EPA's authority under CAA section 112(d)(6) is distinct from the EPA's authority to make the A&N determination under CAA section 112(n)(1)(A) but that information compiled for the A&N proceedings, including hazards and costs, can inform the EPA's analysis under CAA section 112(d)(6).

**Response 12:** The EPA agrees with commenters that its authority to perform the technology review is distinct from the EPA's authority for the appropriate and necessary finding.

**Comment 13:** Commenters said the EPA lacks CAA section 112 authority to set emissions standards in the proposal because the EPA inappropriately determined that it was "appropriate and necessary" to list EGUs as a source category under CAA section 112. Commenters said the 2023 A&N finding is unsound because risk-levels and costs were not weighed as required in *Michigan v. EPA*. Commenters cited portions of the risk assessment in the A&N finding and said that the finding did not have sufficient information to quantify the benefits used to justify the decision that regulating EGU HAP was "appropriate." Commenters also said that the EPA's 2023 Revocation is unsound because it departed from the EPA's statutory requirements for determining risk without adequate explanation. Commenters said that the information provided by and relied upon by the EPA in the 2023 Revocation indicates that the risk associated with EGU HAP has always been below the level the EPA deems acceptable, with an ample margin of safety for sensitive populations.

**Response 13:**  Comments regarding the EPA's appropriate and necessary finding pursuant to CAA section 112(n)(1) are outside the scope of this rulemaking.

**Comment 14:** Commenters requested that the EPA use authorities under the CAA, Executive Order 13990, and Executive Order 12898 to take the following actions: (1) withdraw the proposed rule and complete CAA section 112(d)(6) closer to the eight year milestone in the statute or earlier if advancements in technologies occur, or (2) create a subcategory for existing EGUs employing wet scrubbers without ESP or FFs until the next RTR, and (3) create a retirement subcategory that allows existing units to meet the current standard for fPM so long as

---

[5] *See Nat'l Lime Ass'n*, 233 F.3d at 637.

they opt into the retirement subcategory within 18 months after promulgation with a retirement date no later than December 31, 2035. Commenters said the requested retirement subcategory would allow operations past 2035 for units essential to reliability as determined by reliability authorities.

Commenters said that the EPA should use its authority to create subcategories for units that elect to retire by a date certain and cited recent proposed rules for EGUs at 88 FR 33245 (GHG Standards and Guidelines for Fossil Fuel-Power Plants) and at 88 FR 18824, 18837 (Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category).

**Response 14:** The EPA responded to the comment about creating a retirement subcategory in section IV.C.1 of the preamble and explained its rationale for the updated fPM standard (as a surrogate for non-Hg metal HAP), in section IV.D.1 of the preamble. The EPA disagrees with commenters that it should create a subcategory for existing EGUs with wet scrubbers without ESPs or FF, and the Agency does not find such a subcategory is appropriate. The EPA further disagrees that it should withdraw this action to complete a technology review closer to eight years after the 2020 Technology Review. As the EPA explained in sections II.A and II.E of the preamble, this action is a result of the EPA's review of the 2020 Technology Review.

**Comment 15:** Commenters responded to the EPA's solicitation for comment on what should qualify as an enforceable mechanism for exempting units from certain proposed requirements. Commenters said that all NSR permits and APD-CERT registrations should qualify as enforceable mechanism when issued by a state with a federally approved or delegated permitting program.

**Response 15:** The EPA requested comment on whether EGUs should be able to continue to use quarterly emissions testing past the proposed compliance date for a certain period of time or until EGU retirement, whichever occurs first, provided the EGU is on an enforceable schedule for ceasing coal- or oil-fired operation; and on what would qualify as an enforceable schedule. The EPA address comments on this topic in Chapter 3 of this document.

# CHAPTER 2

## 2. Filterable Particulate Matter Emission Limit (as a Surrogate for Non- Hg HAP Metals)

### 2.1 General

**Comment 1:** Overview of Comments Opposed to the Proposed 0.010 lb/MMBtu fPM limit:

- More stringent limit is not warranted; EPA has not adequately supported the proposed limit.

- EGUs will not be able to comply on a continuous basis with more stringent limit (unit variability, QA/QC requirements for PM CEMS); limit should not change.

- Ratcheting down standards discourages facility efforts to minimize emissions beyond legally required levels; achieving emission rates below standard does not constitute "development in practices, processes, and control technologies."

- Reducing the standard accompanied by more restrictive monitoring requirements adds to the regulatory burden of affected sources and permitting authorities.

- Continuing downward trend in HAP emissions from coal-fired EGUs, revising the standards merely to accelerate this trend slightly is not necessary, particularly given the potential for adverse effects on reliability resulting from early retirements; Proposed change to the standard will do little to further reduce emissions.

- As more capacity and generation shift away from coal due to Inflation Reduction Act (IRA), regulatory, and economic factors, the total annual fPM and HAP emissions from the industry will decline, regardless of whether the fPM standard is made more stringent especially with the addition of IRA incentives to shift more generation to lower-emitting sources.

- Likely impracticable for existing units, especially those with decades of service and/or planning to cease coal-firing operations within the next six years.

**Response 1:** The EPA acknowledges and thanks the commenters for providing these comments. We have discussed the rationale for the final emissions standards in section IV.D of the preamble.

**Comment 2:** Overview of Comments in Support of the Proposed 0.010 lb/MMBtu fPM limit:

- Based on developments in cost, effectiveness of controls, improved practices, improvements in monitoring and ESP/FF technology, a revision to limit is warranted.

- CAA section 112, including the technology review, was intended to improve performance of lagging industrial sources, and a standard that falls far behind what the vast majority of sources have already achieved is inadequate.

- Reductions in emissions of criteria pollutants below the NAAQS thresholds can lead to significant health benefits, and it is appropriate to consider the benefits associated with

19

these reductions in the 2023 Proposal, specifically given these benefits are especially important for the elderly and asthmatic children sensitive to the adverse health effects caused by PM at levels below the NAAQS.

- Proposed revised fPM limit of 0.010 lb/MMBtu for existing coal-fired EGUs is reasonable and achievable and slightly greater than the fPM emission limit required for new and reconstructed units that commenced construction, reconstruction or modification after May 3, 2011, and are subject to NSPS subpart Da.

**Response 2:** EPA agrees with commenters that developments in the cost and effectiveness of PM control technologies, as well as improved practices at EGUs warrant a revision of the fPM standard to a more stringent level. As described in the 2023 Proposal (88 FR 24868), most coal-fired EGUs are reporting fPM emission rates well below the current emission limit of 0.030 lb/MMBtu and the fleet is achieving these performance levels at lower costs than assumed during promulgation of the original MATS fPM emission limit. We have discussed the rationale for the final emissions standards in section IV.D of the preamble.

**Comment 3:** Overview of Comments Opposing the 0.006 lb/MMBtu more stringent limit:

- Creates a host of obstacles, making the standard unrealistic to implement, such as cost effectiveness and PM CEMS measurement uncertainty and correlation.

- Feasibility and cost considerations across the industry even though this lower level may be achievable for some units with a range of control configurations. Commenters do not feel this more stringent limit accurately reflects the current technology and capabilities of the entire EGU industry and is completely untenable.

- EPA should only consider moving toward the more stringent level of 0.006 lb/MMBtu if the agency also considers strategies that are developed with, and would help, some of those hardest-hit areas work through those difficulties with the tighter standard (*e.g.,* providing additional time or resources), so that additional emission reductions could be realistically realized from these areas.

- Because available public data demonstrate that imposition of the proposed standard of 0.010 lb/MMBtu is not cost effective, no standard that is more stringent than the proposed standard can be considered cost effective. Commenters stated that the benefits do not exceed the costs.

**Response 3:** The Agency acknowledges and thanks the commenters for providing these comments, and the final rationale for the emission standards is discussed in section IV.D of the preamble.

## 2.2 Use of fPM as a surrogate

**Comment 1:** Commenters requested that the EPA not rely on the representative use of fPM emissions as a surrogate for total non-Hg metal HAP to evaluate the three more stringent emission limits. Commenters reiterated that 96% of existing coal-fired capacity without known retirement plans before the proposed compliance period already have demonstrated an emission rate of 0.015 lb/MMBtu (LEE qualification) or lower, 91% of existing coal-fired capacity have

demonstrated an emission rate of 0.010 lb/MMBtu or lower, and 72% of existing coal-fired capacity have demonstrated an emission rate of 0.006 lb/MMBtu or lower and suggested that the Agency not use this as justification for setting the proposed fPM limit at 0.010 lb/MMBtu.

Commenters stated that the EPA lacks authority to lower the PM standard because PM is not the pollutant of concern. They reiterated that when the 2012 MATS Final Rule was originally imposed on electric utilities, the EPA determined that sampling of individual non-Hg metals was difficult, time consuming, and costly. Based on those concerns, the EPA allowed the use of fPM as a surrogate for metallic HAP since research had shown that facilities where PM was well controlled were significantly lower in non-Hg metal emissions. Commenters agreed the EPA correctly used that finding to determine that when PM was below 0.030 lb/MMBtu, the risk due to non-Hg metals was below the EPA required risk level. They remind the EPA that this finding confirmed that EGUs do not pose an unacceptable risk to human health and the environment. Commenters indicated those risk values already consider the highest risk from any HAP, and therefore already fully account for any remaining risk from any metallic HAP. Commenters noted that the EPA may only utilize a surrogate to regulate HAP emissions if it is "reasonable" to do so, which the EPA has failed to satisfy the "reasonable" standard in the 2023 Proposal. They continued that for the EPA's use of a surrogate to be "reasonable," the EPA must determine:

- The relevant HAP are invariably present in the proposed surrogate;
- Control technologies for the proposed surrogate indiscriminately capture the relevant HAP along with other pollutants; and
- The control of the surrogate is the only means by which facilities achieve reductions in emissions of the HAP.

The commenters stated the Agency fails to establish that the control of the surrogate is the only means by which facilities control non-Hg metallic HAP emissions. They reiterated that with the 2023 Proposal the EPA is proposing to significantly lower the fPM standards and completely remove the individual non-Hg standards. Commenters expressed concern that PM is not a HAP and was only used by the EPA as a surrogate for non-Hg HAP; thus, it's difficult to understand how the EPA has authority to lower a constitute which is not even included in the list of regulated HAP. Commenters indicated there is no need to further reduce these emissions by lowering the fPM emission standard and suggested if the EPA wishes to lower the limits of non-Hg metals, the Agency should first lower the individual limits and then determine the level of reduction for the surrogate which is proportional to the new non-Hg metals limits. Commenters noted that the EPA has wholly failed to attempt such rationale here, ignoring a highly relevant factor in determining whether individual and total metal HAP standards should continue to be included in the rulemaking. Commenters concluded the EPA's process in setting a new proposed PM standard is backwards and should be reevaluated based on the individual non-Hg metals limits. Commenters stated that direct monitoring of all phases of all HAP metals is an enhancement over the monitoring of a surrogate (PM) for some HAP metals and one phase of Hg. Commenters further stated that Congress gave the EPA a mandate to require enhanced monitoring and major sources are required to use enhanced monitoring such that there is reasonable assurance of HAP control.

Commenters in general supported the EPA's proposal to remove the total and individual non-Hg metals emission limits from the MATS rule to rely solely on the fPM limit as a surrogate for non-Hg metal HAP. They conveyed to the extent that these HAP are not addressed adequately through this surrogate regulation, additional requirements may be necessary.

Commenters stated while fPM is not classified as a HAP under the CAA, non-Hg metals and other elements like arsenic and selenium comprise a significant part of $PM_{2.5}$. Commenters expressed concern over several non-Hg trace elements including cadmium and lead which are considered systemic toxicants that are known to induce multiple organ damage, even at lower levels of exposure; because of this they recommend that the EPA consider an even more protective fPM limit of 0.006-0.007 lb/MMBtu. They continued that these primary particles, along with the secondary particles that are formed as a result of chemical reactions of $SO_2$ and $NO_x$ emissions, carry life-threatening risks. Commenters stated that $PM_{2.5}$ particles are smaller than the diameter of a human hair, making them small enough to lodge deep within the respiratory tract when inhaled. Commenters expressed concern that exposure to $PM_{2.5}$ can lead to respiratory harm, including asthma exacerbations, inflammation of the upper and lower airways, and even respiratory mortality. They continued that $PM_{2.5}$ also causes cardiovascular harm including myocardial infarction, congestive heart failure, cardiac arrhythmias, and strokes; and that the EPA has also determined that exposure to $PM_{2.5}$ is likely to cause cancer.

**Response 1:** We disagree that the EPA lacks authority for lowering the fPM standard as PM is not the pollutant of concern. In establishing fPM as a surrogate for the non-Hg metal HAP for the original MATS rulemaking, the EPA explained that most of the non-Hg metal HAP are present overwhelmingly in the fPM fraction. Selenium may be present in both the fPM fraction or as an acid gas, $SeO_2$, in the condensable PM fraction, which is controlled by the emission limit for acid gas HAP. As non-Hg HAP metals are still components of fPM, regardless of what the limit is, and that PM controls, such as ESPs and FF, control at least 99% of the non-Hg HAP metals, the use of fPM as a surrogate continues to be reasonable. In addition, in response to comments that Congress gave the EPA a mandate to require enhanced monitoring and major sources are required to use enhanced monitoring such that there is reasonable assurance of HAP control, the requirement to use PM CEMS for compliance demonstration purposes succeeds in that mission. Lastly, the EPA is finalizing revised total and individual non-Hg HAP metal emission limits that are lowered proportionally to the revised fPM standard, as described in more detail in section IV.D.1 of the preamble.

## 2.3 Data & Analysis Concerns

### 2.3.1 Data

**Comment 1:** Commenters stated the EPA makes faulty assumptions that intentionally push the fPM emissions baseline lower by selecting the lowest fPM rate from selected reference quarters. Commenters concluded that the EPA only used data from specific quarters in 2017, 2019, and 2021 which were not all inclusive of company's data or the companies were not able to identify their units or replicate the EPA's dataset.

Commenters indicated that the EPA's evaluation of fPM emissions from existing coal-fired EGUs is misleading, incomplete, and may be a misrepresentation of actual fPM emissions. Commenters referenced several issues with the EPA's evaluation and data set:

- All quarters of available 2017 through 2021 data were not included;

    o Commenters requested the EPA provide justification for the Agency's selection of the data, why reliance on the selected data is appropriate, and why certain quarterly data between 2017 through 2021 were excluded, so that interested stakeholders can verify the accuracy and representativeness of the underlying unit-specific data.

- Only selected quarters with the lowest emissions for some units were included;

- Fails to consider whether the units are able to achieve 0.010 lb/MMBtu fPM or a lower emission rate for each quarter during that time period due to the Agency's use of best-case lowest fPM values;

- Commenters conveyed their observations that the data illustrates a large degree of variation in the 30-day averages over-time, and the fact that the emissions happen to be low during a single quarter does not indicate that that same level of performance can be consistently achieved over time;

- The analysis excluded other quarters with higher emissions;

- Some units with no current plans to retire or switch to natural gas were omitted;

- The data set includes periods when coal units were co-firing with natural gas, which will bias the data set artificially low; Commenters suggested that since co-firing units continue to have the capability to combust coal, all of their emissions data is reported as subject to MATS. However, co-firing natural gas inherently results in significantly reduced fPM emissions, which could bias the data set low. Commenters questioned discrepancies between data sets of the 2023 Proposal and cited reference documents which potentially bias information used as rationale for development of this 2023 Proposal;

- Some units that are slated for retirement were incorporated despite the EPA's claim that these units were excluded;

- Commenters stated the EPA deliberately biased the baseline from PM CEMS data low. They stated instead of using all PM CEMS data, the EPA arbitrarily selected quarters of PM CEMS data and relied on 30-day averages observed on the last day of the quarter. This approach also ignores the natural variability of unit operation.

- The data fails to recognize that some units have converted to natural gas co-firing.

- Commenters stated that the EPA's failure to include units that will shut down or no longer burn coal/oil by December 31, 2028 does not appropriately account for units that are likely emitting fPM at levels closer to the current standard than the more stringent proposed fPM limit.

- Commenters further noted that the EPA employed a different data selection methodology for each of those years and based on type of compliance measure used (CEMS vs. stack test).

- Commenters suggested that the EPA analyze more comprehensive historical data sets across a longer timeframe rather than using a snapshot of EGUs demonstrating compliance with the proposed limit during selected quarters prior to concluding that continuous compliance with the proposed limit is achievable.

- Comment: They also suggested if the EPA eliminates performance testing as a compliance option, then the EPA should rely exclusively on a robust set of PM CEMS data in terms of the number of units and datapoints used.

Commenters also provided unit-specific comments and observations:

- Commenters stated the Coronado PM CEMS data that the EPA's referenced for the proposal are not representative of the unit operations or capabilities, stating 10 of 20 quarters reported 90th percentile fPM rates higher than the proposed 0.010 lb/MMBtu fPM standard and 16 of 20 quarters exceeded the baseline fPM rate of 0.0086 lb/MMBtu estimated at proposal. The Coronado operator reports that quarter three of 2019, which is used in the EPA's dataset, reflects normal operation without any maintenance or optimization activities that could have impacted emissions during that quarter.

- Commenters requested correction of what they said are two errors in the EPA's January 2023 Memorandum re: the 2023 Technology Review for the Coal- and Oil-Fired EGU Source Category. They said in Appendix C, Nearman Creek facility (ID 6064_B_N1) is listed as having a capacity of 240 MW. They said the correct capacity for Nearman Creek is 268 MW. The commenters also said that Nearman Creek is identified as having both an ESP and a baghouse as PM controls. They said this is incorrect as Nearman Creek does not have an ESP.

Commenters recommended that the EPA correct the deficiencies, as well as make the Agency's statistical analysis or Python code used for the fPM evaluation available for public review to ensure that the proposed fPM limit is not deemed arbitrary and capricious.

**Response 1:** EPA appreciates the commenters' observations regarding issues about the fPM data. The rationale for the final standards is discussed in section IV.D of the preamble.

For the proposal, the Agency selected quarterly data during the time of year where electricity demand is typically higher (winter and summer) and when EGUs tend to operate more with higher loads, as described in the 2023 Technical Memo (Docket ID No. EPA-HQ-OAR-2018-0794-5789). The Agency did not intentionally exclude quarters with higher emissions, however, the review focused on evaluating the lowest fPM rates EGUs had historically achieved with existing PM controls. However, if the Agency were able to pull data for every quarter for every EGU in this analysis, it would only lower the lowest achieved fPM rate, therefore potentially decreasing PM upgrade costs to meet a lower fPM limit. The Agency disagrees that the data set should remove potential periods when coal units were co-firing with natural gas, as the Agency is not responsible or controls how particular EGUs decide to operate.

In revising the analysis, the Agency reviewed the impacted facility list and made changes based on commenters feedback, such as removing EGUs that have converted to natural gas. EGU retirement plans were updated based on the comments received and the most recent NEEDS database. Many commenters did not provide specific EGUs to include or remove from the analysis, so we were unable to ensure these updates were included. Regarding unit-specific comments, EPA's analysis is based on net summer generating capacity, which has been reported to EIA as 240 MW for Nearman Creek. EPA will update our control information to reflect the absence of a cold-side ESP at this unit.

In response to concerns about the use of limited quarterly compliance data, EPA expanded the analysis to include all available fPM compliance data for 60 EGUs at 18 facilities, including EGUs that the 2023 Proposal indicated would be impacted by the 0.010 lb/MMBtu fPM limit. The EPA acknowledges commenters requested a review of compliance data spanning longer time periods (*e.g.,* 2017-2021 or all available compliance data since promulgation of MATS). Obtaining quarterly compliance data for nearly 300 coal-fired EGUs even for a shorter period of 2017-2021 would require 6,000 separate downloads from CEDRI (5 years of quarterly data for 300 EGUs), producing pdf files unable to be directly evaluated through programming languages and requiring translation of either 3 stack runs and averages or daily 30-day rolling averages for the quarter into Excel. Electronic reporting requirements taking effect in 2024 will enable the Agency to review compliance data in a more time-effective manner. In addition, reviewing all available compliance data for all EGUs would only potentially lower the lowest achieved fPM rate used in the PM upgrade and cost assumptions. Thus, review of additional data could potentially lower costs.

The Agency focused its additional data review on the highest-emitting EGUs, spanning a variety of PM controls, locations, and capacities, and include the Coronado units that the commenters reference above (see Case Study 15 in Attachment 2 to the 2024 Technical Memo, available in the docket), as well as the Gallatin (Case Study 20), Trimble (Case Study 22), and Mill Creek (Case Study 23) facilities that commenters discuss in their comments (Docket ID No. EPA-HQ-OAR-2018-0794-5910). The review of a more comprehensive historical data set reveals the vast majority of EGUs analyzed have long-term records consistently meeting fPM rates of 0.010 lb/MMBtu or lower. For instance, 22 of 30 quarters, (spanning from 2015 to the end of quarter 1 2023, which is more data than the commenters evaluated) assessed for the Coronado facility indicate an average fPM rate equal or less than 0.010 lb/MMBtu. Similarly, the 30-boiler operating day average PM CEMS data from Coronado are greater than 0.010 lb/MMBtu only approximately 30 percent of the time. The review of a more comprehensive data set also revealed the top 20 fPM emitting EGUs discussed in the 2023 Proposal have larger variations in fPM quarter to quarter. As a result of the additional data review, the Agency determined the lowest quarter's 99th percentile is effective to identify EGUs that have historically achieved lower fPM rates despite not being required to do so and without additional capital investments. In order to account for the unit-specific variability, the EPA also assesses the average fPM rate when estimating whether additional improvements may be needed. The details of this expanded analysis, including code plotting historical fPM rates, is included in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category," available in the docket.

**Comment 2:** Commenters attempting to verify the accuracy of the underlying source-specific fPM data, evaluated their unit-specific data across a wider time frame and found that while some of their units may have met the 0.010 lb/MMBtu or 0.006 lb/MMBtu fPM emission rates from time to time, their units did not consistently achieve those rates as will be required if the EPA finalizes its proposed requirement that EGUs must use a PM CEMS to demonstrate compliance with the fPM standard making compliance demonstrations more difficult to achieve.

Commenters requested that the EPA provide additional information to allow commenters to fully evaluate whether the more stringent standard of 0.006 lb/MMBtu is achievable.

**Response 2:** The use of PM CEMS for compliance, while continuous, will also provide owners and operators with real-time data to improve operations. Additionally, the standard using PM CEMS is a 30-day rolling average, compared to averages of three stack test runs. The additional real-time data availability and longer averaging time period will help EGUs achieve continuous compliance.

**Comment 3:** Commenters recognized that while the original MACT floor analysis included 130 units, PM lb/MMBtu data for only 82 of those units was available in the 2019 data, with the difference driven largely by unit retirements and suggest the 2019 emission values are higher on average and show a greater degree of variability than the MACT floor data suggest, especially given one data point for a best performing unit was above the current limit. A few commenters provided a comparison of the 2019 data compiled by the EPA in the merged PM data spreadsheet with the data collected by the Agency during the original 2012 MATS Final Rule ICR that illustrates there have been no changes in performance of either the units used to set the MACT floor or the units that the original 2012 MATS Final Rule ICR data showed had achieved 0.015 lb/MMBtu that warrants a revision.

**Response 3:** The EPA disagrees with commenters with their conclusion that there have been no changes in performance of EGUs. First, while the original MACT standards were based off the 130 best performing sources, the review of the 2020 Technology Review found most of the 274 sources evaluated—not only the best performing in 2012— were performing well below the MACT standard, as illustrated in Figure 1 of the proposal preamble (88 FR 24868). Alternatively, the UPL mean from the MATS ICR (the average of the 130 average fPM test results) was 0.00216 lb/MMBtu. As discussed in the proposal preamble (88 FR 24868), the average fPM rate reported by the best performing 25% of sources was 0.0014 lb/MMBtu, lower than the 2012 UPL mean. The Agency also calculated the average value of the best performing 12% of sources expected to be subject to the final RTR provisions. Of the 296 EGUs assessed in the final rule, the EPA calculated the mean of the best performing 36 EGU (12% of 297) average fPM rates, yielding a rate of 0.0011 lb/MMBtu, almost two times less than the 2012 UPL mean.

Second, it is not clear in Figure 1 presented by commenters (and shown again below) if the MATS ICR and 2019 data are paired for each independent EGU (allowing an "apples to apples" comparison) or if the MATS ICR and 2019 data are each sorted by fPM rates independently. The later would be an inaccurate characterization to illustrate how fPM rates have changed since the original MATS rulemaking. However, if the former is true, the Agency notes that Figure 1

26

presented by commenters shows almost indistinguishable differences for approximately 33 EGUs in the MATS ICR and 2019 fPM rates, as these points are either overlapping or nearly touching. It is likely that these two values for these 33 EGUs are within measurement uncertainty, and therefore cannot be meaningfully discussed as different. Additionally, there appears to be EGUs presented in this figure that are not expected to be impacted by this rulemaking. For instance, the largest 2019 fPM rate presented in the Commenter's Figure 1 of approximately 0.057 lb/MMBtu is the average stack test value for Transalta Centralia Generation (3845_B_BW22, Washington), much larger than the initial standard of 0.030 lb/MMBtu. However, this unit at Transalta Centralia Generation is expected to retire in 2025 and therefore will not be subject to a lower fPM limit. Similarly, the next highest 2019 data point of 0.029 lb/MMBtu is from Duck Creek (6016_B_1, Illinois), which closed in 2019. The EPA does not believe such data points from EGUs closed or soon to be closing before the compliance timeframe, are relevant to be included in the fPM analysis or discussion.



**Figure 1. Comparisons of PM Emissions from ICR and 2019 for MACT Floor Units**

*Figure above captured from Nebraska Public Power District/Agora comments to the docket (Docket ID No. EPA-HQ-OAR-2018-0794-5911).*

### 2.3.2 Merging PM CEMS and Stack Test Data

**Comment 1:** Commenters expressed concern that the EPA's database includes emissions reported from PM CEMS and performance tests that should be evaluated separately, not merged as one data set. Commenters explained that in contrast to the continuous measurements taken by

PM CEMS, indirectly through light scatter or beta attenuation, measurements taken via stack testing are direct measures calculated by the mass of PM and the volume of flue gas from which that mass of PM was sampled and are conducted under representative testing conditions. Commenters expressed that direct and indirect measurements of fPM merged together may lead to results that compromise the accuracy of the data set especially during periods of atypical operation. Commenters indicated that any unit using a PM CEMS to demonstrate compliance with the emissions limit also must conduct annual emissions measurements under steady-state conditions which are utilized in either an RCA or RRA, and that process or fuel related changes, even control equipment repairs or adjustments may have occurred since the last correlation that would not be fully captured in the response of the analyzer.

Commenters conveyed that data in the EPA's evaluation were predominantly stack testing fPM data since the majority of EGUs are using stack testing for compliance and this may bias the data. Commenters indicated that such data does not provide information across a unit's entire load range, including during startups, shutdowns, maintenance, and malfunction events all of which would be captured by a PM CEMS. Commenters recognized that by using a single point of reference or snapshot for most units in the dataset, the EPA has not addressed variability caused by meteorological conditions, load/market demand, unit outages, operating conditions, fuel composition, control device efficiency, and many other factors that greatly impact a unit's emission rate over a period of years. Commenters noted that exclusion of such data likely overstates the units that can demonstrate the more stringent limits on a continuous basis undercounting fPM upgrades or retrofits and project costs. Commenters communicated that if the EPA eliminates performance testing as a compliance option and moves to a PM CEMS only approach, the EPA should rely exclusively on PM CEMS data to set the fPM limit. Commenters noted that this decision would rectify concerns that PM CEMS data has a high bias as opposed to stack test data.

**Response 1:** The Agency recognizes the data from these two compliance demonstrations are different, including averaging over different time periods, continuous vs. "snapshot" observations, and direct vs. indirect measurements. However, the Agency disagrees with commenters that direct and indirect methods of measurement merged together compromises the accuracy of the results. The PM analysis is done on a unit-by-unit basis, meaning for each EGU the assessed fPM rates are only from one method of measurement. Most EGUs have not changed their compliance demonstration since promulgation of the original standards, and use of the recent fPM compliance data ensures that the Agency is assessing the most up to date compliance information available for each EGU. As numerous demonstration methods were allowed for the fPM standard, it would be inconsistent to weigh one method more than the others. Owners and operators are responsible for maintaining their PM CEMS, and if any process or fuel related change occuring since the last correlation alters the correlation, it is the owner or operator's responsibility to take action. Therefore, the Agency disagrees with commenters that stack test and PM CEMS emission data need to be evaluated separately.

Additionally, the Agency disagrees with commenters that the EPA has failed to address emission variability caused by a variety of factors. The EPA evaluated fPM rates based on compliance demonstrations for the final rule. Of 177 EGUs using stack testing, the average value of all evaluated historical average fPM data is 0.00512 lb/MMBtu (median=0.00397 lb/MMBtu).

28

Similarly, of the 113 EGUs using PM CEMS, the average value of the evaluated historical average fPM data is 0.0057 lb/MMBtu (median=0.00464 lb/MMBtu). While more EGUs currently use stack testing to demonstrate compliance, these results indicate there is no substantial difference in average fPM rates between compliance demonstrations.

**Comment 2:** Commenters were split on the EPA's suggestion to rely solely on PM CEMS data versus stack testing for demonstrating compliance with the proposed standard of 0.010 lb/MMBtu, yet some expressed concern that some PM CEMS may struggle to meet the EPA's guideline for average random error contribution to the PM CEMS tolerance to demonstrate compliance with a fPM emission limit of 0.006 lb/MMBtu or lower. However, they were clear on their request that the EPA use only stack test data or CEMS data to set the standard. Commenters stated that courts have recognized that the EPA cannot develop an emission standard based on data derived using one method and require facilities to demonstrate compliance with that standard using another method citing *Portland Cement v. Ruckelshaus,* 486 F.2d 375 (D.C. 1973); *see also Nat'l Lime Ass 'n v. EPA*, 627 F.2d 416, 452-53 (D.C. Cir. 1980); *Amoco Oil Co. v. EPA*, 501 F.2d 722, 743 (D.C. Cir. 1974).

**Response 2:** The EPA agrees with commenters that some PM CEMS may struggle to meet instrument specifications at the more stringent fPM limit of 0.006 lb/MMBtu and points to the rationale for the final fPM standards in section IV.D of the preamble. The Agency disagrees with some commenters that not all fPM compliance data should be used to develop a fPM emission standard. As several methods were allowed for compliance purposes, it would be inconsistent to prioritize some data over others. Since the proposal, the use of average fPM rates have also been incorporated into the final analysis for PM upgrade cost assumptions, which reflect variability and number of data points congruent with compliance methods.

In *Portland Cement v. Ruckelshaus*, the court recognized that it is incumbent on EPA to "explain the discrepancy" where sampling techniques differ from procedures for ascertaining compliance. 486 F.2d at 397. While *Portland Cement* recognized such a difference can raise questions, commenters are incorrect to claim that the EPA cannot utilize a compliance method that differs from the sampling technique used to establish it. Whereas the commenter cited to cases which discussed potential enforcement concerns, *see Nat'l Lime Ass 'n v. EPA*, 627 F.2d 416, 452-53 (D.C. Cir. 1980); *Amoco Oil Co. v. EPA*, 501 F.2d 722, 743 (D.C. Cir. 1974), the EPA reasonably believes that PM CEMS will improve enforcement. As the EPA has explained elsewhere throughout this record, PM CEMS provide owners and operators, regulators, and the public with a cost-effective direct and continuous measurement of the pollutant of concern, thus allowing for more effective enforcement than quarterly stack testing.

### 2.3.3 PM Control Assumptions

**Comment 1:** Commenters suggested that the EPA's evaluation failed to take into consideration different control configurations, particularly the variation in PM removal efficiencies. Some commenters explained their control configuration captures and removes PM from the flue gas path primarily by the existing ESPs, and the wet FGD system downstream of the ESPs will also capture some of the PM that makes it through the ESPs. They stated the effectiveness of the existing ESPs and wet FGD system to control PM emissions and demonstrate compliance with the proposed fPM emission limit of 0.010 lb/MMBtu will be negligible under even the best

operating scenarios. Commenters expressed concern that the EPA's reliance on existing data does not appear to have adequately considered the impact of the degradation in the effectiveness of emission control devices and may have overestimated affected units' ability to comply with the proposed limit. Commenters specifically mentioned units with the same flue gas path and air pollution control equipment in series, yet the units result in significant differences in fPM reduction capabilities. Commenters indicated that some PM control technologies, such as, hotside ESPs, inherently have higher PM emissions. Commenters noted that depending on the coal combusted, units that utilize hydrated lime as a control technology for minimizing HAP, like Hg and sulfuric acid, inherently have higher PM emissions. Commenters noted that wet FGD may also result in higher PM emissions in particular, higher variability in fPM emission rates because wet FGD can either add particulate from mist eliminators or remove additional particulate. Commenters recognized that because control devices perform at their optimum when operating at full-load, steady state conditions, and additional transient operation will negatively affect their removal rates. Commenters stated that while PM emissions may be lower during low-load periods, there generally is particulate layout in the duct work during such periods and, as units ramp to higher loads, the particulate re-entrains, potentially leading to higher emissions, in addition at low loads, wet FGD mist eliminators operate at reduced efficiency and wet FGD slurry carryover can increase PM emissions at reduced loads. Commenters requested that the EPA factor in specific types of control configurations. Commenters noted that if the fPM limit were lowered to 0.006 lb/MMBtu instead of 0.010 lb/MMBtu, units with ESPs may be required to add FFs. They also stated this will leave virtually no margin to maintain compliance in the absence of significant upgrades to the emission control device(s) performance, which would not be cost effective for units with a remaining service life of less than six years.

Commenters noted that the highest emitting units have the oldest equipment, particularly those with scrubbers and ESPs, and that replacement or improvements to degraded controls should allow these units to meet the proposed 0.010 lb/MMBtu fPM standard.

**Response 1:** The EPA acknowledges these comments submitted about the variation of PM removal efficiencies based on control configuration. The EPA evaluated different control configurations for the proposal in Table 3 in the 2023 Technical Memo (Docket ID No. EPA-HQ-OAR-2018-0794-5789). This review found that EGUs with wet scrubbers only are associated with the largest fPM rates, and that other control configurations have lower fPM rates on average. The EPA also acknowledges that some control configurations have inherently higher PM emissions and that some downstream control devices (dry sorbent injection, activated carbon injects, *etc.*) can add particulate loading to the flue gas stream. But, as the EPA has noted several times, 93 percent of sources operating by the compliance period have demonstrated an ability to comply with the more stringent fPM limit of 0.010 lb/MMBtu. Those EGUs include units with a variety of downstream control configurations, including hotside ESPs, dry sorbent injection, and activated carbon injection, *etc*.

The Agency disagrees with commenters that the reliance on historical fPM compliance data does not consider the impact of degradation of the effectiveness of emission control devices that may overestimate unit's ability to comply with the proposed limit. However, the Agency recognizes that EGUs that may have demonstrated an ability to meet a lower fPM rate in the past may not do so consistently. For this reason, the fPM analysis assumptions have been updated to assess

30

both the lowest achieved fPM rate (defined as the lowest quarter's 99th percentile) and average of all evaluated fPM data when estimating PM upgrades. The average fPM rate will account for unit variability as well as some degradation of emission control effectiveness. In cases where the EGU has demonstrated an ability to meet a lower rate but does not do so on average, the Agency has updated PM assumptions based on the PM controls at the facility. If the EGU already has a fabric filter, we assume increased bag frequency change-out (unit specific) or an O&M cost of $100,000/year for EGUs without fabric filters. These assumptions are described in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category," and unit-specific cost assumptions are provided as an excel attachment to the memo.

Related to the comment about EGUs with ESPs needing to install FFs to meet a more stringent limit of 0.006 lb/MMBtu, this comment is not relevant as the Agency did not finalize this standard and therefore does not require a response.

Lastly, the Agency agrees with commenters that usually the highest emitting EGUs have the oldest equipment, and that improvements found to be cheaper than assumed at the original MATS rulemaking will allow EGUs to meet a limit of 0.010 lb/MMBtu.

## 2.4 Compliance Demonstration

### 2.4.1 Removal of PM LEE

**Comment 1:** Commenters stated that if there are to be changes to the numerical emission limit, then there should not be a change to the compliance demonstration method or to the frequency of testing to meet a numerical limit that is only two-thirds of the fPM emission rate that defined a LEE under the previous rule.

The commenters said that sources that are not "low-emitting sources" and required to install a PM CEMS are subject to more stringent requirements associated with the development of the PM CEMS correlation curve (see Performance Standard 11, Section 13.2), which are exceptionally challenging to develop irrespective of the source emitting status.

Commenters stated that this is especially true for EGUs that are equipped with FF PM control devices (baghouses) or equipped with an ESP and a FGD. Baghouses are the most effective fPM control devices available and typically an FGD will control an additional 70% of the fPM remaining after the exhaust gas passes through the ESP, which alone removes 98% - 99% of the fPM. The commenters said that so long as there is not a physical or permitted capability to allow discretionary bypass of the baghouse or ESP/FGD combination, there is no need to require continuous fPM monitoring. With these control equipment devices, which result in extremely low fPM emissions, in place, a requirement to site, procure, install, certify, operate and maintain, quality assure and maintain a data acquisition and handling system to record and maintain records is unnecessary and only serves to increase the cost of the demonstration of compliance with no demonstrated monetized benefit.

Commenters stated that there is no need to either require emissions measurement more frequently than the current fPM LEE schedule or require the use emissions measurement

methods for units equipped with these fPM emissions control equipment devices. The commenters said that units with these devices would be required to meet a fPM limit that is 33% lower than the current fPM LEE limit of 0.015 lb./MMBtu. They said, in practice, other currently installed monitoring devices are used as an indicator of fPM emissions control performance (*e.g.*, opacity monitor for units installed with a baghouse or dry FGD, mist eliminator pressure drop for units installed with a wet FGD), which also reduces the efficacy of the proposed requirements. They said that for context, to qualify as a fPM LEE, the source had to consistently meet a limit that was only 50% of the fPM limit finalized in the rule. They said that moreover, a change in the fPM emission limit from 0.030 to 0.010 (or lower) lb/MMBtu would likely disqualify a source from realizing "low-emitting source" status without any change in source operating practices, procedures, or emission control device performance.

Commenters conveyed their concern over the proposed limit of 0.010 lb/MMBtu fPM due to the EPA rejecting the 0.015 lb/MMBtu limit which is 50% of the current standard and the qualifying emission rate for the LEE program. Commenters recognized a significant factor regarding the reduction in the proposed fPM surrogate to 0.010 lb/MMBtu, or the more stringent 0.006 lb/MMBtu limit; they stated that the EPA is not just revising the numerical value, but also changing both the compliance determination technique and the averaging period. Commenters expressed that the EPA is essentially penalizing sources that have consistently met the LEE limit of the 2012 MATS Final Rule (0.015 lb/MMBtu) by eliminating the reward of testing once every three years after a lengthy demonstration of the ability to meet that limit. Commenters recognized that EGU's demonstrated exemplary agility in complying with the original fPM emissions limit and continued compliance over the past eight (8) years.

Commenters believe lowering the emissions limit closer to the BACT removal efficiency ratings for new EGU's, without health benefit justification, will only subject existing EGU's to unnecessary regulatory scrutiny without any health benefit gain. They stated that the LEE limit allowed units; especially, those that are cycling or load following as the grid integrates more renewable resources, some additional flexibility to operate. Commenters are concerned about increased EGU operation and maintenance (O&M) costs during high inflationary periods on account of the undue financial impacts that will impact utility customers again with little to no health benefits to the public. Commenters stated that qualifying LEE generators or low non-Hg HAP emitters are the most impacted as they are smaller power producers with small customer bases from which to recover regulatory imposed financial burdens.

**Response 1:** The EPA acknowledges and thanks commenters for providing these comments. In requiring PM CEMS, the Agency believes owners and operators will be able to use the real-time data to improve the performance of their EGUs. Additionally, the standard using PM CEMS is a 30-day rolling average, a longer averaging period than the average over three stack test runs conducted quarterly or every 36 calendar months. We have further discussed our rationale for the final emission standards in section IV.D of the preamble.

**Comment 2:** Commenters recommended that the EPA continue to recognize LEE status for EGUs that generate less than 300 MW. Commenters suggested grandfathering the current LEE provision to protect small EGUs and their small customer base from undue financial impacts. They stated if there are to be changes to the numerical limit, then there should not be a change to

the compliance demonstration method or to the frequency of testing to meet a numerical limit that is only one-third less than the fPM emission rate that defined a LEE under the 2012 MATS Final Rule.

**Response 2:** The Agency estimates there are approximately 67 EGUs subject to a lower fPM limit that have a generating capacity less than 300 MW, 19 of which are currently PM LEE. Of the 67 EGUs, the Agency estimates that only 7 would need to invest in bag type upgrades or increased bag changeout frequency to achieve a fPM rate of 0.010 lb/MMBtu. The annualized costs for such upgrades for these units ranges from $10,800/year to $55,600/year. The Agency believes such costs are reasonable.

### 2.4.2 Use of PM CEMS

**Comment 1:** A few commenters recommended that multi-metal CEMS be an allowed alternative for demonstrating compliance with the 2023 Proposal's final rule. Commenters noted that measurement of individual metals is far more meaningful with regards to the intent of the CAA than the proposed fPM surrogate monitoring. Commenters recommendation is based on the proven performance and commercial availability of multi-metal CEMS to demonstrate compliance with HAP metal emission limits as well as an alternative to PM and Hg CEMS. They also stated the use of multi-metal CEMS methods would allow all of the urban HAP metals including Hg and all phases to be continuously monitored with a single CEMS. Commenters stated that the EPA's new total PM standard is a poor surrogate for fPM, which is a weak surrogate at best for HAP metals, particularly when considering such HAP metals as Se.

**Response 1:** The filterable PM surrogate standard has been previously explained and justified in the original MATS rulemaking. As allowed by the NESHAP general provisions, an owner or operator interested in using multi-metals CEMS or other continuous techniques to demonstrate compliance with equivalent or more stringent total or individual metals limits may request permission from the Administrator to seek an alternative test method under the provisions of 40 CFR part 63.7(f) and use the alternative metals limits as provided in the rule.

**Comment 2:** Some commenters participated in a jointly funded effort to investigate PM CEMS and stack testing costs for the purpose of the current rulemaking. Commenters obtained actual cost data from various sources for PM CEMS installation, certification, ongoing quality assurance testing, and operating and maintenance costs, as well as actual cost data provided by various sources and stack test vendors to assess stack testing costs. They concluded that the Agency's justification for the requirement to use PM CEMS as the only compliance determination method in the 2023 Proposal is fundamentally flawed. Commenters noted the current fPM compliance options of periodic emissions testing, CPMS or a PM CEMS are achieving the goal of reducing potential impacts to human health and the environment; adding PM CEMS requirements to all EGUs will make little difference for overall air quality while substantially increasing the costs that must be borne by consumers. Commenters indicated that the Agency has significantly understated PM CEMS costs and significantly overstated ongoing stack test costs for units utilizing the quarterly stack testing and LEE compliance options. Commenters suggested the Agency allow sources to comply with either the quarterly stack testing, LEE or PM CEMS compliance options when finalizing the 2023 Proposal.

**Response 2**: The EPA disagrees with the commenters' suggestion that the selection of the rule's compliance determination method is fundamentally flawed. The EPA selects compliance methodology based on many factors, with the application and availability of continuous emissions monitoring such as PM CEMS, being a chief concern. Periodic testing provides emissions information only during discrete periods of time when testing occurs; it cannot provide continuous emissions information like PM CEMS can. PM CPMS provides parameter, not emissions data, on a continuous basis, as opposed to PM CEMS, which provide continuous emissions data. Note that source owners or operators whose EGUs currently rely on PM CPMS may be able to recast those instruments as PM CEMS and provide continuous filterable PM emissions data for little additional cost. The EPA disagrees that instrumental costs are significantly understated and that quarterly testing costs are significantly overstated. As a reminder, the EPA is not obligated to choose the most cost-efficient manner for compliance demonstrations, even though cost can be an important consideration; rather, the EPA seeks to find appropriate monitoring that is most suitable for compliance demonstration. The costs for instrument use and quarterly testing are derived from averages provided by commenters and are discussed and summarized in the *Revised Estimated Non-Beta Gauge PM CEMS and Filterable PM Testing Costs* memo, available in the docket and in section IV.D of the preamble.

## 2.5 Technical feasibility

### 2.5.1 General

**Comment 1:** Commenters suggested that the EPA's evaluation is flawed and some coal-fired EGUs may not be able to achieve compliance with the proposed fPM standard of 0.010 lb/MMBtu on a continuous basis. Commenters communicated that the EPA's reliance on the 2023 Technology Review memo is problematic for several reasons, and they are concerned that the EPA is overstating the units that will be able to meet the proposed standard. Commenters requested that the EPA describe how, if most of the affected units are already achieving lower emission rates, requiring the remaining units to meet the lower rate is "necessary." They are of the opinion that the EPA should retain the current fPM emission standard of 0.030 lb/MMBtu based on previous analyses performed by the EPA which concluded there are no new technologies or changes in technologies that reduce PM or non-Hg metals. Commenters further noted that although the EPA claims existing coal-fired EGUs have demonstrated that they can achieve an emission rate of 0.010 lb/MMBtu or lower does not necessarily mean that those EGUs can continuously achieve compliance with the emission rates.

Commenters provided that other factors such as EGUs' operational limitations could hinder the ability of some coal-fired EGUs to continuously comply with the proposed fPM standard. Commenters mentioned operational factors, such as, cleaning frequency, operational duration, and filter change out frequency may impact the performance of controls and an EGU's ability to comply with the proposed limit. Commenters noted that some units may be able to achieve a rate of 0.010 lb/MMBtu during shoulder months, yet they may not be able to continuously meet that limit during peak load conditions when they cannot do off-power rapping or maintenance and cleaning of ESPs to remove buildup on the ESPs' wires and plates. Commenters provided examples, such as, if an ESP must be taken off-line for cleaning which requires 24 to 48 hours for cooling before temperatures are low enough for maintenance personnel to safely enter the ESP to perform repairs. Commenters stated that at a minimum, vacuuming may be required of

the ESP inlet and outlet ducts, along with any hoppers that have high levels, and some ESPs may require sandblasting to remove problematic buildup on wires and panels. Commenters expressed concern that the EPA has not evaluated the technological feasibility or safe operating conditions of ESPs. They stated that ESPs cannot safely be engaged at first firing of coal due to a minimum operation temperature necessary for their safe and reliable operation without risking equipment damage, fire, and/or explosion. Commenters indicated that unless there are additional outages scheduled for such maintenance, the units may be unable to maintain compliance with the proposed 0.010 lb/MMBtu limit. Commenters noted that during the summer, most units operate at base load and run at high-capacity factors and may find it difficult to maintain optimal operation of control technologies during peak conditions. Commenters stated capacity factors of coal-fired EGUs are now typically lower during the day when solar and wind are available, but the demand for coal-fired EGUs is greater at night when renewable generation is unavailable. Commenters indicated that the EPA runs the risk of eliminating the necessary compliance margin to account for operational and fuel variability and thus significantly restricting a unit's operational flexibility with the proposed limit.

These commenters explained that even with ESPs, FFs and reagent injection systems; such as, a powdered activated carbon injection system for the removal of Hg in place, not all EGUs have demonstrated continuous compliance with the proposed 0.010 lb/MMBtu fPM limit, much less the EPA's more stringent alternative fPM limit of 0.006 lb/MMBtu put forward as a surrogate for HAP metals. They expressed concern with a standard of 0.010 lb/MMBtu, particularly for ESP controlled units challenged to comply during typical cold starts and may find it impossible to comply during atypical cold starts, or if a unit is forced to attempt more than one cold start within a 30-boiler operating day window. Commenters expressed concern that additional reductions in the emissions of non-Hg metals regulated under the 2012 MATS Final Rule would not be realized if the surrogate fPM emission limit is revised to 0.006 lb/MMBtu or lower for their units and other EGUs with similar emissions control devices.

Commenters suggested plantwide averaging may provide additional compliance flexibility for companies by not requiring every unit to achieve the proposed standard on its own.

**Response 1:** The Agency disagrees with commenters that all EGUs need to have previously demonstrated continuous compliance with the proposed 0.010 lb/MMBtu standard or the more stringent 0.006 lb/MMBtu standard in order to establish an emission limit. The review of all historical fPM CEMS compliance data, collected for the most part over third quarter operation, which is believed to be a period of maximum load operation and is discussed in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category" and accompanying attached Python code plotting the additional fPM compliance data available in the docket, found several EGUs have continuously met these lower fPM limits. Additionally, there was no regulatory reason for EGUs to operate and report emissions less than the limit (0.030 lb/MMBtu), unless their normal operation, coupled with their normal control device operation, resulted in emissions lower that the regulatory limit. Furthermore, the 30-boiler operating day averaging period allows for operational and fuel variability and provides significant flexibility for owners to account for equipment malfunctions and issues and comply with a lower fPM standard. For instance, as shown in section 4 of the 2024 Technical Memo, hourly PM CEMS data (excluding startup,

35

shutdown, and malfunction periods) for Case Study 1 range from near-zero to 1.33 lb/MMBtu from one unit at the facility. The 30-boiler operating day averages for this unit range from 0.001 to 0.015 lb/MMBtu, considerably smoothing out the variable hourly averages. As mentioned above, there was no regulatory reason for this EGU to operate and report emissions less than the limit. In addition, in response to concerns about operational factors, as described in 63.10010(i)(4), data from PM CEMS during any scheduled maintenance are excluded when determining compliance. The EPA agrees with commenters that plantwide averaging is another compliance flexibility available to owners and operators.

**Comment 2:** Commenters suggested the Agency take into consideration the many variables affecting fuel characteristics. Commenters stated the availability of coal is limited to certain regions and, as a result, the characteristics of coal vary depending on location and may impact the unit's ability to demonstrate continuous compliance with the proposed fPM standard. Commenters noted that the ash content of the coal being fired may impact the ability of units to comply with the proposed limit, regardless of the effectiveness of the control technologies in place. Commenters conveyed that using fuel oil for startup and stabilization may impact the ability of units to comply with the proposed limit due to decreases in the removal effectiveness of the ESPs for a short period of time until enough coal is introduced so that the amount of coal ash in the combustion process has scoured the coating of the collecting plates and wires. They expressed concern that the costs associated with adding an FF to well-controlled units cannot be justified simply to address issues which arise rarely and for a short period of time.

**Response 2:** The Agency thanks commenters for providing these comments and agrees fuel characteristics can impact fPM emissions. Using fuel oil during periods of startup for short durations will likely raise fPM emissions for a short period of time, and the 30-day rolling average period will lessen its impact. The Agency previously evaluated the impact of fuel characteristics on fPM emission rates in the 2023 Technical Memo (Docket ID No. EPA-HQ-OAR-2018-0794-5789). This review found for the majority of EGUs burning either bituminous or subbituminous on average have lowest achieved fPM rates below the most stringent standard considered, with larger 95th percentiles of approximately 0.0106 and 0.0155 lb/MMBtu, respectively. These larger fPM values are found for only a few EGUs and are not surprising as there was little incentive towards reducing fPM rates already 50-65% below the standard (and outside the industry compliance margin).

**Comment 3:** Commenters suggested that the age and retirement date of affected units with ESPs should be considered. If an affected unit is planning to retire soon after the effective date of the proposal, installation of FFs would not be a cost-effective choice for the plant owner, who might choose to shut down the plant early and unnecessarily stress electricity generation supply or capacity. The commenters said that to maximize the flexibility of existing coal-fired units, maintain grid flexibility and to provide flexibility in the electric transmission system, the 0.010 lb/MMBtu standard should be preferred.

**Response 3:** The Agency agrees that age and retirement date of affected EGUs should be considered. Of EGUs not meeting the 0.010 lb/MMBtu proposed standard, 14 have announced retirement dates spanning from 2030 to 2042, half of which only have an ESP for controlling fPM (Labadie, Roxboro, Mayo, and Jim Bridger). To meet a 0.010 lb/MMBtu limit, the EPA

estimates ESP upgrades would be required for Labadie, Roxboro, and Mayo, while Jim Bridger only requires O&M at $100,000/year. Therefore, installation of FF would not be required at these EGUs to meet a 0.010 lb/MMBtu standard.

**Comment 4:** Commenters stated that the EPA must also investigate whether there are sufficient vendors to perform fPM upgrade projects or install new fPM controls. The commenters said NRECA's Technical Report estimates that 26 units will be required to upgrade ESPs if the EPA sets the fPM emissions limit at 0.010 lb/MMBtu. This number grows substantially to 52 ESP-controlled units that would need to retrofit to a FF if the limit falls to 0.006 lb/MMBtu. Commenters said they believe there are only about 4 active vendors in the United States market.

**Response 4:** The EPA thanks commenters for providing these comments. In this final rule, the EPA estimates 2 EGUs may require a FF install, 11 may require ESP upgrades, 10 need either a bag type upgrade or increased changeout frequency, and 10 need O&M to meet the final fPM limit of 0.010 lb/MMBtu. The compliance deadline is three years after publication in the Federal Register, and owners and operators may request an additional year for installation of controls if necessary.

### 2.5.2 Intersection with Other Power Sector Rules

**Comment 1:** Commenters identified future regulations such as the Interstate Transport Rules and Regional Haze SIPS that may result in installation of DSI or SDA technologies to reduce $SO_2$ emissions are expected to increase inlet PM loading to the FFs due to more hydrated lime and reaction byproducts placing those units at risk of not being able to meet the proposed fPM standard of 0.010 lb/MMBtu. Commenters indicated that some units may inject sodium or calcium-based products upstream of the PM collection equipment which increases PM loading.

Commenters also requested that the EPA maximize all regulatory flexibilities at the Agency's disposal to align the requirements of the 2023 Proposal and the Proposed CAA section 111(d) Guidelines. The Proposed CAA section 111(d) Guidelines are part of an unprecedented rulemaking package that will transform the electric sector and will come at a similarly unprecedented cost that will be borne by individual residents and businesses. Commenters suggested, rather than exacerbate these costs and strain system reliability by imposing serial outages, the EPA should utilize its substantial discretion under CAA section 112 and decline to revise fPM standards for "long-term" coal units.

Commenters stated that CAA section 111(d)(6) affords the EPA significant discretion in determining whether to revise standards for sources within a source category: "The Administrator shall review, and revise as necessary…" (42 U.S.C. § 7412(d)(6)). Commenters urged the EPA to exercise this discretion and decline to establish fPM requirements for units designated as "long term" units in CAA section 111(d) state plans. Commenters stated that the 2023 Proposal itself acknowledges the breadth of the EPA's discretion. They said the EPA has proposed not to revise multiple standards established by the MATS—the acid gas standards for coal-fired units, the standards for continental and non-continental liquid oil-fired units, and the standards for existing IGCC units. The commenters said, notably, this demonstrates that the EPA is able to parse the need to revise standards for some pollutants and not others, within a single category of sources.

37

Commenters stated that likewise, it is well within the EPA's discretion to recognize coal-fired electric generating units designated as long-term units in CAA section 111(d) state plans and decline to revise fPM standards for these units—similar to its recognition of "non-continental units." They said, importantly, the EPA intends for states to designate units as long-term units no later than 2026 and that this timeline ensures that existing coal units that are not designated as long-term units would be subject to compliance with any revised fPM standard by the applicable statutory deadline.

**Response 1:** The EPA acknowledges and thanks commenters for these comments. Regarding aligning requirements of this rulemaking with the 111(d) Proposed Emission Guidelines, CAA section 112 specifies different requirements for compliance. Specifically, as defined in CAA section 112(i)(3)(A) "…the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of the standard." The Agency has not previously subcategorized based on retirements under CAA section 112, and do not find it appropriate to do so at this time.

## 2.6 Costs

### 2.6.1 General

**Comment 1:** Commenters suggested that the EPA's justification relies heavily on the Agency's estimation of lower than anticipated costs of control technology, significantly underestimating the 2023 Proposal's feasibility and cost of compliance. Commenters advocated that lower costs are neither developments in practices, processes, or control technologies as referenced in CAA section 112(d)(6), nor do lower costs equate to being cost-effective. They noted that the EPA's cost estimates seem to be substantial underestimates. Commenters felt that the EPA provides inaccurate cost estimates for tightening of the current fPM limitations and adequate consideration to the cost impacts of the 2023 Proposal have not been given, particularly for small power generation operators. They recognized that the EPA is required to factor in costs for the RTR analysis; however, in this case, commenters provided that the 2023 Proposal's cost estimates fail to account for all of the fPM upgrades and/or installations required for compliance with the new proposed lower limit. Commenters stated the EPA's cost study was deficient in terms of the number of ESP equipped units required to retrofit improvements, the capital cost assigned for the most significant ESP improvements, improvements in FF operation and maintenance, FF retrofit, and estimates of $/ton cost effectiveness incurred.

Commenters also stated that the EPA's deflated and unrepresentative fPM baseline is not accurate and therefore it is not possible to project the number of units that will need upgrades which lead to cost per ton underestimates that erode the EPA's overall assumption that the 2023 Proposal is cost effective. Specifically, commenters said the EPA's estimate that only 20 units are likely to incur any costs to meet the new standard is incorrect. As an initial matter, it is fatuous to conclude that a unit that happened to emit in a single quarter out of the last 20 quarters at 0.010 lb/MMBtu or less will not be required to do anything to meet the proposed revised standard. The commenters referred to a chart of data and said that even a unit that the EPA says has a "baseline fPM rate" of 0.086 lb/MMBtu was actually emitting more than 0.010 lb/MMBtu

in 10 out of 20 quarters, so clearly, such a unit would need to upgrade control equipment to meet the proposed standard consistently.

Other commenters noted that the proposed changes associated with the 2023 Proposal requirements will cause inconsistency with existing permitting authorities' boilerplate special condition language and guidance documents which will require revisions to prevent regulatory overlap. They expressed concern that the proposed standards will require more time and more resources for regulatory agencies to implement, particularly agencies impacted due to the number of coal-fired units in their state. If the proposed standards are adopted, commenters felt the EPA should consider these impacts and adjust grant funding or other resources to facilitate implementation.

Commenters agreed, as the EPA points out, much of the fleet will not incur such high substantial additional costs; instead, the tens of millions of dollars of annual compliance costs will fall disproportionately on a few facilities. They brought up Colstrip in particular and felt the EPA does not adequately justify its proposal of forcing a few facilities to incur massive compliance costs, only to incrementally reduce emissions that have already been reduced to a level which the EPA agrees poses no danger to the environment or public health. Commenters further recognized setting the standard at 0.006 lb/MMBtu would require additional investment in new or significant upgrades to existing control technology that could both extend the life of units that would have otherwise been retired and complicate other retirement plans by requiring investments in controls in advance of the 2030 timelines contemplated in other rules.

Commenters brought up specific concerns for certain EGUs in their comments:

- Commenters assumed capital costs of at least $350,000,000, and annualized costs of $57,000,000, based on the working assumption that Reheat FF is the most viable technology Colstrip would deploy to comply with the 2023 Proposal.

- The commenters said that the EPA also underestimates the cost of such major ESP upgrades and even putting these major flaws aside, based on the EPA's own identification of units that would require major controls, and assuming the cost of ESP rebuilds at $100/kW, the capital cost of these controls would range from $41.7 million (for the D B Wilson EGU) to $148 million (for each of the Colstrip units).

- Commenters stated that based on their analysis of the Young Station units, commenters asked the EPA to reconsider setting an emissions rate that will require such substantial and costly ESP upgrades. The commenters said that the EPA should weigh the lack of any meaningful health risk posed by HAP emissions from our units with the hefty cost burden that the projects place on a nonprofit entity and, ultimately, on rural and small communities in the form of energy costs.

Commenters stated that in the proposed 0.010 lb/MMBtu limit for fPM, the EPA assumes that approximately eight existing ESPs may need physical equipment upgrades to comply with the proposed fPM emission standard. However, certain wet scrubbed units may need to install FF to meet the 0.010 lb/MMBtu limit. They said that the EPA assumes that to reduce fPM to 0.006 lb/MMBtu or below, FFs would be required and that 65 units would need to install a new FF or

modify an existing FF to meet the lower revised fPM emission limit. The commenters said that if the fPM limit were lowered to 0.006 lb/MMBtu instead of 0.010 lb/MMBtu, units with ESPs may be required to add FFs.

Commenters referenced a recently completed analysis by Andover Technology Partners on the feasibility and costs of complying with lower emission limits, which found "the potential for compliance with lower PM, Hg, and HCl emission standards than in the proposed rule (https://www.andovertechnology.com/wp-content/uploads/2023/06/C_23_CAELP_Final.pdf.)." The commenters said Andover Technology Partners found that the cost to comply with an emission standard of 0.006 lb/MMBtu, (the more stringent alternative considered by the EPA in the 2023 Proposal), on a fleetwide basis is significantly less than the cost estimated by the EPA. Andover Technology Partners attributes this difference "to the assumptions EPA made regarding the potential emission reductions from ESP upgrades, which result in a much higher estimate of baghouse retrofits in EPA's analysis for an emission rate of 0.006 lb/MMBtu." *Id*. The commenters stated that the EPA should consider this new information and adjust its final standards as needed for fPM.

Commenters stated that an fPM emission limit of 0.006 lb/MMBtu would be particularly cost-effective and achievable at a very low and reasonable total cost, particularly when considered in the context of the power sector. They said that the 2023 ATP Assessment finds that EGUs could comply with this limit at an annual cost of about $442 million, while the EPA estimates the annual costs would be $633 million. The commenters said that while the EPA likely overestimates the cost of achieving this standard due to overestimating the number of baghouses that will need to be installed, even an annual cost of $633 million is reasonable in the context of the power sector, which can easily absorb that cost while continuing to provide affordable and reliable power. They said indeed, these costs would be a small fraction of the cost of the original MATS rule (projected and actual).

A few commenters stated that it is not surprising that the EPA's projected annual compliance costs were miniscule within the context of the power sector as a whole; equivalent, for example, to only 0.2% of 2019 total retail electricity sales (the lowest sales figure since 2000) considering 91% of existing EGUs have demonstrated an emission rate of 0.010 lb/MMBtu or lower.

Commenters stated that these costs should be considered in the context of the power sector, and even the EPA's likely overestimated cost would represent only about 0.26% of power sector total expenditures in 2019 ($242.9 billion) or about 0.16% of 2019 revenues ($401.738 billion). They asserted that while the power sector can absorb much larger costs, it is clear that the costs associated with an fPM standard of 0.006 lb/MMBtu are very small compared to power sector total expenditures, capital expenditures, and revenues—and well within the range of historic variability in total expenditures—and therefore can be absorbed without preventing the power sector from serving its function.

**Response 1:** We disagree with commenters that lower costs are neither developments in practices, processes, or control technologies as referenced in CAA section 112(d)(6), nor do lower costs equate to being cost-effective. As stated in the 2023 Proposal, a development may include "any significant changes in the cost (including cost effectiveness) of applying controls

(including controls the EPA considered during the development of the original MACT standards)." 88 FR 24863 (April 24, 2023). The EPA responds to comments on underestimated costs in section IV.C.1 of the preamble.

We also disagree with commenters that using the lowest demonstrated fPM rate is not useful to estimate which EGUs may need to upgrade PM controls. We recognize that EGUs may be capable of meeting lower emission rates, but may not consistently perform at such low emission rates. As such, the analysis has been updated to use the average of all quarterly data reviewed or the lowest achievable fPM rate (lowest quarter's 99th percentile) to identify EGUs requiring improvements to PM controls. Additional details of the revised PM analysis are discussed in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

Regarding comments that the proposed changes will cause inconsistency with existing permitting authorities' boilerplate special condition language and guidance documents, EPA routinely revises its regulations due to statutorily required reviews.

Regarding comments that costs of annual compliance costs will fall disproportionately on a few facilities, the EPA points out that the fleet has been able to "over comply" with the existing fPM standard due to the very high PM control effectiveness of well-performing ESPs and FFs. However, the performance of a few units lags well behind the vast majority of the fleet. For instance, Colstrip is the highest emitting EGU the EPA assessed and the only facility that the EPA is aware of not using the most modern PM controls (*i.e.,* ESP or FF), and instead using a venturi wet scrubber as the only means for fPM controls. In addition, to the comment that emissions are already at a level that does not pose a danger to the environment or public health, as well as emissions will only be incrementally reduced by this rule, the EPA's finding that there is an ample margin of safety under the residual risk review in no way interferes with the EPA's obligation to require more stringent standards under the technology review where developments warrant such standards. Indeed, the technology review required in CAA section 112(d)(6) further mandates that the EPA continually reassess standards to determine if additional reductions can be obtained, without evaluating the specific risk associated with the HAP emissions that would be reduced.

Regarding the comments that EPA overestimated costs of compliance, the Agency has reviewed the additional information the commenters referenced and agrees with the commenters that ESPs are able to achieve greater fPM emission reductions at lower costs than assumed at proposal. We have lowered the costs of some ESP upgrades and increased the collection efficiencies, as shown in Table 3 of the 2024 Technical Memo. The impact of these updates to the ESP assumptions is a reduced need for EGUs to install a FF to meet a fPM limit of 0.006 lb/MMBtu, which lowers annual costs to approximately $400 MM. However, as described in the final rule and throughout this document, the EPA is finalizing a fPM limit of 0.010 lb/MMBtu as this is the lowest possible fPM limit utilizing PM CEMS.

As stated in Chapter 1 above, the EPA requested comment on whether EGUs should be able to continue to use quarterly emissions testing past the proposed compliance date for a certain period of time or until EGU retirement, whichever occurs first, provided the EGU is on an enforceable

schedule for ceasing coal- or oil-fired operation; and on what would qualify as an enforceable schedule. The EPA address comments on this topic in Chapter 3 of this document.

We agree with commenters that the overall costs borne by the power sector are small compared to its revenue. The rationale for the final emission standards is provided in section IV.D of the preamble.

**Comment 2:** Commenters stated that while the EPA's estimates for the costs of most control upgrades are generally reasonable (*e.g.,* minor and typical ESP upgrades; FF bag replacements; FF replacements), commenters believed the EPA has substantially underestimated the cost of the control upgrades that would be required for most of the 20 units that the EPA estimates would have to take action to meet the proposed standard of 0.010 lb/MMBtu (*i.e.,* ESP rebuild). The commenters said that the EPA estimated an ESP rebuild would cost $75-$100/kW. They said the NRECA technical evaluation (EPA-HQ-OAR-2018-0794-5994 Attachment A) looked at four real-world ESP rebuild projects and the costs of three out of the four projects exceed the high end of the EPA's range, with two at almost twice that amount (*i.e.,* about $200/kW). Based on the four real-world ESP rebuilds, the mean cost is $133/kW. The commenters said that the cost effectiveness ratio, based on the EPA's unrealistically low "baseline fPM rates" but adjusting for a minimum compliance margin of 20% and a mean cost for ESP rebuilds of $133/kW, would increase from a maximum of $14,700,000 estimated by the EPA to about $22,000,000 per ton of total non-Hg metal HAP removed.

**Response 2:** The Agency responds to the comment on costs of ESP rebuilds in section IV.C of the preamble.

We recognize that the rule's changes may impact requirements from other permitting actions or consent decrees; to the extent that EGU owners or operators wish to merge and/or revise those other actions or decrees with the rule's requirements, they should contact and work with the respective regulatory authorities.

**Comment 3:** Commenters stated that the EPA must take the unique attributes of small entities into account when setting the time frames required for installation of fPM upgrades or new controls. The commenters said that cooperatives have specific parameters unlike most investor-owned utilities. Revenue availability impacts the timing of projects. They said in addition to this 2023 Proposal, the EPA's suite of other environmental regulations for GHGs, effluent limitations guidelines, ozone season NOx, and coal ash also require significant expenditures within the same time period (2025-2030).

Commenters stated that the EPA is correct that a standard that would require a capital expenditure of $52 million for a single unit would likely result in the shutdown of the West Virginia EGU. The commenters said that the same is surely also true, however, for all units that would be required to expend close to $40 million and more in capital cost to upgrade control equipment as a result on the Proposed Rule. They asserted that this is especially true given that the EPA also has recently proposed other rules that are likely to result in a large number of coal-fired EGUs electing to shut down by 2032. The commenters said that in the current, uncertain climate regarding the viability of any coal-fired EGU past 2032, the 2023 Proposal is likely to

42

result in substantially more shutdowns that the mere 500 MW the EPA estimated and if the Agency insists on proceeding with the proposed standard, it must realistically assess the viability of these EGUs and account for their shutdown in evaluating the cost effectiveness and impact of the 2023 Proposal on cost as well as the reliability of the electric grid.

Commenters stated that it is hardly necessary to elaborate on this issue with respect to the alternative fPM standard of 0.006 lb/MMBtu. The commenters said that the capital cost of FF construction exceeds that of major ESP upgrades significantly. Given the economic and regulatory climate (including the proposed ELG and CAA section 111(d) proposals), a revised standard that would require the installation of a FF on an EGU that currently has no such controls would surely doom such a unit to shut down. The commenters argued that the premature shutdown of a minimum of 52 EGUs by mid-2027 would increase the cost of this 2023 Proposal substantially and would have a devastating effect on reliability.

Commenters noted the EPA fails to account for the reduction in remaining useful life and utilization that also may result from the EPA's other rulemakings targeting Colstrip, including the Proposed Coal Combustion Residue Rule and the Proposed GHG Rule. They expressed concern that with a limited lifespan and limited generation to recoup the costs, Colstrip is far more likely to suffer a premature retirement with the potential for serious economic disruption and impacts on grid reliability and transmission.

The commenters said that in its evaluation of the impact of the proposed standard, the EPA claims this rule would result in only about 500 MW of shutdowns. The commenters said that those shutdowns, it turns out, correspond to a single unit at a West Virginia power plant, which, at $100/kW, would require an ESP upgrade with a capital cost of about $52 million.

**Response 3:** The Agency thanks the commenters for these comments. The Agency has discretion under CAA section 112(i)(3)(A) to establish compliance dates "as expeditiously as possible, but in no event later than 3 years after the effective date of such standard." The Administrator, as described in CAA section 112(i)(3)(B), may also "issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards." The EPA has finalized the 3 years compliance date for the fPM standard as discussed in section III.C of the preamble.

Regarding comments that the rule is likely to result in substantially more shutdowns than the EPA projected, we direct these responses to Chapter 8 of this document.

As the Agency is not finalizing a more stringent emission limit of 0.006 lb/MMBtu, these comments do not require a response. The rationale for the final standards is discussed in section IV.D of the preamble.

### 2.6.2 Cost-Effectiveness Comparisons

**Comment 1:** Commenters stated that cost effectiveness is an important consideration in technology review under CAA section 112(d)(6) and indeed, the EPA undertook cost effectiveness analyses for three possible fPM standards: 0.015, 0.010, and 0.006 lb/MMBtu. They said that largely based on these analyses, the EPA is proposing a revised standard of 0.010

lb/MMBtu; and it rejected the lower, 0.006 lb/MMBtu standard because it is not cost-effective, although it also is soliciting comments on this more stringent standard. Commenters also expressed concern that the EPA's rationale is not only arbitrary on its face, but it is also arbitrary because it reverses, without explanation, the EPA's prior acknowledgements that cost effectiveness should account for the cost effectiveness of imposing controls at each affected facility, and not simply on an aggregate nationwide basis. They stated at the very least, these costs should factor strongly into the EPA's assessment of what is "necessary" pursuant to the provisions of CAA section 112(d)(6) and CAA section 112(f)(2).

Commenters referenced the NRECA technical evaluation for this 2023 Proposal entitled "Technical Comments on National Emissions Standard for Hazardous Air Pollutants: Coal- and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology" (Technical Report). The commenters stated that the NRECA Technical Report finds meaningful errors in the EPA's cost analysis that must be corrected. They said the errors lead to sizeable cost per ton underestimates that erode the EPA's overall assumption that the proposal is cost-effective.

**Response 1:** The EPA thanks commenters for these comments. The rationale for the final emission standards is discussed in section IV.D of the preamble.

**Comment 2**: Commenters stated that for the proposed 0.010 lb/MMBtu standard, the Agency estimates that the revised standard would only impact 20 affected EGUs and bear an annual cost between $77.3 million and $93.3 million for a total fPM reduction benefit of 2,074 tpy and total non-Hg metal HAP reduction of 6.34 tpy. A reduction of 6.34 tpy is equivalent to a 2.57% reduction of total non-Hg metal HAP emissions reported for this sector compared to 2020 emission rates. The commenters said that across all emission sectors the proposed reduction represents a 0.30% reduction of fPM emissions compared to 2020 emission rates.

Commenters believed that the proposed 0.010 lb/MMBtu standard is not cost-effective. The commenters said that these are small reductions, at high cost and based on the costs and emission reductions, the EPA calculated a cost effectiveness ratio (*i.e.,* the estimated cost to reduce one ton of total non-Hg metal HAP) of $12,200,000 to $14,700,000. Commenters stated that even assuming that the EPA's unrealistically low fPM baseline cost effectiveness ratio is correct, the EPA's proposal to revise the fPM standard to 0.010 lb/MMBtu based on cost effectiveness of up to $14.7 million per ton of total non-Hg metal HAP removed (equivalent to $44,900 per ton of fPM removed) is inconsistent with the EPA's prior actions. The cost effectiveness ratio that the EPA says in this proposal is acceptable is substantially higher than the cost effectiveness ratio the Agency has previously found to be decidedly not cost-effective. They further said that the Agency uses the cost effectiveness ratio as a tool to compare against cost effectiveness values from other proposed regulations in determining reasonableness and in the past, the EPA has decided against revising fPM (which is typically used as a surrogate for non-Hg metal HAP) standards based on cost effectiveness ratios substantially lower than the cost effectiveness here. They said that the EPA should follow these precedents and acknowledge that the proposed $12.2 to $14.7 million per ton of non-Hg metal HAP reduced is not cost-effective. They argued that the Agency should not finalize the proposed standard of 0.010 lb/MMBtu for that reason. By the same token, the alternative, more stringent standard of 0.006 lb/MMBtu is even more grossly not

cost-effective. The commenters said that at a cost effectiveness of $25.6 million per ton of non-Hg metal HAP reduced, the alternative standard of 0.006 lb/MMBtu should not even be considered.

Commenters provided the following examples of previous rulemakings found not cost-effective:

- In the EPA's technology review for the Petroleum Refinery Sector, the Agency considered a lower fPM emission standard for existing fluid catalytic cracking units. They said that the EPA found that lowering the standard would cost more than $10 million per ton of total non-Hg metal HAP reduced (in that case, equivalent to $23,000 per ton of fPM reduced) and argued that the Agency decided against revising the standard because it was not cost-effective.

- In the Iron Ore Processing technology review, the EPA considered revising the non-Hg metal HAP standard but found that implementing wet scrubbers incurred a cost effectiveness of $16 million per ton of non-Hg metal HAP and that the Agency decided against revising the standard because it was not cost-effective.

- In the Integrated Iron and Steel Manufacturing Facilities technology review, the EPA contemplated a standard that would require upgrading all fume/flame suppressants at blast furnaces to baghouses to control non-Hg metal HAP emissions. They said the Agency found a proposed standard would cost $7 million per ton of non-Hg metal HAP reduced and concluded that the controls were not cost-effective, and made a similar finding for a proposed standard that would have cost $14,000 per ton of volatile HAP reduced.

- In considering beyond-the-floor MACT for Portland Cement Manufacturing, an evaluation that also considers cost effectiveness, the EPA decided against imposing a more stringent non-Hg metal HAP standard because it resulted in "significantly higher cost-effectiveness for PM than EPA has accepted in other NESHAP." They said the EPA noted in that rulemaking that it had previously "reject[ed] $48,501 per ton of PM as not cost-effective for PM," and noted prior EPA statements in a subsequent rulemaking providing that $268,000 per ton of HAP removed was a higher cost-effectiveness value for PM than the EPA had accepted in other NESHAP standards.

Commenters stated that considering the "cost-effectiveness" of the 0.010 lb/MMBtu limit, the upper limit of the projected annual costs per ton of fPM are substantially lower than the per ton costs that the EPA has considered to be cost-effective in other technology reviews; thus, the EPA should strengthen the standard to at least 0.010 lb/MMBtu.

**Response 2:** The Agency thanks commenters for providing these comments. The rationale for the final emission standards is discussed in section IV.D of the preamble.

**Comment 3:** Commenters agreed with the EPA that lowering the standard to 0.006 lb/MMBtu at $25.6 million per ton of total non-Hg metal HAP reduced is not cost-effective.

Commenters stated that EPA concludes that units without baghouse technology, such as ESP-only units, would need to install a baghouse (FF technology) to achieve a limit of 0.006

lb/MMBtu. The commenters said that cost implications are particularly significant for electric cooperatives. Baghouse technology is estimated to cost $282,715 per fPM ton. They argued that the cost of that retrofit project would force unit retirements in an already burdened sector.

These commenters stated there is no doubt that meeting that lower emissions rate is technologically feasible using currently available controls and they urge the EPA to adopt the 0.006 lb/MMBtu limit. The commenters said Andover Technology Partners found that the cost to comply with an emission standard of 0.006 lb/MMBtu, (the more stringent alternative considered by the EPA in the 2023 Proposal), on a fleetwide basis is significantly less than the cost estimated by the EPA. Andover Technology Partners attributes this difference "to the assumptions EPA made regarding the potential emission reductions from ESP upgrades, which result in a much higher estimate of baghouse retrofits in EPA's analysis for an emission rate of 0.006 lb/MMBtu." *Id*. Commenters stated that though cost effectiveness on a dollar-per-ton basis is is less relevant in the CAA section 112 context than with other CAA provisions, the $103,000 per ton of fPM and $209,000 per ton of filterable PM$_{2.5}$ estimates that the EPA calculated for the 0.006 lb/MMBtu standard are reasonable and comparable to past practice regarding technology reviews under CAA section 112(d)(6). They stated that the EPA has previously found a control measure that resulted in an inflation-adjusted cost of $185,000 per ton of PM$_{2.5}$ to be feasible and cost effective for the ferroalloys production source category and proposed a technology review for secondary lead smelting sources costing an inflation-adjusted $114,000 per ton of fPM. Using the ATP cost estimate, the 0.006 lb/MMBtu standard has even better cost effectiveness at about $72,000 per ton of fPM and $146,000 per ton of filterable PM$_{2.5}$. The commenters further said that the EPA also calculated the cost effectiveness based on unit-specific heat input and allowable emissions at $1,610,000 per ton, showing that a standard of 0.006 lb/MMBtu allows far less pollution at low cost to the power sector. They concluded that all of these metrics and approaches to considering costs show that an fPM standard of 0.006 lb/MMBtu would require cost-effective reductions and can be achieved at a reasonable cost that would not jeopardize the power sector's function.

Commenters stated that while there are better and more appropriate cost metrics and considerations in the context of CAA section 112, it is also worth noting that the benefits of an fPM standard of 0.006 lb/MMBtu far outweigh the costs. They said that the EPA projects annual net benefits of this standard to be $1.1 billion in the RIA. Due in part to the challenge of monetizing the benefits of HAP reductions these benefits are primarily co-benefits, but the combination of quantified and unquantified benefits clearly justifies the modest cost, and the fact that the EPA likely underestimates the benefits and overestimates the costs of this standard in the RIA suggests the net benefits may be even higher than projected. The commenters said but even based on the EPA's projections, the environmental and public health benefits of setting the fPM standard at 0.006 lb/MMBtu clearly far outweigh the costs, further indicating that the costs of this standard are reasonable.

**Response 3:** The Agency appreciates commenters for raising these comments. The rationale for the final emission standards is discussed in section IV.D of the preamble.

**Comment 4:** Commenters stated that the cost effectiveness estimates for actual or allowable emissions are exorbitant and would easily serve as a basis to take no action at all, especially given the acceptable level of risks identified in the risk review.

Commenters noted that the EPA also includes in the record cost effectiveness values "based on allowable" emissions that are, of course, lower than the relevant, actual cost effectiveness values discussed above. The EPA says it included these values for the following reason:

> "Because this cost-effectiveness evaluation [commenters added: *i.e., that based on actual emission performance and expected reductions and cost*] only considers improved fPM control needed at a few units and not the entire fleet, we also evaluated an alternative cost-effectiveness approach that considers allowable emissions, assuming emission reductions achieved if all evaluated EGUs emit the maximum allowable amount of fPM (*i.e.*, at the current standard of 3.0E–02 lb/MMBtu), and the associated costs for EGUs to comply with the three potential fPM standards." (88 FR 24870)

Commenters stated that this stated reason is a non sequitur, all the more so, given that here the EPA candidly concedes: "This cost-effectiveness approach using allowable emissions is not comparable to the standard methodology used in CAA section 112 rulemakings, [but does consider if the fleet were operating at levels allowed by the 2012 MACT rule.]" (2023 Technology Review Memo pg. 12, EPA-HQ-OAR-2018-0794-5789). The commenters argued that these cost effectiveness numbers – based on what they described as counter-factual imaginary reductions in fPM/non-Hg metal HAP from an imaginary situation in which every EGU in the EPA's database is operating at the current 0.030 lb/MMBtu fPM limit and thus their reductions at zero cost are nonetheless attributable to the proposed revised standard – are not otherwise used or discussed in the rulemaking and for good reason, as they are irrelevant and by the Agency's own admission, "not comparable" (*Id*.) to the standard methodology used in all previous RTR as well as beyond-the-MACT-floor rulemakings. The commenters said that what they seem to be, however, is a tacit, further concession by the EPA that the actual cost effectiveness values for this Proposed Rule, which are comparable to the methodology used in CAA section 112 rulemakings, are so much higher than values the EPA has previously found to be not cost-effective, that the Agency found it useful to float irrelevant, but lower cost effectiveness values based on "allowable" emissions. The commenters concluded that any reliance by the EPA on the latter cost effectiveness values, contrary to the standard methodology heretofore used in CAA section 112 rulemakings, would be arbitrary and capricious.

**Response 4:** The Agency disagrees with commenters that the allowable cost effectiveness values presented in the proposal are exorbitant and irrelevant. The Agency presented this alternative cost effectiveness ratio to demonstrate that a lower fPM standard may be cost-effective if EGUs were performing at the 0.030 lb/MMBtu emission limit. This approach has not been used for other rulemakings as overcompliance with a numerical emission limit is rare. The rationale for the final emission standards is discussed in section IV.D of the preamble.

### 2.6.3 Compliance Margin

**Comment 1:** Commenters conveyed that most EGUs typically operate well below the limit to allow for a compliance margin in the event of an equipment malfunction or failure because

sources need to operate below current limits established in the 2012 MATS Final Rule at all times, which they encouraged the EPA to consider when setting new limits. Commenters claimed with the proposed fPM limit of 0.010 lb/MMBtu, an appropriate design margin of 20% necessitates that control technologies must be able to achieve a limit of at least 0.008 lb/MMBtu or lower. They expressed concern that EPA fails to take design margin into consideration in the cost analysis. They stated that by ignoring the need for a design and operating margin cited in at least two of the Agency's publications (Hutson, 2012 and Parker, 2023), the EPA underpredicts the number of units that would require retrofits.

Commenters stated that the EPA must add a compliance margin in its achievability assumptions. They argued that the EPA misjudges the number of EGUs that must undertake retrofits by failing to factor in a compliance cushion. The commenters said that the EPA has long recognized that a design/compliance margin is needed due to operational variability and recognized this concept in the context of the original MATS technology analyses. They said a margin of at least 20% is industry-standard and identified in the 2012 Control Needs Memo.

Commenters stated that in the cost analysis, the EPA did not assign a design/compliance margin and by making this choice, the EPA underestimates the number of units that require retrofits. They said the Technical Analysis (EPA-HQ-OAR-2018-0794-5956 Attachment 1) revises the cost analysis to adjust the number of units requiring upgrades to total 26 ESPs to meet 0.010 lb/MMBtu and projects a much higher project cost based on actual project build cases. The commenters said that to achieve 0.006 lb/MMBtu, 52 ESP-equipped units would need to retrofit to a baghouse, and 23 units with baghouses would need to adopt an enhanced operation and maintenance protocol, increasing the EPA's estimate (65 versus 87). The commenters said that the cost per ton value is considerably higher with the additional retrofits and higher project costs and they included a table showing that this results in a very significant cost difference: with the EPA's average cost/ton being $37,300-$44,900 for 0.010 lb/MMBtu proposed rate compared to the Technical Analysis cost/ton being $67,262 and the EPA's average cost/ton $103,000 for 0.006 lb/MMBtu proposed rate compared to the Technical Analysis cost/ton being $282,715.

Commenters requested that the EPA revise its cost analysis, apply appropriate cost values based on representative projects, and then apply at least a minimum of 20% compliance margin in the cost analysis to adequately reflect the number of units that would need to undertake fPM control upgrades.

The combination of a very low fPM standard and having to account for measurement uncertainty and correlation methodology for PM CEMS would likely necessitate an "operational target limit" of 50% of the applicable limit – *i.e.,* a compliance margin of 50%, as the EPA seems to recognize in the docket. The commenters said that even using the EPA's unrealistic "baseline fPM rates" and the lowest possible compliance margin of 20%, the NRECA technical evaluation estimates that 37 units – almost twice as many as the EPA's estimate – would be required to take substantial action to comply with the proposed standard.

**Response 1:** The Agency has responded to this comment in section IV.C of the preamble.

## 2.7 Alternatives to Proposed 0.010 lb/MMBtu Limit

**Comment 1**: Commenters reiterated that the 2012 MATS Final Rule (77 FR 9304) established a limit on fPM as a surrogate for non-Hg metal HAP based on the primary technologies for controlling fPM being an ESP and/or FF and the EPA's 2023 Technology Review memo shows that across the country, all but two existing coal- and oil-fired power plant units, Colstrip Units 3 and 4, now operate one or both of these technologies and have achieved fPM emissions rates lower than the current standard of 0.030 lb/MMBtu. A few commenters advocated that the EPA adjust the standard for non-Hg metal HAP emissions to 0.020 lb/MMBtu or 0.024 lb/MMBtu or greater rather than the proposed limit of 0.010 lb/MMBtu, which reflects the average performance of the top 50% of the best performing units evaluated by the EPA for the 2023 Proposal. Commenters recognized that a fPM standard of 0.024 lb/MMBtu would not compromise the ability of the power sector to provide affordable and reliable electricity that can be achieved at a reasonable cost, particularly when considering coal unit retirements that are likely to occur due to the current policy environment and other regulations. Commenters suggested that a limit of 0.024 lb/MMBtu should be achievable by Colstrip Units 3 and 4. Certain commenters felt a limit of 0.025 lb/MMBtu fPM may be more achievable, especially as compared to the 0.010 lb/MMBtu fPM limit, as it would at least provide Colstrip an opportunity to try to meet the limit without new control technology given its unique circumstances.

Commenters suggested that relevant to Colstrip, the EPA should lower the standard for non-Hg metal HAP emissions to no higher than 0.024 lb/MMBtu, rather than the proposed limits of 0.010 lb/MMBtu or 0.006 lb/MMBtu. Commenters noted that Colstrip has typically been able to remain just below the current limit of 0.030 lb/MMBtu; however, due to occasional variability in fuel and operating conditions, Colstrip has, since 2018, hired consultants and engineers to explore ways to further enhance the efficiencies of the venturi wet scrubbers. They stated this work has made the venturi wet scrubber emissions more stable, yet the work demonstrated that 0.015 lb/MMBtu fPM is not achievable with upgrades to the existing wet scrubbers and further that the efforts to reduce fPM emissions with the existing control technology has reached its limits. Commenters expressed concern that these comprehensive efforts reflect all known upgrades available to be implemented to the Colstrip scrubber/combustion process to reduce fPM, which enables Colstrip to achieve compliance with the current 0.030 lb/MMBtu fPM limit with an adequate compliance margin, while the majority of stack testing has shown emission rates between 0.020 lb/MMBtu and 0.025 lb/MMBtu fPM with several instances where stack tests were above 0.025 lb/MMBtu fPM.

Commenters further stated the EPA should not finalize the 0.010 lb/MMBtu fPM limit, but should the EPA do so, the Agency should establish subcategories so that it accounts for Colstrip's unique design and circumstances and establish a subcategory for coal-fired units that use wet scrubbers to address both $SO_2$ and PM, and that do not have ESPs or FFs, where the fPM limit for those units is no lower than 0.025 lb/MMBtu pursuant to its authority under 42 U.S.C. § 7412(c)(5).

Commenters stated that Colstrip is in full compliance with the current MATS standards, which the EPA does not dispute meet the statutory objectives of the CAA. They said, however, as the EPA also acknowledges and Talen explains in detail, Colstrip cannot come into compliance with either of the candidate standards set forth the 2023 Proposal without extensive supplementation

of existing pollution controls – the venturi wet scrubbers currently in use cannot meet the proposed standards. The commenters stated that as detailed by Talen, upgrading Colstrip to comply with the 2023 Proposal is cost-prohibitive, resulting in at least $350,000,000 in capital costs, plus an additional $15 million annual operating costs. They said Colstrip is the only facility identified by the EPA as facing this predicament. The commenters also noted that the 2023 Proposal, in combination with the other proposed rules, disincentivizes superior performance. The commenters stated that as detailed by Talen, the venturi scrubbers control both $SO_2$ and fPM and Colstrip has been a high performer in $SO_2$ emission reduction for years because of that system, but under the 2023 Proposal Colstrip would be punished for having "wrong" system to control fPM, in comparison to other facilities. The commenters argued that that no other utility bears anywhere close to the burden that they would bear under the 2023 Proposal.

Commenters stated that in addition, if Colstrip is closed in the near term, adequate and reliable electrical service will not be able to be provided to Montana customers without new replacement baseload capacity. The commenters stated that Colstrip currently plays an essential role in baseload capacity for NorthWestern, and there are no near-term feasible means to replace Colstrip's capacity with other existing NorthWestern capacity or market purchases from in-state or out-of-state sources. The commenters stated that imported power is further constrained by significant transmission limitations.

Commenters have modeled and evaluated scenarios for closure of Colstrip in 2025, 2030, and 2035, and 2042 in its May 2023 Integrated Resource Plan. The 2025 and 2030 closure scenarios expose NorthWestern to extreme degrees of market risk, resulting high probabilities of ruinous market electricity purchases and grid instability.

Commenters stated that if they participate in upgrades to Colstrip, they will either need to materially increase electricity rates for Montana customers, or redirect funding previously earmarked for other projects - projects that may be abandoned to fund Colstrip upgrades include transmission improvements, planned upgrades to facilities that are in excess of maintenance requirements, or other non-required beneficial capital projects. The commenters stated that the vast majority of these have direct environmental benefits, deferral of which would undermine or even fully negate the environmental benefits of the 2023 Proposal. The commenters stated that alternatively, the only baseload capacity that can conceivably be constructed within the statutory compliance deadlines is new natural gas generation capacity. The commenters stated that carbon-free baseload alternatives are either unproven or require significantly longer development times. They said that the net result would be a substantial investment in a new, large, long-lived fossil fuel based generation assets and this outcome would clearly contradict the objectives of Executive Order 13990. Commenters also stated that the adverse net environmental consequences of capital reallocations from the subjects identified above would be reduced utilization of renewables, slowing progress toward the commenters' Net Zero 2050 objectives. The commenters stated that perversely, a very plausible scenario under the 2023 Proposal, if implemented in its current form, would be to extend the life of Colstrip, and result in the heavier utilization of Colstrip than in the absence of the 2023 Proposal. Commenters said they have not had the opportunity to fully calculate the emissions consequences, but there is a significant likelihood that, as applied to Colstrip, the 2023 Proposal would have the effect of increasing net

carbon and HAP emissions over Colstrip's remaining life than if Colstrip is exempted from the 2023 Proposal. The commenters stated that such a result would certainly be contrary to the objectives of Executive Order 13990.

Commenters stated that they have been substantially and uniquely prejudiced by the EPA's course of action. The stated that the 2020 Final Action confirmed that Colstrip's pollution controls satisfy the requirements of the CAA, and there have been no significant technological or implementation advancements since the 2020 RTR that would change that conclusion. The commenters stated that had commenters known that the EPA would undertake a complete reversal of the conclusions of the 2020 RTR just three years later, they could have factored compliance costs earlier and more robustly into their Integrated Resource Planning process.

Commenters stated that their source portfolio generally generates enough energy to serve average load, but is significantly short on both peaking and flexible capacity. They said that a key reason that they did not plan for new baseload capacity was that they had made substantial investments in Colstrip to comply with the 2012 MATS Final Rule and regional haze requirements. Commenters said they knew that Colstrip would be able to achieve CAA statutory and health-based standards over the medium-to-long term. Commenters said they had contemporaneous public assurances from the EPA to that effect. Commenters said they knew that there were no significant pollution control technology advancements in the offing that would change control performance and consequently, the 2019 ERPP and 2020 Supplement focused investment on the identified peaking and flexible capacity needs, as well as improving transmission capabilities.

Commenters stated that they currently plan to invest over $2.4 billion in capital outlays over the next five years. The commenters stated that many of these investments are required by law and others are intended to improve system reliability, better utilization of renewables, or other projects (*e.g.,* wildfire mitigation) with demonstrable and significant environmental benefits.

Commenters stated that 2023 Proposal costs would constitute significant increase in capital commitments, weighted toward the earlier part of the five years and could imperil the ability to make those critical investments.

Commenters stated that any rate increases to cover 2023 Proposal Costs would be on top of other recent rate increases funding the existing capital and operational budgets. The commenters stated that presently pending before the MPSC is a 28% residential electricity rate settlement, driven in material part by investments in carbon free and reduced-emissions projects. They asserted that the 2023 Proposal Costs did not factor into the settlement. Commenters were uncertain that the MPSC would approve cost recovery for such a large new increase on top of other recent increases and may not approve any portion of it. The commenters stated that as a result, the most likely outcome of the 2023 Proposal Costs would be to force commenters to evaluate postponing or abandoning previously approved capital projects.

The commenters said they support the EPA's efforts to establish appropriate limits on Colstrip's emissions of HAP. They said the EPA explains, exposure to these pollutants harms human health, including "potential neurodevelopmental impairment, increased cancer risks, and

contribution to chronic and acute health disorders, as well as adverse impacts on the environment." (Final Rule, Revocation of the 2020 Reconsideration and Affirmation of the Appropriate and Necessary Supplemental Finding, 88 FR13956, 13968 (Mar. 6, 2023)). They said because of the proximity of the Northern Cheyenne tribal members to the Colstrip plant-living both on the Reservation and in the nearby community of Colstrip, where many tribal members are employed-they are disproportionately impacted by exposure to HAP.

The commenters stated that although cost-effective pollution controls are available to reduce toxic air emissions from Colstrip Units 3 and 4, namely baghouses and ESPs, Colstrip's owners have refused to install them and as a result, Colstrip has the highest rate of fPM emissions (a surrogate for non-Hg HAP) in the country and is the only plant still operating without industry-standard PM controls. They asserted that Colstrip has a history of exceeding even the current standard for non-Hg HAP.

The commenters stated that two of Colstrip's owners-NorthWestern Energy and Talen Montana-and Rosebud mine owner Westmoreland oppose the EPA's proposal to strengthen the MATS rule to align with CAA requirements. They said that according to the companies, compliance with lower limits for non-Hg HAP would be too costly. The commenters said that such arguments irresponsibly ignore the acute health effects-including premature deaths that Colstrip's toxic emissions have on Northern Cheyenne tribal members and the many others who live in close proximity to the plant.

The commenters urged the EPA to finalize MATS and said that under the new standards, Colstrip Units 3 and 4 should be required to install the same controls that other plants around the country have already installed and to operate those controls to achieve maximum emission reductions, as the CAA requires per 42 U.S.C. § 7412(d)(2), (f).

**Response 1:** The EPA thanks commenters for providing additional information and fPM compliance data for the Colstrip facility, which has been considered when establishing the final emission standard. Setting an alternative emission limit of 0.025 lb/MMBtu through subcategorization requires distinction among class, type, and size of sources. Given the similar characteristics of this facility, which is not unique in its design and circumstances compared to the rest of the fleet, the EPA disagrees with the notion that a lower standard for a subset of coal-fired EGUs is warranted. In fact, the only difference in circumstances that the EPA is aware of is the use of less-effective PM controls at Colstrip. Specifically, Colstrip is the only facility that the EPA is aware of using a venturi wet scrubber as the only means for fPM controls. The venturi wet scrubber has not been effective maintaining fPM rates below the current standard of 0.030 lb/MMBtu, as other commenters have pointed out previous fPM rate exceedances. As described in the 2024 Technical Memo, Colstrip is the only facility the EPA estimates need an FF install to comply with a 0.010 lb/MMBtu standard. Further rationale for the final emission standards is discussed in section IV.D of the preamble.

Regarding comments about the impact of closing Colstrip on reliable electrical service, facilities may request an additional time extension through the Department of Energy under the Federal Power Act section 202(c), which are made on a case-by-case basis based on a substantial need for grid reliability. In addition, as other commenters have noted, NorthWestern Energy has

recently joined the Western Resource Adequacy Program ("WRAP"), a regional reliability planning and compliance program in the West.

Comments supporting a lower fPM rate for the Colstrip facility are supportive of the Agency's position and do not require a response.

**Comment 2:** Commenters suggested further strengthening of the limit is essential because EGUs have seen significant improvements in fPM emissions rates since 2011 due to wider deployment of fPM control technologies on units projected by the EPA to be operating in 2028 which present a variety of approaches to lower fPM emission limits with implications for upgrades and actions required to meet a revised standard for fPM. Commenters felt an even stronger level could yield more health benefits and prevent hospital and emergency department admissions for cardiovascular and respiratory illnesses. Commenters in support of a lower more stringent limit stated that a fPM standard of 0.0024 lb/MMBtu would encourage many coal-fired EGUs to choose better-performing controls to achieve greater emission reductions using available control technologies in various configurations. Commenters suggested that the finding and fact that emissions performance still varies significantly not only supports revising the standards, but also provides support for a standard significantly below the proposed level of 0.010 lb/MMBtu. Commenters conveyed that the lagging performers in the coal fleet in particular are not even close to achieving the maximum degree of reduction in HAP emissions that can be achieved with proven controls and should be required to reduce their emissions further.

**Response 2:** We agree with commenters that further strengthening the fPM limit is essential. The rationale for the final emission standards is discussed in section IV.D of the preamble.

**Comment 3:** As an additional alternative, the EPA should establish a subcategory with units making an enforceable commitment to retire, where the fPM limit remains at 0.030 lb/MMBtu through retirement. Commenters expressed that the EPA's proposal to make the fPM limit more stringent, as well as require CEMS to demonstrate compliance with that limit, has far-reaching ramifications for EGUs, particularly given Colstrip's unique design and circumstances.

**Response 3:** The EPA's response about establishing a subcategory for EGUs making retirement commitments is provided in Chapter 2.5.2 of this document.

# CHAPTER 3

## 3. PM Emission Monitoring

**Comment 1:** Commenters said that PM CEMS could be used to demonstrate compliance with the emission limits of 0.010 lb/MMBtu and 0.006 lb/MMBtu, based on compliance reports showing even lower levels at units with PM CEMS and technical information about the capability of PM CEMS. They said that the fact that PM CEMS have been used to demonstrate compliance in a majority of units in the eight best performing deciles provides strong evidence that PM CEMS can be used effectively to measure low levels of PM emissions, down to a revised standard of 0.0024 lb/MMBtu. The commenters said that the 2023 ATP Assessment notes that PM CEMS are capable of demonstrating PM levels down to 0.0015 lb/MMBtu or less, and that the main concern is calibration. They stated that the EPA's memorandum on PM CEMS Random Error Contribution by Emissions Limit (PM CEMS Memo) suggests that by increasing the sampling time to 8 hours for a standard of 0.003 lb/MMBtu an average random error contribution of less than 41% can be achieved. The commenters argued that while the cost of the PM CEMS may increase as a result, it is still reasonable, and PM CEMS can and should be required for compliance with a standard of 0.0024 lb/MMBtu.

Commenters stated the EPA must require the use of PM CEMS to monitor their emissions of non-Hg metal HAP. PM CEMS are now more widely deployed than when MATS was first promulgated, and experience with PM CEMS has enabled operators to more promptly detect and correct problems with pollution controls as compared to other monitoring and testing options allowed under MATS (*i.e.,* periodic stack testing and parametric monitoring for PM), thereby lowering HAP emissions. Commenters stated employing PM CEMS as the only monitoring option for non- Hg metal HAP—and complying with the revised emissions standards reflecting these improvements in monitoring—is "achievable." In addition, they said the use of PM CEMS is also cost-reasonable for compliance demonstration. As the EPA notes, the EUAC for PM CEMS is also "less expensive than quarterly [stack testing]." The commenters said that given the cost estimates in the Proposal and the estimate by Andover Technology Partners, total costs of installing PM CEMS for the set of plants that do not currently have PM CEMS would be clearly reasonable, especially since PM CEMS is both more effective and less costly than periodic stack testing.

Commenters stated their FWE200DH PM CEMS is able to detect PM at the levels proposed in the rule. Their unit uses light scattering technology that can detect as low as 0.1 mg/m3.

**Response 1:** The Agency agrees that the collected data demonstrate that a filterable PM limit of 0.010 lb/MMBtu is achievable now for PM CEMS. While PM CEMS are able to produce values at lower levels provided correlations are developed appropriately, the Agency selected this limit in consideration of factors such as run times necessary to develop correlations, potential random error effects, and costs. The Agency agrees use of CEMS in general and PM CEMS in particular enable owners or operators to detect and quickly correct control device or process issues in many cases before the issues become compliance problems. As described in the *Revised Estimated Non-Beta Gauge PM CEMS and Filterable PM Testing Costs*, available in the docket, the EPA calculated average costs for PM CEMS and quarterly testing from values submitted by

commenters in response to the proposal's solicitation; these values are discussed in section IV.D of the preamble. While the average EUAC for PM CEMS exceeds the average estimated annual cost of quarterly Method 5I emission testing, the benefits associated with PM CEMS, such as providing continuous emissions data to EGU owners or operators, regulators, or nearby community members, are not included with commenters' estimated values. As a reminder, the EPA is not obligated to choose the most cost-efficient manner for compliance demonstrations, even though cost can be an important consideration. Consistent with the discussion contained in 88 FR 24872, the Agency finds the transparency and ability to detect and correct potential control or operational problems quickly, makes PM CEMS the best choice for this rule's compliance monitoring. Finally, the Agency appreciates the PM CEMS manufacturer providing laboratory detection levels for one of its instruments; the value provided is about two orders of magnitude below the selected limit, suggesting that the limit can be measured appropriately by this instrument.

**Comment 2:** Commenters stated the EPA must require units that use HCl as a surrogate for acid gas HAP to monitor HCl using CEMS as part of its CAA section 112(d)(6) review as this will reduce emissions. They said currently, facilities may use quarterly stack testing for compliance that shows regulators and the public little about emissions in the many days and hours between stack tests when emissions could be much higher than during a planned test. HCl CEMS are now more widely deployed in many industries such as municipal waste combustors, cement plants, and biomass and other power generating units than when MATS was first promulgated, and experience with HCl CEMS has enabled operators to more promptly detect and correct problems with pollution controls as compared to other monitoring and testing options allowed under MATS (*i.e.,* periodic stack testing). The commenters said that for units that demonstrate compliance using the HCl limit, employing HCl CEMS as the only monitoring option for HCl would be both achievable and cost-reasonable and that HCl CEMS analyzers cost approximately $80,000 to $250,000, not including the costs of commissioning and startup testing, which may be in similar amounts, which is reasonable.

Commenters stated that several provisions of the CAA give the EPA authority to mandate the use of HCl CEMS for compliance demonstration for acid gas HAP. CAA section 112(b)(5) provides: "The Administrator may establish, by rule, test measures and other analytic procedures for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants." Separately, CAA section 114(a)(1)(C) authorizes the Administrator to require operators "on a…continuous basis…to…install, use, and maintain such monitoring equipment, and use such audit procedures, or methods…as the Administrator may reasonably require." And CAA section 114(a)(3) provides: "The Administrator shall in the case of any…owner or operator of a major stationary source…require enhanced monitoring…." The commenters said that the EPA's conclusions as to HCl CEMS in the original MATS rulemaking does not pose any obstacle to adopting such requirements now. They said the 2011 MATS rule presents lower initial costs and annual costs for HCl CEMS than for PM CEMS. In that rulemaking, the agency found that the operation and maintenance issues for the CEMS mentioned are no different than for other CEMS now in wide use and acceptance by the industry. The commenters said that in light of the EPA's conclusion in the 2011 proposal that HCl CEMS is a reasonable monitoring option, it would be more than "reasonabl[e]" within the meaning of

CAA section 114(a)(1)(C) for EPA to require this monitoring technique as part of a strengthened rule.

**Response 2:** The Agency disagrees with the commenters' suggestions that HCl CEMS must be required for MATS. The rule's HCl limits were not considered for revision primarily because no new control technologies or improvements have been introduced for HCl emission reductions. Moreover, most EGUs rely on sulfur dioxide emissions as a surrogate for HCl emissions, enabling use of existing $SO_2$ CEMS as a continuous check on HCl emissions. As mentioned in the original MATS rule preamble, this is logical because acid gas controls remove HCl prior to sulfur dioxide. For these reasons, no changes were made to HCl monitoring.

**Comment 3:** Commenters stated the EPA should retain all current options for demonstrating compliance with non-Hg metal HAP standards, including quarterly PM and metals testing, LEE, and PM CPMS. They said removing these options goes beyond the scope of the RTR and does not address why the reasons these options were originally included in MATS are no longer valid. Commenters said they have previously raised concerns about PM CEMS that the EPA has avoided by stating that CEMS are not the only compliance method for PM. They stated that previously, the EPA has determined these compliance methods were both adequate and frequent enough to demonstrate compliance. The commenters said that sources would still be required to comply with the limits at all times including between performance tests and the compliance assurance monitoring that the EGUs must perform under other rules will ensure that the requirement of CAA section 63.10000(b) to operate and maintain the control equipment consistently and will provide credible evidence for the Administrator's determination that the requirement is met.

Commenters stated that the EPA should revise the current PM CPMS provisions to remove the requirement to establish an operating limit equivalent to 75% of the standard, especially if the PM standard is lowered to 0.010 lb/MMBtu or 0.006 lb/MMBtu. The commenters said that setting the operating limit to the equivalent to the standard over a 30-day basis will show that the unit and control devices are operating in a way that would be reasonably expected to demonstrate compliance with the PM limit based on and interpolation of the most recent most recent performance test. They said requiring PM CEMS would not remove the uncertainty in measurement as a PM CEMS is still deemed acceptable if just 75% of the data are within 25% of the correlation during an RCA or just two-thirds of the data are within 25% of the correlation for an RRA.

Commenters argued that the EPA erred in not differentiating between stack test data and CEMS data when determining the revised PM standard. They said because stack tests are a snapshot in time, they do not capture the potential seasonal variability and spikes in emissions during load changes or when additional pieces of equipment (*i.e.,* pulverizers, scrubber chambers) are put into service. The commenters argued the EPA should take this into consideration when selecting what data to use when determining the level and compliance requirements of the standard. They also argued the EPA should not select data from certain quarters to set the standard, but instead use all available PM data.

Commenters stated the EPA used 1-hour stack test data to justify the proposed PM standard of 0.010 lb/MMBtu. They said that since the EPA believes this data is reliable enough to set the standard, 1-hour test runs are congruent with the revised standard and appropriate for compliance demonstration.

Commenters stated there is great difficulty in accurately measuring emissions using CEMS for both low-emission normal operations and potentially high-emission non-normal operations. They said allowing flexibility in using separate methods (and equations) during excess emission events to quantity those emissions would be beneficial.

Commenters stated the EPA should not attempt to justify the requirement for all EGUs to demonstrate compliance via PM CEMS by stating that new units require PM CEMS. They said that there are currently no new EGUs in operation and there likely never will be. The commenters said supporting the proposed use of PM CEMS at low fPM concentrations by stating the requirement is consistent with a theoretical requirement for new EGUs that have not been built and will never be built is no support at all.

**Response 3:** The Agency disagrees with the commenter who suggests that the rule should retain all previous options for demonstrating compliance with either the individual metals, total metals, or fPM limits. As the rule now contains an fPM limit with compliance demonstrated only using PM CEMS, EGU owners or operators choosing to use the fPM limit for compliance purposes would not need to use multimetals CEMS or non-Hg metals testing. However, as mentioned earlier, to the extent that an EGU owner or operator would want to rely on a non-Hg metals emissions limit and to conduct non-Hg metals monitoring, the EGU owner or operator may use the alternative test method provisions in the NESHAP general provisions to request such a limit. As an aside, the Agency is aware of just one EGU that reports non-Hg metals results from testing (the Agency is unaware of any EGU that uses multimetals CEMS for compliance purposes); however, that EGU relies on fPM for compliance purposes. As PM CEMS is now the required compliance demonstration approach for fPM and eligibility for a fPM LEE program – which was not proposed - would be based on a value lower than the fPM limit (0.010 lb/MMBtu), which is one-third of the current fPM LEE eligibility value, the fPM LEE program has been made moot. The PM CPMS approach was included in the original rule as a means for EGU owners or operators to become familiar with PM CEMS operation. As the PM CEMS data demonstrate, PM CEMS, whose usefulness and durability was doubted by some during the initial rule development, have demonstrated their suitability for the electric utility industry such that PM CPMS as training guides are no longer required. The Agency agrees with the commenter who suggests that EGU owners or operators will continue to manage and adhere to parametric monitoring associated with their fPM control devices; however, with the advent of PM CEMS for compliance purposes, the Agency suggests that EGU owners or operators may find cost savings from using their newly-installed PM CEMS to streamline their compliance assurance monitoring (CAM) and similar applicable requirements in their title V permits. As mentioned earlier, the commenter's suggestion to revise PM CPMS monitoring requirements is moot, since PM CPMS are to be replaced with PM CEMS. The Agency does not understand one commenter's suggestion that the tolerance for PM CEMS does not reduce uncertainty; that suggestion seems to conflate acceptable tolerances with uncertainty. Most, if not all, values contained in Agency rules have tolerances. For this rule, the tolerance will be expanded to help

ease the transition into PM CEMS. Over time, as EGU owners and operators become familiar with the instrumentation and its operation, the rule may start reducing this tolerance, as has been done in other rules such as in the acid rain monitoring provisions. On the other hand, every measurement has one or more components of uncertainty, and the Agency strives to reduce such uncertainties and prefers to keep such uncertainties below half the measured value. A correlation established using a minimum amount of collected fPM mass should ensure such uncertainties are minimized.

As mentioned earlier, the Agency disagrees with the commenters who suggest that stack test data and PM CEMS data should have been considered separately. MATS imputes both quarterly emission test average values and PM CEMS average values into 30-boiler operating day rolling averages, those values are to account for normal operation which should and would include periods of load and equipment changes. The Agency also disagrees with the commenters who suggest that distinct periods should not have been used when considering appropriate emission limitations because the Agency wanted to obtain emissions information from those periods where demand was highest; that period is believed to occur over in the third quarter of the year. Other operational periods are not expected to have larger or more continuous loads. The Agency believes the commenter who suggests that the Agency used one hour test results as the basis for the revised emission limit is mistaken; as mentioned earlier, MATS uses the equivalent of the average emissions test value as each hourly value from the 30-boiler operating day rolling average compliance period.

While the Agency agrees that measuring very low and non-normal high fPM emissions can be challenging, as long as the correlation equation is determined appropriately, PM CEMS should be able to provide valid responses. In many cases where non-normal high fPM emissions occur, the Agency expects instrumental problems or out-of-control periods might be the cause; if so, then such data would not be included for compliance purposes. Rather, the occurrence, duration, and steps to correct and prevent recurrence will be reported. In any event, the commenter provided no such alternatives or equations for consideration, so no changes will be made to the rule. The Agency disagrees with one commenter's suggestion that PM CEMS are required because new EGUs are already required to use PM CEMS; restating the existing requirement was not intended to be a justification; rather, it was a reminder of how new EGUs are to comply with the rule. It remains accurate to state that new EGUs are required to use PM CEMS and that this requirement is not new or unknown; it was included in the original rule promulgated over 11 years ago.

**Comment 4:** Commenters noted the similarity of the Portland Cement MACT (40 CFR part 63, subpart LLL) PM monitoring requirements to the proposed PM CEMS requirements and that the EPA rejected the use of PM CEMS in portland cement plants in favor of PM CPMS. The commenters said that the low limits for PM would require impractical run times to reduce uncertainly of measurements during the correlation process and in that industry, the EPA noted the variance in particulate sizes that caused issues with measurements, but they have not addressed that EGUs can have varying sizes of particulate based on specific operational conditions and control equipment. They said that the uncertainty in the Method 5 measurements create a high degree of failures of PS-11, RCA, and RRA failures with emission limits this low and the use of PM CEMS should not be required.

**Response 4:** The Agency disagrees with the commenters' suggestions that EGUs have similar characteristics as Portland Cement Plants. This issue has already been discussed and addressed in the proposal preamble at 88 FR 24873,

> "…The conditions experienced by portland cement facilities that required revisions to emission limits and compliance determination method are not similar to those expected to be faced by EGU owners or operators subject to MATS. First, the fuel used by coal-fired EGUs is more uniform and its characteristics are more consistent than those of the fuel and additive mixtures used by portland cement kilns. Such fuel combustion particle consistency allows technologies such as light scattering and scintillation, in addition to beta gauges, to be used by PM CEMS for compliance determination purposes. Moreover, consistent fPM particle characteristics for EGUs provide stable correlations for those EGUs with existing PM CEMS; while the fPM particle characteristics provide correlations that remain within specifications, as evidenced by ongoing relative correlation audits, for some EGUs the existing correlations do not change and can continue to be used now and in the future without having to develop a new correlation. Second, the…MATS emission limit of 1.0E–02 lb/ MMBtu, …coupled with [the rule's shift to a minimum sample catch]…~~from a minimum sampling collection time of 3 hours per run, based on a typical sampling rate of 3⁄4 cubic feet per minute~~, avoids the measurement problems described by the Portland Cement NESHAP by reducing the average inherent measurement uncertainty for half of the proposed emission limit (where the EGU is expected to operate) from more than 50 to 80 percent... As shown, inherent measurement uncertainty does not appear to be problematic for the …emission limit…Third, Performance Specification 11 (PS 11) [and Procedure 1], which provide[~~s~~] procedures and acceptance criteria for validating PM CEMS technologies, already anticipate[~~s~~] and include [an] approach[~~s~~] for developing[multi]-level emission correlations for PM CEMS. Those techniques include varying process operations; varying fPM control device conditions; [and] PM spiking …"  [6]

EGUs have consistent fuel characteristics in comparison to Portland cement facilities; EGU fuels are typically contracted to meet a certain range of requirements, and control devices which yield ash with uniform characteristics; in contrast, Portland cement facilities combust many various types of fuels with differing ingredients, typically acquired by seeking out lower cost batches, resulting in clinker developed according to cement specification needs, not to uniform particle size specifications. The Agency believes these differences allow PM CEMS use at EGUs.

As mentioned earlier, the Agency believes adjustments from minimum test run duration to minimum fPM mass collection will reduce overall test campaign durations while reducing measurement uncertainty to acceptable levels. One of the commenters reviewed the results from correlation testing, RCAs, and RRAs from 20 EGUs, adjusting tolerances to determine how the

---

[6] Strikethrough and text in brackets added by EPA from original proposal for clarification.

existing EGUs would fare using the range of potential limits contained in the proposal. That commenter concluded that it may be difficult for EGU owners or operators to meet the proposed limits, especially the ones below 0.010 lb/MMBtu, without additional work. The Agency also reviewed correlation testing, RCA, and RRAs from 32 EGUs and found similar results as that commenter, analysis provided in docket entitled "Evaluation of PM CEMS QA Criteria at Different Emission Limits." However, when the tolerance adjustments were applied in the analysis, the Agency found little difference between the expected performance at 0.020 lb/MMBtu and at 0.010 lb/MMBtu with a revised tolerance. At least 3 EGUs met all criteria for each of the correlation testing, RCA, and RRA procedures at the rule's new fPM limit, even though the EGUs were not trying to operate at emission levels other than 0.030 lb/MMBtu. Moreover, 13 EGUs met the criteria for each of two procedures (as the RCAs occur every 3 years, many of the reviewed results had not conducted RCAs). The Agency's quick check showing at least 80% of existing results could meet the new limit with the revised tolerances without needing further adjustments or repeat testing demonstrates that PM CEMS are well-positioned to operate well at the rule's limit. Therefore, the rule will maintain use of PM CEMS with the revised tolerances.

**Comment 5:** Commenters stated that the EPA's cost estimates contradict the Agency's suggestion that the use of PM CEMS is a more cost-effective monitoring approach than quarterly testing, especially for units that qualify as LEE. They said that the EPA used estimates from ICAC or Envea/Altech which do not include numerous costs associated with PM CEMS which make them not cost effective, such as the cost of stack testing associated with the PS-11 correlations, and the ongoing costs of RCAs and RRA, which are a large part of the costs associated with PM CEMS and would rise substantially in conjunction with the proposed new PM limits. The commenters said that the ICAC estimated range of PM CEMS installation costs are particularly understated and outdated and should be ignored by the Agency. The commenters said they are willing to meet with the EPA to discuss and correct these cost estimates. They said that the EPA estimates may also understate PM CEMS cost by assuming the most commonly used light scattering based PM CEMS will be used for all applications. The commenters said that while more expensive, a significant amount of beta gauge PM CEMS are used for MATS compliance, especially where PM spiking is used for PS-11 correlation and RCA testing and that this higher degree of accuracy from beta gauge PM CEMS may be needed for sources without a margin of compliance under the new, more stringent emission limit.

**Response 5:** The Agency has responded to this comment in section IV.C. of the preamble.

**Comment 6:** Commenters stated PM CEMS do not directly measure PM in the stack, but instead measure some other characteristic that is then related to PM levels. They state this results in PM CEMS not being technically appropriate for all coal-fired units, especially to operate within the proper QA/QC criteria under Procedure 2 and establishing the correlation curve under PS-11, both of which will be even more difficult under lowered emission standards.

Commenters said that an operator would not know if their CEMS fails a QA/QC criteria in real-time, resulting in many hours of invalid data that are not reflective of poor maintenance or operation but rather the difficulties associated with the quality assurance procedure at such low emission levels.

60

Commenters said that the EPA should include additional provisions in Appendix C of 40 CFR part 63, subpart UUUUU to mitigate the effects of this downtime, such as provisional data periods following a failed RRA or RCA. Alternatively, they said the EPA could require an RCA only if the RRA is unsuccessful. Increased sample volume does not mitigate these challenges, especially calibrating equipment to measure PM levels against a limit of 0.010 or 0.006 lb/MMBtu. Commenters also proposed the EPA consider the use of "QA operating quarters" and "grace periods" consistent with 40 CFR part 75 in the MATS Appendix C.

Commenters stated that the requirements of PS-11 will become extremely hard to satisfy at the low emission limits proposed. For PS-11, RCA, and RRA, the tolerance interval and confidence interval requirements are expressed in terms of the standard that applies to the source. They said that PS-11 states that the 95th percentile confidence interval half range from the correlation test must be within 10% of the PM limit and that the tolerance interval half range from the correlation test must have a 95% confidence that 75% of all possible values are within 25% of the PM limit. The commenters said that test data from operating units was reviewed by the commenter and found to have significantly higher PS-11 failure (>80%), RCA failure (>80%), and RRA failure (60%) rates at the more stringent proposed emission limits. They stated that the cost, complexity, and failure rate of equipment calibration remains one of the biggest challenges of the use of PM CEMS and therefore other compliance methods should be retained. Commenters also noted that repeated tests due to failure could result in higher total emissions from the units.

Commenters stated that the difficulty of PM CEMS calibration cannot be easily fixed using PM spiking with PS-11 and that depending on the physical design of the facility, it may be difficult to introduce PM to the exhaust stream, and the increased PM content can have negative effects on scrubbers and CCS systems. The commenters said that its use with light-scattering CEMS can also have issues due to differing PM sizes and while possible to use, PM spiking is not a panacea for solving calibration issues.

Commenters state the EPA should not reference EPRI's research into a Qualitative Aerosol Generator (QAG). The commenters said the project lost funding due to its cost and complexity, as well as the EPA's lack of response despite several attempts by EPRI to get the EPA involved in the project that sought to make PM CEMS correlations more efficient. They disagreed that the Agency should use an EPRI project the EPA never showed any support for and attempt to use that defunct project to support this rulemaking proposal.

Commenters stated units with CAM plans already in place should have a carve out to allow continued use of their CAM plan that utilizes performance indicators and operational parameters to ensure compliance with the particulate standard. They said their facility has had issues with PM CEMS in the past and they believe the use a CAM plan will ensure compliance even better than requiring PM CEMS.

**Response 6:** The Agency disagrees with the commenters' suggestions that PM CEMS are somehow not technically applicable for fPM measurement due to their inherent operation. PM CEMS have been available for use in compliance with this rule for over 11 years; around one-

third of EGU owners or operators have chosen to rely on PM CEMS as their compliance determination method. It is unlikely that owners or operators would choose to use PM CEMS if they were unsuitable for use. Recognizing the commenters' suggestion that the tolerance for lower-level emission limits might require more attention from owners or operators, the Agency has agreed to revise the tolerance such that the value associated with a 0.015 lb/MMBtu limit will be available for use. As already mentioned, the Agency believes the adjusted tolerance will reduce if not eliminate the concern from commenters that using the former tolerance could prove problematic.

The Agency disagrees with the commenters' suggestions that the PM CEMS requirements in Appendix C be revised to include acid rain rule components such as provisional data periods, grace periods, and QA operating quarters. Such suggestions were made and rejected in the original MATS rule and are not included in this rule. As mentioned before, the compliance framework for the acid rain rule, in which source owners or operators are allowed to purchase allowances should they find their EGUs out of compliance, has no parallel in the NESHAP program. Because no allowances exist for exceedances of the emission limits for this rule, EGU owners or operators need to pay close attention to their PM CEMS and need to minimize the potential for errors or potential errors associated with PM CEMS downtime.

As already mentioned, in recognition of the potential for more difficulty in meeting existing tolerance requirements, the rule will adjust those tolerances to ease the transition for some for PM CEMS use. Also, as mentioned earlier, the pass rates from the Agency's review of correlation, RCA, and RRA reports from 36 EGUs shows projected passing rates at the rule's emission limit using the adjusted tolerances range from 78% for correlation testing, to 81% for RRAs, to 73% for RCAs; these passing rates are much greater than the commenters' reported results. Because the Agency's analysis predicts a good passing margin and because many owners or operators are expected to be able to make adjustments to their equipment to enable passing, the rule will maintain use of PM CEMS for the emission limit with the revised tolerances.

The Agency disagrees with the commenter's concern over use of spiking to develop correlations. The Agency is unaware of – and commenters did not provide – evidence of spiking not working; moreover, the Agency is unaware of individual EGUs being unable to meet their PM CEMS QA/QC requirements. The Agency notes that the three-year period between promulgation and compliance dates for this rule would be a good time for EGU owners or operators who are concerned about their familiarity with PM CEMS, issues with control devices, or effects of EGU operation to install PM CEMS early and gain valuable experience before compliance with the rule's revised emission limit is required.

The Agency disagrees with the commenters who suggest that an EPRI report on approaches for lower level PM CEMS measurements should not be mentioned. Despite the commenters' assertions, the Agency was briefed on EPRI's study but was not made aware of the conclusions, if any, from this study. Without mentioning the report, the Agency would not have been aware of the commenters' beliefs. The Agency remains interested in results of this and other similar studies, as it wants to continually advance approaches and procedures to measure emissions continuously; should the commenters share that interest, the Agency recommends the commenters build consensus to complete that work and to share the results with the Agency.

While the Agency endorses use of CAM plans in general, as mentioned earlier, the Agency finds use of PM CEMS, that provide continuous measurement of the pollutant of concern, is superior to the continuous parameter monitoring contained in most CAM plans. The rule will maintain the use of PM CEMS; as mentioned earlier, the Agency recommends EGU owners or operators who experienced or who expect to experience difficulties with PM CEMS use the period between rule promulgation and the required compliance date to gain experience with PM CEMS.

**Comment 7:** Commenters stated that the EPA's recommendation to require longer test runs does not remove the drawbacks of CEMS use for compliance demonstration. They said that the EPA has proposed requiring longer testing times and greater sample volume requirements; this not only introduces the chance of additional measurement issues but also poses a problem for EGUs that operate as non-baseload units and may operate infrequently. The commenters expressed concern that longer Method 5 tests could negatively impact certain FGD control devices, requiring up to nine hours of testing per unit could result in the unit having to operate solely for testing purposes and thus increasing total air emissions. The commenters also said that some facilities have Title V permits requiring monitoring PM via CEMS on a much shorter averaging time that does not exclude testing periods and thus, MATS testing requirements could cause violations of their permits. The commenters concluded that the test sample volumes should be left to the individual facility's discretion.

**Response 7:** In consideration of the commenters' suggestions about lengthy duration of correlation testing, as mentioned earlier, the Agency plans to adjust from a minimum sample volume requirement to a minimum collected mass requirement of at least 3 milligrams; this change should reduce sampling times and potential impacts on control devices from operating in a less than efficient manner during high level correlation testing. EGU operational frequency is determined primarily by EGU owners and operators in conjunction with others; the Agency has little to no control over an EGU's operational schedule; whatever the duration of EGU operation, it must meet the rule's emission limitations. Therefore, EGU owners or operators should be prepared to make adjustments in operational and performance schedules as appropriate to ensure that their sources operate such that good correlations can be obtained and maintained. The Agency does not find the commenters' suggestions to reduce or eliminate necessary correlation testing for PM CEMS appropriate; such correlation testing ensures the PM CEMS yield results to demonstrate compliance with the rule. While such testing has the potential to have increased emissions over the testing period, the results of such testing are not included when assessing compliance; even if such results were included in the rule's 30-boiler operating day rolling average and if 6 runs at high load level require total durations of 12 hours for correlation testing, the periods of potential elevated emissions would comprise less than 2% of the averaging period. The Agency believes EGU owners and operators could make necessary adjustments to maintain compliance if it were required – and it is not required - for this rule during correlation testing. To the extent EGU owners or operators are subject to other applicable requirements via their title V permits, changes to this rule may or may not impact those rules; EGU owners or operators are encouraged to meet with their permitting authorities to discuss possible resolutions to what EGU owners or operators perceive to be problems with compliance with meeting other, non-Agency requirements. As mentioned earlier, the rule will change from a minimum sample volume collection to minimum collected mass requirement; this change is consistent with the

commenters' suggestion to allow individual facilities the ability to determine sample volumes necessary during testing.

**Comment 8:** Commenters stated that sources approaching retirement should be allowed to retain quarterly stack testing for PM compliance even if required of other units as it would not be cost-effective. To be consistent with the EPA's proposed GHG rule, commenters recommend allowing sources to continue to use quarterly testing (or potentially less frequently if the unit qualifies as an LEE) provided that the unit is required to cease operation before 2032 (consistent with the proposed "immediate term" source category under the proposed GHG guidelines for existing coal-fired EGUs). Other commenters argued that units with a planned retirement date before 2035 or 2040 should be exempt from the PM CEMS requirement.

Commenters stated they agree with the EPA's proposed compliance option for units that will permanently cease burning coal by the end of 2028. They are also requesting that in lieu of quarterly emissions testing the EPA allow periodic emissions testing as part of the Part 75-required CEMS RATA test. The commenters note there has been a large decrease in electricity generation from coal units since the rule first went into effect and this trend is likely to continue. They noted this has resulted in many units, especially those facing retirement in the next decade, only operating during periods of peak electric demand, so this flexibility in the testing schedule will allow units to avoid operating solely for the purposes of emissions testing.

Commenters stated the EPA should consider that use of PM CEMS may not be appropriate for EGUs that co-fire coal with another fuel, such as biomass or natural gas, during normal operation or startup. PM CEMS and regular QA testing would incur increased testing costs for these units. They stated that some units burn natural gas during normal operation but would like to maintain the ability to burn coal, so these units would require increased coal consumption (and therefore emissions) just to complete the required calibration testing. The commenters said that in addition, the EPA should perform additional research to investigate if co-firing results in accurate CEMS measurements before enforcing a limit of 0.010 lb/MMBtu fPM during co-firing periods. They said that the EPA should consider reasonable exemptions such as allowing coal-fired units that co-fire other fuels the option to continue to use the quarterly stack-testing and CPMS options and exempting units from the requirement to use a PM CEMS if they have an fPM control technology and documented Compliance Assurance Monitoring in place. The commenters said that the EPA should also allow the option to demonstrate fPM emissions compliance during periods of PM CEMS monitor downtime via stack testing, similar to Part 75.

Commenters urged the EPA to retain the 36-month PM stack testing established under the LEE program, quarterly stack testing and CPMS options for IGCC EGUs. They said that IGCC units are built with stacks more akin to a combustion turbine and they do not have the necessary annular space to allow installation of PM CEMS. The commenters said that exposure to the elements, particularly in an area with large seasonal fluctuations, would impact the sensitivity and accuracy of the CEMS. Additionally, IGCC units do not have PM control devices for de-tuning, which is required for conducting PS-11 to establish the correlation curve. They argued that this and other factors cause certification of PM CEMS on IGCC units to be infeasible.

Commenters stated units involved with CCS projects should retain the option to use stack testing for compliance. They said that PM emissions must be measured from the CCS stack being constructed adjacent to the Young Station after $CO_2$ is removed. The commenters said that PM CEMS correlating testing will cause operational impacts on the CCS operations due to PM detuning for long time periods, resulting CCS operations being adversely affected or even shut down for long periods.

Commenters state the EPA should allow units that operate at capacity factors of 20% or less to continue to use quarterly stack testing to demonstrate compliance with the fPM standard and not be required to install PM CEMS. They note the EPA has proposed that the best system of emission reduction for units operating at a capacity factor of 20% or less and ceasing operation by January 1, 2035, is routine methods of operation and maintenance, and harmonization between the two rules is critical to allow operators to continue to provide reliable energy where monitoring costs will not be recouped.

**Response 8:** The EPA disagrees with commenters who suggest that the Agency should allow sources approaching retirement to continue to use quarterly stack testing for PM and further discussion is provided in section IV.C of the preamble. The Agency disagrees with the commenters' suggestions not to require PM CEMS for EGUs that co-fire fuels other than coal. EGU owners or operators determine their EGUs' fuel mixes; to the extent that EGU owner or operators wish to change the firing status of their EGUs, they are able to decrease coal use – while increasing other fuels – and no longer have coal-fired EGUs subject to this rule. The Agency disagrees with the commenters' suggestions to continue to allow use of quarterly stack testing or PM CPMS in co-fired EGUs; as mentioned, the Agency finds PM CEMS to be effective for compliance monitoring for such sources. While the Agency agrees EGU source owners or operators would be well advised to operate their emission control devices in a manner consistent with good engineering control practice and to collect and assess control device parameters on an ongoing basis – as required by the CAM rule – PM CEMS provide continuous measurement of the pollutant of concern, so parameter monitoring is redundant for this rule's compliance monitoring.

The Agency agrees with commenters who suggest that IGCC characteristics preclude the use of PM CEMS; moreover, IGCC emissions are more akin to those from gas- or oil-fired turbines than EGUs. Therefore, the rule will not require IGCCs to use PM CEMS for compliance purposes. Moreover, any IGCC that qualifies for LEE status under the original rule may use the 3 year testing schedule, provided it maintains emissions no greater than 50% of the fPM standard.

The Agency notes that best system of emission reduction (BSER) determinations are associated with New Source Performance Standards, not with NESHAP. Therefore, other BSER determinations have no impact on this rule. The Agency expects all EGUs, including coal- and oil-fired EGUs, except IGCCs to use PM CEMS, regardless of capacity factor.

The EPA addresses the comment about CCS and PM CEMS in section VI.C of the preamble.

**Comment 9**: Commenters stated that current MATS PM CEMS QA/QC requirements require artificial PM loading pursuant to Performance Specification 11. The commenters said that EGUs

must intentionally turn off multiple fields of ESPs to achieve an increase in PM needed for the test and if the unit has a wet FGD, slurry injection may need to be reduced to negate any filterable PM reduction in the wet FGD.

Commenters asserted that meeting the requirements of Performance Specification 11 will be much harder with a lower fPM limit, as the tolerance interval criteria depend on the applicable emission limit. The commenters said that more Performance Specification 11 tests are likely to occur, creating additional air emissions due to detuning ESP and wet FGD control systems to obtain elevated PM conditions. They argued that the EPA should not propose changes in the MATS Rule that will extend the duration of these abnormal operation conditions.

Commenters stated that the EPA should recognize that if the MATS fPM rate is reduced to 0.010 lb/MMBtu or lower, then the frequency of RCAs will increase significantly. RCAs must be performed if a RRA does not meet specifications. The commenters said that a more stringent fPM limitation will result in more QA test failures because the pass/fail specification for tests are expressed as a percentage of the fPM limit. They said that CEMS equipment must attain "passing" results in a much narrower band due to the percentages calculated using the lower fPM limitations.

Commenters stated that the EPA should consider the consequence of lowering PM CEMS requirements on correlation testing. They said these tests will increase the time during which sources must detune control devices and significantly increase the time and cost to perform the test. The commenters said that as the fPM limitation drops lower, the frequency and duration of QA/QC tests and detune conditions will rise. Commenters advocated for minimizing intentional emissions increases as much as possible.

**Response 9:** The Agency agrees with commenters who suggest that PM CEMS correlation testing for the rule's emission level will likely require more planning and adjustment than is currently needed; however, such additional attention to correlation testing should not automatically eliminate use at lower emission levels. The Agency recognizes that in order to obtain acceptable correlations, control device operation, test run duration, and acceptability criteria may need adjustment. To that extent, the rule will not require a minimum test run duration, rather, a minimum fPM catch of 3 milligrams will be specified; moreover, the rule will allow a broadened QA performance criterion equivalent to that of an emission limit of 0.015 lb/MMBtu at the rule's emission limit of 0.010 lb/MMBtu. These revisions will ease the transition to new, as well as existing, application of PM CEMS. While no one desires lengthy periods of suboptimal emission control device operation, the Agency believes these modifications balance the need for accurate correlation information – and subsequent PM CEMS compliance readings – with short duration periods of higher fPM emissions, especially since the results of these periods when combined with emissions from normal operation are not expected to exceed the 30-boiler operating day rolling averages. Finally, the Agency's review of a subset of initial correlation testing, RRAs, and RCAs from 36 EGUs with PM CEMS shows that passing rates using these revised criteria appear to be within expected performance.

**Comment 10:** Commenters noted that in the Federal Register notice, the EPA mentions meeting with commenters to discuss cost estimates for equipment and installation of PM CEMS and

attributes numbers to both. Commenters suggested that there are more nuances in arriving at cost estimates, such as whether lower-cost paths or higher-end paths are taken, etc., and also observed that the EPA does not state explicitly if the cost of a PM CEMS was included in estimates for compliance costs of individual plants. Commenters noted that Jim Staudt's report (cited in the RTR Proposal and entered in the docket) quoted an estimated installed cost of $250,000 for PM CEMS. However, the costs listed for CEMS do not include costs for the annual Relative Response Audit or the 3-year (minimum) RCA required when utilizing PM CEMS as a compliance indicator. The commenters' current assessment is that this number is now dated and that a more reasonable assumption is an updated estimated installation cost of $350,000 for PM CEMS and they asserted that this increased cost can be attributed to ongoing supply chain challenges, requirements for specialized installation and significantly higher cost of project management labor. They concluded that this higher cost further supports not requiring units that fall in the Permanent Cessation category to install CEMS prior to their imminent retirement.

Commenters stated that there are some utilities that have installed PM CEMS for other reasons such as requirements in NSR consent decrees to monitor PM emissions. Commenters therefore recommend that the 2023 Proposal continue to provide sources the choice of determining compliance with the PM standards either through quarterly testing or use of CEMS.

**Response 10:** The Agency disagrees with the commenters' suggestions that the values supplied by other commenters lack nuance or are unclear. The Agency sought comments from all interested parties and, as described in the *Revised Estimated Non-Beta Gauge PM CEMS and Filterable PM Testing Costs*, available in the docket, the EPA calculated average costs for PM CEMS and quarterly testing from values submitted by commenters in response to the proposal's solicitation. While the average EUAC for PM CEMS exceeds the average estimated annual cost of quarterly Method 5I emission testing, the benefits associated with PM CEMS use, such as providing continuous emissions data to EGU owners or operators, regulators, or nearby community members, are not included with commenters' estimated values. As a reminder, the EPA is not obligated to choose the most cost-efficient manner for compliance demonstrations, even though cost can be an important consideration. Consistent with the discussion contained in 88 FR 24872, the Agency finds the transparency and ability to detect and correct potential control or operational problems quickly, makes PM CEMS the best choice for this rule's compliance monitoring. Even though core inflation is returning to pre-COVID levels and supply chain issues are diminishing, the Agency believes that to the extent prices are higher today, such increases occur across the board for goods and services and the Agency sees no specific distinctions for PM CEMS equipment. Finally, to the extent that consent decrees have PM CEMS or testing requirements other than those contained in this rule, the Agency recommends EGU owners or operators seek to modify such decrees so that sources are subject to one set of equivalent or most stringent requirements; should EGU owners or operators choose not to seek modification or if modification should prove not to be appropriate, then EGU owners or operators would need to meet the requirements of the consent decrees and the rule separately.

# CHAPTER 4

## 4. Review of the Hg Emission Standards

### 4.1 Overview of Hg Emissions from Combustion of Coal

**Comment 1:** Commenters stated that the experience in the jurisdictions of the Attorneys General and Local Governments confirms that stringent limits on power-plant Hg emissions can be readily achieved at lower-than-predicted costs and thus should be adopted nationally through CAA section 112(d)(6). They said that to address widespread Hg contamination of state waterbodies, at least fourteen states have for years enforced state-based limits on power-plant Hg emissions, and nearly every one of those states has imposed a more stringent emissions limit than the proposed standards. The commenters said that these lower emissions limits have driven significant and meaningful Hg emission reductions, which have proven to be both achievable and cost-effective.

Commenters supported the proposal and said that despite significant reductions in power-plant emissions of Hg and other HAP since 2012, emissions from coal-fired power plants continue to impact their most vulnerable residents and contribute to Hg contamination of natural resources.

Commenters stated that as detailed in the 2022 States Comments, coal-fired units have capably complied with the existing standards and have done so at significantly lower cost than the EPA initially projected. They stated that this is due in part to improvements and cost reductions in pollution controls, including the ACI technology used to control Hg and similarly, coal-fired power plants have been able to achieve state-law emissions limits at reasonable cost, even where they are more stringent than the current standards.

Commenters referenced a recently completed analysis by Andover Technology Partners on the feasibility and costs of complying with lower emission limits, which found "the potential for compliance with lower PM, Hg, and HCl emission standards than in the proposed rule (https://www.andovertechnology.com/wp-content/uploads/2023/06/C_23_CAELP_Final.pdf.)." Andover Technology Partners found that lower Hg emission limits are achievable for both lignite (low rank) and non-lignite (not low rank) coal units and that significant reductions in HCl emissions are also achievable. The commenters stated that the EPA should consider this new information and determine whether additional Hg limits for non-lignite coal-firing units and acid gas limits are merited. They argued that if the EPA finds that additional Hg or acid gas limits are merited, the Agency should propose them in a future action.

**Response 1:** The EPA acknowledges and thanks the commenters for providing these comments. We have discussed the rationale for the final emission standards for lignite-fired EGU in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category." The EPA will continue to review emission standards and other requirements as part of routine CAA section 112(d)(6) technology reviews, which are required by statute to be conducted at least every 8 years.

**Comment 2:** Commenters stated that the EPA notes that Minnesota has adopted Hg reduction standards that go beyond the 2012 MATS Final Rule in the reduction target and is seeking information about the cost of compliance with a more restrictive standard. (88 FR 24879). They said that Minnesota Rule 7011.0561 establishes Hg emission controls that are more stringent than the current MATS rules and that by January 1, 2018, owners, or operators of a coal-fired EGU in Minnesota with a nameplate electricity generation capacity greater than 100 MW were required to control Hg such that at least 90% of the Hg present in the fuel is captured and not emitted or demonstrate that the unit emits no more than 0.8 lb Hg per TBtu. The commenters said that Minnesota utilities have opted to comply with the emissions rate form of the standard primarily because of their use of Hg CEMs. They said that emissions data is required by Minn. R. 7011.0561 subp. 6.J. to be reduced to 30-day averages for comparison to this standard.

**Response 2:** The EPA acknowledges and thanks the commenters for providing these comments. The EPA did not propose to change the Hg emission standard for affected sources firing non-lignite coals (such as the coal-fired EGUs in Minnesota that fire primarily subbituminous coal). We have discussed the rationale for the final emission standards in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category." The EPA will continue to review emission standards and other requirements as part of routine CAA section 112(d)(6) technology reviews, which are required by statute to be conducted at least every 8 years.

## 4.2 Hg Emission Reductions Since Promulgation of the 2012 MATS Final Rule

### 4.2.1 Hg Emissions From Coal-Fired EGUs in 2021

**Comment 1:** Commenters stated that the MATS rule currently requires a less stringent Hg emission standard for lignite-burning plants than is required for other coal-fired plants owing to earlier questions of the performance and cost effectiveness of controls on lignite-burning plants. As a result, lignite-burning plants are emitting "beyond their weight." The 2023 Proposal indicates that 16 of the top 20 Hg-emitting electric power plants use lignite as a fuel. Taken as a whole, the 2023 Proposal states that in 2021 lignite burning plants emitted almost 30% of the Hg from the power generating sector while producing only 7% of the country's electricity.

Commenters stated that the [2012] MATS rule successfully reduced emissions of Hg by coal- and oil-fired electric power plants. As a result of MATS and other changes in the industry, emissions of Hg from the electricity-generating industry, once the largest anthropogenic source of Hg emissions, have fallen from pre-MATS levels of 29 tpy to less than 3 tpy in 2021.

**Response 1:** The EPA acknowledges and thanks the commenters for providing these comments. We agree that Hg emissions from coal- and oil-fired EGUs have dropped by 90+% since promulgation of the MATS rule in 2012 (as compared to pre-MATS emissions). We also agree that lignite-fired EGUs emit a disproportionate amount of Hg – emitting 30% of all Hg emissions from affected sources while generating 7% of megawatt-hr. We have discussed the rationale for the final emission standards for lignite-fired EGU in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 2:** Commenters stated that the EPA must revise the Hg limits to no higher than 0.15 lb/TBtu for not-low-rank coal units and no higher than 0.5 lb/TBtu for low-rank coal units based on developments in practices, processes, and control technologies. They stated that the 2021 Andover Technology Partners report notes advances in control technologies that support stronger Hg standards like more advanced activated carbons with higher capture at lower injection rates and carbons that are tolerant of flue gas species. The commenters said that these developments have made over 90% Hg capture possible under virtually any circumstances and other advances in fuel additives, scrubber operation, scrubber systems like Gore Technology, and scrubber additives provide additional ways to reduce Hg emissions, and further support stronger Hg limits for all coal plants.

**Response 2:** The EPA acknowledges and thanks the commenters for providing these comments. We have taken these comments and the referenced information into consideration when establishing the final emission standards. The Agency did not propose to revise the Hg emission standard for "not-low-rank coal units" (*i.e.,* those EGUs that are firing on a coal fuel other than lignite) in the 2023 Proposal (88 FR 24879). The EPA will continue to review emission standards and other requirements as part of routine CAA section 112(d)(6) technology reviews, which are required by statute to be conducted at least every 8 years. We have discussed the rationale for the final emission standards in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

### 4.2.2 Limited CAA Section 114 Request

**Comment 1:** Commenters stated that the dataset collected by the CAA section 114 request consisted of 17 units each submitting two, one-week periods of data and associated operational data preselected by the EPA. They said that seven of these units were in North Dakota, eight were in Texas, and two were in Mississippi and of the North Dakota units, only one reported burning only lignite coal, the rest reported burning primarily refined coal, and one reported burning no lignite coal. The commenters said that station reported co-firing 35.6% natural gas and 64.4% refined coal and the data was also similar in Texas and Mississippi where only three of 12 units reported using only lignite coal and five of the 12 reported using greater than 75% subbituminous coal (Table-7 in the 2023 Proposal). Commenters stated that if the EPA's intent was to assess lignite-fired units, then the units evaluated should burn lignite, not refined coal, subbituminous coal or natural gas.

**Response 1:** According to fuel use information supplied to EIA (on form 923), 13 of 22 EGUs that were designed (and permitted) to burn lignite utilized "refined coal" to some extent in 2021, as summarized in Table 7 in the proposal preamble (88 FR 24878). EIA form 923 does not specify the type of coal that is "refined" when reporting boiler or generator fuel use. For this technology review, the EPA has assumed that the facilities have utilized "refined lignite," as reported in fuel receipts on EIA form 923.

Regarding the commenters claim that, if the EPA's intent was to assess lignite-fired units, then the units evaluated should burn lignite, not refined coal, subbituminous coal or natural gas. The EPA intent was to evaluate the Hg emission control performance of units that are permitted to burn lignite (and thus are part of the subcategory that has been subject to an emission standard of

4.0 lb/TBtu). The use of "refined coal" or co-firing with other fuels such as natural gas or subbituminous coal are considered to be Hg control options for a unit with an emission standard of 4.0 lb/TBtu, which was based on the use of lignite as its fuel.

**Comment 2:** Commenters said they found it curious that the EPA requested information for only select time periods in the CAA section 114 request. They said that upon further study, it appears that the EPA hand-picked these time periods, possibly to showcase low and high Hg emissions ranges. Upon study of the Young Station's operational data for these time periods, it is highly likely that these ranges showcase the variability of Hg content in lignite instead different control scenarios. The commenters stated that for this reason, they specifically warned the EPA in the CAA section 114 response that the time periods requested are not representative of emissions achievable on a 30-day rolling basis. Nonetheless, the EPA relied on these data and operational information as representative.

Commenters reiterated notes from their CAA section 114 ICR response, stating that their Unit 1 and 2 Hg emissions and operational data for weeks 1 and 2 are not representative of emissions achievable on a 30-day rolling basis for the units, nor are the weeks comparable to one other. They said the significant differences between the two weeks are:

- Most importantly, lignite coal quality varied significantly, including variability of Hg concentrations. Coal quality between the two weeks differed based on our analysis of the sorbent and PAC applied as compared to the Hg emission rates, as discussed below.
- Unit 1 - week 1 and week 2 used different Hg control equipment and halogen manufacturers.
- Unit 2 - week 1 and week 2 used the CCS system, which is no longer operating and was replaced by the modified NALCO system in November 2021.
- Unit operation varied. Week 1 included low-load operation conditions, which were not present during week 2. Hg emissions are reported as higher at lower loads.

Commenters stated that the data provided in the response to the CAA section 114 requests was insufficient to inform the EPA of any meaningful Hg information. This data would not be scientifically useful for setting a new Hg standard and the EPA requested information which sources did not have (*e.g.*, inlet Hg monitoring data).

Commenters stated that in addition, a limited 7-day data set does not account for fuel quality variability. While commenters said they do not test inlet Hg concentrations, they said they do have coal analysis of random samples taken from coal conveyor belt as the coal storage silos are filled. They said a maximum of six samples are collected daily and analyzed for proximate analysis and while these samples do not include Hg concentrations, but do show considerable variation in ash content, Btu value, and other constituents.

Commenters said that units are unique and referred to data from two EGUs identified as "Unit 1" and "Unit 2". They said operators utilize the same Hg control strategies for the two units. However, Unit 2 consistently has higher Hg emissions in comparison to Unit 1. The differences in Hg emissions are impacted by operating characteristics of the units, such as varying load

71

levels/load swings, unit size, wet scrubber design differences, and ductwork configuration. They said inconsistent hourly emissions and Hg system data illustrate these differences and should assist the EPA in understanding unit variability in general and with respect to Unit 1 and Unit 2 operations. For this reason, the responsive weekly data cannot reliably or reasonably support changes in permitted emission rates or permit conditions because this limited data set is not representative of current operations, fuel variability, and uncertainty in fuel quality. They said these factors all contribute to differences in emission characteristics. The commenters stated that even though week 1 and week 2 are not comparable weeks, commenters reviewed the data regarding PAC used and sorbent used in their possession. Week 1 reported lower Hg emissions in comparison to week 2 values. However, commenters did not inject any PAC during week 1. They injected 1.9 ppm of sorbent. Commenters believe that CCS did not inject more than 6 ppm of halogen, although no documentation of that quantity is available. Lower Hg emissions were likely the result of a weekly coal batch that was lower in Hg content during week 1. In comparison, commenters injected PAC and halogen during week 2. Hg emissions were higher, likely due to low load operation during that week and suspected coal quality variations.

Commenters further stated that conversely, Unit 2 week 1 PAC was injected at a higher rate than week 2. Week 1 had lower $CO_2$ during most of this 7-day period and yet was able to maintain a Hg emission rate around 2.17 lb/TBtu, while Hg emissions during week 2 were around 3.0 lb/TBtu with normal-high load operation and $CO_2$ concentrations averaging 10%. Commenters attributed the inability to correlate the Hg emissions with the control system data to variability of coal quality and lack of information regarding operation of the halogen system during the pre-November 2021 operating period. In other words, the lack of Hg control information for Unit 2 during week 1 prevents commenters from drawing a conclusion regarding the variables that impacted Hg emissions that week.

**Response 2:** The EPA did not rely exclusively (or even mostly) on information obtained from the CAA section 114 information request. The EPA relied on a variety of data sources in developing the proposed and final Hg emission standards for lignite-fired EGUs. These data included historical coal analyses, the results from demonstration tests (including those conducted by DOE and others), publicly available Hg emissions data that is reported to the EPA for compliance demonstration, and data and information obtained from owners/operators of lignite-fired EGUs from EPA's limited CAA section 114 information survey. We have discussed the rationale for the final emission standards – including the data and data sources – in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 3:** Commenters stated that the EPA did not include data for the Coyote Station in the limited Information Collection Request, even though Coyote Station is the only North Dakota lignite-fired EGU that utilizes halogenated Powdered Activated Carbon sorbent to exclusively control Hg, the very type of sorbent that the EPA suggests in its proposal ought to be used by lignite-fired EGUs to lower their Hg emissions to the proposed level.

**Response 3:** The EPA relied on a variety of data sources in developing proposed Hg emission standards for EGUs burning lignite. This included historical coal analyses, results from demonstration tests (including those conducted by DOE and others), publicly available Hg

emissions data, and data and information obtained from owners/operators of lignite-fired EGUs from EPA's CAA section 114 information survey. The EPA conducted a limited (*i.e.*, from 9 or fewer entities) CAA section 114 information survey and selected the entities for the survey to maximize amount of data. The EPA was unaware of the specific control technologies used at the various sources (which was one of the objectives of the survey) and, therefore did not know that Coyote Station is the only North Dakota lignite-fired EGU utilizing exclusively halogen PAC to control Hg. We have discussed the rationale for the final emission standards – including the data and data sources – in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 4:** Commenters argued that against their direction, the EPA inappropriately used commenters' data in the 2023 Technology Review memo, without any caveats, to manufacture a Hg baseline. They said the Young Station data are not reliable for use in the EPA's database and the EPA cannot engage in data selectivity to arrive at a skewed end result. They said the EPA should reconsider the assumptions and data used in this analysis and develop a reasonable baseline and evaluation of the feasibility of lignite units to achieve a lower Hg limit.

Commenters stated that the EPA disregarded information provided by commenters regarding the actual Hg content of the lignite fired in its units and instead determined that it was appropriate to use an assumed Hg content. Commenters stated that the EPA provided no explanation for why site-specific information that it was provided was not used in the EPA's analysis. Commenters stated that the reliance on assumptions over available, site-specific data has resulted in significant flaws in the EPA's assessment of current control efficiencies of lignite-fired EGUs, the ability of these units to achieve a significantly lower Hg limit, and the costs associated with this new limit.

**Response 4:** The EPA relied on a variety of data sources in developing proposed Hg emission standards for EGUs burning lignite. The EPA did not rely exclusively on information collected in the limited CAA section 114 survey. The EPA relied on historical coal analyses, results from demonstration tests (including those conducted by DOE and others), and publicly available Hg emissions data, to supplement the data and information obtained from owners/operators of lignite-fired EGUs from EPA's CAA section 114 information survey. We have discussed the rationale for the final emission standards – including the data and data sources – in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 5:** Commenters stated that the EPA's inclusion of Limestone Units 1 and 2 and Martin Lake Units 1, 2 and 3 in its lignite-fired EGU analysis is inappropriate. These units had begun or had already completed the process of transitioning to non-lignite fuel prior to the 2023 Proposal. The EPA was aware of these transitions and did not even issue a CAA section 114 request for Limestone Units 1 and 2. During transition, these units are burning a different mix of fuel, and upon completion of these units' transition, they will no longer be part of the lignite EGU subcategory at all. Commenters stated that as a result, these sources cannot be reflective of any Hg controls that may have developed within the lignite subcategory, and the EPA must re-perform its analysis after removing these units.

**Response 5:** The EPA relied on a variety of data sources in developing proposed Hg emission standards for EGUs burning lignite. The EPA did not rely exclusively on information collected in the limited CAA section 114 survey. In their response to the EPA's CAA section 114 survey, the owner/operator of the Martin Lake EGUs indicated that they have "historically fired a blend of lignite and western coal" and did not state that they were in the process of transitioning to non-lignite fuel. In late 2023, Limestone Units 1 & 2 were still permitted as lignite-fired EGUs and subject to a Hg emission limit of 4.0 lb/TBtu, despite firing on nearly 100% non-lignite fuel. These sources are, therefore, still part of the subcategory. In these cases, the use of non-lignite fuel must be viewed as a Hg emission control strategy – since CAA section 112(d)(2) states that "[e]missions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which—(A)reduce the volume of, or eliminate emissions of, such pollutants through process changes, **substitution of materials** or other modifications," [emphasis added]. In a related context, in *U.S. Sugar Corp. v. EPA*, the D.C. Circuit held that the EPA could not exclude unusually high performing units within a subcategory from the Agency's determination of MACT floor standards for a subcategory pursuant to CAA section 112(d)(3). 830 F.3d 579, 631-32 (D.C. Cir. 2016) (finding *"an unusually high-performing source should be considered[,]" in determining MACT floors for a subcategory, and that "its performance suggests that a more stringent MACT standard is appropriate."*). While the technology review at issue here is a separate and distinct analysis from the MACT floor setting requirements at issue in *U.S. Sugar v. EPA*, similarly here the EPA finds it is appropriate to consider emissions from any units that are permitted to burn lignite and are therefore subject to the prior Hg emission standard of 4.0 lb/TBtu and are part of the lignite-fired EGU subcategory, for the purposes of determining whether more stringent standards are appropriate under a technology review.

### 4.3 CAA Section 112(d)(6) Technology Review of the Hg Standards

**Comment 1:** Commenters stated that the technology-based review conducted under CAA section 112(d)(6) need not account for any information learned during the residual risk review under CAA section 112(f)(2), unless that information pertains to the statutory factors relevant to the CAA section 112(d)(6) review, such as the cost of achieving maximal emission reductions. Nor does CAA section 112(d)(6) require the EPA to find unacceptable risk or the absence of an ample margin of safety as a prerequisite to determining that it is necessary to strengthen standards. Where achievable at reasonable cost, the EPA must secure the deepest HAP reductions possible, apart from any identified health or environmental impacts.

**Response 1:** The EPA agrees with commenters that the CAA section 112(d)(6) technology review and CAA section 112(f)(2) residual risk review are distinct analyses. *See Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015). As the EPA discusses elsewhere

throughout the record for this rulemaking, cost is one of several factors the EPA considers in determining whether updated standards are necessary under the technology review.

### 4.3.1 Review of the Hg Emission Standard for Non-Lignite-Fired EGUs

**Comment 1:** Commenters expressed agreement with the EPA's proposal to retain the Hg emission standard of 1.2 lb/TBtu for non-lignite-fired EGU units. The EPA based this decision primarily on the fact it lacks detailed information about control configurations and efficiencies. They said the Agency also did not identify any developments in practices, processes, and control technologies that would justify revising the Hg standard for non-lignite-fired EGUs under CAA section 112(d)(6).

Commenters stated that available Hg emissions do not provide a basis for revising the current Hg standard. They said the EPA reports bituminous coal-fired and subbituminous coal-fired EGUs achieve an average annual Hg rate of 0.4 lb/TBtu and 0.6 lb/TBtu, respectively. The commenters said, however, compliance under MATS is based on neither an average rate among EGUs, nor on an annual rate, rather compliance is based on 30-day rolling rate for each EGU. They said, accordingly, the Agency's data about average annual performance is not relevant to the standard at issue. They argued that these data do not account for the variability in Hg emission rates between EGUs and on day-to-day and month-to-month basis for each EGU. The commenters stated that variability is driven by myriad factors, and strongly supported retaining the current Hg standard for non-lignite coal-fired EGUs.

Commenters stated that their attached NRECA technical evaluation contains data that support retaining the current Hg standard. Indeed, even looking at annual average rates, analyses of the 2018 data show that the sum of the annual average with the standard deviation, which is the range of variability in the data, approaches the current 1.2 lb/TBtu standard. In addition, commenters offered the following observations that highlight the vast variability in factors that affect Hg emissions – first, the variability in Hg content of non-lignite coals, for both bituminous and subbituminous coals, is considerably broader than the EPA suggests in the 2023 Proposed Rule.

Commenters stated that secondly, the variability in process conditions for Hg removal (*i.e.,* Hg content in coal, sorbent composition, sorbent injection rates, co-benefits, and re-emission) is also broad and does not support further lowering Hg standard for non-lignite-fired EGUs. Sorbent injection plays a critical role in removing Hg emissions from bituminous and subbituminous coal-fired EGUs. They said that the EPA correctly points out that increasing sorbent injection rates generally increases Hg removal but with diminishing returns as more sorbent is added. For example, research tests at Ameren's Labadie Unit 3 explored the effectiveness of conventional activated carbon, brominated active carbon, and conventional activated carbon for Powder River Basin subbituminous coal. Results show that increasing sorbent rates of any of the three materials could only reach a control maximum of 90% removal. Consequently, it is not at all assured that an EGU that relies on sorbent injection for Hg control could increase its Hg removal efficiency simply by increasing the amount of sorbent used.

Commenters stated that the co-benefits of SCRs and FGDs are highly variable. They said they are unaware of actions that could be taken to improve the co-benefit removal efficiency of

particular equipment installed at a particular EGU. Emission control efficiencies are further potentially undermined by re-emission of Hg from wet FGD. Uncaptured Hg in wet FGD may be re-released in solution during the blowdown stage, precipitated and released as an unintended byproduct, or reduced from an oxidized state and re-enter the flue gas. Upsets in wet FGD can also reduce the collection efficiency and re-emit Hg emissions.

Commenters stated that Hg control efficiencies are further impacted by variability in electricity loads. They said that an in-plant study, for example, found that loss of oxidation/reduction potential control, known to vary over load cycles, results in Hg re-emissions. They argued that little, if anything, can be done to mitigate control efficiency variability due to load variability.

Commenters acknowledged that the EPA has solicited comments on its proposed decision not to revise the Hg standard for non-lignite-fired EGUs and requested information that could possibly support a revised standard. Commenters are unaware and do not believe such information exists. In any event, if additional information submitted to EPA leads the Agency to consider a revised Hg standard for non-lignite coal-fired EGUs, commenters respectfully suggested (and requested) that the EPA must first propose such a revised standard in a Supplemental Notice of Proposed Rulemaking or a separate Notice of Proposed Rulemaking and take comment on such a proposed standard before adopting it.

**Response 1:** The Agency did not propose to revise the Hg emission standard for "not-low-rank coal units" (*i.e.*, those EGUs that are firing on a coal fuel other than lignite) in the 2023 proposal (88 FR 24879). The EPA will continue to review emission standards and other requirements as part of routine CAA section 112(d)(6) technology reviews, which are required by statute to be conducted at least every 8 years. If, in the technology review, the Agency determines that modification of any emission standards is warranted, it will first propose revision to the standards and solicit comment on those proposed revisions.

**Comment 2:** Commenters urged the EPA to adopt an even more stringent standard than the existing 1.2 lb/TBtu standard for non-lignite-fired power plants, similar to the lower emissions limits that many states have been implementing for years. Commenters noted that state experience demonstrates that lower emissions limits— in particular 0.6 lb/TBtu—are being met using proven and affordable control technologies. Data from units consuming not-low-rank coal (*i.e.,* non-lignite) shows that fully 80% of all such units are capable of achieving 90% Hg emissions capture or better and emissions rates of 0.65 lb/TBtu or less. Commenters stated that if 80% of such units are capable of achieving—and indeed exceeding—0.65 lb/TBtu, it is plainly a technologically feasible standard. Commenters recognized the EPA's concern about assessing the costs of meeting such a lower Hg standard without having collected CAA section 114 data on the type and injection rates of sorbents and chemical additives. Commenters stated that the EPA should be able to evaluate those costs using other available data sources. Commenters thus urged the EPA to adopt a more stringent standard for non-lignite units of at least 0.65 lb/TBtu pursuant to its CAA section 112(d)(6) review.

Commenters stated that a Hg standard of 0.3 lb/TBtu could be complied with at a modest cost to most units, and no cost for some units. The cost would not exceed 1 mill/kWh and would likely be much less. Units with FFs would have very little, if any, cost increase.

Commenters stated that EGUs burning higher rank coals (non-lignite coals) may have opportunities to reduce Hg emissions through use of a SCR system installed primarily for $NO_x$ control (*e.g.,* under the EPA's "Good Neighbor Plan"). While these systems do not directly capture Hg, they can, under the right conditions, enhance the oxidation of $Hg^0$ in the flue gas for increased Hg removal in a downstream PM control device or in a wet FGD scrubber. Commenters recommended that the EPA should lower the standard to 0.3-0.7 lb Hg/TBtu for higher rank coals.

**Response 2:** The Agency did not propose to revise the Hg emission standard for "not-low-rank coal units" (*i.e.*, those EGUs that are firing on a coal fuel other than lignite) in the 2023 proposal (88 FR 24879). The EPA will continue to review emission standards and other requirements as part of routine CAA section 112(d)(6) technology reviews, which are required by statute to be conducted at least every 8 years. If, in the technology review, the Agency determines that modification of any emission standards is warranted, it will first propose revision to the standards and solicit comment on those proposed revisions.

**Comment 3:** Commenters stated that to be consistent with the EPA's obligation to consider maximum achievable HAP emission reduction and costs, the EPA should review the latest data to ensure the Agency is selecting the appropriate level of stringency for its standards.

**Response 3:** The EPA acknowledges and appreciates this comment.

### 4.3.2 Review of the Hg Emission Standard for Lignite-Fired EGUs

**Comment 1:** Commenters supported the EPA's proposed 1.2 lb/TBtu Hg emissions limit for lignite coal-fired units, which represents a starting point that can and should be revisited and strengthened as new compliance data becomes available. The proposed limit is the same Hg emissions limit that non-lignite-fired units already meet—and that many of those units regularly exceed. The commenters said that applying the experience of non-lignite units, the EPA correctly observes that available controls and methods of operation, especially ACI systems, will allow lignite-fired units to meet the same Hg standard that is being met by units firing on non-lignite coal supply and that the costs of doing so are reasonable. They said that the Agency appropriately relies on the beyond-the-floor costs from the 2012 MATS Final Rule, the injection rates reported in the CAA section 114 survey results, and the calculated cost effectiveness of using ACI controls. The commenters stated that the EPA has also used a conservative method of determining the cost of injecting non-brominated ACI, and, further, correctly recognizes that even with differences (and similarities) in feedstocks, lignite-fired units simply are not yet deploying any of the most effective control technologies that are already in use and proven at non-lignite-fired power plants. As the EPA notes, the projected cost of the revised lignite Hg standard, $8,703 per lb of Hg removed, is significantly lower than the cost it has previously found acceptable—both in calculating the existing Hg standards and in other rulemakings.

Commenters stated that given the experience of many jurisdictions in implementing more stringent Hg standards and the EPA's robust analysis in the 2023 Proposal, the determination that it is "necessary" under CAA section 112(d)(6) to reduce the emissions limit for lignite-fired units to 1.2 lb/TBtu is well-supported—especially since proven, cost-effective technology is so

readily available. Further, because that emissions limit is the existing standard for non-lignite sources, the EPA correctly applies the known cost effectiveness and usability of ACI and other technologies in non-lignite units to inform its decision to propose the same standard for lignite units. While the commenters supported the EPA's adoption of the proposed 1.2 lb/TBtu limit, commenters stated they would also support further Hg emission reductions by lignite units below that limit and encourage the EPA to collect information on those units' compliance with the proposed limit in order to support possible future strengthening of the standard.

**Response 1:** The EPA acknowledges and appreciates these comments.

**Comment 2:** Commenters found that the EPA's proposal to reduce the Hg limit for lignite-fired EGUs is well supported. Additionally, commenters recommended that the EPA consider a lower 1.0 lb/TBtu annual limit. They said that in comparison to the proposed limit, the lower limit would cut an additional 135 lb of Hg emissions annually, reducing the total emissions from these facilities to 675 lb/year.

Commenters stated that tighter emission limits for lignite-fired EGUs will result in Hg emission reductions across national park ecosystems impacted by lignite-fired EGU emission sources in North Dakota, Texas, and Mississippi. They said that using insects (dragonfly larvae) as indicators of Hg risk, their analysis finds that greater than three-fourths of the dragonfly Hg data across 15 national parks in relative proximity to the lignite-fired EGUs subject to MATS fall into the moderate or high (100-700 ng/g dw) impairment categories for potential Hg risk. Additionally, they said that an index of moderate impairment or higher suggests that Hg concentrations in top predator fish species may exceed the EPA benchmark for protection of human health, threatening them mandate to provide visitor enjoyment opportunities and keep resources unimpaired for future generations. The commenters said that Hg in fish data from parks near the lignite-fired EGUs, including Theodore Roosevelt (North Dakota), Voyageurs (Minnesota), and Big Thicket (Texas) National Parks, Buffalo National River (Arkansas), and Jean Lafitte National Historical Park and Preserve (Louisiana) illustrate the presence of Hg in fish in these parks. The commenters said that elevated fish Hg concentrations are particularly evident at Voyageurs and Big Thicket national parks.

Commenters cited reports for both Hg and non-Hg monitoring in national parks. Commenters presented Hg monitoring data in national parks that indicate more than two-thirds of dragonfly larvae across 135 national parks fall into the moderate or higher impairment categories. The commenters said that data on the top predator fish species may exceed the EPA benchmark for protection of human health a cited a study by Eagles-Smith et al. Commenters said that Justice 40 communities were disproportionately burdened by this legacy contaminant across the landscape. Commenters cited significant improvements in concentrations measured at national parks between 2011 and 2020 and attributed these improvements to MATS. Commenters said the National Parks Service is concerned by levels of Hg in fish that exceed human and wildlife health thresholds, and the deleterious effects Hg may be having in fish in several western national parks. Commenters said the strengthening of MATS would likely lessen the impact of this pollutant on ecological integrity and visitor experiences across the national park system.

**Response 2:** The EPA acknowledges and appreciates these comments. The EPA proposed (and is finalizing in this action) to revise the Hg emission standard for EGUs in the lignite-fired subcategory from an emission limit of 4.0 lb/TBtu to an emission limit of 1.2 lb/TBtu. However, the EPA has not proposed any revisions to the MATS emission standards under the CAA section 112(f)(2) risk review. Rather, the revisions were proposed in response to a CAA section 112(d)(6) technology review. CAA section 112(d)(6) requires that the EPA review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards at least every 8 years.

**Comment 3:** Commenters stated that according to the 2023 Technology Review memo, the EPA based its proposed change to the Hg emissions limits on information provided routinely to the EPA and to the EIA, information that the EPA solicited under CAA section 114, 42 U.S.C. 7414(a), in May 2021, and any "additional information was obtained from the EPA's NEEDS database." (2023 Technology Review memo at 18). Commenters stated that the EPA has multiple unsupported contentions and fails to cite some of its foundational contentions. For example, the EPA states that the information from the EIA and the CAA section 114 survey "showed developments that demonstrate that lignite-fired EGUs can achieve a Hg emission rate that is much lower than the current standard, and that there are cost-effective control technologies and methods of operation that are available to achieve a more stringent standard." 88 FR 24857. Commenters stated that the record shows that available information generally related to fuel consumption does not, by itself, show the new standard is achievable.

Commenters stated that while the EPA includes a summary of the CAA section 114 survey responses in Table 9 of the 2023 Technology Review memo, there are no citations to docket document identification numbers for the survey and responses or an explanation of the methodology of the CAA section 114 survey requests. For example, the EPA does not provide a comprehensive list of which lignite-fired EGUs were surveyed. Nor does the EPA provide an explanation of which lignite-fired EGUs it chose to survey. (2023 Technology Review memo at 13-14; 88 FR 24876: "EPA solicited information related to Hg emissions and Hg control technologies from certain lignite-fired EGUs to inform this CAA section 112(d)(6) technology review"). Commenters stated that the EPA does not explain why it supplemented the data from these "certain lignite-fired EGUs" with NEEDS data. *Id*.

**Response 3:** The EPA did not rely exclusively (or even mostly) on information obtained from the CAA section 114 information request. The EPA relied on a variety of data sources in developing the proposed Hg emission standards for EGUs burning lignite. This included historical coal analyses, results from demonstration tests (including those conducted by DOE and others), publicly available Hg emissions data, and data and information obtained from owners/operators of lignite-fired EGUs from EPA's limited CAA section 114 information survey. The cover letters, correspondence, and all submitted information for EPA's limited CAA section 114 were available in the rulemaking docket and are easily found using a simple keyword search. We have discussed the rationale for the final emission standards – including the data and data sources – in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 4:** Commenters expressed concern that the EPA is proposing a substantial reduction in the Hg emission standard based on inaccurate data and a flawed evaluation of the Hg control capabilities of lignite-fired EGUs. They said first, the EPA's CAA section 114 request was very limited considering the amount of data available and, in many cases, the EPA disregarded the very information that was submitted in the responses. The commenters said that certain units burning large percentages of subbituminous coal have transitioned or are in the process of transitioning to the non-lignite subcategory, and such units should have been removed from the EPA's evaluation. They said specifically, the EPA's evaluation — encompassing a review of 22 EGUs "that were designed to burn lignite utilized refined coal to some extent in 2021" (EPA Technical Memo, PDF p. 18) — contains major flaws, some of which are summarized below:

- The majority of these EGUs do not primarily burn all lignite coal. As denoted in Table 10 of the EPA's technical memo, the evaluation of 22 EGUs includes only four EGUs that burn 99.7% or more lignite coal, with the other 18 EGUs burning only 37.6% or less lignite coal.
- It is unclear whether the Hg emissions that the Agency reviewed for the 22 EGUs were from units operating at full or partial load.
- Rather than using actual sampled data of lignite Hg concentrations that had been provided in the CAA section 114 responses, the EPA used IPM data to assign inlet Hg concentrations to various lignite-fired EGUs.

**Response 4:** The EPA disagrees that the proposed changes are based on inaccurate data and a flawed evaluation of the Hg control capabilities of lignite-fired EGUs. We have discussed the rationale for the final emission standards – including the data and data sources – in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category." All EGUs examined for the proposal were permitted as lignite-fired units. To review that emission standard, the EPA evaluated the 2021 performance of lignite-fired EGUs (including those permitted to burn lignite but utilized significant amounts of subbituminous coal or natural gas in 2021). Many of the EGUs used "refined coal." Refined coal is typically produced by mixing proprietary additives to feedstock coal to help capture emissions when the coal is burned. EIA form 923 does not specify the rank of coal that is "refined" in boiler or generator fuel data. For the technology review, the EPA assumed that facilities reporting the use of refined coal have utilized "refined lignite," which was confirmed in EIA form 923 fuel receipts and costs and the EPA received no comments challenging that specific assumption. The Hg emission standards under MATS must be met based on a rolling 30-day rolling average and apply whether the affected source is operating at full or partial load. In any case, operational data for EGUs are available through the EPA's Clean Air Markets Program Data (CAMPD) at https://campd.epa.gov/. The EPA has also discussed adjustments to assumed coal Hg content elsewhere in this document, in the 2024 Technical Memo and in the preamble for this final action.

**Comment 5:** Commenters stated that the lignite units evaluated that are equipped with SCR are not representative of North Dakota lignite units. Although SCR has been demonstrated on the types of lignite found in other parts of the country, it is not in North Dakota. They said, in fact, North Dakota lignite differs substantially because it has a different chemical makeup that contains a much higher concentration of alkali metals (*e.g.,* sodium and potassium) that render

the catalyst ineffective and unable to operate for more than a short period of time, prohibiting any cost-effective application of SCR. The commenters further said the relatively high concentration of sodium in North Dakota lignite forms vapor, condenses, and then coats other particles, or it forms its own particles at a size range of 0.02-0.05 μm. As a vapor or as a very small particle, the sodium will reach the SCR and plug the pores of the catalyst, which is the key feature that allows for improved oxidation of other pollutants. The sodium also poisons the catalyst both inside the pores and on the surface, rendering the active component of the catalyst inactive.

**Response 5:** The EPA acknowledges this comment; however, the Agency did not propose to require the use of SCR on EGUs firing North Dakota lignite or on any other EGU in the April 2023 proposal.

**Comment 6:** Commenters stated that the EPA also does not address boiler design in the Technical Memo, despite that during the original rule development, boiler design had a large bearing on actual Hg emissions. To illustrate, the commenters said that the EPA explained that circulating fluidized bed boilers as compared to pulverized coal boilers had much lower emissions: [T]here are other EGUs in this subcategory that are circulating fluidized bed combustion units which do not meet the height-to-depth ratio parameters in the proposed rule, nor are they anything like the pulverized coal EGUs we initially identified as having the 3.82 height-to-depth ratio… they were particularly concerned about the circulating fluidized bed units because other circulating fluidized bed units are well represented among the best performing EGUs for Hg in the =8,300 Btu/lb subcategory, but the circulating fluidized bed units burning low rank virgin coal are not achieving the same levels of Hg emissions control. The commenter said including the best performing circulating fluidized bed units from the other subcategory in the low rank virgin coal subcategory would likely lead to a Hg standard as stringent as the standard for EGUs in the =8,300 Btu/lb subcategory because the circulating fluidized bed units from the other subcategory would be used to establish the floor.

**Response 6:** We did not address boiler design in the April 2023 proposal because, in the final MATS rule preamble (77 FR 9378-9), we explained that "we believed at proposal that the boiler size was the cause of the different Hg emissions characteristics that led us to propose subcategorization, but many commenters indicated that it was not the boiler size but the fact that the EGUs burned … low rank virgin coal … that causes the disparity in Hg emissions." And, we further noted that "[a]fter fully considering the available information, including the comments received, we have concluded that it is appropriate to continue to base the subcategory definitions, at least in part, on whether the EGUs were designed to burn and, in fact, did burn low rank virgin coal, but that it is not appropriate to continue to use the height-to-depth ratio criteria because that approach would potentially exclude EGUs we identified as having different Hg emission characteristics and include EGUs that did not have different emissions characteristics."

**Comment 7:** Commenters stated that in the calculation for 2021 Hg emissions (EPA's Table-8 in the 2023 Proposal), the EPA used a value of 7.76 lb/TBtu as the estimated inlet Hg value. Based on this value, the EPA calculated the necessary removal percentage to comply with a 1.2 lb/TBtu limit as 84.5%. Commenters believed this value is low based on Hg data obtained from the local mine which exclusively supplies lignite coal to the Antelope Valley and Leland Olds Stations.

They said that when considering all the drill core data available from the mine, the maximum value of Hg in the coal is 40.95 lb/TBtu. This value is over five times the value EPA used in its calculation of Table-8 in its preamble to the 2023 Proposal. Furthermore, the average value in the coal data is 11.33 lb/TBtu which is nearly 1.5 times the inlet value of 7.76 lb/TBtu that the EPA used. Based on the maximum value, the Antelope Valley Station and the Leland Olds Station would need to remove 97% of the Hg to reach a limit of 1.2 lb/TBtu. Similarly, at an inlet of 11.33 lb/TBtu the remove needed equals 89.4%. Commenters strongly requested that the EPA reevaluate the inlet Hg content of lignite fuels using actual data provided in the CAA section 114 responses.

**Response 7:** We have discussed the rationale for the final emission standards – including the data and data sources – in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category." The EPA has evaluated additional sources of information and has adjusted assumed Hg inlet concentrations for all sources.

**Comment 8:** Commenters stated that the EPA also generally claims to have reviewed "available literature and other studies and available information" to assert that there are developments in practice, process, or control technology that justify the 2023 Proposal (88 FR 24880). Commenters stated that this literature fails to adequately distinguish between lignite and subbituminous coals and further, unlike the 2012 MATS Final Rule, none of the reviewed materials were named, specified, or provided, making the alleged basis for the 2023 Proposal unavailable for public scrutiny, verification, or meaningful comment in violation of the APA. They argued that the only explicit information that the EPA shared was that one commenter had informed them that costs of compliance for end users has decreased over time "due to the many options that are available to control Hg emissions . . . and a robust industry of technology suppliers that drive innovation through internal research and development" and another commenter stated that "ACI2 systems operate more reliably, and users utilize technology to improve dispersion of sorbents in flue gas for better performance." (88 FR 24867; 24880). The commenters said that while the EPA provides document identification numbers (EPA-HQ-OAR-2018-0794-4940 and EPA-HQ-OAR-2018-0794-1171), these comments do not provide empirical evidence supporting these statements. Commenters stated that the 2023 Technology Review memo provides unsubstantiated statements that inhibit the EPA from providing a reasonable explanation for finding that there are technological developments.

Commenters stated that the EPA asserts that the 2020 Final Action did not consider developments in the cost and effectiveness of the proven control technologies and did not evaluate the current performance of emission reduction control equipment and strategies at existing MATS-affected EGUs to determine whether revising the MACT standards was warranted (2023 Technology Review memo at 2). They said, however, the 2020 RTR did consider the current performance of existing technology as it noted EGUs were in compliance. EPA-HQ-OAR-2018-0794-0015 (2018 Technology Review memo) at 10 ("This review identified no developments…in practices, processes, or control technologies for Hg that have been implemented in this source category since promulgation of the current MATS rule . . . Based on the effectiveness and proven reliability of these Hg control technologies, and the relatively short period of time (~six years) since the promulgation of the MATS rule, no

developments in practices, processes, or control technologies nor any new technologies or practices were identified."). The commenters stated, further, the 2018 Technology Review memo analyzed subbituminous and lignite coals in separate categories and recognized that while halogen (chlorine) capture was commonly used and appropriate for subbituminous coals, it was sparsely used for lignite coals. *Id*. at 9-10. Commenters asserted that the EPA has failed to provide a reasoned justification why the prior conclusions in the 2018 Technology Review memo should now be abandoned.

**Response 8:** We have discussed the rationale for the final emission standards – including the data and data sources – in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category." The EPA also notes that numerous reference were made to a report developed by Andover Technology Partners (https://www.andovertechnology.com/wp-content/uploads/2021/08/PM-and-Hg-Controls_CAELP_20210819.pdf ) in the preamble and in the 2023 Technical Memo (Docket ID No. EPA-HQ-OAR-2018-0794-5789). That report, which was available in the rulemaking docket and was cited by other commenters, is titled "Analysis of PM and Hg Emissions and Controls from Coal-Fired Power Plants" and contains much detail on advancements in Hg controls and other developments that would allow lignite-fired EGUs to meet a more stringent Hg emission limit. As discussed in section II.D of the final rule preamble, the 2020 Technology Review did not evaluate the current performance of emission reduction control equipment and strategies at existing lignite-fired EGUs. Nor did the 2020 Technology Review specifically address the discrepancy between Hg emitted from lignite-fired EGUs and non-lignite coal-fired EGUs or consider the improved performance of injected sorbents or chemical additives, or the development of $SO_3$-tolerant sorbents.

**Comment 9:** Commenters stated that the EPA improperly makes assumptions to reach its conclusion that the new Hg emissions limits are achievable. One final major assumption the EPA makes is that of feasibility. Commenters stated that none of the 22 lignite EGUs are currently in compliance with the proposed new Hg emissions limit. According to EIA's collected data on fuel use in 2021, there are 22 EGUs that were designed to burn lignite. 13 of the 22 EGUs were designed and used refined coal. EPA makes multiple assumptions: that these 13 EGUs used refined lignite, that the EGUs will continue to use refined lignite despite the stated intention to discontinue using refined coal after the tax credits end in 2021, that brominated ACI will yield the same predicted 90% control with refined lignite as with virgin lignite, and that the capture methods currently used can reasonably be transitioned to using brominated ACI. Again, the EPA states that while the Agency is "not proposing to mandate the use of any particular control technology" for lignite coal, it essentially admits that brominated ACI is the only feasible option for lignite coal EGUs (88 FR 24882). The commenter said, further, in concluding that brominated ACI is cost effective, the EPA admits it is using a Gulf Coast lignite EGU as its model and makes no attempt to determine whether the Gulf Coast lignite EGU is representative of other regional lignite-fired EGUs, such as North Dakota Fort Union EGUs that burn lignite coals with significantly different Hg and chlorine concentrations (2023 Technology review memo at 24-25).

**Response 9:** See section V.C of the preamble for the final rule. There the EPA notes that Twin Oaks units 1 & 2 – both firing Gulf Coast lignite (which has a higher Hg content than lignite

mined in North Dakota) has routinely demonstrated the ability to meet an emission limit of 1.2 lb/TBtu. The EPA also notes that, similar to many comments that were received on the 2023 Proposal suggesting that the proposed standard is unachievable, several commenters on the original MATS proposal argued, at that time, that the final Hg limit of 4.0 lb/TBtu for low rank (lignite) coal EGUs was "based on too little data" and was "technically and economically unattainable." (*See* 77 FR 9393).

The EPA assumed use of Gulf Coast lignite in the model plant calculation because the mean Hg content is higher than that of Fort Union lignite and thus should be more challenging to control. The EPA also does not "admit that brominated ACI is the only feasible option for lignite coal EGUs" and the Agency discusses the use of other technologies such as injection of chemical additives. However, even if use of brominated ACI was the only feasible option for lignite coal EGUs, that would not be a reason to not finalize the more stringent Hg emission standard. There is no requirement that the EPA identify more than one control technology to meet a final promulgated emission standard. The EPA does not mandate the use of any particular control technology. Rather, the EPA promulgates numerical emission standards (or, at times, work practice standards) and affected sources may meet the standard using a variety of control technologies or strategies.

**Comment 10:** Commenters stated that the EPA also overlooked key factors associated with lignite fuel. In asserting that the proposed 1.2 lb/TBtu limit could be achieved with additional activated carbon injection, they argued that the Agency failed to account for the impacts of the higher sulfur content of lignite coal as compared to subbituminous coal, and that such higher sulfur content leads to additional $SO_3$, which is known to negatively impact the effectiveness of activated carbon.

**Response 10:** The impact of coal sulfur content and $SO_3$ is discussed in section V.D of the preamble.

**Comment 11:** Commenters stated that neither the 2023 Technology Review memo nor the 2023 Proposal provide specific factual evidence to refute the 2020 Final Action or the 2018 Technology Review memo findings that there are no new developments in practice, processes, or control technologies for reduction of Hg emissions in coal-fired power plants. They said without providing the specific evidence that was allegedly considered, the EPA "determined that available controls and methods of operation will allow lignite-fired EGUs to meet the same Hg emission standard that is being met by EGUs firing on non-lignite coals, and the costs of doing so are reasonable." (88 FR 24880). Commenters argued that without that evidence and data, the EPA's alleged "determination" is arbitrary and capricious.

**Response 11:** The EPA did not rely exclusively (or even mostly) on information obtained from the CAA section 114 information request. The EPA relied on a variety of data sources in developing the proposed Hg emission standards for EGUs burning lignite. This included historical coal analyses, results from demonstration tests (including those conducted by DOE and others), publicly available Hg emissions data, and data and information obtained from owners/operators of lignite-fired EGUs from EPA's limited CAA section 114 information survey. We have discussed the rationale for the final emission standards – including the data and

data sources – in section V.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 12:** Commenters stated that CAA section 7412(d)(3)(A) requires the EPA to exclude from its minimum "achievability" analysis for existing sources those that "within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate applicable to the source category and prevailing at the time[.]" The commenters said, however, the EPA has not excluded any sources from its technical analysis of achievable rates on this basis and this results in a skewed analysis towards a lower "achievable" emissions standard using a method explicitly prohibited by the CAA. (5 U.S.C. 706(2): reviewing court shall hold unlawful and set aside agency actions that are "not in accordance with law" and "in excess of statutory [] limitations"); *Bethesda Health, Inc. v. Azar*, 389 F. Supp. 3d 32, 41 (D.D.C. 2019): setting aside as arbitrary and capricious agency action that contradicts its own regulations). Commenters stated that although this requirement is only expressly listed with respect to setting the initial MACT floor, it would be unreasonable and arbitrary to interpret requirements imposed under technology review not to be subject to the same requirement since the EPA could otherwise easily circumvent the statutory limit at will simply by adding such sources back to its achievability analysis under each successive technology review period. They said that in any case the EPA has not identified any rationale for exempting CAA section 112(d)(6) technology review determinations from this same constraint. The commenters stated that in accordance with the CAA, the EPA must determine what the LAER rate is for this category, and then exclude from its achievability analysis any sources that already meet the lower emissions limit contemplated in the 2023 Proposal.

**Response 12:** As the commenters noted the CAA section 112(d)(3)(A) requirement is only expressly listed with respect to setting the initial MACT floor. However, the EPA does not interpret this as required under the CAA section 112(d)(6) technology review and it has not been the Agency's prior practice.

## 4.4 Proposed Revision of the Hg Emission Standard for Lignite-Fired EGUs

### 4.4.1 Both Lignite and Subbituminous Coal Are Low Rank Coals With Low Halogen Content

**Comment 1:** Commenters stated that the 2023 Proposal assumes sorbent injection Hg removal observed with PRB (subbituminous) coals is achievable for lignite. They said that the EPA finds that increasing sorbent injection rate and adding halogens (to compensate for loss of refined coal) will be equivalently effective. The commenters argued that this assumption is incorrect.

Commenters stated that NRECA's Technical Analysis confirms that North Dakota lignite coals have a distinctly different composition as compared to PRB. The commenters said that one particularly relevant difference is sulfur content and said lignite flue gas causes measurable $SO_3$ in quantities that - as summarized by the EPA's contractor for IPM model inputs - reduce

the effectiveness of sorbent by 50% and in some cases present a barrier to 90% Hg removal. They said that the EPA's analysis must take this fact into consideration.

Commenters stated that in relying heavily on the performance of a single power plant that uses halogenated activated carbon injection to control Hg, the EPA's reasoning in the proposal amounts to the following:

> "For the 2012 MATS Final Rule, the EPA calculated beyond-the-floor costs for Hg controls by assuming injection of brominated activated carbon at a rate of 3.0 lb/MMacf for units with ESPs and injection rates of 2.0 lb/MMacf for units with baghouses (also known as FF). Yet, in responses to the CAA section 114 information survey, only one facility (Oak Grove) explicitly indicated use of brominated activated carbon. Oak Grove units #1 and #2 (both using FF for PM control) reported use of brominated activated carbon at an average injection rate of less than 0.5 lb/MMacf for operation at capacity factor greater than 70%. The Oak Grove units fired, in 2021, using mostly refined coal. That injection rate is considerably less than the 2.0 lb/MMacf assumed." (88 FR 24881)

Commenters stated that Oak Grove is not the only lignite-fired facility that utilizes halogenated activated carbon – Coyote uses it too, but the EPA did not examine data from Coyote. Commenters stated that Oak Grove is also not representative of most, if not all other, lignite-fired facilities. Oak Grove is a relatively new facility that began operation in 2009/2010 and is the only 100% lignite-fired EGU that utilizes SCR reduction for $NO_x$ control. They said, as the EPA correctly acknowledges, while a SCR system that has been installed for $NO_x$ control does not itself capture Hg, it can under the right conditions enhance the oxidation of $Hg^0$ in the flue gas. Commenters stated that SCR is not a demonstrated technology for North Dakota Lignite EGUs (and certainly not cost-effective for Hg control even if the EPA disagrees about the feasibility of SCR for lignite). They said, in addition, as the EPA acknowledges, Oak Grove applied an aqueous bromine salt to the coal in addition to the use of brominated activated carbon. The commenters asserted that there was no attempt by the EPA to evaluate the impact of this "coal refinement" technique nor does the EPA make any attempt to compare the Hg control effectiveness of the halogenated activated carbon at Oak Grove to that of PRB subbituminous coal-fired EGUs. They said putting aside the SCR and use of refined coal at Oak Grove, the average Hg emission rates of the two units at that plant at an ACI rate of about 0.5 lb/MMacf, according to the EPA, was 2.01 to 2.59 lb/TBtu. The commenter said that the average Hg emission rate for the Big Stone Plant, also equipped with an SCR and at a halogenated ACI rate of about 0.4 lb/MMacf (and even without using refined coal), was 0.5 lb/TBtu. They said, that is, the empirical data show PRB coal is so different from lignite that roughly the same ACI rates resulted in Hg emission rates at the lignite-fired Oak Grove EGUs four to five times larger than the Hg emission rates at the PRB subbituminous coal-fired Big Stone Plant. They concluded, clearly, controlling Hg from subbituminous coal-fired EGUs and lignite-fired EGUs is not the same.

Commenters stated that to highlight the real-world difference between the ability of lignite-fired and PRB-fired EGUs to control Hg, they created a table to show a comparison between their similarly configured Big Stone Plant and Coyote Station facilities. Additionally, they included figures showing rolling 30-boiler operating day average Hg emission rates and the daily average

ACI feed rates for Big Stone Plant and Coyote Station for years 2021-2022. Their table showed that Big Stone Plant (which is PRB-fired) and Coyote Station (which is North Dakota lignite-fired) are similarly configured plants that utilize the same halogenated ACI for Hg control. The commenters said, however, Coyote Station's average sorbent feed rate on a lb/MMacf basis is more than three times higher than Big Stone's, yet Coyote Station's average Hg emissions on a lb/TBtu basis are more than five times higher than Big Stone's.

Commenters stated that as a result of treating EGUs burning subbituminous coal as burning lignite coal, seven EGUs were considered "lignite-fired EGUs" in the EPA's analysis even though they use 0% lignite coal. They said this also includes at least one EGU that co-fires natural gas, which influences the Hg lb/TBtu values submitted.

Commenters also noted that a 90% Hg removal is required to meet 1.2 lb/TBtu for North Dakota lignite and this value exceeds the nominal 80% removal estimated by the EPA. They said that greater than 90% value is unlikely to be sustained over a longer period of time such as a 30-day rolling average basis. The commenters argued that the EPA must step away from equating PRB coal and lignite coal as these coals are not equivalent for Hg control purposes.

**Response 1:** The EPA has not equated PRB (subbituminous) coal and lignite and has not suggested that the coals are equivalent or that they are not distinct ranks of coal. However, the EPA has noted that subbituminous coal and lignite (both Fort Union and Gulf lignites) are MUCH more similar than subbituminous coal and bituminous coal. Yes, despite subbituminous and bituminous coals being quite different – with respect to their alkalinity, their Hg content, their halogen content, their heating value, their sulfur content, their moisture content, etc. … they are still subjected to the same Hg emission limit – 1.2 lb/TBtu. All types of coal – eastern and western bituminous coal, western subbituminous coal, anthracite, waste coal, coal refuse, etc. – all are quite different in many, many ways. But they are all subject to the same emission limit – 1.2 lb/TBtu. The fact that lignite has some characteristics that are unique is the reason that it is a separate class/rank of coal. However, as the EPA has discussed in the 2023 Proposal, in the 2023 and 2024 Tech Memos, and in the preamble for the final rule, many of the properties of lignite that challenge the control of Hg are shared by other coal types that are able to meet the 1.2 lb/TBtu emission limit.

**Comment 2:** Commenters stated that both lignite and PRB coal do contain less chlorine than bituminous coal, but other major differences in composition exist that the EPA does not recognize, such as the sulfur content and the alkalinity of inorganic matter. Commenters stated that the EPA's failure to recognize these differences manifests itself as assuming ACI effectiveness observed on subbituminous coal (specifically PRB) extends to lignite. Commenters included a figure showing the variability of sulfur content for eight North Dakota lignite mines as well as a figure showing the variability of fuel alkalinity compared to sulfur content for eight North Dakota mines – specifically, the ratio of calcium and sodium to sulfur – *i.e.,* the (calcium + sodium)/sulfur metric.

**Response 2:** The differences (and similarities) in composition and other properties of lignite and subbituminous coal (and other coals) are discussed the section V of the final preamble and in a supporting technical memorandum titled "1998 ICR Coal Data Analysis Summary of Findings."

All coal types have variable properties. All coal types have variable Hg content. Bituminous coals, in particular, have a wide range of properties as they are mined in a variety of regions in the U.S. This includes bituminous coal from the upper Appalachian region, the mid- and lower Appalachian regions, the interior states (*e.g.*, IL, IN, OH, *etc.*). The U.S. has also imported lower sulfur bituminous coals from Columbia. Because of their typically higher sulfur content, many bituminous coals produce relatively higher levels of $SO_3$ in the flue gas (… which can be enhanced further for sources with an installed SCR for $NO_x$ control). Yet, all of these coals – with a very wide range of compositions and properties – are all subject to the 1.2 lb/TBtu Hg emission standard.

**Comment 3:** Commenters stated that the EPA acknowledges that "the halogen content of the coal — especially chlorine — largely influences the oxidation state of Hg in the flue gas stream" (2023 Technology Review memo at 22), but then goes on to state that lignite and PRB coals should have similar Hg capture rates despite citing to the U.S. Geological Survey publication entitled "Mercury and Halogens in Coal—Their Role in Determining Mercury Emissions From Coal Combustion." The U.S. Geological Survey publication fails to distinguish between the chlorine contents of lignite and PRB coals (See USGS Publication at Figure 5), but acknowledges that PRB coals can have lower Hg concentrations than lignite coals and that Hg concentration depend on the geographic area from which the lignite and PRB coals are obtained.

**Response 3:** Both subbituminous coal and lignite have relatively lower natural halogen (and higher natural alkalinity) and need to add additional halogen to oxidize the $Hg^0$ vapor in the flue gas stream for effective capture.

### 4.4.2 The Hg Content of Fort Union Lignite and PRB Subbituminous Coal Are Similar

**Comment 1:** Commenters stated that the EPA's proposal to lower the Hg standard for lignite-fired EGUs ignores the complete chemical composition of lignite-coal and technical challenges in Hg control technologies for EGUs firing lignite coal. They argued that the Agency ignores the wide variability of Hg content, sulfur content, and alkalinity of inorganic matter in Fort Union (North Dakota) Lignite. The commenters stated that the EPA assumes an average Hg content for Fort Union lignite of up to 7.8 lb/TBtu and that assumption is not supported by any test data – EPA's analysis relies solely on the IPM assigned inlet Hg content value of 7.81 to derive an 85% Hg control rate to meet a 1.2 lb/TBtu standard.

Commenters stated that the average 2021 inlet Hg concentrations for the Oak Grove units were greater than 25 lb/TBtu, compared to the average inlet concentration of 5.5 lb/TBtu that the EPA assumes for subbituminous coal. They said that to achieve a 1.2 lb/TBtu Hg limit with an inlet concentration of 5.5 lb/TBtu, a source must achieve an approximately 78% control efficiency, whereas to meet that limit with a 25 lb/TBtu inlet concentration, a source must achieve a greater than 95% control efficiency. Commenters stated that the EPA must account for the stark difference in the inlet Hg concentrations as it assesses whether the same limit is appropriate for the different fuels. The EPA instead decides to focus on annual average Hg emission rates from lignite-fired EGUs in 2021. Commenters stated that a unit's annual average emission rate does not account for the fluctuations in stack emissions that occur when looking at a 30-day rolling

average—the averaging period for the standard here—and it also ignores the reductions and control efficiencies already achieved given the initial Hg content of the fuel.

Commenters stated that the EPA asserts in the preamble that "The Hg Content of [North Dakota] Fort Union Lignite and PRB Subbituminous Coal Are Similar." (88 FR 24881). They said that in support of this proposition, the EPA states:

> "As can be seen in Table 8 above, for the 2012 MATS Final Rule, the EPA estimated the Fort Union lignite-fired EGUs inlet Hg concentration at up to 7.8 lb/TBtu and estimated the inlet Hg concentration of subbituminous coal-fired EGUs at up to 8.65 lb/TBtu. These values are very similar to results from a published study that found the average Hg concentration of Fort Union lignite and PRB subbituminous coals to be very similar. The study found that the Fort Union lignite samples contained an average of 8.5 lb/TBtu and the PRB subbituminous coal samples contained an average of 7.5 lb/TBtu." (88 FR 24881)

Commenters stated that there is no information on PRB subbituminous coal Hg content in Table 8 of the preamble. Commenters suspected that the EPA instead meant to reference Table 7-6 of Chapter 7 of the IPM Documentation, which lists ranges of Hg content for various types of coal in the U.S. In particular, Table 7-6 does include an average Hg content of 8.65 lb/TBtu for "Medium Sulfur Subbituminous (SE)." They said, however, tracing back the designation of "Medium Sulfur Subbituminous (SE)" to Tables 7-4 and 7-1 of the IPM Documentation, the coal supply for that designation is not PRB coal at all; it is a coal from San Juan, New Mexico.

Commenters stated that in contrast, Wyoming PRB subbituminous coal, according to Table 7-6, has a substantially lower Hg content of 2.03 to 6.44 lb/TBtu. They said that compared to the North Dakota lignite data in the IPM documentation, the EPA's own data suggests that Wyoming PRB subbituminous coal has an inlet Hg concentration less than half of North Dakota lignite, again highlighting the difference in Hg content between the two types of coal.

Commenters included a figure illustrating how actual chemical composition tests for lignite from Fort Union mines in North Dakota show a substantial Hg content variability within each mine. Commenters stated that the data reported in the figure also show how high the Hg content of North Dakota lignite typically is: the 75th percentile of data from each lignite supplier significantly exceeds EPA's value of 7.8 lb/TBtu by a substantial margin. They said that for one North Dakota lignite mine, the 75th percentile Hg content is upwards of 18 lb/TBtu, more than double the EPA's assumption and based on these actual Hg content data for North Dakota lignite mines, achieving a 1.2 lb/TBtu requires an Hg removal rate of approximately 93-95% for unavoidable instances where lignite Hg content is at the 95th percentile of observed values. The commenters said that such high removal efficiencies cannot be achieved by sorbent injection and argued that they certainly cannot be achieved given the other chemical composition differences between lignite and PRB coals.

Commenters presented drill core data and indicated that there are many examples where two or three Hg samples were analyzed from the same core. They provided some examples of the variability in a table presented by the commenters where samples with the same drillhole ID are

from different seams of the same boring. They said that these samples were taken just feet apart from one another, which means it will be mined and hauled to the plant immediately for fuel. The commenters said that given the variability of the different seams, it's apparent that periods when inlet Hg is much higher than the 7.76 lb/TBtu the EPA claims in its calculations will occur and should the plant receive a slug of 32 lb/TBtu coal, that would require greater than 96% removal to maintain a limit or 1.2 lb/TBtu. Commenters stated that the EPA should acknowledge the wide variability in lignite coal and retain the lignite subcategory.

Commenters presented a figure showing Hg content and variability for eight North Dakota lignite mines compared to the fixed value of 7.7–7.8 lb/TBtu, assumed by the EPA as representing North Dakota lignite, as summarized in Table 11 of the 2023 Technology Review memo. The figure shows – with the exception of the Tavis seam – all mean values of Hg content exceed the EPA's assumed value that serves as the basis of the EPA's evaluation. The commenters said more notably, the 75th percentile value of Hg for each seam – slightly more than one standard deviation variance from the mean – in all cases significantly exceeds the value assumed by the EPA. Commenters stated that of note is that the variability of Hg depicted in their figure is not necessarily observed only over extended periods of time – such as months or quarters – it can be witnessed over period of days or weeks. This is attributable to the sharp contrast in Hg content of seams that are geographically proximate and thus are mined within an abbreviated time period. Commenters provide a table showing that achieving a 1.2 lb/TBtu requires an Hg removal rate of approximately 93-95% for unavoidable instances where coal Hg content is at the 95th percentile of observed value. They said that the approximate 93-95% Hg removal requirements well exceed the 85% Hg removal based on the IPM-assigned Hg content.

Commenters presented a physical map showing the location of "boreholes" in a lignite field with imbedded text describing the Hg content as ppm. They said that these example boreholes– separated by typically 660 feet–and the factor of 3 to 6 variation of Hg content present a meaningful visualization of Hg variability in a lignite mine, and the consequences for the delivered fuel.

**Response 1:** For this final rule, the EPA re-evaluated coal data from the 1998 ICR data (as explained in great detail in the preamble and in a supporting technical memorandum titled "1998 ICR Coal Data Analysis Summary of Findings" available in the rulemaking docket. Specifically, the EPA evaluated the coal Hg data to characterize the Hg content of lignite mined in North Dakota, Texas, and Mississippi and to characterize by seam and by coal delivered to a specific plant. The results are presented as a range of Hg content of the lignites as well as the mean and median Hg content. The EPA also compared the fuel characteristics of lignites mined in North Dakota, Texas, and Mississippi against coals mined in Wyoming (subbituminous coal), Pennsylvania (mostly upper Appalachian bituminous coal), and Kentucky (mostly lower Appalachian bituminous coal). The Agency also included in the re-evaluation, coal analyses that were submitted in public comments by North American Coal (NA Coal). In addition to the Hg content, the analysis included the heating value and the sulfur, chlorine, and ash content for each coal that is characterized.

**Comment 2:** Commenters stated that the 2023 Proposal will create drastic consequences for as reducing the lignite emissions standards to levels of other coal ranks effectively eliminates the

lignite sub-category. They said that the EPA has well documented support from the original rule for lignite as a subcategory. Commenters encouraged the EPA to review the original documentation and, at a minimum, reaffirm the lignite category at the emissions standards as they currently exist. They said that the EPA does not have the scientific justification to support the 2023 Proposal's emission standards. They said further that in some cases, the EPA decided to rely on information from nearly 30 years ago versus collecting new information or even using the information obtained during the original rule development: "EPA considered the Utility Study, the Mercury Study, the NAS Study, and certain additional information, including information about Hg emissions from coal-fired EGU s that EPA obtained pursuant to an ICR under the authority of section 114 of the CAA. 65 FR 79826-27". 76 FR 24976, 24984.4 42 U.S.C. section 7412(d)(6).

Commenters stated that the EPA presented a body of evidence in the original 2011 Proposal and 2012 MATS Final Rule in support of the lignite category, for example:

> "For Hg emissions from coal-fired units, we have determined that different emission limits for the two subcategories are warranted. There were no EGUs designed to burn a non-agglomerating virgin coal having a calorific value (moist, mineral matter free basis) of 19,305 kJ/kg (8,300 Btu/lb) or less in an EGU with a height-to-depth ratio of 3.82 or greater among the top performing 12% of sources for Hg emissions, indicating a difference in the emissions for this HAP from these types of units. The boiler of a coal-fired EGU designed to burn coal with that heat value is bigger than a boiler designed to burn coals with higher heat values to account for the larger volume of coal that must be combusted to generate the desired level of electricity. Because the emissions of Hg are different between these two subcategories, we are proposing to establish different Hg emission limits for the two coal-fired subcategories. For all other HAP from these two subcategories of coal-fired units, the data did not show any difference in the level of the HAP emissions and, therefore, we have determined that it is not reasonable to establish separate emissions limits for the other HAP." 76 FR 25037.

Commenters said that they agree with the EPA's assessment in the 2012 MATS Final Rule and that none of this information has changed. They said however, the EPA now claims to have determined, from a 1994 published study, that the 20 Hg content of North Dakota lignite and PRB subbituminous coal are similar and uses this as rationale to refute the credible information utilized in the 2012 MATS Final Rule. Commenters reviewed the 1994 published study and believe the EPA is egregiously misrepresenting (or ignoring) the conclusions reached in the study. They said the 1994 published study states that these results demonstrate the importance of using up-to-date information when assessing emissions at electric utilities or 21 other sources. Since the EPA relied on this 1994 paper to conclude that North Dakota lignite is comparable to PRB subbituminous coal, the Agency should heed the advice of the authors and use up-to-date information instead of a study from nearly 30 years ago. The commenters stated, further, this 1994 data was also available at the time of the 2011 Proposal but did not sway the final EPA decision that lignite was, in fact, "different". The commenters said that based on the lack of new scientific data, this appears to show that the EPA is seeking out and selectively choosing data to support its prepackaged conclusion to lower the lignite Hg standard. They argued that if the EPA was interested in better understanding the Hg concentrations and how much they vary per coal

seam and per coal mine, it would have worked with commenters and the North Dakota lignite EGU industry to obtain this information.

Commenters noted that as stated throughout the 2011 Proposal and 2012 MATS Final Rule, the EPA recognized the importance of up-to-date data in determining Hg emissions limits, which is why much of the 2010 ICR data confirmed the subcategorization for Hg (and not the other pollutants). Commenters requested that the EPA explain its decision to now revert to an older 1994 published study to "change" the determination from the 2010 ICR data.

**Response 2:** For this final rule, the EPA re-evaluated coal data from the 1998 ICR data (as explained in great detail in the preamble and in a supporting technical memorandum titled "1998 ICR Coal Data Analysis Summary of Findings" available in the rulemaking docket. The EPA has updated its assumptions regarding Hg content (and variability) based on that evaluation.

### 4.4.3 The Hg Content of Gulf Coast Lignite Is Greater Than That of Fort Union Lignite; and Several Lignite-Fired EGUs in Texas Have Co-Fired Significant Quantities of Subbituminous Coal

**Comment 1:** Commenters stated that the EPA's proposal to lower the Hg standard for lignite-fired EGUs ignores the complete chemical composition of lignite-coal and technical challenges in Hg control technologies for EGUs firing lignite coal. They said the EPA ignores the wide variability of Hg content, sulfur content, and alkalinity of inorganic matter in Gulf Coast Lignite. Commenters stated that the Hg content of Gulf Coast lignite coal is high: the 75th percentile from Mississippi and Texas mines exceeds 40 lb/TBtu and 29 lb/TBtu, respectively. Commenters included a figure depicting the Hg content variability for Mississippi and Texas.

Commenters stated that the EPA in the 2023 Proposal assigned an Hg inlet value of 12.44 to 14.88 lb/TBtu to Gulf Coast lignite, deriving a control rate ranging from 80% to 90% to meet the 1.2 lb/TBtu standard. The commenters said that however, based on actual Hg content data for Gulf Coast lignite, achieving a 1.2 lb/TBtu requires an Hg removal rate of approximately 96% - 97% for unavoidable instances where lignite Hg content is at the 95th percentile of observed values. They said that current Hg control technologies available for lignite-fired EGUs cannot reach these theoretical control efficiencies and that this is exacerbated by other chemical composition differences between lignite and PRB coals.

Commenters stated that the differences between North Dakota and Texas lignite coal do not support the EPA's assumption that all Hg emission reduction technologies apply equally to all lignite. They said the EPA relies on Texas' Oak Grove EGU's use of the brominated ACI and use of refined lignite to justify the Agency's reasoning that use of brominated ACI would be effective to reduce Hg emissions for all lignite coal. Commenters stated that this facility uses SCR, which is not a compatible technology with North Dakota lignite. Commenters stated that the EPA failed to even explore whether SCR (via the introduction of halogens) is technically feasible for North Dakota lignite coal. They said, in actuality, the EPA has recognized that SCR is likely infeasible for North Dakota lignite to reduce Hg concentrations as required in the 2023 Proposal.

Commenters stated that in the past, the EPA has worked with a consultant that recognized, "[w]ith flue gas $SO_3$ concentrations greater than 5-7 ppmv, the sorbent feed rate may be increased significantly to meet a high Hg removal and 90% or greater Hg removal may not be feasible in some cases." Sargent & Lundy, IPM Model – Updates to Cost and Performance for APC Technologies: Mercury Control Cost Development Methodology, Project 12847-002, at 3 (Mar. 2013). They said that this is because North Dakota lignite has significantly higher sodium content than PRB coals and the relatively high concentration of sodium in North Dakota lignite forms vapor, condenses, and then coats other particles, or it forms its own particles at a size range of 0.02-0.05 µm. The commenters said that as a vapor or as a very small particle, sodium will pass through any upstream emissions control equipment and will reach the SCR regardless of whether the SCR is located before other emission control devices (high-dust configuration) or after those other controls (low-dust or tail-end configurations). They went on to say that once the sodium particles reach the SCR, they plug the pores of the catalyst, which are the key feature that allows for improved oxidation of other pollutants. The sodium also poisons the catalyst both inside the pores and on the surface, rendering the active component of the catalyst inactive. The commenters said that recent efforts to address these concerns through either cleaning or regeneration of the catalyst have not been successful, even at pilot scale. They said that a study recently cited by the North Dakota Department of Environment Quality provides additional details on these efforts and the unsolved technical challenges that remain regarding the impact of alkali metals in North Dakota lignite on the technical feasibility of SCR.

Commenters stated that this is not new information to the EPA and the EPA previously challenged North Dakota's determination that SCR was not a demonstrated BACT for lignite-fired EGUs in United States v. Minnkota Power Coop., Inc. They said that in Minnkota, a US District Court agreed with North Dakota's determination that SCR was not justified or feasible as a BACT for lignite-fired EGUs. The commenters said, importantly, the EPA did not appeal or challenge this ruling.

Commenters stated that for these reasons, the EPA's attribution of the lower Hg emissions to the substantial amounts of PRB coal used in Texas lignite-fired EGUs is not appropriate for extrapolation to North Dakota lignite-fired EGUs. They said according to EIA 2021 data provided in Table 7 of the 2023 Proposal, 13 of the 21 facilities are listed as using significant portions of refined coal (often greater that 90%), while the EPA simultaneously admits it does not have data on the type of coal that is refined. They said, further, only five of the listed facilities burn lignite in concentrations over 30%. Commenters stated that without a clearer picture of the makeup of that refined coal, and how it differs from lignite plant burning non-refined coals, the EPA's conclusions are not reasonably justified.

**Response 1:** For this final rule, the EPA re-evaluated coal data from the 1998 ICR data (as explained in great detail in the preamble and in a supporting technical memorandum titled "1998 ICR Coal Data Analysis Summary of Findings" available in the rulemaking docket. The EPA has updated its assumptions regarding Hg content (and variability) based on that evaluation. The impact of coal sulfur content and $SO_3$ is discussed in section V.D of the preamble. Contrary to commenters assertions, the EPA has not proposed or suggested that SCR is a required component of Hg control for EGUs firing North Dakota lignite.

### 4.4.4 The Proposed More Stringent Hg Emission Standard Can Be Achieved, Cost-Effectively, Using Available Control Technology

**Comment 1:** Commenters stated that Hg emissions limits of 0.15 lb/TBtu for not-low-rank coal units and 0.5 lb/TBtu for low-rank coal units would be achievable for units with a range of control configurations. They said that for units with an ESP but no scrubber, which are particularly challenging to control for Hg, ACI can be used, and the rate of injection increased to improve the rate of Hg removal. The commenters said that to the extent that some units with an ESP may be required to install a baghouse to comply with a more stringent fPM standard, the baghouse by itself is likely to improve the Hg emissions rate without an increase in injection rate.

Commenters stated that the 2023 Proposal's contention that the anticipated enhanced use of brominated activated carbon at lignite plants as a result of this rule could have "positive non-air impacts" seems reasonable. The summary of Hg control technologies used at each lignite plant shows that most use a combination of halogen-based Hg control techniques, including brominated activated carbon; precombustion treatment of coal with bromine; and spraying bromine into the combustion chamber. The commenters said that as the 2023 Proposal emphasizes, the amount of bromine associated with brominated activated carbon use is much less than the amount used with these other technologies. They said moreover, unlike these other technologies which can release halogens to air and water at various points, the bromine remains bound to the particles where it reacts to capture gaseous Hg and then, in turn, is captured by downstream pollution control devices (*e.g.,* an FF). Commenters agreed that any cross-media transfers of bromine to receiving water bodies and emitted to the atmosphere with the use of brominated activated carbon "are not expected (or would certainly be lower) with the use of brominated solvents" relative to these other technologies.

Commenters stated that there is likely to be some cost associated with achieving a 0.5 lb/TBtu Hg standard for low-rank coal units, as none of the 20 low-rank coal units that do not have announced retirement dates by 2027 have achieved a Hg emissions rate at or below that level, but all of them have a baghouse or a scrubber installed which suggests they are capable of achieving very low emissions. They said that the use of a baghouse or scrubber means very high capture efficiencies are expected to be achievable, as ACI or chemical additives should be effective for lowering Hg emissions rates. The commenters said that ACI has been very effective in reducing Hg emissions to well below 0.5 lb/TBtu in not-low-rank coal units, which suggests this rate should be achievable for low-rank coal units.

Commenters stated that for not-low-rank coal units, 35 of the units that have not announced plans to retire by the end of 2027 had Hg emissions under 0.15 lb/TBtu with a variety of PM control devices. These include units with an ESP, a baghouse, both an ESP and a baghouse, or a venturi scrubber, which shows that this level of Hg emissions is achievable for a range of control configurations. Units with a scrubber, baghouse, or REACT technology (using activated coke to capture $NO_x$, $SO_2$, and Hg) may be capable of achieving this rate without ACI, and in some cases these units may use fuel additives or scrubber chemical additives instead of ACI to achieve lower Hg emissions rates. The commenters said that four of the units that have achieved Hg emissions below 0.15 lb/TBtu have only an ESP but no scrubber for acid gas control and therefore,

available information regarding these units shows that a Hg emissions rate of 0.15 lb/TBtu is feasible for not-low-rank coal units and demonstrated for a range of control configurations.

Commenters stated that though the EPA has access to information regarding types of sorbents used by units in the Air Market Program Data, the type of sorbent and rate of injection are not required to determine whether additional Hg reductions are feasible and cost-effective at coal units. ATP has previously estimated incremental costs of controls to lower Hg emission rates for low-rank and not-low-rank units, and for not-low-rank units there is significantly more data available to the EPA that can be used to evaluate costs of compliance with a lower Hg standard than was available when MATS was promulgated. The commenters said that the Agency has years of Hg emissions data, information regarding coal type, air pollution control configuration, and the type of carbon being used. The commenters said that published material on ACI and other approaches, as well as publicly available data relevant to control costs at different rates and for different configurations, provides adequate information to determine additional reductions that are achievable at reasonable costs.

**Response 1:** The EPA acknowledges these supportive comments. However, the EPA has not proposed any revisions to Hg emission standard for EGUs firing coal other than lignite. Nor, has the EPA proposed revision to the Hg emission standard for lignite-fired EGUs below the value of 1.2 lb/TBtu that is being finalized in this action. CAA section 112(d)(6) requires that the EPA review and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards at least every 8 years. The EPA will continue to evaluate developments in practices, process, and control technologies and will propose revised emission standards, if warranted.

**Comment 2:** Commenters stated that they identified two significant mathematical errors that the EPA must correct. They said the EPA's cost effectiveness calculation is based on a model plant analysis for a hypothetical 800 MW lignite unit and the EPA assumes that the hypothetical plant would meet the current standard of 4.0 lb/TBtu by injecting 2.5 pounds of non-brominated activated carbon per million actual cubic feet (106 acf), and the EPA assumes that 5.0 lb/106 acf of brominated activated carbon would be needed to meet the proposed standard of 1.2 lb/TBtu. The commenters said that then, the EPA calculates the hourly amount of carbon required under each of these two scenarios using the following equation:
2.5 lb sorbent/MMacf × 9860 scf/MMBtu × 520 R/785 R × 8,880 MMBtu/hr × 1 MMacf/1,000,000 acf = 287 lb sorbent/hr

Commenters stated that this equation contains two critical errors. First, the term intended to convert standard temperature to actual temperature is inverted. The correct conversion factor is 785 R / 520 R. Second, the F-factor of 9,860 scf/106 Btu provides the volume of flue gas produced from combusting one million Btu of lignite at stochiometric conditions (*i.e.,* 0% excess air), whereas typical flue gas contains approximately 50% excess air and would be 6% O2 wet, so the 9,860 factor must be increased by (20.9 ÷ (20.9 – 6.0)). The commenters said that these errors are corrected in the revised equation below to provide a more a realistic volumetric flow rate for a hypothetical 800 MW lignite unit:

9860 scf/MMBtu × 20.9/(20.9 - 6) × 785 R/520 R × 8,880 MMBtu/hr = 1.83 × 106 acf/hr

Commenters stated that using this equation, more realistic hourly injection rates can be computed. At 2.5 lb/106 acf, the hourly injection rate would be 457 lb/hr, well above the EPA's estimate of 114 lb/hr. And, at 5.0 lb/106 acf, the hourly injection rate would be 915 lb/hr, well above the EPA's estimate of 287 lb/hr. The commenters stated that when the other assumptions that the EPA used to estimate annual cost effectiveness are applied, the resulting cost effectiveness value reveals the significance of these two errors. They said further that based on the EPA's assumptions for capacity factor (80%) and cost per pound of sorbent ($0.80 non-brominated; $1.15 brominated), the annual cost for 2.5 lb/106 acf of non-brominated injection would be $2,560,000 per year, and the annual cost of 5.0 lb/106 acf brominated injection would be $7,370,000 per year, for a difference of $4,810,000 per year. The commenters said since the hypothetical plant would also emit 247 lb per year and 47 lb per year in the two scenarios, respectively, the correct cost effectiveness value can be calculated as follows:

Incremental cost effectiveness = $\{(\$7.37 \times 106 - \$2.56 \times 106)/(247 - 74)\} = \$27,800$ per lb Hg

Commenters stated that these errors together result in an underestimate of the annual cost effectiveness value by more than a factor of three. They said that the EPA calculates a cost effectiveness of $8,703 per pound of Hg removed, but the corrected formula yields a cost of $27,800 per pound. The commenters said that this cost difference is significant and impactful enough to have caused a different rulemaking outcome and that the EPA must reconsider whether the proposed Hg limitation would be cost-effective and reasonable.

Commenters stated that the EPA has significantly underestimated costs of reducing emissions to 1.2 lb/TBtu. The commenters said that the NRECA Technical Analysis found that the EPA's calculation of cost–effectiveness for lignite fuels ignores the role of FGD, present in 18 of the 22 reference stations, in removing Hg. They said that study concludes that this erroneous assumption may cause an under-estimation of the cost for additional Hg removal. The commenters said that the errors in the EPA's formula cast further doubt of the cost effectiveness of achieving 1.2 lb/TBtu. The commenters concluded that the EPA must consider the cost burden of compliance as to small entities and asked for this consideration in light of the fPM costs and the cumulative cost impacts of other rulemakings by the Agency.

**Response 2:** The EPA acknowledges the error in the model plant cost calculation/equation provided in the 2023 Technical Memo (Docket ID No. EPA-HQ-OAR-2018-0794-5789). The EPA has corrected the equation (as shown in the 2024 Technical Memo) and calculated the cost per lb of Hg controlled for a model 800 MW lignite-fired EGU, as described in the 2024 Technical Memo. For an 800 MW EGU firing Texas lignite EGU, the cost effectiveness of using the brominated carbon sorbent at an injection rate of 3.0 lb/MMacf was $3,050 per lb of Hg removed while the incremental cost effectiveness was $10,895 per incremental lb of Hg removed. The cost effectiveness of using the brominated carbon sorbent at an injection rate of 5.0 lb/MMacf was $5,083 per lb of Hg removed while the incremental cost effectiveness was $28,176 per incremental lb of Hg removed. These costs are below or reasonably consistent with the cost effectiveness that the EPA has found to be acceptable in previous rulemakings for Hg controls.

**Comment 3:** Commenters stated that the capture of Hg by wet FGD – in many cases prompted by the role of SCR catalysts to oxidize $Hg^0$ – can be a primary mean for Hg capture. They said however, such co-benefits are highly variable, and depend on the ratio of elemental to oxidized Hg in the flue gas, and the consequential Hg "re-emission" by a wet FGD. They said that there are means to remedy this variability in some instances, but broad success cannot be assured and without the specifics of FGD design and operation, Hg removal via wet FGD cannot be predicted.

Commenters stated that the fate of Hg entering a wet FGD is uncertain. They said if in the oxidized state, Hg upon entering the FGD solution can (a) remain in solution and be discharged with the FGD-cleansing step of "blowdown" (b) precipitate as a solid and be removed with the byproduct (typically gypsum), or (c) be reduced from the oxidized to the elemental state, thus re-emitted in the flue gas. The commenters said that several means to minimize Hg re-emission exist, including injection of sulfite and controlling the scrubber liquor oxidation/reduction potential – these means can limit Hg remission but are additional process steps that are superimposed upon the task of achieving high efficiency $SO_2$ removal. They said the extent these means can be universally applied without compromising $SO_2$ removal is uncertain.

Commenters stated that an in-plant study showed that increasing load for a wet FGD-equipped unit can elevate Hg re-emission, eventually exceeding 1.2 lb/TBtu. The commenter said that this observation can be due to loss of the control over the oxidation/reduction potential – a key factor in FGD Hg removal. They said the chemical additives can adjust oxidation/reduction potential but complete and autonomous control may not be available – for example, in a systematic evaluation of FGD operating variables conducted at a commercial power station, factors such as limestone composition and the extent to which units must operate in zero-water discharge – as perhaps mandated by the pending Effluent Limitation Guideline – can affect ORP and thus Hg-reemission.

Commenters stated that upsets in wet FGD process conditions can prompt Hg re-emission – specifically, one observer noted two units that "….experienced a scrubber reemission event causing the Hg stack emissions to increase dramatically above the MATS limit and significantly higher than the incoming Hg in the coal and the event lasting for several days." (Pavlisch, J. et. al., 2016). The commenter said this high Hg event was eventually remedied over the short-term operation, but long-term performance is not available.

Commenters stated that lignite is a high moisture content, low-rank coal and is typically mined adjacent to the powerplant to reduce shipping costs – as a result, the fuel (*i.e.,* lignite) is a key component of the design of the boiler adjacent EGU. The commenters said that lignite-fired EGUs cannot simply switch to a different type of coal, and they stated that attempting to mine around lignite seams with higher Hg concentrations is neither feasible nor consistent with how the EPA applies the NESHAP standards. Commenters argued that given the inherent variability of Hg content within each mine and each mine seam, the fact that the EPA used annual average Hg content data from 2021 to support their control and costs analyses is troubling because the averaging time for the emission limits is a 30-operating day rolling average.

**Response 3:** The EPA has focused on the use of sorbent injection technologies – either pre-halogenated or in combination with chemical additives. There are many advanced sorbent – including non-carbon sorbent, $SO_3$ tolerant sorbents, "concrete friendly" sorbents to choose from. Moreover, every lignite-fired EGU is either equipped with a FF/baghouse or a scrubber plus PM control (ESP or FF). So, there are also opportunities to enhance Hg control with the downstream control technologies.

**Comment 4:** Commenters stated that the EPA focuses on the fact both lignite and PRB coals have low halogen content and produce difficult-to-control $Hg^0$ vapor in the flue gas stream to conclude that lignite-fired EGUs can simply increase the amount of halogenated sorbent injected to reduce Hg emissions to 1.2 lb/TBtu – a limit that PRB coal-fired EGUs are able to consistently meet. The commenters said that the EPA, however, fails to recognize very consequential differences in the chemical composition of lignite and PRB coals that result in very different Hg removal effectiveness for sorbent injection for the two coals.

Commenters stated that specifically, one of the most important characteristics of PRB coal is that it typically has very low sulfur content, with combustion resulting in very little – "essentially unmeasurable" – $SO_3$ in the flue gas. They said in contrast, the higher sulfur content of lignite combined with equal or lower total alkali relative to sulfur allows much higher levels of $SO_3$ in lignite-generated flue gas.

Commenters stated that $SO_3$ in the flue gas has a substantial and well-documented detrimental effect on the Hg removal effectiveness of activated carbon sorbent, the material used to capture Hg emissions. They said Sargent & Lundy, the EPA's contractor in preparing an analysis of Hg control technology, recognized the impact of $SO_3$ on activated carbon sorbent Hg removal effectiveness, stating "'[w]ith flue gas $SO_3$ concentrations greater than 5-7 ppmv, the sorbent feed rate may be increased significantly to meet a high Hg removal and 90% or greater Hg removal may not be feasible in some cases. The commenters said that based on commercial testing, capacity of activated carbon can be cut by as much as one half with an $SO_3$ increase from just 5 ppmv to 10 ppmv.'"

Commenters stated that additionally, flue gas $SO_3$ further complicates Hg removal because of operational temperature. The commenters said that lignite-fired EGUs that emit measurable levels of $SO_3$ observe higher gas temperatures at the air heater exit. They said the air heater exit is also the location activated carbon sorbent is injected to avoid corrosion. The commenters said that pilot plant studies have shown that an increase of gas temperature at the heater exit from 310°F to 340°F decreased sorbent Hg removal by 13% from 81% to 68%.

Commenters stated that lignite and PRB coal are different and said that taken together, these differences – the high variability of Hg content in lignite coal that would require Hg control efficiencies greater than 90% to meet the proposed standard; the presence of flue gas $SO_3$ in lignite-fired EGUs that can decrease Hg control efficiencies by half; and, challenges with balancing high temperatures at the heater exit that can further decrease Hg control efficiency up to 13% – make EPA's proposed Hg emission standard for lignite-fired EGUs of 1.2 lb/TBtu not achievable.

**Response 4:** The impact of coal sulfur content and $SO_3$ is discussed in section V.D of the preamble.

**Comment 5:** Commenters stated that the EPA has not completed the initial task of determining whether lignite units are able to achieve 1.2 lb/TBtu. They said once feasibility is determined (assuming it is feasible), the means of achieving 1.2 lb/TBtu with a compliance margin must be determined. The commenters said that then, costs may be assigned to that control strategy. They said that none of these steps have taken place.

**Response 5:** The EPA has shown that there are EGUs in the "lignite-fired EGU" subcategory that have demonstrated an ability to meet the 1.2 lb/TBtu Hg emission limit while firing on lignite coal. Further, the EPA has indicated that there are numerous ways that EGUs that are firing non-lignite coals are meeting that standard. Indeed, the existing lignite-fired EGUs are currently employing a variety of control strategies (chemical additives, liquid sorbents, activated carbon injection, brominated sorbent injection, *etc.*).

**Comment 6:** Commenters stated that Sargent and Lundy (S&L) identified the following missing components that would be needed to calculate cost: (1) Demonstration testing to determine feasibility; (2) A PAC dosage rate determined during testing; (3) A guaranteed injection rate from vendors; and (4) the role of the Hg content variability of the lignite to define an appropriate compliance cushion. They asserted that none of these steps were taken by the EPA, and a 60-day comment period is obviously insufficient for sources to obtain this data and information. The commenters said that the EPA has not adhered to its initial burden of identifying what is feasible, instead causing sources to scramble to "prove a negative" during a condensed comment period.

**Response 6:** The EPA has provided a cost estimate to meet the 1.2 lb/TBtu emission standard in the 2023 Proposal supporting materials and has provided an updated cost estimate in the 2024 final rule and supporting materials (see the 2024 Technical Memo) and has found the costs to be reasonable.

**Comment 7:** Commenters stated that the EPA's substantial Hg limit reduction for lignite units is unjustified. They said that the EPA proposes to effectively eliminate the low rank coal subcategory established for lignite-powered facilities by lowering the Hg standard to 1.2 lb/TBtu. The commenters said that the EPA justifies this revision by finding that "available controls and methods of operation . . . will allow lignite-fired EGUs to meet the same Hg emission standard that is being met by EGUs firing on non-lignite coals." The commenters said that the EPA also finds that the costs of meeting the same standard as other EGUs is reasonable. Commenters took issue with both of these conclusions.

Commenters stated that S&L examined the feasibility and cost of MRY Unit 2 to attain the newly proposed limit of 1.2 lb/TBtu. The commenters said that S&L was able to conclude the following within the 60-day comment period:

- Units firing lignite coal with lower heating values have to accommodate frequently changing coal quality and require a wide range of flexibility to account for instances of firing high Hg seams of coal to consistently achieve required Hg emissions.

99

- The Young Station's lignite coal supply has a wide range of Hg content between 0.053 ppm and 0.184 ppm, which results in projected Hg emissions between 4.79 lb/TBtu and 17.42 lb/TBtu. A considerable operating margin is needed to allow for consistent adjustments.

- Documented evidence of a lignite unit achieving 1.2 lb/TBtu or below has not been found/reviewed.

- The existing equipment on MRY Unit 2 may not be able to achieve the recently proposed 1.2 lb/TBtu Hg limit for lignite fired units.

- Demonstration testing would be required to determine a PAC dosage rate, guaranteed injection rate, and the emissions rate that can be achieved when considering the Hg content variability of the lignite.

- Additional modifications to MRY Unit 2's control system may be required that cannot be determined at this time; however, it is likely that the existing lances and transport piping would need to be replaced to accommodate a higher injection rate.

**Response 7:** The EPA has acknowledged the variability in Hg content for North Dakota lignite. However, the owner/operators of other EGUs firing non-lignite fuels (subbituminous coal, eastern and western bituminous, anthracite, coal refuse, *etc.*) also experience a wide range of Hg content. As shown in Table 3 in the preamble for the final rule, the EGUs firing lignite from Texas and Mississippi experience fuel with much higher Hg content and greater variability. Twin Oaks units 1 & 2 (firing Texas lignite) have consistently demonstrated the ability to meet an emission standard of 1.2 lb/TBtu (or lower) and Red Hills units 1 & 2 (firing Mississippi lignite) have reported Hg emissions very near 1.2 lb/TBtu. Non-lignite coals in Kentucky (mostly bituminous), Pennsylvania (mostly bituminous), and Wyoming (mostly subbituminous) all show variability – in fact, coals mined in Pennsylvania had a higher average Hg content (14.5 lb/TBtu) and a wider range of variability (0.1 – 86.7 lb/TBtu) than the average Hg (9.7 lb/TBtu) and variability (2.2 – 62.1) of lignite mined in North Dakota. The EPA understands that some modifications to existing control technology may be needed to meet the revised emission standard. Accordingly, the EPA is allowing up to 3 years for sources to come into compliance with the revised standard. Under certain circumstances, sources may request an additional year from their permitting authority for the installation of controls.

**Comment 8:** Commenters stated that the EPA has a legal obligation to ensure all standards are "achievable." The D.C. Circuit interprets achievable to mean "capable of being met under most adverse conditions which can reasonably be expected to recur." (White Stallion Energy Center, LLC v. EPA.) The commenters said that the EPA's analysis falls short based on the lack of testing data and misguided assumptions.

Commenters stated that as S&L notes, there is no Hg test data available to demonstrate that lignite units can achieve 1.2 lb/TBtu. They said this fact alone calls the EPA's analysis into question. The commenters said that while courts have not required the EPA to present test data, the EPA must rely on a reasonable assumption, presented in the record, that the standard can be achieved, but does not present such an assumption.

**Response 8:** Commenters have claimed that Hg control from lignite-fired EGUs is challenging because the Hg content of lignite is high and variable – but EGUs firing non-lignite coals also experience fuel with high Hg content and variable content. Commenters have claimed that the low halogen content coupled with highly alkaline ash makes it challenging to capture Hg from lignite-fired EGUs – but EGUs firing subbituminous coal face the same challenge. Commenters have claimed that $SO_3$ in the flue gas of lignite-fired EGUs challenges the ability of such sources to effectively control Hg – but $SO_3$ is typically much more of an issue for EGUs firing higher sulfur bituminous coal and the EPA has noted multiple control technology vendors that offer "$SO_3$ tolerant" sorbents and other control technologies to overcome that challenge. EGUs firing non-lignite coal with high variability Hg content, high $SO_3$ in the flue gas, low natural halogen and high alkalinity – eastern bituminous coals, western bituminous coals, subbituminous coals, waste coals, anthracite, etc. all must meet an emission limit of 1.2 lb/TBtu despite the "adverse conditions" created by each of these challenges. The EPA has also noted that Twin Oaks units 1 & 2 – firing Texas lignite – have demonstrated the ability to meet or exceed the 1.2 lb/TBtu.

**Comment 9:** Commenters stated that the EPA's rationale for changing the lignite emission limit was that activated carbon performance has improved since 2011 and currently some lignite units are meeting the 4 lb/TBtu limit with apparently low levels of Hg removal. The commenters said thus, there is room to increase Hg removal in lignite units.

Commenters stated that Staudt's analysis of data for lignite Hg emissions showed an inverse relationship between Hg emission rate and estimated Hg capture. The lowest emission rates (1-1.25 lb/TBtu) were associated with the highest estimated Hg capture (85% – 88%). The commenters said that the highest emission rates (~3.8 lb/TBtu) were associated with 57% – 58% estimated Hg capture - that is, the worst-performing units were operating with low Hg removals that are very much less than possible with state-of-the-art control technologies and less than removal levels demonstrated by the best-performing units. The commenters said that the majority of the low-rank virgin coal units already use ACI and could increase their treatment rate to achieve higher Hg capture rates and that Staudt estimated that an emission limit of 1 lb/TBtu for lignite-fired units would require less than 95% capture in every case, and in most cases much less.

**Response 9:** The EPA acknowledges these comments and agrees that there is room to increase the Hg removal in lignite units.

**Comment 10:** Commenters stated that the Hg inlet numbers utilized in the proposed rule appear to be underestimated and said Fort Union lignite (ND and MT) and Gulf Coast lignite (TX and MS), as reported by USGS in Fact Sheet FS-095-01, are indicated at 14 lb/TBtu and 27 lb/TBtu, respectively. The commenters said that using the values indicated by the USGS, 2021 removal would be 80% – 90% and with the higher Hg inlet numbers, 92% – 98% reduction in the Hg content would be needed to achieve a 1 lb/TBtu. They said as indicated above, Hg reduction is an inverse relationship between treatment and removal. As the Hg content is reduced, the opportunity for a Hg molecule to become captured by a sorbent is decreased or becomes more challenging. The commenters said that the proposed lower Hg compliance rates may require substantially more chemical to be applied for treatment of the emissions. The commenters said

furthermore, given the specific mechanisms involved in Hg capture, it is possible that Hg reduction may be maximized and 1.2 lb/TBtu or lower may not be achievable, in practice.

Commenters stated that the EPA also assumes that lignite units can achieve 1.2 lb/TBtu using halogenated carbon. Although the Young Station does not use this product, another North Dakota lignite facility is already using it. These units observe variability and declining reductions with the increase of injection rates. This North Dakota facility is using more PAC than the EPA assumes in its analysis.

Commenters stated that their units further underscore the variability of Hg levels in lignite coals. Commenters observed potential operational concerns that their relatively new Hg control system will have to achieve such a low rate, given the challenges of reducing Hg in lignite coals due to the correlation curve.

**Response 10:** The EPA has updated the Hg content of coals as discussed in the preamble for the final rule and in a supporting technical memorandum titled "1998 ICR Coal Data Analysis Summary of Findings" available in the rulemaking docket at EPA-HQ-OAR-2018-0794.

**Comment 11:** Commenters stated that the EPA significantly underestimated the cost of additional Hg controls. They said that the current Hg control system at Coal Creek was designed to control to the existing 4.0 lb/TBtu Hg limit, using both a halogenated coal additive in conjunction with a chemical added to the wet FGD reaction tanks, and REC estimates that Coal Creek currently removes approximately 260 lb of additional Hg per unit at a cost of approximately $1.25M per unit per year. The commenters said that importantly, the removal efficiency of Hg based on increased additives is not linear and at Coal Creek specifically, the high variability in inlet Hg concentrations has resulted in the halogenated chemicals used to maintain compliance with the current Hg limits to be applied at rates known to cause premature corrosion of major boiler components. The commenters said, for instance, since the MATS rule has been in effect, Coal Creek has seen significant increases in corrosion of boiler components and as an example has had to install ceramic coated air heater baskets and has had an increased amount of ductwork repair. They argued that examples like this have resulted in significantly increased outage and maintenance costs. Commenters believed the proposed limit of 1.2 lb/TBtu is unachievable with its current control system and that controlling Hg emissions further will require additional control equipment. Commenters stated that such costly controls are not warranted here, where the EPA's own analysis indicates that the remaining risks from the subcategory are not associated with Hg.

**Response 11:** The halogenated coal (*i.e.,* refined coal) has been used at many coal-fired EGUs, not just lignite-fired EGUs and others have expressed concern regarding increased corrosion from the use of chemical additives. Many owners/operators have indicated that they no longer use halogenated coal since the refined coal tax credit has expired. Pre-brominated (or pre-halogenated) sorbents can be added without release of the bromine (or other halogen) that contributes to the corrosion. The cost of the installation of the equipment needed to inject halogenated sorbents (*i.e.*, storage silo, injection system/lances, *etc.*) is small relative to the installation costs of other controls (*e.g.*, baghouse/FF, wet or dry FGD scrubber, SCR, *etc.*) and, the use of sorbents instead of chemical additives has the added potential to reduce corrosion and

on-going component repair and replacement. Also, the more stringent Hg emission limit for lignite-fired EGUs is being revised from a CAA section 112(d)(6) technology review, not from a CAA section 112(f)(2) risk review.

**Comment 12:** Commenters stated that the costs of these revisions to the Hg standards are reasonable considering the industry's annual revenues, capital expenditures, and total expenditures. The EPA should consider costs in the context of what the power sector can absorb while continuing to serve its function of providing power. These costs are eminently reasonable in the context of the power sector's 2019 total expenditures of $242.9 billion and revenue of $401.738 billion. If the EPA strengthens the fPM standard to 0.0024 lb/MMBtu, the $166 million incremental cost of the Hg standards would be about 0.07% of the power sector's 2019 total expenditures, or about 0.04% of 2019 revenue. If the EPA strengthens the fPM standard to 0.006 lb/MMBtu, the $468 million incremental cost of the Hg standards would be about 0.19% of 2019 total expenditures or about 0.12% of 2019 revenue. These cost estimates are also small compared to power sector capital expenditures and within the range of historical variability in capital expenditures. These are clearly costs that the power sector can easily absorb while continuing to serve its function of providing power.

**Response 12:** The EPA acknowledge these helpful comments.

# CHAPTER 5

## 5. Other proposed actions - technology review

**Comment 1:** Commenters stated that the EPA must consider the full range of technological developments that have occurred since the standards were originally promulgated. Commenters agreed that any of the types of developments that the EPA identifies in this proposal could necessitate strengthening standards, including: add-on control technologies, a process change or pollution prevention alternative, work practices or operational procedures, and any operational change or other factors not considered in the original rulemaking; improvements to controls that were identified and considered in the original rulemaking; and a significant change in the cost or cost effectiveness of controls. Commenters encouraged the EPA to expand this already broad list to include other factors, whether "developments" or not, that necessitate revisions, such as lower emissions rates and gained experience with monitoring. Commenters suggested that the EPA need not identify the incremental emission reductions that each development achieves; rather, that the Agency may point to the collective effect of developments, including lower emissions rates, to justify strengthening standards. The commenters said that this more holistic, inclusive view of the factors that may necessitate revisions to standards under CAA section 112(d)(6) aligns better with the statutory language, and that the EPA must consider all such factors in its reviews. They said, for instance, emission rates far below the current limits, coupled with identifiable improvements in control technologies, practices, and monitoring, present a compelling reason to lower the standards for each of the classes of HAP emitted by coal- and oil-fired power plants.

**Response 1:** The Agency agrees with commenters that we must consider the full range of technological developments since promulgation of the original standards. The Agency has provided its rationale for the final emission standards in section IV.D of the preamble.

**Comment 2:** Commenters stated that the EPA is justified in leaving Hg standards for non-lignite units, standards for IGCC units and oil-fired units, as well as acid gases and organic HAP unchanged, given that the Agency correctly concludes that there are no new technological advancements that would justify any updates to these standards. The commenters said that should the EPA seek to change any of these levels, the Agency must do so through a separate notice-and comment rulemaking process.

**Response 2:** The comment supports the conclusions in the proposed rule that the EPA is finalizing. For this reason, the comment requires no response.

## 5.1 No Revisions to Work Practice Standards for Organic HAP

**Comment 1:** Commenters agreed with the EPA that there are no new developments in technology or methods of operation that would result in cost-effective emission reductions and that Organic HAP work practice standards should be retained without change. Commenters noted that the periodic burner tune-ups required by the work practice standard are effective at ensuring good combustion.

Commenters stated that it is irrelevant whether the EPA believes there are "no developments that would result in cost-effective emission reductions of organic HAP." (88 FR 24882). Commenters asserted that the Agency's obligation to set numeric emission limits for power plants' emissions of dioxins, benzene, carbon disulfide, dichloromethane, and toluene is not conditional on the agency's beliefs about their cost effectiveness. Commenters said that where, as here, the EPA's existing emission standards for a source category fall short of the basic requirements for CAA section 112 emission standards, the EPA must fix such defects in its RTR for the category. (*La. Envtl. Action Network v. EPA*, 955 F.3d 1088, 1098 (D.C. Cir. 2020)).

**Response 1:** In the preamble, the EPA acknowledged it received a petition for reconsideration from environmental organizations that sought the EPA's reconsideration of organic HAP work practice standards. The EPA plans to continue its review and will respond to the petition in a separate action.

**Comment 2:** Commenters stated that the EPA must set numeric emission limits for toxic organic HAP. Commenters noted that when the Agency promulgated its original air toxics standards for power plants, it set work practice limits for all organic HAP they emit, including dioxins, claiming "the significant majority of data for measured organic HAP emissions from EGUs are below the detection levels of the EPA test methods." (77 FR 9304, 9369), and as such, measurement of organic HAP emissions is "not practicable" under CAA section 112(h)(2) and, therefore, that it is "not feasible" to prescribe an emission limit for them (*Id*.). The commenters stated that the EPA has emissions data from at least fifty sites and that at least 50% of these data are above detection limits; per the EPA, 307 of the 322 power plants it modeled for its residual risk assessment, reported emissions of dioxins and polycyclic organic matter (POM) at levels high enough to support a risk assessment and demonstrate a cancer screening level greater than 1. The commenters said therefore, applying the EPA's own stated rationale for setting work practice requirements, it is "practicable" to measure emissions for dioxins, POM, benzene, carbon disulfide, dichloromethane, and toluene and therefore "feasible" to set numeric emission limits for them.

Commenters also noted that application of the emission measurement methodology is not "impracticable" just because emission measurements are below detection levels. Rather, in those circumstances, the emission measurement technology has been applied and has yielded measurements. Specifically, it is showing that emissions are below detection levels. They said such information allows the EPA to both set emission limits and implement emission limits, in the same sense that a very low or zero emission test result allows the EPA to do so, and the Agency has used non-detect results for these purposes in the past.

Commenters stated that the EPA's past argument that it "expect[s] organic HAP emissions are lower than the values from the 2010 ICR testing when the EPA concluded that it was not feasible to accurately measure organic HAP emissions because EGUs are now required to conduct periodic tune-ups and more efficient combustion leads to additional reductions in organic HAP" (EPA–HQ–OAR–2018–0794–4560, at 112 (Apr. 2020)) is irrelevant and misleading. The commenters said that because the record shows that application of measurement technology is practicable for at least some of the organic, the belief that organic HAP emissions are lower now than in 2010 is irrelevant. Commenters asserted that the EPA neglects to mention its own

conclusion that the only work practice it established for organic HAP—periodic tune-ups—would not reduce emissions, and as such, the EPA's claim that organic HAP emissions are lower now than in 2010 is inconsistent with the agency's own statements in the record.

**Response 2:** As stated in the response above in this section, the Agency plans to review the organic HAP work practice standards in a separate action as part of a petition for reconsideration.

### 5.2 No Proposed Revisions to the Acid Gas Standards for Coal-Fired EGUs

**Comment 1:** Commenters expressed agreement with the EPA that no revisions to the standards for Acid Gas are necessary. Commenters said they are unaware of any cost-effective improvements that would result in further acid-gas emission reductions. The commenters said that if additional information leads the Agency to consider revised standards for acid gases or organic HAP, commenters requested that the EPA first propose such revised standards in a Supplemental Notice of Proposed Rulemaking or a separate Notice of Proposed Rulemaking and take comment on such proposed standards before adopting them.

**Response 1:** As no emission standards for acid gases or organic HAP were proposed or finalized, this comment does not require a response.

**Comment 2:** Commenters asserted that an HCl emission limit of 0.0006 lb/MMBtu could be achieved through improvements to wet FGD systems and DSI systems and noted the following:

- Costs of upgrading wet FGD systems, estimated at \$43/kW (2019\$), are well below the \$100/kW that EPA assumed in its 2011 modeling (2009 dollars). Most units with wet FGD systems should be able to achieve HCl emissions rates of 0.0006 lb/MMBtu with little to no additional costs. They asserted that already some units are performing at rates of 0.0001 lb/MMBtu, which should be achievable for other units with wet FGD systems with additional upgrades.

- Emissions of acid gases specifically associated with already installed dry FGD systems decreased overall between 2011 and 2019. Costs of upgrading dry FGD systems, estimated to be as low as \$17/kW, are well below the \$100/kW that EPA assumed in its 2011 modeling. Costs have also come down as FF technology has improved, allowing for these components of the dry FGD to be smaller and less expensive. These upgrades could lower HCl emissions to a rate of 0.0006 lb/MMBtu with no further changes. The commenters said that however, based on data that EPA released with the proposed rule, no units equipped with dry FGD systems would need to make changes to achieve an HCl standard of 0.0006 lb/MMBtu.

- DSI systems now need less reagent or sorbent to achieve the same levels of acid gas reduction, partly because of advances in equipment and design of injectors that improve performance by better dispersing the reagent. Costs are lower than anticipated because FFs are typically not needed. These upgrades, on the order of \$10/kW, could lower HCl emissions to a rate of 0.0006 lb/MMBtu. However, considering data that EPA released with the proposed rule, most if not all DSI-equipped units could achieve an HCl standard of 0.0006 lb/MMBtu by increasing sorbent injection rates, without making additional capital investments. Commenters asserted that the EPA does not need more information

on DSI rates to determine whether reductions in HCl and HF are feasible and cost-effective. Commenters stated that emissions data are available that would allow the EPA to calculate achievable reductions at each unit using DSI, or at a generic, model unit.

Commenters noted that per the Agency "[i]t is not clear that improvements in a wet or dry FGD scrubber would result in additional HCl emission reductions since HCl emissions are already much easier to control than $SO_2$ emissions", however, recent HCl and $SO_2$ emissions data from units equipped with wet FGD systems or DSI show a strong correlation between emissions rates for these two pollutants, and all units with dry FGD are already emitting below a rate of 0.0006 lb/MMBtu. The commenters said that therefore, data indicate that improvements to wet FGD or DSI systems that would reduce $SO_2$ emissions would also reduce HCl and HF emissions.

**Response 2:** The EPA acknowledges and thanks the commenters for providing these comments. We have taken these comments and the referenced information into consideration when establishing the final emission standards. The Agency did not propose to revise the acid gas emission standard for HCl or $SO_2$ in the 2023 Proposal (88 FR 24882). We have discussed the rationale for the final emission standards in section IV.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 3:** Commenters stated that the incremental costs of achieving an HCl limit of 0.0006 lb/MMBtu are reasonable, especially when taking into account planned retirements and retirements that would likely already occur given the IRA, industry trends, and other regulations. They said the Andover Technology Partners' report—which does not account for retirements projected to occur under the IRA or cost reductions from FF installations to reduce fPM emissions—finds that coal-fired units could comply with this limit at an annualized cost of $191 million. The commenters said that the total cost is reasonable, as illustrated by comparisons to the industry's annual revenues (0.048% of 2019 revenue of $401.738 billion) and total expenditures (0.078% of 2019 total expenditures of $242.9 billion). If units implemented measures to meet a revised fPM limit, the incremental annualized costs to meet this acid gas limit would be even lower.

**Response 3:** The Agency thanks commenters for providing this additional information. The rationale for the final emission standards is discussed in section IV.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 4:** Commenters urged the EPA to leverage the improvements to controls that will likely result from a strengthened fPM standard and secure further reductions in harmful acid gas emissions as well. The commenters said that the fact that most units with acid gas controls are already complying with an HCl limit of 0.0006 lb/MMBtu, while most units without such controls are not, suggests that this revised standard would better reflect the emissions levels achievable through measures that have been widely implemented and have proven cost-effective.

**Response 4:** The EPA acknowledges these comments. The rationale for the final emission standards is discussed in section IV.D of the preamble and in the 2024 Technical Memo entitled

"2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

**Comment 5:** Commenters stated that the EPA should eliminate the coal refuse subcategory. The subcategory is not based on any design differences that could properly be used to identify a separate class, type, or size of coal-fired power plant and contrary to the EPA's stated rationale that coal refuse contains exceptionally high concentrations of chlorine and sulfur, plants within the subcategory feature no design elements that require them to burn those high-HAP materials. The commenters said that the plants in the subcategory are capable of burning (and currently burn) fuels other than coal refuse such as low-sulfur coals that allow for compliance with the acid gas standards applicable to other plants. They said the Agency has identified no design features that render the plants in the subcategory incapable of meeting the general acid gas standards. The commenters said that furthermore, the acid gas standard established for the coal refuse subcategory does not reflect the maximum achievable reduction in emissions from those units and five of the six units within the subcategory have met enforceable $SO_2$ limits that are more stringent than EPA's finalized standard for the subcategory and done so over a sustained period. Commenters asserted that the EPA's acid-gas standard—set at the level of the worst performer in the subcategory—violates CAA section 112's requirement that the EPA's standards reflect the "maximum achievable reduction in emissions," and be no less stringent than the emission reductions actually achieved by the best performing sources.

Commenters urged the EPA to lower the 2020 rulemaking compliance limit for the EBCR burning EGUs category. The commenters shared the concerns that these facilities are having negative effects on the air and water quality of Shenandoah as well as other nearby Class I areas and public lands.

**Response 5:** As noted by the commenters, the proposal did not address the acid gas standard for EBCR-fired EGUs. As such, these comments are outside the scope of the proposed action and no response is necessary.

**Comment 6:** Commenters found that developments since 2012 likely warrant strengthening the current 0.20 lb/MMBtu $SO_2$ standard. They said improvements in a wet or dry FGD scrubber would likely result in additional HCl emission reductions as the EPA's use of $SO_2$ as a surrogate for acid gas emissions implies a direct relationship as indicated in its May 3, 2011 MATS proposal; therefore, as compliance with stringent $SO_2$ limits increase, then acid gas HAP emissions would decrease. Commenters recommended that the EPA consider Circulating Dry Scrubber (CDS) technology as a more-effective option for controlling $SO_2$. They said that a CDS FGD system has a similar installed cost to a comparable SDA FGD system. The commenters noted that it is likely that the EPA did not consider CDS as a control type in this action due to EPA's use of CAMD which lumps CDS into the Dry Lime FGD category. The commenters asserted that if all affected EGUs were limited to 0.10 lb/MMBtu or less, annual emissions could be reduced by 56% (about 460,000 tons of $SO_2$/year).

**Response 6:** The Agency did not propose any changes to the $SO_2$ surrogate standard. The EPA will continue to review emission standards and other requirements as part of routine CAA section 112(d)(6) technology reviews, which are required by statute to be conducted at least

every 8 years. If, in the technology review, the Agency determines that modification of any emission standards is warranted, it will first propose revision to the standards and solicit comment on those proposed revisions.

## 5.3 No Proposed Revisions to Standards for Continental Liquid Oil-Fired EGUs

**Comment 1:** Commenters urged the EPA to retain the current definition of the limited-use liquid oil-fired subcategory and not impose new HAP standards on EGUs in this subcategory, given that there are already limits on the amount of fuel oil that can be burned. Commenters noted that the Agency has not identified any justification for the costs required for implementation and compliance with new HAP standards. They said any changes to the existing HAP standards for EGUs in this subcategory may lead to reliability issues, as these units are crucial to maintaining grid reliability during cold winter spells, other extreme weather events, or when natural gas is curtailed, as acknowledged by the Agency. Commenters provided the example of Winter Storm Uri in 2021, where the Public Utility Commission of Texas directed the development of a firm fuel product—now called "Firm Fuel Supply Service"— which incentivizes the addition and maintenance of alternative fuel capability at EGU facilities primarily fueled by natural gas resulting in securing 2,940 MW of alternative fuel capability from EGUs as part of its initial procurement of this service
(https://interchange.puc.texas.gov/Documents/52373_336_1180125.PDF).

**Response 1:** The EPA's response to this comment is discussed in section VI.C of the preamble.

**Comment 2:** Commenters stated that testing liquid oil for HAP metals is theoretically possible. They said, however, based on their preliminary research, these tests are expensive and challenging to perform, and they found it difficult to find a laboratory that could do the analysis down to suggested levels.

**Response 2:** The EPA acknowledges and thanks the commenters for providing these comments. We have taken these comments and the referenced information into consideration when establishing the final emission standards.

## 5.4 No Proposed Revisions to Standards for Non-Continental Liquid Oil-Fired EGUs

**Comment 1:** Commenters stated that the EPA should not impose new HAP standards for EGUs in non-continental areas because any additional standards would require large investments to achieve compliance, divert investments away from renewable energy development, or force premature retirement — of which the latter may jeopardize resilience and reliability in these areas. Other commenters also stated that the proposal is justified given the incredibly low utilization of these units, which are reliability critical assets, and which are likely to be retired and replaced by flexible fuel units in coming years.

**Response 1:** The comment supports the conclusions in the proposed rule that the EPA is finalizing. For this reason, the comment requires no response.

**Comment 2:** Commenters requested that the EPA not require oil-fired EGUs in non-continental areas to switch from residual oil to cleaner fuels. Any change to distillate fuel would be cost-

prohibitive as natural gas may not be physically accessible or otherwise consistently acquired in non-continental areas. Commenters asserted that a switch to distillate oil would increase fuel costs by at least 7%, resulting in an approximate increase of $61 million per year (without accounting for inflation or grid changes). They said, additionally, the EPA should not require liquid oil-fired EGUs in non-continental areas to switch to cleaner fuels after a certain number of hours of operation. The commenters said that this would force EGUs to undertake significant modifications to plant infrastructure to support two different types of fuel oil. Modifications, such as building additional fuel oil storage tanks, which may be difficult at facilities located in urban areas where there is insufficient land available for such an expansion on the site's footprint. Commenters noted that diverting large capital outlays to such modifications would not be fiscally sound, particularly in areas with aggressive Renewable Portfolio Standards (RPS). For instance, Hawaii's RPS requires electric generating companies to sell increasing percentages of electricity generated from renewable sources, where the percentage must reach 40% by 2030, 70% by 2040, and 100% by 2045. The commenters said that owners and/or operators of EGUs in these areas would thus need to outlay significant investments for both endeavors — complying with any changes to their MATS requirements while simultaneously meeting the RPS — and the costs required for both would ultimately need to be passed down to customers, further increasing electricity costs, which already are nearly three times higher than the average in the continental U.S.

**Response 2:** The EPA acknowledges and thanks the commenters for providing these comments. We have taken these comments and the referenced information into consideration when establishing the final emission standards. We have discussed the rationale for the final emission standards in section IV.D of the preamble.

**Comment 3:** Commenters requested that the EPA not eliminate or revise the fPM standard because for non-continental liquid oil-fired EGUs, the fPM standard is crucial to simplifying the monitoring requirements and, more importantly, reducing the costs associated with ongoing MATS compliance. The cost of performance testing to demonstrate compliance with the surrogate fPM standard is much lower than the cost of performance testing to demonstrate compliance with the numerous standards for individual non-Hg HAP metals, as well as for total non-Hg HAP metals. The commenters said that requiring monitoring and testing for each individual non-Hg HAP metal would significantly increase compliance costs and, thereby, electricity rates. Commenters noted that, for example installing Hg, HCl, HF, and PM emission controls on its non-continental MATS-applicable fleet to comply with the current MATS for continental oil-fired EGUs is estimated to cost nearly $1 billion. Commenters added that unlike many states in the continental U.S., there is excellent natural air quality in remote island locations due to geographical isolation, island configuration, and trade winds and as such, any emission reductions achieved by amending the existing MATS standards likely would have only a de minimis impact on air quality, and the cost of complying with any amendments would be vastly disproportionate to their benefits.

**Response 3:** The comment supports the conclusions in the proposed rule that the EPA is finalizing. For this reason, the comment requires no response.

## 5.5 No Proposed Revisions to Standards for IGCC EGUs

**Comment 1:** Commenters expressed agreement with retaining the emission standards for IGCC and oil-fired EGUs.

**Response 1:** The comment supports the conclusions in the proposed rule that the EPA is finalizing. For this reason, the comment requires no response.

# CHAPTER 6

## 6. Other proposed actions

**Comment 1:** Commenters stated that EPA could also contextualize HAP emission reduction benefits within the context of cumulative pollution burdens which could make incremental emission reductions lead to more significant risk reductions. They said for example, HAP emissions from these power plants alone may not exceed EPA's "acceptable" risk thresholds, but they might exceed the threshold when combined with cumulative burden from other sources. The commenters said that communities that bear a disproportionate burden of environmental harms may benefit from revisiting the environmental justice analysis.

**Response 1:** EPA is required to provide the risk information necessary to inform RTR regulatory decisions and, to this end, the EPA conducts a comprehensive assessment of the risks associated with exposure to the HAP emitted by the source category and supplements that with additional information that is available about other possible concurrent and relevant risks. While the incorporation of additional background concentrations from the environment in our risk assessments (including those from mobile sources and other industrial and area sources) could be technically challenging, they are neither mandated nor barred from our analysis. In developing the decision framework in the Benzene NESHAP that is currently used for making residual risk decisions, the EPA rejected approaches that would have mandated consideration of background levels of pollution in assessing the acceptability of risk, concluding that comparison of acceptable risk should not be associated with levels in polluted urban air (54 FR 38044, 38061, September 14, 1989). Background levels (including natural background) are not barred from the EPA's ample margin of safety analysis, and the EPA may consider them, as appropriate and as available, along with other factors, such as cost and technical feasibility, in the second step of its CAA section 112(f) analysis. This assessment excludes background contributions because the available data are of insufficient quality upon which to base a meaningful analysis. Further, our approach here is also consistent with the approach we took regarding this issue in the Hazardous Organic NESHAP (HON) RTR (71 FR 76603, December 21, 2006), which the court upheld in the face of claims that the EPA had not adequately considered background concentrations. (NRDC v. EPA, 529 F.3d 1077 (D.C. Cir. 2008)).

**Comment 2:** Commenters stated Coal Creek anticipates playing a crucial role in North Dakota's aggressive goal of being carbon neutral by 2030 and reducing the carbon intensity of power delivered in the MISO region. The commenter said that there are plans to install 400 MW of wind at Coal Creek and there is active work with the Energy and Environmental Research Center at the University of North Dakota towards the installation of a full-scale post-combustion $CO_2$ carbon capture system designed to capture 95% of $CO_2$ emissions at the facility.

**Response 2:** The EPA acknowledges and thanks the commenters for providing these comments. We have taken these comments and the referenced information into consideration when establishing the final emission standards. The rationale for the final emission standards is discussed in section IV.D of the preamble and in the 2024 Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category."

## 6.1 Startup Requirements

**Comment 1:** Commenters stated the use of the four-hour startup definition should continue to be allowed. They said the EPA's determination that only eight EGUs are currently using that option is insufficient justification for eliminating the definition. Given that the 2023 Proposal does not identify any flaws with the current definition, the EPA should explain why elimination of the four-hour definition from MATS is appropriate when there are units currently relying on it. Commenters also stated that the EPA should consider providing reasonable exemptions for the EGUs that currently use that definition, thus gradually phasing out the definition without imposing any additional compliance burdens. The commenters also argued that with potentially lower fPM standards, more facilities may need the additional flexibility allowed by this definition of startup as their margin of compliance is shrunk. They noted startup or non-steady state operation is not conducive to CEMS accuracy and may create false reporting of emissions data biased either high or low depending on the actual conditions.

Commenters stated several facilities are currently required to use the four-hour startup definition per federal consent decrees or state agreements. They said such a scenario provides clear justification for a limited exemption, as MATS compliance should not result in an EGU violating its consent decree. Commenters noted other scenarios where state permits have special conditions with exemptions from emission limits during ramp-up or ramp-down periods. They said many facilities alleviate high initial emissions by using alternate fuels to begin the combustion process, which has been demonstrated as a Best Management Practice and to lower emissions. Commenters noted that the permit modification process, let alone any physical or operational modifications to the facility, could take significantly longer than the 180-day compliance deadline, depending on public comments, meetings, or contested hearing requests made during the permit process.

Commenters stated the second part of the startup definition has seen limited use due to the additional reporting requirements that the EPA imposed on sources that chose to use the definition, which are unnecessary and should be removed from the rule. The commenters said that the analysis the EPA conducted during the startup/shutdown reconsideration showed that the definition was reasonable, and one could argue that it may be especially needed if the EPA further reduces the limits given the transitory nature of unit and control operation these periods.

Commenters stated the second paragraph of the startup definition should remain in the rule as removing this for simplicity is not an adequate justification. They said the EPA is conflating the MACT standard-setting process with this RTR process. Though the EPA notes the best performing 12% of sources do not need this alternative startup definition, commenters stated this change is beyond the scope of the technology review.

Commenters stated that the EPA should consider allowing the use of diluent cap values from 40 CFR part 75. As these are limited under MATS, commenters noted startup and shutdown variations are more pronounced than if diluent caps were to be allowed. They said that with a lower emissions limitation, the diluent cap would mathematically correct for calculation inaccuracies inherent in emission rate calculation immediately following startup.

Commenters stated the second paragraph of the startup definition is beneficial to units that require extended startups. They said including allowances for cold startup conditions could allow some EGUs to continue operation until more compliant generation is built, which would help facilitate a smooth transition to newer plants that meet the requirements without risking the reliability of the electric grid. Commenters also noted some control devices, such as ESPs, may not be operating fully even when the plant begins producing electricity.

Commenters stated RATA must be conducted at greater than 50% load under 40 CFR part 60 and at normal operating load under 40 CFR part 75. They said that it is not reasonable to require facilities to certify their CEMS at greater than 50% capacity and use it for compliance at less than 50% capacity. Commenters stated that startups have constantly changing flow and temperatures that do not allow compliance tests to be conducted during these periods.

**Response 1:** The Agency has responded to this comment in section VII.C of the preamble. PM CEMS are not subject to RATAs and as the Agency did not propose changes to HCl CEMS, the comment on RATAs being conducted at greater than 50% load is moot.

**Comment 2:** Commenters stated the EPA should finalize its proposal to remove the unlawful definition of startup that allows excess emissions during this period. The commenters stated that the EPA must remove the second paragraph of the startup definition as there is no legal basis under CAA section 112(h) for a work practice standard in lieu of a numerical limit during this period. The commenters said that the CAA only allows work practice standards in two specific, very limited situations, only one of which EPA relied upon to establish the extended startup period here—when "the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations." (42 U.S.C. § 7412(h)(2)). That the vast majority of coal-fired EGUs have chosen the first startup definition shows that it is practicable to measure emissions during the four hours in question. The commenters said that as during the 2012 MATS Final Rule, the EPA is again taking the position that the length of startup should be based on what the best performers can achieve when it should seek to ensure the source category as a whole measure their emissions during the four hours in question. The commenters said that if the EPA were to take the position that each and every EGU must be able to measure its emissions during the extended startup period before requiring compliance with numeric standards during these four hours, that position would be contrary to the plain language of the statute, which only allows the EPA to establish work practice standards due to inability to measure emissions when measurement is not practicable for a "particular class of sources."

Commenters said that the small number of EGUs that have chosen the second definition do not constitute a "particular class of sources." (42 U.S.C. § 7412(h)(2)(B)). They argued that the EPA has also never suggested that CAA section 112(h)'s other avenue for promulgating work practice standards—when "a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or [when] any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law" (42 U.S.C. § 7412(h)(2)(A))—applies during the first four hours of electricity generation. They said nor could the EPA: HAP from EGUs can be and are emitted through units' stacks (the conveyances designed and constructed to emit such pollutants), and no requirement for or use of EGU stacks would be inconsistent with any federal, state, or local law.

114

Commenters said that because there is no statutory basis for work practice standards during the four hours in question, the EPA must remove the extended startup period and impose numeric standards during those four hours. They said further that there is no statutory basis for the extended startup period makes it "necessary" (42 U.S.C. § 7412(d)(6)) under CAA section 112(d)(6) to remove this extended work practice period.

Commenters stated compliance with the numeric standards beginning at electricity generation is consistent with the EPA's Acid Rain Program, which—for more than two decades— has required all EGUs to measure emissions using CEMS any time units are combusting fuel, including the first four hours of electricity generation, and count those emissions for compliance purposes. They said that the EPA has attested to the accuracy of that Acid Rain emissions data in its Plain English Guide to the program's monitoring regulations: "Part 75 . . . [e]nsur[es] that the emissions from all sources are consistently and accurately measured and reported. In other words, a ton of emissions from one source is equal to a ton of emissions from any other source." (EPA, *Plain English Guide to the Part 75 Rule*, at 6 (June 2009)). The commenters said similarly, the Agency's Policy Manual for these monitoring requirements states: "To ensure that allowances are consistently valued and . . . all of the projected emission reductions are in fact achieved, it is necessary that actual emissions from each affected utility unit be accurately determined. To fulfill this function, Title IV requires that affected units continuously measure and record their $SO_2$ mass emissions." (EPA, *Part 75 Emissions Monitoring Policy Manual*, at iii (2013)).

Commenters stated that eliminating the extended startup period is necessary under CAA section 112(d) because removing it would achieve emission reductions. They stated that startups can take place many times every year – for example, the EPA found that the "average EGU had between 9 and 10 startup events per year during 2011 – 2012, but data from a small number of EGUs indicated significantly more startup events (*e.g.,* the EGUs with the most startup events had over 100 startup events in 2011 and over 80 in 2012)." (EPA–HQ–OAR–2009–0234–20451, at 4 (Nov. 2014)). The commenters said that more recently, the National Association of Regulatory Utility Commissioners (NARUC) found that the average coal-fired EGU had 10.64 startups in 2018. They said that emissions from EGUs that choose the second startup definition can be elevated during the extended startup period because the applicable work practice standards allow EGUs to burn dirty fuels such as coal and not operate their pollution controls at all (for non-particulate controls) or not operate them at levels that would fully reduce emissions (for ESPs for particulate control). The commenters said that when ESPs are not fully operational while coal is being fired during startup, particulate emissions could be roughly 10 to 100 times higher than they would be if this pollution control equipment fully operative. The commenters said this is especially important because, as coal-fired EGUs are forced into more and more intermittent use by less expensive gas-fired units and renewable energy, the amount of cycling and number of (at least cold) startups will likely increase. They asserted that even the worst performers should have no trouble meeting MATS beginning at generation, since those standards generally have a 30-day averaging period.

Commenters stated removing the extended startup period promptly would be administratively efficient, since—as EPA recognizes in the proposed rule here—the D.C. Circuit's decision in

*Chesapeake Climate Action Network* requires the Agency to conduct 42 U.S.C. § 7607(d)(7)(B) reconsideration proceedings concerning environmental groups' objections that there is no valid basis for the extended startup period. The commenters said that if the EPA were to finalize its proposal to remove the extended startup period, there would be no need to conduct separate reconsideration proceedings.

Commenters stated that the extended startup option should be removed as cost is irrelevant because the EPA has no valid statutory basis for retaining the extended startup period and cost is irrelevant in the context of EPA's CAA section 112(d)(6) review of this issue because it is "necessary" to revise MATS to correct a legal defect—that MATS allows compliance with work practice standards even though the CAA instead requires numeric standards during all of the extended startup period. They said that nevertheless, the EPA is correct that removing the extended startup period "would result in little to no additional expenditure since the additional recordkeeping and reporting provisions associated with the work practice standards of paragraph (2) of the definition of 'startup' were more expensive than the requirements of paragraph (1) of the definition of 'startup.'" The commenters said that further, the fact that the overwhelming majority of EGUs have chosen the first definition makes clear that measuring emissions during the extended startup period is not cost-prohibitive.

Commenters stated removing the extended startup period now is also important because the EPA characterized the 2014 startup definition as a stopgap and asserted—both in the administrative record and in the D.C. Circuit—that it would assess whether to maintain this work practice period during the RTR. They said in fact, the EPA vowed to the D.C. Circuit that it would consider removing the four-hour extended startup work practice period from the NESHAP for industrial boilers (a period that was based primarily on when EGUs can purportedly begin to measure emissions) in exactly the circumstances that are present here—when operators choose and comply with the first startup definition.

**Response 2:** The Agency appreciates the commenters' support for removing startup definition #2, even though the Agency disagrees that the definition is unlawful or unavailable as a work practice standard. Moreover, in contrast to the commenters' suggestion, the Agency maintains that emission measurements during periods of startup – as well as shutdown and certain malfunctions – are not practicable. This view is consistent with that already explained and contained in the *Denial of Petitions for Reconsideration of Certain Startup/Shutdown Issues: MATS*, available in the MATS docket at EPA-HQ-OAR-2009-0234-20581 and in the *Startup and Shutdown Technical Support Document*, available in the MATS docket at EPA-HQ-OAR-2009-0234-20427.

The Agency continues to disagree with the commenters' contention to equate the acid rain program and its requirements contained in 40 CFR part 75 with those of this program and its requirements contained in 40 CFR part 63. As explained earlier in this document and in the aforementioned *Denial of Petitions for Reconsideration of Certain Startup/Shutdown Issues: MATS*, available in the MATS docket at EPA-HQ-OAR-2009-0234-20581, the commenters err by failing to acknowledge that the distinct measurement techniques necessary for an emissions trading program, such as that contained in the acid rain program, established under title IV of the Clean Air Act Amendments (CAAA), allows source owners or operators to purchase credits for

116

emissions in excess of an annual threshold and differ from those found in continuous emissions compliance programs, which contain never-to-be exceeded emission limits, such as those established under section 112 of title I of the Clean Air Act. Moreover, the commenters continue to misunderstand the purpose of the Agency's analysis of the startup data obtained from the acid rain program: that analysis was conducted to determine the end of startup based on when controls were engaged, not to assess the accuracy of emission measurement at the beginning the startup period.

While the Agency will remove startup definition #2 from the rule and is taking action consistent with the D.C. Circuit's direction in *Chesapeake Climate Action Network v. EPA* by taking comment on the proposal to remove this definition, 952 F.3d 310 (D.C. Cir. 2020) as the commenters' desire, the Agency does not necessarily agree with the commenters' claims concerning the potential magnitude of emissions from not fully engaged control devices. Moreover, because work practice standards, not emission standards, are in place during periods of startup, the Agency lacks data to determine and does not agree with the commenters' incorrect assertion that startup emissions may not be problematic since they can be included in 30-boiler operating day rolling averages.

## 6.2 Removing Non-Hg Metals Limits

**Comment 1:** Commenters urged the EPA to retain the non-Hg metal HAP limits and associated testing option under MATS. While fPM is a suitable surrogate for non-Hg metal HAP, and thus the EPA was and is justified in setting a standard for fPM under MATS, it is incongruous for EPA to eliminate the standards for the pollutants that are actually the subject of CAA section 112(d)(6) – the non-Hg metal HAP. The commenters said that the EPA offers no substantive reason for eliminating the actual HAP standards and that removing the individual and total non-Hg metal standards untethers the reduction of non-Hg metal HAP standards from the fPM emission limits. The commenters said that here, removing the individual and total non-Hg metal standards appears to confirm that the purpose of this Proposed Rule under CAA section 112(d)(6) is, in truth, to effect reductions in fPM, regardless of any reductions in the pollutants of interest – the HAP.

Commenters stated although few EGU owners have chosen to demonstrate compliance with the non-HG metal HAP standards, these EGUs presumably selected that for a reason. They said that no matter how justified a surrogate is, there will be situations in which the underlying HAP – the pollutant of real interest – may not follow the generally applicable correlation between the HAP and the surrogate that the fPM standard is based upon. The commenters said that for example, on scrubbed sources, the PM is mostly potential limestone slurry or gypsum carry-over rather than coal ash, which is largely removed by other control equipment and the supplemental removal by being "washed out" by the scrubber. The commenters asserted that if the PM is low, it is certainly an indication that the metals have been captured somewhere, but higher PM concentration due to issues with the scrubber mist eliminators might not suggest higher non-Hg metal emissions and direct Method 29 testing would be a better indicator of performance than PM. The commenters said that for that reason, the EPA should retain the flexibility for EGUs to meet either the fPM or individual/total non-Hg metal HAP standards.

Commenters stated that the suggestion that weekly non-Hg metals testing might be needed is nonsense. They said that the EPA has suggested that "very frequent emissions testing, perhaps on the order of weekly" might be needed if "our proposal to remove non-Hg metals from the rule not finalized" in order "to provide more information on compliance status." (88 FR 24886). The commenters said that quarterly PM or metals testing, which the EPA categorized as frequent in the original rulemaking, is adequate to show compliance in conjunction with the other monitoring required under other rules to ensure proper operations of controls. They argued that imposing more frequent testing would be unnecessary, costly, and impractical, particularly given the changing dispatch of coal-fired EGUs.

Commenters stated the EPA should not remove the LEE option for fPM and non-HG HAP metals. The commenters said that the EPA is proposing to remove the LEE option for fPM and non-Hg HAP metals because requiring PM CEMS would render the current stack testing compliance compliance method for the LEE program "superfluous." If the EPA establishes the final fPM standard at 0.010 lb/MMBtu, the Agency should nonetheless retain the LEE option and allow LEE to continue demonstrating compliance through stack testing (without any changes to the current test frequency). The commenters said that stack testing via the three-year cycle after meeting the LEE limit is much less costly than quarterly testing and thus, units that currently rely on the LEE provisions would face an exponential increase in monitoring costs associated with installing, implementing, and using PM CEMS, including employing additional technicians to operate the equipment.

**Response 1:** The response to these comments is provided in section IV.D of the preamble. Additionally, as mentioned earlier, because a non-Hg metals LEE program was not proposed, consideration of a non-Hg metals LEE program is moot.

**Comment 2:** Commenters expressed support of continued reduction in emissions of non-Hg HAP metals under the recommended revisions. They said that in the 2012 MATS Final Rule, the EPA determined that non-Hg metals like chromium and nickel, emitted by power plants as particulates, pose cancer risks, and that power plants continued to be a significant source of these and other toxic metals, such as arsenic and cadmium, which have serious health effects. The commenters said that in 2012, the EPA studied the chronic inhalation risk from HAP other than Hg emitted by a small subset of potentially regulated facilities and found that nickel, hexavalent chromium, and arsenic emissions posed serious risk. A 2023 literature review illustrates the growing evidence of the significant adverse health effects from exposures to both individual metals and groups of non-Hg metals in air pollution. The commenters said researchers now better understand than at the time MATS was promulgated how exposure to multiple metals in addition to other air pollutants impairs human health more severely than exposure to metals individually. The commenters said that this reinforces the need to set a stringent emissions standard to protect communities from these dangerous pollutants. They concluded that cumulative health risks of exposures to HAP metals and mixtures of metals from multiple sources and multiple exposure pathways bolsters the EPA's proposal to strengthen the standards for non-Hg metals emitted from EGUs.

**Response 2:** As already established by the original MATS rulemaking, the Agency determined that fPM is an appropriate standard for non-Hg metals. Therefore, the Agency agrees with

commenters' assertion and will reduce the current fPM emissions limit by two-thirds. Regarding non-Hg metal HAPs, EPA is aware that new scientific information has become available since the current health benchmarks for nickel, hexavalent chromium and arsenic were developed. It is premature to estimate what, if any, revisions to the IRIS assessment for these metals may be needed until a comprehensive evaluation is conducted. At time of writing, the IRIS assessments for hexavalent chromium and inorganic arsenic are still underway. More detailed information on the IRIS assessment development process is available on the IRIS website.

Regarding cumulative risks, we disagree with the comment that we failed to consider or account for cumulative risk. The individual cancer risks for each source category were aggregated for all carcinogens. In assessing noncancer hazard from chronic exposures for pollutants that have similar modes of action or (where this information is absent) that affect the same target organ, we aggregated the hazard quotients. This process creates, for each target organ, a target-organ-specific hazard index (TOSHI), defined as the sum of hazard quotients for individual HAPs that affect the same organ or organ system. All TOSHI calculations presented here were based exclusively on effects occurring at the "critical dose" (*i.e.,* the lowest dose that produces adverse health effects).

**Comment 3:** Commenters stated that the removal of the option to report HAP metals directly could inadvertently overlook the presence of vapor-phase metals, such as $SeO_2$, or metals present in extremely small PM. They said this could potentially lead to an inaccurate estimation of actual metal HAP emissions and urge the EPA to continue to include the option for facilities to monitor metals directly. The commenters said they are currently working with the EPA in a Small Business Innovation Research Project to develop a method to allow for continuous or semi-continuous non-Hg metals monitoring. They said their innovative approach holds promise in terms of providing direct measurement of speciated and total metals, while EPA Method 29 only provides intermittent data, and the PM surrogate does not provide metals data at all.

**Response 3:** As established by the original MATS rulemaking, the Agency determined that fPM (and acid gases for vapor phase selenium) is an appropriate surrogate for non-Hg metals. Therefore, the Agency disagrees with the commenters' assertion that non-Hg metals limits are needed as a check on vapor phase metals emissions.

**Comment 4:** Commenters stated that CAA section 112(d)(3) requires the EPA to set standards for existing sources based on the emission averages of the best performing 12% of current facilities. Further, CAA section 112(d)(6) requires that the EPA review and revise these standards at least every 8 years. They said; thus, it is clear that Congress intended the EPA to periodically adjust emissions standards as industry standards improved. Commenters stated that for the Agency to accurately revise the standards for HAP metals, the EPA needs to monitor for HAP metals emissions directly to better understand how the "best performers" reduce HAP metal emissions or prevent HAP metal emissions from increasing. They said, that is, the efficacy of various HAP metal emission reduction/prevention options cannot be assessed unless each HAP metal is measured because each has unique and wide-ranging chemical and physical properties dictating their presence and behavior under various conditions. The commenters argued that this will be particularly important if processes and/or chemistry changes through the

addition of reactants to facilitate other aspects of the process such as minimization of corrosion and catalyst poisoning, enhancement of collection efficiency of other species such as Hg.

Commenters stated that failure to monitor HAP metals directly will significantly impair the EPA's ability to revise emissions standards in the future and would not be consistent with the intent of the CAA to ensure that emissions standards are updated every 8 years based on improvements that the best performers have implemented.

**Response 4:** The Agency agrees with the commenter that initial MACT emission limits are to be based on the emissions of the best performing sources; however, the Agency disagrees with the commenter's assertion that the CAA section 112(d)(6) ongoing review and revisions involves recalculation of best performing sources. The EPA is not obligated to recalculate MACT floors in the course of the periodic technology review. *NRDC v. EPA*, 529 F.3d 1077, 1084 (D.C. Cir. 2008); *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 7–9 (D.C. Cir. 2015). Rather, CAA section 112(d)(6) requires review of technological advances in source operation and controls, coupled with revision of emission limits if warranted. The rule's use of PM CEMS as the compliance determination method for the fPM emission limit will not impair or impede review of future improvements to EGU process operation or non-Hg metals or fPM control devices, so the Agency finds the commenter's concerns unfounded.

**Comment 5**: Commenters stated that HAP metals have wide ranging health and environmental impacts and unless each is monitored directly and continuously, these impacts cannot be fully assessed. They said that simply monitoring PM provides only limited information for assessing these potential health and residual risk impacts. Direct measurement of each individual HAP metal should be required to fully assess environmental impacts and health risks related to such metals. They commenters said that current scientific literature is beginning to indicate that PM mass concentration may not be the best indice for associating health effects with exposure to ambient PM. Contemporary researchers in the field of airborne metals' health effects are finding that the metals components of PM are responsible for a substantial portion of the observed PM impact, and can cause various significant health effects from pulmonary inflammation to increased heart rate variability to decreased immune response. They said that these effects are not only seen from chronic exposure, but also from short-term peaks in ambient air concentrations (Chen and Lippmann 2009) and data show that the metals in PM may be more dangerous than other PM components (Konkel 2009). The commenters stated that a study of PM2.5 in 2010 showed that metals were the important source for cellular oxidant generation and subsequent health effects (Maciejczyk 2010). In addition, transition metals, such as iron, vanadium, nickel, chromium, copper, and zinc, have been cited as most likely to be toxic on the basis of their ability to support electron exchange (Ghio 1996), and catalyze and generate reactive oxygen species (ROS) in biological tissues (Chen and Lippmann 2009). The commenters said that ROS, such as hydroxyl radicals (OH·), are thought to be involved in various forms of lung injury and are considered to be both genotoxic and carcinogenic (Knaapen et al. 2004). The commenters concluded that taking this information into consideration, monitoring stack emissions for only PM does not provide an adequate depiction of the potential for the components of that PM to cause negative health effects.

Commenters stated that legislation concerned with monitoring only PM mass concentrations fails to address the substantial differences in potential health effects linked to specific metal species and their independent variability (Moreno 2009). They said that a more effective approach would be to address the specific metals of concern independently, focusing control efforts on the most toxic species. The commenters said they recommend that the EPA at least promulgate specific language in its rules to allow alternative multi-metals monitoring to demonstrate compliance with EPA proposed alternative HAP metal emission limits.
(The commenters provided the following references:

- Chen and Lippmann, (Chi-Chen, Lung and Morton Lippmann). "Effects of Metals within Ambient Air Particulate Matter (PM) on Human Health." Inhalation Toxicology, 2009: 21: 1-31.
- Konkel, Lindsey. "Heavy Metal: Some Airborne Particles Pose More Dangers than Others." Environmental Health News, December 17, 2009)

**Response 5:** The Agency acknowledges the comments and references related to the health and environmental effects of HAP metals. As mentioned earlier, as allowed by the NESHAP general provisions, an owner or operator interested in using an alternative such as multi-metals CEMS to demonstrate compliance with the equivalent metals limits provided in the rule may request permission from the Administrator to use an alternative test method under the provisions of 40 CFR part 63.7(f).

### 6.3 Removing Use of PM CPMS for Compliance Determinations

**Comment 1:** Commenters stated the option to use PM CPMS for compliance under the current MATS rule should be retained as a way to mitigate the high testing costs associated with PM CEMS – especially under the more stringent proposed PM limit – while still provide a continuous indicator of performance. The commenters believe the limited use of PM CPMS is due to three reasons:

1. The original PM CPMS provisions set the operating limit at the value measured during the compliance test, which would have eliminated any margin of compliance and made demonstrating compliance capricious. This was not "fixed" in the 2016 technical corrections at which point many facilities had selected other compliance demonstration methods.

2. Other sources that might have used the PM CPMS provisions have found the LEE provisions more attractive since it has allowed them to reduce the associated testing to once every three years after showing their emissions were less than half the limit for three years.

3. Sources might otherwise be inclined to use a PM CPMS but find the requirement to set the operating limit at a point representing 75% of the underlying PM standard (*i.e.,* to give up 25% of their compliance margin) to be too onerous.

Commenters stated that PM CPMS should be retained, particularly if the EPA eliminates the quarterly and/or LEE testing options, because like PM CEMS it offers "increased transparency

and accelerated identification of anomalous emissions," which EPA suggest are its reasons for proposing that all existing coal-fired sources should use PM CEMS. The commenters said that under the new reporting requirements that start in 2024, sources that use continuous monitoring systems, which would include both PM CEMS and PM CPMS instruments, will be required to report the 30-boiler operating day averages in their quarterly compliance reports as well as the results of annual PM performance test and associated PM CMPS operating limits needed to interpret the compliance status of the PM CPMS 30-boiler operating day averages.

**Response 1:** The Agency disagrees with the commenters' suggestion to keep PM CPMS based on their supposition for PM CPMS non-use. Rather than speculate on potential motives for non-use, the Agency prefers to look at actual use patterns – very few EGU owners or operators chose to use PM CPMS for compliance purposes. While PM CPMS provide data more continuously and more transparently than quarterly testing, they do not supply data in terms of the emission limit. Because the Agency strives for continuous determination of the pollutant, not a parameter, of concern, PM CPMS will be removed from the rule and replaced by PM CEMS. Moreover, results reported in terms of the emission limit (pounds per million Btus), as obtained by PM CEMS, will be more transparent than milliamps or other parameters provided by PM CPMS for third parties such as citizen groups to assess when reviewing compliance reports.

# CHAPTER 7

## 7. What compliance dates are we proposing, and what is the rationale for the proposed compliance dates?

**Comment 1:** Commenters expressed support for the Agency's proposed compliance dates of up to three years after the effective date for affected sources to meet any new emission limits of the 2023 Proposal. Commenters also supported allowing sources three years to install PM CEMS, if required when the 2023 Proposal is finalized. Commenters communicated that EGUs that determine major control upgrades are needed to meet the revised standards must carefully evaluate numerous financial, technical, and regulatory variables before they can decide whether affected EGUs can meet the revised standards and remain viable. Commenters conveyed that the regulatory and economic analysis will require a significant effort to complete considering other laws and regulations that affect coal-fired EGUs. Commenters agreed three years is reasonable for control equipment installation or modifications and associated designing, planning, budgeting, and procurement that may be necessary to meet the standard as allowed under CAA section 112(i)(3)(A). However, commenters expressed concern over potential delays due to the limited number of specialized vendors/companies with the expertise to conduct such work, and the current shortage on the availability of parts. Commenters recognized many of the parts are no longer in production and would have to be custom manufactured, which would add to the timeframe needed for compliance. Commenters expressed concern that the permitting process alone may take more than six months, and if there are public comments, public meetings, or contested case hearing requests, issuance of the pre-construction permit authorization may require several years to resolve all issues. Commenters also indicated that additional time is necessary to effectively operate emission control and monitoring equipment to demonstrate compliance with the revised standards. Some commenters suggested it would be more appropriate to allow time for any major modifications to be completed during the typical EGU three-year outage cycles to minimize costs and impacts to grid operations. Commenters agreed that the three-year allowance is consistent with the time the EPA allowed sources to comply when the 2012 MATS Final Rule was promulgated and is necessary to allow affected EGUs to evaluate whether additional controls will be required to meet the revised standards. Commenters concluded the proposed three-year timeline reasonably accounts for both the complicated process of converting to a new monitoring system and the forthcoming retirement of EGUs.

Commenters stated that the EPA must provide sufficient time to perform upgrade projects. They said the time frames for fPM improvements in the 2023 Proposal cannot be met. The commenters said that the EPA sets a three-year deadline from the forthcoming final rule's effective date to comply with the new MATS emissions limitations. Commenters advocated for additional time to allow for fPM emissions limitation compliance commensurate with the time frames in the S&L Young Analysis.

Commenters recommended the EPA apply an effective date of five (5) years to this regulation that allows for EGU's time to adequately budget, procure, install, and certify the necessary equipment and controls to comply.

Commenters noted that FF are the most expensive and complex technology likely to be utilized to control HAP emissions to comply with the 2023 Proposal, and it is reasonable to expect an FF to be deployed in two or three years. Commenters agreed with the 2023 ATP Assessment, that PM CEMS and HCl CEMS should only take a matter of months to deploy. Commenters stated for other fPM control options, upgrades to existing FF can be accomplished in less than a year and upgrades to ESPs may also be completed in under a year, with the most complex ESP upgrades taking up to two years. Commenters stated for Hg controls, fuel or scrubber chemical additive systems can be deployed in less than a year. Commenters suggested for units that need to make operational changes only, such as units with existing ACI systems that will need to increase treatment rates, a one-year compliance deadline is more appropriate. Commenters stated that in regard to PM CEMS, two years is an appropriate compliance deadline given that two-thirds of units currently do not have such systems in place and the demand for such systems may create manufacturing and installation delays; followed by testing to demonstrate initial compliance. Commenters noted that it is possible that some EGUs may not be able to complete all aspects of this transition to PM CEMS in time. Commenters felt that EGUs should be able to deploy and upgrade all controls in two years, and therefore two years with the possibility of a third year, if necessary, would be an appropriate timeline for compliance with the revised standards. (2023 ATP Assessment at 49)

Commenters supported the option of affected sources requesting a one-year extension for compliance, if the affected sources demonstrated it is necessary, similar to what was provided during the 2012 MATS Final Rule as allowed under CAA section 112(i)(3). Commenters expressed concerns about their ability to complete these projects in the current three-year compliance window because of ongoing supply chain issues that could limit the availability of parts (many of which require custom fabrication) and contract resources that are qualified to execute the work scope, in addition to the cost considerations associated with ESP and FGD projects. Commenters expressed concern during implementation that many units may need an additional year to avoid unnecessary threats to the reliability of the electric grid as with the original 2012 MATS Final Rule if the EPA finalizes the 2023 Proposal. Commenters suggested the Agency provide guidance in the 2023 Proposal's final rule regarding extensions under CAA section 112(i)(3). Commenters requested that the EPA establish, streamline, and simplify the process of applying for the one-year extension under CAA section 112(i)(3).

**Response 1:** The EPA acknowledges and thanks the commenters for providing these comments. We have taken these comments and the referenced information into consideration when establishing the compliance schedule for the final emission standards. The rationale for final compliance timeline for the emission standards is discussed in section III.C of the preamble.

**Comment 2:** Commenters suggested that the EPA use its authority to create subcategories of affected facilities that elect to permanently retire by the compliance date as the Agency has taken in similar proposed rulemakings affecting coal- or oil-fired EGUs. Commenters stated the EPA should subcategorize those sources that have adopted enforceable retirement dates and not subject those sources to any final rule requirements. They indicated that the EPA is fully authorized to subcategorize these units under CAA section 112(d)(1). Commenters asked that the EPA consider other simultaneous rulemakings, such as the proposed Greenhouse Gas Standards and Guidelines for Fossil Fuel Power Plants, where the EPA has proposed to essentially retain

the current standard applicable to EGUs that would elect to shut down by January 1, 2032. Commenters also referenced the retirement date of December 31, 2032, in the proposed Effluent Limitation Guidelines.

Commenters expressed that creating a subcategory for units facing near-term retirements that harmonizes the retirement dates with other rulemakings would greatly assist companies with moving forward on retirement plans without running the risk of being forced to retire early, which could create reliability concerns or, in the alternative, deliberating whether to install controls and continue operation longer than planned to recoup investments in the controls. Commenters suggested that the EPA allow units with limited continued operation be allowed to continue to perform quarterly stack testing to demonstrate compliance with the fPM limitations. Commenters relayed that imposing different standards on these subcategories would continue the status-quo for these units until retirement. Commenters requested that the EPA's actions recognize that it would make no sense to require an EGU slated to retire in the near term to expend substantial resources on controls in the interim since these sources are very unlikely to find it viable to construct significant control upgrades for a revised standard that would become effective in mid-2027, a mere five years before the unit's permanent retirement. Commenters further noted if the EPA does not establish such a subcategory or take other action to ensure these units are not negatively impacted by the rulemaking, the retirement of some units could be accelerated due to the high costs of installing a PM CEMS and the need to rebuild or upgrade existing ESP or install FF to supplement existing ESPs. Commenters stated although this may be the EPA's preferred outcome, the EPA cannot ignore the need for a coordinated retirement of thermal generating capacity while new generation sources come online to avoid detrimental impacts to grid reliability.

Commenters suggested that if the EPA decides to proceed with revised standards in this 2023 Proposal, the Agency should create a subcategory for coal-fired EGUs that elect by the compliance date of the revised standards (*i.e.,* mid-2027) to retire the units by December 31, 2032 or January 1, 2032; if the EPA prefers to tie this 2023 Proposal to the proposed emission guidelines instead of the effluent limitation guidelines and maintain the current MATS standards for this subcategory. Commenters requested that the EPA coordinate the required retirement date for the 2023 Proposal with others rules so that all retirement dates align. Commenters reiterated that the EPA has multiple authorities with overlapping statutory timelines that affect commenters' plans regarding the orderly retirement of coal-based EGUs and their ability to continue the industry's clean energy transformation while providing the reliability and affordability that their customers demand. Commenters suggested EGUs that plan to retire by 2032 should have the opportunity to seek a waiver from PM CEMS installation altogether and continue quarterly stack testing during the remaining life of the unit. They also suggested that should a unit not retire by the specified date; it would be required to immediately cease operation or meet the standards of the rule. Commenters supported an EGUs failure to comply would then be a violation of the 2023 Proposal's final rule subject to enforcement.

**Response 2:** The EPA has responded to this comment in section IV.C of the preamble.

# CHAPTER 8

## 8. Cost, Environmental, and Economic Impacts

## 8.1 What are the air quality impacts?

**Comment 1:** Commenters stated that per the EPA's own analysis, 91% of units could achieve compliance with the proposed PM limit with current controls and lowering the PM limit would not have a large impact on the sector. They said that this means that there would be little to no actual environmental benefit from lowering the limit, since many regulated sources are already operating at this rate. In other words, the proposed tighter limit does very little to reduce actual emissions. The commenters said that tightening the PM limit only unnecessarily increases compliance uncertainty for the regulated sources already operating under the intense scrutiny of the federal government and various non-governmental organizations opposed to coal.

Commenters stated that in addition to the lack of actual PM emission reductions, the EPA provides no quantitative rationale of the issues to be resolved by lowering the limit. The commenters said that the EPA must explain what PM, or non-Hg metal HAP, environmental issues are currently being caused by North Dakota's EGUs subject to the current limit and how a lower limit will resolve these issues.

Commenters stated that this is not the first time that the EPA has expressed the desire to lower emissions limits, simply for the sake of lowering emissions limits and without a direct measurable improvement to the environment, when a regulated source is already achieving a lower emission rate. Commenters referenced their previous comments on this issue and stated that this approach disincentivizes regulated sources from operating below their current allowable limits. If the EPA (or a state) gets in the habit of lower limits solely because a regulated source is already achieving a lower limit, the regulated sources may not continue to operate below allowable levels for other species. Commenters believed the 2023 Proposal will ultimately result in more real-world air pollution as regulated sources will inevitably operate closer to their allowable limits in fear of being saddled with unnecessarily strict compliance burdens simply for operating better than they are required to.

**Response 1:** The EPA addresses comments on the EPA's authority in Chapter 1 of this document. Additionally, the EPA does not believe that tightening the standards in this rulemaking creates disincentives to emitting below allowable limits in other rules. If facilities are emitting below allowable limits, these emissions levels must be operationally and/or economically more advantageous than operating strictly at the limit.

**Comment 2:** Commenters stated that it is arbitrary for the EPA to take credit for $CO_2$ decreases associated with the 2023 Proposal when the EPA is simultaneously rendering any such emissions irrelevant in its contemporaneously proposed GHG NSPS rulemaking requiring carbon capture on these very same sources. They argued that the Agency is required to account for other rulemaking actions it has proposed when evaluating a given proposed rulemaking and as such, the EPA cannot double count anticipated $CO_2$ emission reductions from this rulemaking when

126

this rulemaking would not in fact cause such reductions, or at least not to the same magnitude, when the EPA's other related rulemakings for this same source category are accounted for.

Commenters stated that the EPA's estimated benefits related to decreased ozone emissions is flawed because it accounts for decreases in ozone exposures generally, without accounting for the fact that the EPA has in another contemporaneous rulemaking determined that Montana emission sources do not significantly contribute to any out of state ozone concentrations above the EPA's NAAQS for ozone, and thus any benefits related to reduced ozone related to Colstrip emissions cannot be assumed to occur outside Montana.

Commenters stated that although the EPA estimates that a vastly disproportionate majority of costs and emission reductions (*e.g.,* of PM) will be localized at Montana power plants, the EPA does not appear to limit its modeling of benefits from reduced PM emission exposures to populations actually within a scope that could be affected by such plants, or otherwise account for the localized nature of benefits from reduced emission exposures to populations near relevant facilities the EPA anticipates PM emission reductions to actually occur. Commenters argued that it would be arbitrary to account for health benefits nationwide from reduced exposures without first demonstrating that such populations are actually geographically capable of benefitting from any reduction in emissions from Colstrip and the other facilities from which the EPA anticipates the 2023 Proposal to force PM reductions.

**Response 2:** The EPA generally considers finalized, rather than proposed, rules in the baseline of its analyses. The emission reductions anticipated under this rule would be attributable to this rule. Where possible, the EPA will include the requirements of this rule in the baseline for future power sector rules. Section 3.2 of the final RIA describes the power sector modeling platform and lists the major regulations that are incorporated into the baseline for this action,

As to the dispersion of impact of changes in ozone concentrations, when quantifying the number and economic value of ozone-attributable premature deaths and illnesses, the EPA estimates the change in exposure by using the results of photochemical air quality modeling simulations performed for the continental U.S. Using these air quality surfaces, the EPA estimates the impact on populations located both proximate to the affected facility as well as those individuals living away from the facility. Consistent with the best available science, the EPA quantifies the benefits of reducing ozone concentrations using a no-threshold model; this accounts for the change in the risk of premature death and illness at exposures commonly experienced by U.S. populations, including concentrations at relatively low levels.

With respect to the comment about PM emissions and localized impacts, the EPA address comments on the EPA's authority in Chapter 1 of this document. The health benefits analysis presented in the RIAs for this action is performed pursuant to Executive Order 12866, as amended by Executive Order 14094. The RIAs for this action analyze the benefits (and costs) associated with the projected emissions reductions under this rule to inform the EPA and the public about these projected impacts. As emissions are projected to change in many parts of the country, as well as potentially disperse regionally, the analysis covers the contiguous U.S.

**8.2 What are the cost impacts?**

**Comment 1:** Commenters had concerns regarding the projections made in the IPM reference case entitled "Post-IRA 2022 Reference Case" (Post-IRA IPM) used in this Rule. Their comments also extend to the EPA's use of the reference case in other rulemakings. They said that while the EPA may make projections to assess compliance impacts, those projections must be reasonable and premised on a firm foundation.

Commenters stated that the Post-IRA IPM makes projections based on a number of tax credit provisions of the IRA, which address application of Carbon Capture and Storage (CCS) and other carbon mitigation options. These include: (i) New Clean Electricity Production Tax Credit (45Y); (ii) New Clean Electricity Investment Credit (48E); Manufacturing Production Credit (45X); CCS Credit (45Q); Nuclear Production Credit (45U); and Production of Clean Hydrogen (45V). The commenters said that the EPA assumes that these IRA provisions will substantially change the generation mix of the nationwide power sector by 2030. They said the Post-IRA 2022 Reference Case includes compliance with the EPA's suite of power sector rules.

Commenters stated that the EPA assumes that these new tax credits will have sweeping impacts on the power sector – particularly in the short-time frame of only 7 years for generation to be retired and replacement generation to be built. The commenters said that the EPA's model fundamentally assumes that the IRA and other power sector rules will cause retirement decisions and replacement capacity to be built – which is uncertain in itself – and then forecasts that these changes can feasibly occur by 2030. They argued that many variables would need to fall into place to achieve this improbable outcome.

Commenters stated that although the IRA presents cooperatives with helpful opportunities, the EPA should not rely on the IRA in its projections in a rulemaking until implementation has further matured. The commenters stated that NRECA's Technical Analysis revealed assumptions and data used in the Post-IRA IPM are wrong or unrealistic. The Post-IRA IPM's flaws are significant enough to result in a different rule outcome. Commenters asked the EPA to correct these errors.

**Response 1:** Sections 3.2 and 3.3 of the RIA for this final action details the EPA's Power Sector Modeling Platform 2023. IPM is a state-of-the-art, peer-reviewed, dynamic linear programming model that can be used to project power sector behavior under future business-as-usual conditions and to examine prospective air pollution control policies throughout the contiguous U.S. for the entire electric power system. The EPA has used IPM for almost three decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emissions impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM.

The modeled "baseline" for any regulatory impact analysis is a business-as-usual scenario that represents expected behavior in the electricity sector under market and regulatory conditions in the absence of a regulatory action. EPA frequently updates the baseline modeling to reflect the latest available electricity demand forecasts from the U.S. EIA as well as expected costs and

availability of new and existing generating resources, fuels, emission control technologies, and regulatory requirements. This modeling used as the baseline for this rule includes recent updates to state and federal legislation affecting the power sector, including Public Law 117-169, 136 Stat. 1818 (August 16, 2022), commonly known as the Inflation Reduction Act of 2022 (the IRA).

EPA has an obligation to represent all existing statutes as accurately as possible in baseline analysis. While it is important to recognize the key areas of uncertainty discussed in section 3.6 of the RIA, they do not change the EPA's overall confidence in the projected impacts of the final rule as presented in the RIA.

The model and EPA's input assumptions undergo periodic formal peer review. The rulemaking process also provides opportunity for expert review and comment by a variety of stakeholders, including owners and operators of capacity in the electricity sector that is represented by the model, public interest groups, and other developers of U.S. electricity sector models. The feedback that the Agency receives provides a highly detailed review of key input assumptions, model representation, and modeling results. IPM has received extensive review by energy and environmental modeling experts in a variety of contexts.

Furthermore, the potential impacts of the IRA are widely expected to be substantial in scope. A recent report considered projections from 10 multi-sector models and 4 electric power sector models and found that the IRA spurs substantial $CO_2$ emission reductions from the electric power sector of 49 to 83% (median of 69%) below 2005 levels in 2030, and lowers economy-wide $CO_2$ emissions, which includes electricity generation and use, by 35 to 43% (median of 39%) below 2005 levels in 2030.

**Comment 2:** Commenters observed that the residual risk conclusions are directly relevant to the cost considerations. The costs of the substantial fPM and Hg control projects that would be required by the 2023 Proposal are informed by the benefits of those projects, which in the CAA section 112(f)(2) analysis, is the cost measured against the reduction in health risk and other benefits. The commenters said that these costs lack reasonable justification without a nexus to any health benefits from reductions of HAP. They said, in fact, the EPA's benefit-cost analysis in the RIA did not include any quantification health benefits from HAP reductions. The commenters said that the EPA must factor its CAA section 112(f)(2) findings into its technology cost analysis.

**Response 2:** In addition to the residual risk review, the CAA requires the EPA to conduct a technology review for major sources every eight years. EPA evaluates whether there have been developments in technologies or other air toxics emission reduction approaches since issuance of the initial MACT. This analysis includes, but is not limited to, evaluating whether technologies available at the time of the initial MACT have changed to more efficient, cost-effective methods warranting tighter standards. The EPA also addresses comments on the EPA's authority in Chapter 1 of this document.

As noted in the section I.A.2 of the preamble to the final rule, in selecting the final standards, the EPA considered the statutory direction and factors laid out by Congress in CAA section 112.

Separately, pursuant to Executive Order 12866 and Executive Order 14904, the EPA prepared an analysis of the potential costs and benefits associated with this action, which is presented in the RIA. The analysis presented in the RIA does not inform the setting of the standards; rather, the RIAs for this action analyze the benefits and costs associated with the projected emissions reductions under this rule to inform the EPA and the public about these projected impacts.

## 8.3 What are the economic impacts?

**Comment 1:** Commenters stated that the preamble to the 2023 Proposal discusses the success of the MATS rule, which was promulgated in 2012. As the EPA notes, 2019 data show that affected EGUs have reduced their Hg emissions by 86%, acid gas HAP emissions by 96%, and non-Hg metal HAP emissions by 81% compared to pre-MATS levels. The commenters said that in the EPA's 2020 National Emission Inventory data, coal- and oil- fired EGUs contribute significantly less Hg emissions and make up only 11.6% of all Hg emissions from all reporting sources. The commenters said that similarly, coal- and oil-fired EGU non-Hg metal HAP emissions account for 11.5% of total non-Hg metal HAP from all reporting sources.

Commenters stated that more recent data show greater HAP reductions from EGUs. They said the EPA's Emission Reduction Progress Report shows that coal- and oil-fired EGU sources regulated under MATS emitted a combined 3 tpy of Hg in 2021, a 90% decrease of Hg from 29 tpy pre-MATS in 2010. The commenters said that non-Hg metal HAP from coal- and oil-fired EGU sources emitted 246 tpy in 2020, which is a 70% decrease from 854 tpy in 2011.

Commenters stated that while the most drastic reductions in Hg and non-Hg metal HAP occurred around the compliance deadline for MATS, mostly due to substantial investments by EGU owners to meet the MATS standards, EGU HAP emissions continue to decline further, absent any revisions to the MATS standards, due in large part to regulatory pressure (*i.e.,* other EGU regulations the EPA has and is promulgating) as well as economic pressures that are leading inexorably to increasing shutdowns of coal-fired EGUs. The commenters said that in 2011, before MATS was promulgated, electric utilities owned 332 coal-fired EGUs in the U.S. In 2021, there are now 169 coal-fired EGUs in the U.S., a reduction of over 50%. They said that according to the EPA, based only on current public announcements of EGU shutdowns, there will be accelerated retirements of over 50% of the remaining coal-fired EGUs in the U.S. by 2040. In truth, many more coal-fired EGUs are likely to retire well before 2040, even if public announcements to that effect have not been made. The commenters said that for these reasons, the EPA should not seek to revise the MATS standard as it proposes in the 2023 Proposal. Not only are EGU HAP continuing their steady and substantial decline regardless of whether the 2023 Proposal is finalized as proposed; as discussed below, the risk that EGU HAP emissions pose is minute, and the 2023 Proposal itself–if finalized–would result in substantial additional near term-shutdowns of coal-fired EGUs. They argued that this would further exacerbate the reliability concerns that power generators and regional transmission operators have been grappling with and warning about.

Commenters stated that tradeoffs are further exacerbated by the anticipated costs of other EPA proposed rules regulating the power sector such as EPA's proposed rule, "Supplemental Effluent Limitations Guidelines (ELG) and Standards for the Steam Electric Power Generating Point Source Category" (the "ELG proposed rule") and the proposed rules, "New Source Performance

Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units, Emission Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units" (the "CAA section 111 proposed rules"). The commenters said that both the ELG proposed rule and the CAA section 111 proposed rules include this concept by proposing the establishment of subcategories where new requirements vary by the date a unit will cease coal combustion. They said that the EPA should consider establishing a similar mechanism in this proposed rule as the rationale for this approach is uniform across these rulemakings-to incentivize sooner coal retirements and to avoid significant new capital investment in coal units that will retire.

**Response 1:** The Agency conducted a review of the 2020 Technology Review pursuant to CAA section 112(d)(6), which focused on identifying and evaluating developments in practices, processes, and control technologies for the emission sources in the source category that occurred since the original MATS rule was promulgated. EPA's response to comments with respect to the revised fPM standard are presented in section IV.C of the preamble. EPA's response to comments with respect to the revised Hg limits are presented in section V.C of the preamble.

For the EPA's response to comments regarding reliability concerns, see section II.D of the preamble to the final action. For the EPA's response to comments suggesting the EPA consider retirement-based subcategories, see section II.B of the preamble.

**Comment 2:** Commenters stated that the nation is facing an energy reliability crisis. The commenters said that the North American Electric Reliability Corporation recognizes the unprecedented, rapid evolution of the electricity grid due to retirements of fossil generation and renewable generation coming on-line. North American Electric Reliability Corporation predicts electricity shortfalls in the MISO portion of the electricity grid. They said that S&P Global reports that: "Utilities in MISO are retiring fossil capacity in exchange for investments in renewable energy resources either contracted or added to their rate base; however, those exchanges are not happening fast enough to replace all the generation coming offline." (Bennet, 2023).

Commenters stated that despite air quality improvements and reliability fears, the EPA presses the power sector further in the 2023 Proposal. The commenters said that this spring, the EPA released additional power sector rules. They said these rules that impact electric cooperatives include:

- Supplemental Effluent Limitations Guidelines and Standards: EPA proposes costly effluent control technologies. EPA's public comment period recently ended for ELGs.

- Regional Haze: This program is in the midst of the second planning period, ending in 2028. Many states, including North Dakota, recently submitted or are in the process of finalizing their state implementation plans which involve emission reductions to fulfill state reasonable progress goals.

- PM 2.5 NAAQS: EPA's proposal to lower the PM 2.5 annual standard further complicates the reliability equation. EPA is considering public comments in response to its proposed rule on the reconsideration of the NAAQS for PM. A lower PM 2.5 annual standard would restrict options for siting new electricity generation, particularly in urban

areas that have a higher background PM 2.5 value due to anthropogenic sources. That final rulemaking is scheduled for release later this year.

Commenters stated that the EPA should also consider the impact of the Federal Good Neighbor Plan for the 2015 Ozone NAAQS, the proposed GHG Standards and Guidelines for Fossil Fuel-Power Plants, and the proposed Effluent Limitation Guidelines rulemaking on the reliability of the nation's electric power grid.

Commenters stated that the EPA's suite of new rules further place reliability at risk. Department of Energy Secretary Granholm and EPA Administrator Regan signed a Memorandum of Understanding on electric sector resource adequacy and reliability coordination in March of 2023. The commenters said that this agreement memorialized their shared objective of supporting the continued delivery of "a high standard of reliable electric service." They said the compound effect of the EPA's proposed rules jeopardizes this objective by unreasonably affecting crucial baseload coal and natural gas power plants.

Commenters stated that the 2023 Proposal has a meaningful role among these rules, as it proposes costly retrofits and other requirements that are drivers for retirements without health or economic justification. The commenters said that the collective impact on reliability of the suite of regulations for coal and natural gas power plants must be evaluated by the EPA, Department of Energy, regional transmission organizations, affected EGUs, and others.

Commenters stated that in May, Jim Matheson, CEO of the National Rural Electric Cooperative Association, released the following statement on the reliability and cost impacts to the country's 900 electric cooperatives in the context of the newest addition to the EPA's suite of environmental compliance rules:

> "Nine states experienced rolling blackouts last December as the demand for electricity exceeded the available supply. Those situations will become even more frequent if EPA continues to craft rules without any apparent consideration of impacts on electric grid reliability. American families and businesses rightfully expect the lights to stay on at a price they can afford. The EPA needs to recognize the impact this proposal will have on the future of reliable energy before it's too late."

Commenters stated that the reliability and the costs of this 2023 Proposal should be considered as required by CAA section 112. The commenters said that it is crucial for the EPA to evaluate the overall regulatory context as the burden of environmental compliance on electric cooperatives and their end users is cumulatively affected by the compliance timelines of these concurrent rulemakings.

Commenters stated that the EPA does not give adequate consideration of the cost impacts of the Proposed Rule on cooperatives. They said that cooperatives have limited financial resources and assets to leverage. The commenters said that if cooperatives are unable to finance ESP upgrade projects within the time frames identified by the 2023 Proposal, the only choice is to shut down. They argued that the loss of power to North Dakota's rural communities is an unacceptable

option. The commenters said the EPA should consider the specialized impacts on smaller utilities, which the Agency has done in other RTR reviews.

Commenters stated that last year, the EPA rejected other technologies based on cost per ton. They said for example, in the Proposed Rule for Bulk Gasoline Terminal NESHAP, the EPA found: "The cost-effectiveness and incremental cost effectiveness of reducing the area source emission limit for large bulk gasoline terminals to 10 mg/L are approximately $12,000 and $13,000 per ton of HAP emissions reduced, respectively, which we determined is not cost-effective." The commenters said that in comparison, even EPA's cost per ton estimates for the 2023 Proposal are far above this level (starting at $37,300).

Commenters requested that the EPA adopt a comprehensive "reliability safety valve" (RSV) that would allow grid operators to rely upon the EGUs subject to the EPA emissions restrictions, including restrictions imposed by the MATS rule, when necessary to serve system demand in the unusual event of an actual or anticipated grid emergency. They said that the EPA has previously approved an RSV in the context of the Clean Power Plan. Commenters believed a similar measure that applies more broadly across all EPA-regulated emissions would be appropriate because there are multiple EPA requirements that restrict operations of coal- and gas-fired units limiting the availability of those plants to the grid.

Commenters stated that if the EPA decides to proceed with a final rule consistent with the 2023 Proposal, the Agency should provide an accommodation or subcategory applicable to EGUs featuring a low capacity factor—as it does in the proposed GHG rule and the currently existing low utilization subcategory of the ELG Rule.

Commenters requested that the EPA consider adding additional language allowing for an administrative compliance order so the EPA may consider the reliability impacts of the proposed MATS rule on a case-by-case basis similar to the option for an administrative compliance order in EPA's recently proposed GHG rule.

**Response 2:** For the EPA's response to comments regarding reliability concerns, see section II.D of the preamble. With respect to comments about the cost-effectiveness estimates, see the EPA's response to related comments in section IV.C. of the preamble. With respect to the suggestion to establish subcategories like those in other rules, see the EPA's response to similar comments section II.B of the preamble.

With respect to comments suggestion the EPA consider the specialized impacts on smaller utilities, pursuant to the Regulatory Flexibility Act, the EPA performed an analysis of the cost impacts to small entities and found there is not a Significant Economic Impact on a Substantial Number of Small Entities. These analyses are found in section 5.2 of the RIAs for the proposed and final rules. The results of the small entity analysis for the final rule are also summarized in section IX.C of the preamble.

**Comment 3:** Commenters stated that in a February 24, 2023, the PJM regional transmission organization (RTO) that coordinates generation and delivery in a 13-state region, issued a review of its generation resource adequacy. They said that PJM declared the rush to retire traditional

baseload generation resources "present[s] increasing reliability risks…" and "the amount of generation retirements appears to be more certain than the timely arrival of replacement generation." The commenters said, as detailed in the report, 40 GWs of baseload "thermal" generation sources (mostly coal fired assets) are projected to be retired by 2030, representing 21% of the ISO's installed capacity.

Commenters stated that the same analysis confirmed the challenges of replacing current coal fired generation with other resources, noting that 5.2 MW of solar capacity and 14 MW of wind generation capacity are needed to equal one MW of thermal generation. They said that as if the staggering replacement ratios were not enough- roughly 6,760 MW of solar or 18,200 MW of wind to replace a 1,300 MW coal plant- PJM's review revealed that few of these intermittent resource projects are actually complete: "Despite the sizeable nameplate capacity of renewables in the interconnection queue, the historical rate of completion for renewable projects has been approximately 5%."

Commenters stated that PJM also identified difficulties with replacing coal plants with natural gas generation and said that as PJM correctly observes, international demand for natural gas has strained fuel supplies "resulting in significantly higher fuel costs for PJM's natural gas fleet." They said, for example, from January 2021 to December of last year, the average cost of natural gas for electric generation increased 187%, from $3.20 /MMBtu to $9.20/MMBtu. The commenters stated that during certain months, the price of natural topped $16.00 /MMBtu, a 400% increase over the January 2021 prices. From 2021 to 2022, to average price of natural gas to generate electricity in the U.S. increased 39.5% (+$2.06). The commenters stated that the cost of coal to generate electricity increased as well, but only by 26% (+$0.55) from January 2021 to December 2022. The average cost of all coal generation in the U.S. increased only 20% (+$0.40) from 2021 to 2022. In West Virginia, the cost of natural gas to generate electricity increased +$2.59/ MMBtu or 62% from 2021 to 2022 compared to coal generation costs that increased +$0.35 or 16% during the same period. The commenters stated that, put simply, the PJM system footprint is running out of sources to provide reliable power during normal operating conditions, much less extreme weather events that test dependability of generation during periods of high demand. The commenters stated that in the referenced report, PJM predicts annual demand growth of 1.4% per year for the next 10 years, with certain areas of its system subject to growth as high as 7% annually. The commenters stated that coupled with accelerated coal plant retirements, higher cost natural gas and the reality of 8 intermittent wind and solar resources, the ISO accurately concludes "For the first time in recent history, PJM could face decreasing reserve margins" and "the amount of generation retirements appears to be more certain than the timely arrival of replacement resources." As stated by PJM's CEO, "I think we need to subtract [generation resources] slower and subtract generation only when the replacement generation is here at scale."

Commenters stated that in November 2022, NERC issued its Winter Reliability Assessment for 2022-2023, finding that "A large portion of the North American bulk power system is at risk of insufficient electricity supplies during winter peak conditions" and urging policy makers "to preserve critical generation resources". The commenters stated that similar conclusions were issued by NERC in its 2022 Summer Reliability Assessment, finding that certain areas are facing capacity generation deficits "resulting in high risk of energy emergencies". The commenters

stated that these concerns were confirmed and echoed by the Federal Energy Regulatory Commission (FERC): "We're headed for a reliability crisis and we are just not ready yet to transition the nation's energy system to intermittent sources".

Commenters stated that in March of this year, NERC again alerted the EPA about the dangers of accelerating coal plant retirements through its various rulemaking initiatives, noting "a steady increase in reliability risk associated with the pace at which the transformation of the grid is occurring" and warning the EPA and the federal Department of Energy that "the pace of change needs to be managed and we have stressed the critical need to evaluate the impacts of these policies on reliability."

Commenters stated that recently, members of FERC detailed the tenuous status of the nation's electricity system to Congress, emphatically declaring "the United States is heading for a reliability crisis. I do not use the term 'crisis~ for melodrama, but because it is an accurate description of what we are facing:

> "I think anyone would regard an increasing threat of systemwide, extensive power outages as a crisis .... In summary, the core problem is this: Dispatchable generating resources are retiring far too quickly and in quantities that threaten our ability to keep the lights on. The problem generally is not the addition of intermittent resources, primarily wind and solar, but the far too rapid subtraction of dispatchable resources, especially coal and gas. We know that there is a looming resource adequacy crisis. Our market operators have been explicitly telling us as much for years. Both MISO and ISO-NE have warned about upcoming scarcity and PJM, the Nation's largest wholesale market, and the one that serves Washington, D.C., has recently raised the alarm about impending shortfalls. Were any more proof required of our markets' failure, in the midst of PJM's dire warnings, somehow the prices in its procurement auction, at a time of impending scarcity, went down."

Commenters stated that commissioner James Danly also testified "As an engineering matter, there is no substitute for reliable, dispatchable generation. Intermittent renewable resources like wind and solar are simply incapable of, by themselves, of ensuring the stability of the bulk electric system." The commenters stated that in response to questions from the Senate Energy & Natural Resources Committee, Commission Chairman Phillip confirmed the testimony offered by the other FERC commissioners: "I am extremely concerned about the pace of retirements we are seeing of generators which are needed for reliability on our system. NERC and the grid operators have warned us about this. We might be fuel neutral, but we are not reliability neutral."

Commenters stated that unfortunately, the frailty of nation's electric system, which has been wrought with massive retirements of coal generation capacity, was clearly demonstrated during Winter Storm Elliot. The commenters stated that several ISOs, including the Tennessee Valley Authority and Duke Energy (in its Carolina system footprint) were forced to implement rolling blackouts to maintain the integrity of their power systems and in a least one case, to maintain minimum system voltage requirements for the Eastern lnterconnection. The commenters stated that both systems have retired substantial amounts of coal fired generation over the last 10 years and in the PJM footprint, the ISO took what can only be described as extreme measures to escape

135

rolling blackouts or a broader systemwide failure. The commenters stated that the grid operator issued multiple conservation orders to virtually all the utilities in its system and availed itself of emergency provisions under the federal Power Act to allow restricted generation assets to produce electricity.

Commenters stated that in addition to the overall weakness of the nation's electric generation and delivery system, Winter Storm Elliot revealed an alarming infirmity in PJM's generation ability that has become dominated by natural gas generation. They said that during the storm, roughly 40% of the natural gas generation capacity was in "forced outage" unable to generate electricity or respond to increased calls for power to meet load. The commenters stated that an additional 6,000 MW of generation was expected and "scheduled" to generate on the morning of the storm but could not provide power. As noted by PJM itself, "the vast majority of these resources were gas fired..." The commenters stated that in a more recent review, PJM determined that the bulk of the gas plant outages were related to fuel supplies, with 473,208 MWh of generation capacity unavailable to produce power because of a lack of fuel. The commenters stated that while other generation sources experienced difficulties as well, including coal, those outages were mechanical, and equipment based. They said that plant components can be repaired, and generation can resume. They said that lack of fuel, especially one like natural gas that is supplied in real time, or "just in time" with no stockpiles on hand cannot be remedied: "Natural gas production in the Appalachian basin dropped by over 25% during the storm ... as a result, natural gas generation was limited in PJM and the Northeast... despite many plants having firm or uninterruptible natural gas supply contracts."

Commenters stated that similar disruptions to gas fired generation were seen in other ISO/ RTO systems around the country, further revealing the brittle state of a power system that has become overly dependent on natural gas supplies. For example, in the MISO ISO, 75% of the system's forced outages were natural gas plants, with approximately 29% of the total gas generation fleet unable to produce electricity: "Gas supply availability contributed to increased unplanned outages ... that pushed MISO into emergency procedures." Commenters stated that in addition to gas plant outages from fuel supply issues, other sources provided little generation to satisfy the increased demand. The commenters stated that wind generation increased at certain times but was very variable during the same period, with MISO noting that "wind was often derated over the time period" presumably due to "overspeed conditions" that prevent turbines from generating during high-wind speeds. The commenters stated that regarding solar generation, as observed by Duke Energy officials in proceedings before the North Carolina Utilities Commission, solar performed as expected but did not provide any power or increased generation when it was needed the most confirming their "intermittent" nature and inability to "load follow". Commenters stated that in large part, it was coal fired generation that spared PJM and other ISOs from imposing rolling blackouts and more serious system failures. The commenters stated that coal and oil-fired power plants (with onsite fuel inventory) accounted for 80% of the increased generation capacity needed in PJM during the storm.

**Response 3:** For the EPA's response to comments regarding reliability concerns, see section II.D of the preamble to the final action. Also note that, as shown in section 3.5.4 of the RIA for the final rule, the EPA does not project incremental changes in operational capacity to occur in response to the final rule.

**Comment 4:** Commenters stated that the EPA should reject what they called the self-serving opposition to the proposed MATS revision from Colstrip owners Talen Montana and NorthWestern Energy (and allied industry parties). In their early comments on the 2023 Proposal, Talen Montana and NorthWestern Energy urged the EPA not to finalize the proposed rule because the compliance costs for Colstrip Units 3 & 4—which failed to install modern PM control technology in response to the 2012 MATS—would cause the units to prematurely shut down. They indicated this would be detrimental to Montana's economy and grid reliability if the owners were to retire those units. They asserted that such claims deserve no weight.

Commenters stated that not only would it be improper to defer a national standard based on its impacts to the single regulated facility that avoided prior control upgrades, but also the Colstrip owners' claims related to impacts to Montana's economy and grid-reliability are not credible. The commenters said that as an initial matter, there would be nothing premature about near-term retirement of Colstrip. As noted, Colstrip Units 3 and 4 became operational in 1984 and 1986 and are approaching 40 years old. The fact that they cannot reliably comply with current air pollution standards suggests that the units already have reached the end of their economic useful life. They said that rather than continuing to resist investments that would improve the health of communities surrounding the Colstrip plant, Talen Montana and NorthWestern Energy, should plan for the transition away from coal energy and the closure of Colstrip. The commenters said that alternative energy sources—sources that lack the serious health consequences posed by continued coal combustion without proper pollution controls—are available and cost-effective.

Commenters stated that Talen Montana and NorthWestern Energy are outliers even among their Colstrip-owner peers, who already are committed to eliminating Colstrip power from their portfolios. The commenters said that Puget Sound Energy and Avista Corporation plan to exit their ownership by December 31, 2025. Portland General Electric and PacifiCorp will end their Colstrip ownership no later than the end of 2030. They asserted that only NorthWestern Energy and Talen Montana lack definitive plans to end their reliance on Colstrip by the end of the decade.

Commenters stated that as the last holdout among its regulated utility peers, NorthWestern Energy has not planned for alternative generation. In its biennial resource planning, NorthWestern did not consider future resource portfolios that exclude Colstrip, including scenarios in which dispatch planning models may find retirement of Colstrip the economically optimal option. The commenters said that NorthWestern's cost analyses and dispatch modeling have not considered the costs of reasonably foreseeable future regulation, such as control upgrade costs under the CAA's regional haze program, nor has NorthWestern put Colstrip to the test against other feasible generation alternatives, such as market purchases or the development of new renewable energy resources. The commenters said that NorthWestern does not appear genuinely interested in whether Colstrip is a good deal for its customers or not. They said instead, the company appears to cling to Colstrip as a prime revenue source for the company, and now NorthWestern has plans to increase its ownership in the plant—from 222 MW to 444 MW starting January 1, 2026. The commenters said argued that NorthWestern's financial incentive to keep Colstrip open is an illegitimate reason to avoid the establishment and enforcement of important health-based pollution limits.

Commenters stated that despite NorthWestern's claims about Montana's economy and grid reliability, NorthWestern Energy can replace Colstrip power with existing and alternative capacity, including from market purchases and abundant wind, solar, and storage resource opportunities. The commenters said that NorthWestern recently joined the Western Resource Adequacy Program, which has moved the company from a capacity deficit to a large capacity surplus. Commenters provided a table illustrating that NorthWestern's current capacity position improved by 101 MW in the winter and 180 MW in the summer relative to last year's projection. The commenters said that this was primarily driven by reductions in NorthWestern Energy's required planning reserve margin and increases in the capacity accreditation of reservoir hydro, wind, and solar under the Western Resource Adequacy Program. The commenters said that the Western Resource Adequacy Program provides these benefits by tapping diversity in load and resource output patterns across the region. They said that while the capacity projection in Table 1 includes NorthWestern Energy's 222 MW Colstrip share, it shows that NorthWestern Energy's capacity need is not nearly as dire as the company has claimed.

Commenters stated that even if NorthWestern Energy needs additional capacity, other resources such as wind, solar, and storage (made even more affordable under new Inflation Reduction Act programs), as well as market purchases, can work together to more cost-effectively and reliably meet that need than continued reliance on Colstrip coal power. NorthWestern's interconnection queue includes significant new generation, including new renewable and storage projects with signed interconnection agreements, the last step before a project proceeds to construction. The commenters said that beyond these resources, Montana is likely to see continued development of renewable and storage resources due to its strong renewable resources and the extended and expanded renewable and storage tax credit provisions in the Inflation Reduction Act.

Commenters stated that the Pacific Northwest region, in which NorthWestern Energy is a market participant, also has a large capacity surplus that will only grow as the Western Resource Adequacy Program comes into effect, so if NorthWestern needs capacity it can more cost-effectively obtain it through long-term market purchases. The commenters said that NERC's recently released Long-Term Reliability Assessment shows large capacity surpluses in the Northwest region through the end of this decade, as more than 9,000 MW of likely resource additions and an additional 5,000+ MW of potential resource additions keep pace with expected load growth and retirements. The commenters said that NERC's Winter Reliability Assessment also shows the Western Power Pool has a nearly 35% reserve margin for this winter.

Commenters stated that not only is abundant clean-energy capacity available to replace Colstrip power, but it would also provide significant reliability and economic benefits, rather than harm, to Montana. In a recent Montana district court trial, *Held, et al v. State of Montana*, Dr. Mark Jacobson, Ph.D., Director of the Atmosphere/Energy Program at Stanford University, provided expert testimony regarding "…the feasibility of transitioning the State of Montana to 100% clean, renewable energy in all energy sectors by mid-century." (*Held et. al. v. State of Montana*, Mont. 1st Jud. Dist. Ct, Lewis and Clark County, *Case No.CDV-2020-307.*) A key portion of his research was "to analyze resulting electric grid stability for the Western Electricity Coordinating Council region of the United States, which is the grid region in which Montana resides." The commenters said that Dr. Jacobson and his colleagues concluded that transitioning to 100% clean

energy resources would reduce end use power demand by approximately 61.4%, would result in a stable grid, and would provide profound benefits for the state:

> "[C]onverting from fossil fuel energy to WWS [wind, water and solar] is estimated to eliminate ~130 Montana air pollution premature mortalities and many more illnesses per year in 2050, avoiding ~$1.7 billion per year (2020 dollars) in 2050 health costs (based on statistical cost of life, morbidity, and additional environmental impacts). Converting will eliminate another $21 billion in 2050 climate costs to Montana and the world. Most noticeable to those in Montana, converting to WWS will reduce annual total energy costs for Montanans from $9.1 to $2.8 billion per year, or by $6.3 billion per year (69.6 percent savings). The total energy, health, plus climate cost savings, therefore, will be a combined $29 billion per year (decreasing from $32 to $2.8 billion per year), or by 91 percent. This is called the social cost savings (or economic savings)." (*Id*.)

Commenters stated that replacement generation for Colstrip is available, and it is preferable to continued reliance on an uneconomic and polluting fossil fuel resource that has no place in the future energy economy.

**Response 4:** The Agency acknowledges these comments and addresses the rationale for the final fPM standards in section IV.D of the preamble.

**Comment 5:** Commenters stated that the EPA states in this concurrent proposed GHG NSPS rulemaking that CCS, and the additional control technologies required for CCS to work, may both cause co-reductions in fPM as well. The commenters said that accordingly, it is arbitrary for the EPA not to account for the impact of these planned fPM reductions on whether any additional controls on fPM were "necessary" for purposes of CAA section 112(d)(6) at all.

Commenters stated that the EPA's cost analysis does not appear to account for other indirect impacts of such temporary retrofit induced shutdowns, including unavailability of power during the retrofit, security risks associated with even temporarily reduced electric generation capacity, and increased costs to the utilities, coal suppliers, and ratepayers purchasing needed makeup power on the open market.

**Response 5:** The EPA considers the cost and emissions impacts of finalized rules in the baseline against which these incremental costs and benefits are measured. Furthermore, the EPA notes that while the pollution control retrofits that EGUs might install for compliance with this rule can require taking a unit out of service for some period of time when connecting ductwork, etc., these activities can normally be scheduled during otherwise planned outages that individually might last a couple of weeks to perhaps months for steam turbine overhauls. There are often multiple outages a year, and these are typically scheduled at times when load demand is low.

**Comment 6:** Commenters stated that if enacted, they also concerned that the 2023 Proposal might have unintended consequences on another important national policy objective - decarbonization and the transition to renewable energy. The commenters said that the Butte miners of the last century made copper that electrified the country and provided metals essential to the war efforts. They said that as a domestic producer of copper with an estimated 30 years of

ore reserves, they are well positioned to supply copper - essential to renewable energy - to help meet the challenges of this century. The commenters said that this is not possible without reliable power.

**Response 6:** The EPA agrees that copper is an important domestic resource. For the EPA's response to comments regarding reliability concerns, see section II.D of the preamble to the final action.

## 8.4 What are the benefits?

**Comment 1:** Commenters stated that the EPA appropriately monetizes climate benefits using the social cost of carbon and specifically, the EPA relies on the interim estimates of the social cost of carbon from the Interagency Working Group on the Social Cost of Greenhouse Gases in the 2023 RIA.

Commenters stated that by adopting the Interagency Working Group's climate-damage estimate, the EPA properly adopts a global framework for valuing climate impacts, rejects a 7% discount rate, and makes other methodological choices based on the best-available and most widely-cited models for monetizing climate damages that existed at the time of the Interagency Working Group's analysis. The commenters said that however, in part because they do not include the most recent evidence, the Interagency Working Group's climate-damage valuations are widely considered to be conservative underestimates. They said that the EPA could additionally perform a sensitivity analysis to reflect the revised climate-damage valuations from the EPA's Draft SC-GHG Update which would indicate even larger climate benefits.

**Response 1:** As discussed in section VIII.E of the preamble and section 4.4 of the RIA, EPA has updated its approach and now uses estimates of the SC-GHG that reflect recent advances in the scientific literature on climate change and its economic impacts and incorporate recommendations made by the National Academies of Science, Engineering, and Medicine[7]. The EPA published and used these estimates in the RIA for the December 2023 Final Oil and Gas NSPS/EG Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review."

**Comment 2:** Commenters stated that the EPA could enhance its discussion of the benefits of reducing HAP emissions in or alongside its tables comparing the monetized effects of the alternatives. The commenters said that the EPA's comparison tables for the costs and benefits of the regulatory options feature the monetized effects, and the EPA clarifies that "[t]he results presented in this section provide an incomplete overview of the effects of the proposal, because important categories of benefits, including benefits from reducing Hg and non-Hg metal HAP emissions, were not monetized and are therefore not directly reflected in the quantified benefit-cost comparisons." (2011 RIA at 7-7). The EPA "anticipate[s] that taking non-monetized effects into account would show the proposal to be more net beneficial than the tables . . . reflect." *Id.*

---

[7] National Academies of Sciences, Engineering, and Medicine (National Academies). 2017. Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide. National Academies Press.

Even if the EPA cannot monetize these benefits, the EPA could add a row quantifying HAP emission reductions to the table itself or a qualitative note about the HAP benefits to the table. The commenters said that additionally, in the accompanying discussion of HAP reduction benefits, the EPA focuses on the benefits of reducing Hg even though there are significant non-Hg metal reductions, too. They said the EPA could add further discussion of these benefits to this section to clarify their relevance.

Commenters stated that even if the EPA cannot monetize the benefits of HAP emission reductions, it is widely recognized that a cost-benefit analysis should give "due consideration to factors that defy quantification but are thought to be important" and that extends to factors that are not fully monetized. The commenters said that the mere fact that a benefit cannot currently be monetized says little about the magnitude of its value and in fact, some of the most substantial categories of monetized benefits of environmental regulation were once considered unquantifiable, let alone translatable into dollar terms. The commenters said that recognizing the potential significance of effects that cannot be fully monetized or quantified, executive orders governing RIA explicitly instruct agencies to consider such effects when analyzing proposed rules. The commenters said that similarly, Circular A-4 cautions agencies against ignoring the potential magnitude of direct unmonetized benefits, emphasizing that "the fact that benefits, costs, and transfers often are uncertain, or difficult to monetize or quantify, does not necessarily make them either highly speculative or minor." (OMB, Circular A-4: Draft for Public Review 28).

Commenters cited authorities described by the Court in *Michigan v. EPA* and said that the proposal's consideration of non-HAP health and climate benefits was consistent with the Court's recognition that the Agency's benefits analysis may not fail to consider important aspects of problems.

Commenters stated that the EPA should also qualitatively discuss the incremental benefits of non-Hg metal HAP emission reductions, since these emission reductions are a significant component of HAP emission reductions under the 2023 Proposal. The commenters said that lastly, even if the total benefits of each alternative are small, it is still possible that the benefits of one alternative are more highly concentrated in an overburdened community, which is relevant to assessing the distributional desirability of that alternative.

Commenters stated that in 2020, the Science Advisory Board (SAB) submitted an evaluation of the technical basis underlying EPA's 2020 MATS Residual Risk and Technology Review and Cost Review [Docket ID EPA-HQ-OAR-2018-0794-4572] The commenter said that evaluation specifically noted that the categorical exclusion of co-benefits in that analysis "depart[ed] the Agency's long-standing practice and is contrary to both the Agency's guidance document on economic analysis and to the recommendations of the Office of Management and Budget." They said it further noted that "[a]s the agency's guidance has been previously reviewed by the SAB, excluding co-benefits is a departure from the Board's recommended practice."

**Response 2:** The EPA expanded the discussion in the RIA of potential but not quantified impacts of HAP emissions reductions and the finalized monitoring provisions. There is

additional text in the body of the RIA, as well as additional information presented in the benefit and net benefits tables in the RIA.

**Comment 3:** Commenters stated that nowhere in the record does the EPA quantify any benefit from reducing HAP from coal-fired EGUs beyond those achieved by the existing MATS regulations. The commenters said that if the residual risk from coal-fired EGUs HAP emissions is extremely small, there is hardly any benefit from reducing HAP further from these units. They said the EPA all but concedes those facts by claiming in the 2023 RIA only "co-benefits" derived from reductions in non-HAP that are not the target of section 112 of the CAA or this rulemaking.

Commenters stated that an example of the EPA's suspect characterization of the health benefits is as follows: "While the screening analysis that the EPA completed suggests that exposures associated with Hg emitted from EGUs, including lignite-fired EGUs, are below levels of concern from a public health standpoint, further reductions in these emissions should further decrease fish burden and exposure through fish consumption including exposures to subsistence fishers." (2023 RIA at 0-8). The commenters said that the EPA admits that the current exposure associated with Hg is below levels of concern from a public health perspective, yet the EPA still advocates for further decreases. They said that if Hg exposure is not currently a problem, the EPA should not propose to further reduce the exposure. Commenters said they do not understand why the EPA wants to put further strain on North Dakota's critical energy grid; stress and potential failure of the grid would result in health and potentially life-threatening consequences.

Commenters stated that this theme is consistent across the entire "Benefits Analysis" section of the RIA and said another example is as follows:

> "Regarding the potential benefits of the rule from projected HAP reductions, we note that these are discussed only qualitatively and not quantitatively .... Overall, the uncertainty associated with modeling potential benefits of Hg reduction for fish consumers would be sufficiently large as to compromise the utility of those benefit estimates-though importantly such uncertainty does not decrease our confidence that reductions in emissions should result in reduced exposures of HAP to the general population, including methylmercury exposures to subsistence fishers located near these facilities. Further, estimated risks from exposure to non-Hg metal HAP were not expected to exceed acceptable levels, although we note that these emission reductions should result in decreased exposure to HAP for individuals living near these facilities." (2023 RIA at 4-1 – 4-2.)

Commenters stated that with respect to the EPA's claim that the 2023 Proposal will result in "climate co-benefits," commenters discouraged the EPA from utilizing the "social cost of carbon" metric to estimate any such benefits. The commenters said that metric remains subject to significant criticisms explained in greater detail in other contexts, such as whether it fairly recognizes the disconnect between local costs and global benefits, whether it overestimates the potential risks from climate change and therefore the benefits from reducing GHG emissions, and whether it is fair to assume similar emission reductions that would be needed globally to realize any benefits at all despite the lack of any framework for ensuring those global reductions will occur. Until those and other criticisms are address, commenters asked the EPA to refrain

from relying on the "social cost of carbon" in evaluating the costs and benefits of any rule, but in particular the 2023 Proposal that is not intended to address climate change at all.

The commenters argued that the EPA's reliance on the social cost of GHGs in unlawful and urged the Agency to refrain from relying on the interim SC-GHG estimates developed by the Interagency Working Group due to a number of flaws. The commenters stated that reliance on the SC-GHG suffers from these flaws:

- They said GHGs are not HAP and therefore not an appropriate target for a CAA section 112 rulemaking; further, GHG emissions from EGUs are not reduced by ESPs or FFs, and so the asserted benefits of the rule are wholly attenuated from what they require. Therefore, the SC-GHG estimates do not and cannot reflect a reasonably foreseeable effect of the proposed action.

- They said the lack of consensus on discount rates used for the SC-GHG estimates can lead to misleading results.

- They said the SC-GHG estimates have not been subject to a robust independent peer review and may not be considered a generally acceptable scientific method for evaluating effects of a proposed action under the CAA or APA.

- They said the SC-GHG estimates fail to comply with relevant administrative procedural requirements, including proper notice and comment procedures and agency guidance on peer review and information quality.

Commenters stated that the EPA analyzed the costs of additional controls by focusing primarily on industry-wide metrics, as if the costs of its proposal would be spread evenly over the entire industry. They said, however, the EPA's basis for tightening the standards is that only a few units are under-performing, while the majority are over-performing, confirming costs of compliance with the new standard will not be evenly spread. The commenters said that according to the proposal, lowering fPM emission limits would bring a small number of sources, just 9% of the fleet, up to the performance of the rest of the fleet. Commenters stated that if the EPA were to evaluate the impact of the additional costs of its new standard on just on those sources that will incur the costs, the impacts would look more dramatic.

Commenters stated that the EPA should not seek to impose almost $2 billion of cost on any source category when there is no benefit associated with reducing the same pollutants the statute targets. The commenters said that the EPA certainly should not do so for an industry that is reducing its emissions at a high pace because it is on the way to retiring most, if not all, units in the source category in little over a decade. They said more importantly, as the Supreme Court admonished in *Michigan v. EPA*, the "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and disadvantages of agency decisions." 576 U.S. 743, 753. They said that the Court faulted the EPA's refusal to "consider whether the costs of its decision outweighed the benefits" (*Id*. at 750) in that rulemaking, explaining "[o]ne would not say that it is even rational … to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Id*. at 752.

143

Commenters stated that it is well-established that cost is a major consideration in technology review rulemaking. They said that under *Michigan*, therefore, the EPA must consider the costs of this regulation under section 112 of the CAA in relation to benefits intended by the statutory requirement mandating this regulation– HAP reductions. Moreover, this is the source category that was the subject of *Michigan*, and that may be regulated under CAA section 112 only upon a determination that it is "appropriate and necessary" to do so. The commenters said that since *Michigan* held that cost and benefits must be considered in determining whether it is "appropriate" to regulate EGUs under CAA section 112 in the first place, it necessarily follows that the same A&N threshold must also apply to this RTR rulemaking, which is merely a follow-on to the initial MACT rulemaking.

**Response 3:** In conducting the technology review under CAA section 112(d)(6), the D.C. Circuit established that the EPA is not required to consider health benefits in deciding whether to revise an emissions standard. In *Ass'n of Battery Recyclers v. EPA*, the Court stated that: "Equally without merit is industry petitioners' claim that EPA's decision to revise emissions standards under section 112(d)(6) was arbitrary and capricious. Although petitioners contend that EPA failed to consider public health objectives or other controls imposed on emissions sources in determining whether more stringent standards were 'necessary,' nothing in section 112(d)(6)'s text suggests that EPA must consider such factors. To the contrary, the statute directs EPA to 'tak[e] into account developments in practices, processes, and control technologies,' . . . not public health objectives or risk reduction achieved by additional controls." 716 F.3d 667, 672 (D.C. Cir. 2013) (citing 42 U.S.C. § 7412(d)(6)). As the EPA explained in the 2023 Proposal (88 FR 24865) and final rule the EPA does consider costs, technical feasibility, and other factors when evaluating whether it is necessary to revise emission standards under CAA section 112(d)(6), consistent with the statute's direction to "require the maximum degree of emissions reductions . . . achievable." CAA section 112(d)(2). And as discussed at length in section IV.C.1 of the final rule preamble, declining to require standards that meet the criteria under 112(d)(6) because the EPA had concluded the residual risk review would be inconsistent with the text, structure, and legislative history of section 112.

Moreover, it is not the EPA's practice (and the EPA does not think it is appropriate) to rely on the results of benefit-cost analyses undertaken to comply with E.O. 12866 in determining whether to revise a CAA section 112 standard. Most importantly, this is because important categories of benefits from reducing HAP cannot be monetized, making the monetized results of the benefit-cost analysis ill-suited to the EPA's decision-making on regulating HAP emissions under CAA section 112. As discussed in the 2023 Proposal (88 FR 24870) and final rule, the EPA considered costs in a variety of ways in determining the appropriateness of updating emissions standards pursuant to CAA section 112(d)(6). While there is some overlap in the consideration of costs for the revised standards the EPA is promulgating pursuant to its CAA section 112(d)(6) authority, and the EPA's analysis of the overall costs and benefits of the rule pursuant to E.O. 12866 (discussed in section VIII of final rule preamble), the EPA is not required to, and does not believe it is appropriate to, rely on the results of the monetized benefit-cost analysis in determining whether it is necessary to revise standards under CAA section 112(d)(6). Further, the EPA finds that its consideration of costs, in addition to other statutory factors, is consistent with the Supreme Court's direction in *Michigan v. EPA* that "[i]t will be up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for

144

cost." 576 U.S. 743, 759 (2015). The EPA disagrees with the commenters insofar as they suggest that the EPA was required—under *Michigan* or any other authority—to rely on the results of the benefit-cost analysis in setting standards in this rulemaking. In *Michigan*, the Supreme Court concluded that the EPA erred when it concluded it could not consider costs when deciding as a threshold matter whether it is "appropriate and necessary" under CAA section 112(n)(1)(A) to regulate HAP from EGUs, despite the relevant statutory provision containing no specific reference to cost. 576 U.S. at 751. In doing so, the Court held that the EPA "must consider cost— including, most importantly, cost of compliance—before deciding whether regulation is appropriate and necessary" under CAA section 112. *Id.* at 759. In examining the language of CAA section 112(n)(1)(A), the Court concluded that the phrase "appropriate and necessary" was "capacious" and held that "[r]ead naturally in the present context, the phrase 'appropriate and necessary' requires at least some attention to cost." *Id.* at 752. This capaciousness was relevant in the context of section 112(n)(1)(A) because that section directs the EPA to determine "whether to regulate" the emission source, which is a context in which "[a]gencies have long treated cost as a centrally relevant factor." *Id.* at 753. The Supreme Court added in *Michigan* that it "need not and [does] not hold that the law unambiguously required the Agency, when making this preliminary estimate [of costs under the 'appropriate and necessary' standard of CAA 112(n)(a)(1)], to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value. It will be up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id.* at 759.

In this rule, the EPA has accounted for cost in multiple ways that satisfy the Court's admonition in *Michigan*. Further, given both the difficulty of monetizing the benefits of HAP reductions and the statutory requirement to reduce HAP emissions to the "maximum degree" achievable, the EPA does not believe that the results of a benefit-cost analysis are an appropriate metric to rely on in the context of setting the standard in this rule. Notably, the EPA is unable to monetize the benefits of the HAP reductions, which are the target pollutant in this rule.[8] In addition, the benefits of the additional transparency provided by the requirement to use PM CEMS for communities that live near sources of hazardous air pollutants, and the assurance PM CEMS provide that the standards are being met on a continuous basis, are not monetizable. While the EPA does not believe benefit-cost analysis is the right way to determine the appropriateness of a standard under CAA section 112, the EPA notes that when all of the costs and benefits of this action are taken into account (including non-monetized benefits) this final rule is a worthwhile exercise of the EPA's CAA section 112(d)(6) authority.

Regarding the discount rate used within the SC-GHG, consistent with the recent scientific literature, the recommendations of the National Academies, and the recent update of OMB Circular A-4, the SC-GHG now relies on the use of a dynamic discount rate. This discount rate is calibrated to observed market interest rate in the near term and uses a Ramsey approach to dynamically update the discount rate over the long-term. See the preamble of this rule, the 2023

---

[8] *See National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units—Revocation of the 2020 Reconsideration and Affirmation of the Appropriate and Necessary Supplemental Finding*, 88 FR 13956, 13970-73 (March 6, 2023) (discussing current limitations to monetizing and quantifying most benefits from HAP reductions).

Final Oil and Gas NSPS RIA, and the supplementary document for the Final Oil and Gas NSPS, "EPA Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances," for more details. Within the RIA for this final rule, EPA uses updated SC-GHG estimates that EPA believes represents the latest available science and follows the recommendations of the National Academies of Science, Engineering, and Medicine. Please refer to the appendix to the rule, "Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances," for detailed responses pertaining to the rigor of the updated methodology, including the discounting approach.

Note that the EPA presented these updated discount rate estimates in a sensitivity analysis in the December 2022 Supplemental RIA that address recommendations of the National Academies of Sciences, Engineering, and Medicine (2017), and invited public comment on the sensitivity analysis and on the technical report, titled External Review Draft: Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances, that was included as Supplementary Material to the Oil and Gas Supplemental Proposal RIA and explained the methodologies used for developing the new Social Cost. The EPA published and used these estimates in the main analysis of the RIA for the December 2023 Final Oil and Gas NSPS/EG Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review" and responded to public comments received on the new estimates in the Response to Comments document for the Final Oil and Gas Rulemaking.

EPA follows applicable guidance and best practices when conducting its benefit-cost analyses, including OMB Circular A-4 and EPA's Guidelines for Preparing Economic Analyses. We therefore consider our analysis methodologically rigorous and a best estimate of the projected benefits and costs associated with the final rule.

With respect to the social cost of greenhouse gases (SC-GHG), as more fully discussed in and RIA Chapter 4.4, EPA has updated its approach in the final rule and the final approach uses updated estimates of the SC-GHG that reflect recent advances in the scientific literature on climate change and its economic impacts and incorporate recommendations made by the National Academies of Science, Engineering, and Medicine.[9] The EPA published and used these estimates in the RIA for the Final Oil and Gas NSPS/EG Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," signed December 2, 2023. As we explain in RIA Chapter 4.5, the SC-GHG is based on a voluminous record, significant public process, and peer-review by an expert panel. EPA's use of SC-GHG for purposes of assessing the climate benefits of this rulemaking is clearly reasonable.

An updated discussion of the reasons for focusing on the global impacts of GHGs when calculating the SC-GHG can be found in the preamble for this final rule, as well as the RIA for the December 2023 Final Oil and Gas NSPS/EG Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." Within the RIA for this final rule, EPA used updated

---

[9] National Academies of Sciences, Engineering, and Medicine (National Academies). 2017. Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide. National Academies Press.

146

SC-GHG estimates that EPA believes represents the latest available science and follows the recommendations of the National Academies of Science, Engineering, and Medicine. Please refer to the appendix to the RIA, "Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances" for detailed responses pertaining to the rigor of the updated methodology and responses pertaining to the global focus of the SC-GHG estimates.

Note that the EPA presented these updated estimates in a sensitivity analysis in the December 2022 Supplemental RIA that address recommendations of the National Academies of Sciences, Engineering, and Medicine (2017), and invited public comment on the sensitivity analysis and on the technical report, titled External Review Draft: Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances, explaining the methodological updates that was included as Supplementary Material to the Oil and Gas Supplemental Proposal RIA. The EPA published and used these estimates in the main analysis of the RIA for the December 2023 Final Oil and Gas NSPS/EG Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review" and responded to public comments received on the new estimates in the Response to Comments document for the Final Oil and Gas Rulemaking.

Contrary to assertions, EPA has fully complied with applicable requirements, including Section 307(d) of the Clean Air Act in this rulemaking. Contrary to these commenters assertion that EPA, and the federal government more generally, has no statutory authority for the use of the SC-GHG, the government in fact started using an SC-GHG value in response to a 2008 court ruling on a Department of Transportation fuel economy rule (see the 2023 Final Oil and Gas NSPS RIA for a more complete history of government use of the SC-GHG). The 2021 IWG values for the SC-GHG were set to be equal to the estimates developed by the IWG in 2016 prior to it being disbanded. These prior estimates were the product of a substantive process, and were approved by the 2017 NAS report as being reasonable to use as a temporary measure while developing an improved set of estimates.

With respect to the inclusion of the co-benefits of GHG reductions in EPA's analysis to which numerous commenters objected, it has been standard practice for decades to include co-benefits within benefit-cost analyses. Whether the rule is intended to reduce HAPs, PM precursors, GHGs, or any other pollutant is not relevant to the decision to include GHG reductions in the analysis. This is no different than the inclusion of ancillary costs within the analysis. Both the 2003 OMB Circular A-4 ("Identify the expected undesirable side-effects and ancillary benefits of the proposed regulatory action and the alternatives. These should be added to the direct benefits and costs as appropriate") and the updated 2023 OMB Circular A-4 ("Your analysis should look beyond the obvious benefits and costs of your regulation and consider any important additional benefits or costs, when feasible") encourage the inclusion of co-benefits and co-costs (or ancillary benefits and costs).

## 8.5 What analysis of environmental justice did we conduct? (Executive Order 12898)

**Comment 1:** Commenters state that HAP emissions from coal-fired power plants continue to disproportionately impact people of color and low-income communities in the Southeast. The commenters said that an assessment of the demographic data in the vicinity of three power plants—Plant Barry in Alabama, and Winyah Generating Station (Winyah) and Wateree Station (Wateree) in South Carolina—reveals that disproportionate numbers of people of color and

people with low incomes live in the vicinity of all three plants compared to the overall demographics of the state in which the plants are located.

The commenters said that specifically, the population living within 10 kilometers of Plant Barry in Alabama consists of 47% people of color overall, and 39% Black people, compared to statewide percentages of 35% and 27%, respectively. They said within 5 kilometers of the plant, the disparities are even greater: the population comprises 53% people of color and 43% Black people. Likewise, the two plants in South Carolina are particularly striking examples of the disproportionate burdens that people of color and low-income communities face. They further said that the overall population of South Carolina is 37% people of color and 27% Black people, and the state poverty rate is 15%. But within 10 kilometers of the Winyah plant, the population is 54% people of color and 47% Black people, and the poverty rate is 21%. Moreover, within 1 kilometer of the Winyah plant, the percentages of people of color and of Black people jump to 69% and 68%, respectively. Finally, the population within 10 kilometers of the Wateree plant in South Carolina is 85% people of color and 82% Black people—more than double the statewide percentages of 37% and 27% — and the poverty rate is 23% while the state-wide poverty rate is 15%.

Commenters stated that the EPA should evaluate all relevant impacts at the level most appropriate to capture those impacts and tailor the demographic analysis appropriately to understand who is most impacted. This level can depend on the dispersal pattern and distance traveled by the pollutant at issue. The commenters said that the EPA should conduct demographic analysis at the appropriate level for the pollutants studied in order to best analyze impacts on the most-affected communities and accordingly, the EPA should explain why averaging population within a 10 km radius is the appropriate analysis for the pollutants covered by this rule.

Commenters stated that averaging the demographics of a large set of facilities could obscure significant demographic differences at individual facilities. The commenters said that by examining the demographic profiles of individual facilities to understand the communities potentially most heavily impacted by pollution, the EPA could determine if emission reductions at specific facilities would affect environmental justice communities of interest. The commenters said that the EPA could then evaluate how each statutorily permissible alternative affects emission reductions at facilities near these communities and better understand the alternatives' respective distributional impacts.

**Response 1:** For the proximity analysis, as indicated in section 6.4 of the final RIA, the 10-km distance was determined to be the shortest radius around these units that captured a large enough population to avoid excessive demographic uncertainty. Specifically, a 5-km radius was evaluated, but it was found that 12% of the units had fewer than 100 people living within 5km of the units. Therefore, a 10-km distance, which yielded only 3% of the units with a population of less than 100 people, was chosen to provide greater certainty in the demographics. Although we show the overall demographics in the RIA for the groups of units investigated, the analysis did include facility-level demographics data. This facility-level demographic data will be submitted to the rulemaking docket for the public to access.

**Comment 2:** Commenters stated that Congress expressed a clear intent to reduce the harms that HAP inflict on these often disadvantaged, overburdened communities through regulation under CAA section 112. The commenters said that these impacts on overburdened communities refute any hypothetical claims by opponents that it is not necessary to strengthen the standards, in light of multiple statutory indicia of Congress's concern with protecting the most exposed individuals and sensitive populations—which have been shown largely to overlap with environmental justice communities because of historical and ongoing discrimination and other chemical, environmental, physical, and social stressors and extrinsic vulnerabilities. The commenters said that because these considerations are important to the threshold decision whether to regulate— and conduct ongoing risk evaluations for—this source category, they would dispel any argument that the EPA's action to strengthen the standards under CAA section 112(d)(6) is unreasonable or unwarranted.

Commenters stated that under CAA section 112(d)(6), the EPA's review is a recurring regulatory requirement that Congress intended to achieve maximum feasible reductions in HAP emissions regardless of remaining risks. From a policy standpoint, that obligation is all the more important where HAP emissions are inflicting cumulative—though unquantifiable—harms on already overburdened communities, which are often communities of color or low-income communities. The commenters said that moreover, certain "developments," such as improvements in pollution monitors that could benefit fenceline communities, may enhance equitable outcomes under the standards. The commenters said that accordingly, the EPA's strengthening of the standards is important to address persistent impacts from EGUs' HAP emissions on environmental justice communities.

Commenters stated that benefits to communities of color, Indigenous communities, and low-income communities foreclose any arguments that a strengthening of the standards that reflects developments in pollution controls is not necessary. Executive Order 12898 directs each federal agency to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." (Executive Order 12898, section 1-101, 59 FR 7629). The commenters said that it is appropriate for the EPA to address disproportionate impacts on communities of color, Indigenous communities, and low-income communities based on several statutory considerations as well.

Commenters stated that Congress required the EPA to set standards reflecting the maximum achievable emission reductions for hazardous air pollution because Congress understood the importance of protecting the public from this especially dangerous class of pollutants. Congress also required that special attention be given to reducing harm to "sensitive populations." The commenters said that based on the evidence showing the numerous severe health concerns implicated by HAP, commenters strongly support strengthening the MATS limits, which will protect the health of all Americans, but especially the sensitive populations impacted by EGU hazardous pollution who are disproportionately communities of color, Indigenous communities, and low-income communities.

**Response 2:** The EPA acknowledges the commenter's support in its decision to strengthen the standards. As exposure results generated as part of the 2020 Residual Risk analysis were below both the presumptive acceptable cancer risk threshold and the noncancer health benchmarks, and this final regulation should still reduce exposure to HAP, there are no 'disproportionate and adverse effects' of potential EJ concern. We also note that the potential reduction in Hg and non-Hg HAP metal emissions would likely reduce exposures to people living nearby coal plants potentially impacted by the amended standards. The analysis supporting these conclusions is presented in section 6 of the final rule RIA. The analysis is also summarized in the preamble in the Executive Order 12898 section.

**Comment 3:** Commenters stated that the EPA's proposal to require strengthened fPM standards as a surrogate for non-Hg metals would reduce the pollution burden of communities of color, low-income communities, and Indigenous communities disproportionately impacted by the pollution emitted from the covered coal plants. The commenters said that because $PM_{2.5}$ contains toxic metals, strengthened fPM standards would reduce the toxic metals exposures disproportionately experienced by these communities. The commenters said that in addition, recent studies more closely link exposures to PM and ozone to a range of health impacts and risks, especially among communities facing multiple stressors and vulnerabilities, which are often communities of color, Indigenous communities, or low-income communities.

Commenters stated that in summarizing the benefits from $PM_{2.5}$ and ozone reductions achieved under MATS, the EPA has observed that "[n]ewer scientific studies strengthen our understanding of the link between $PM_{2.5}$ exposure to a variety of health problems, including: premature death, lung cancer, nonfatal heart attacks, new onset asthma, irregular heartbeat, aggravated asthma, decreased lung function, and respiratory symptoms, such as irritation of the airways, coughing or difficulty breathing." (87 FR 7669). Commenters noted that the Agency, in the 2019 Integrated Science Assessment for Particulate Matter, also determined that there is a "likely to be causal relationship" between long-term $PM_{2.5}$ exposure and nervous system effects such as cognitive decrements and dementia. And the 2020 Integrated Science Assessment for Ozone finds a "likely to be causal relationship" between short-term ozone exposure and key metabolic effects such as disruptions in the body's processes to maintain stable levels of glucose and insulin.

Commenters stated that new research also indicates that $PM_{2.5}$ exposures from coal-fired power plants disproportionately harm Black populations. The commenters said that in 2011, the EPA concluded that MATS would significantly reduce the risks of $PM_{2.5}$-related premature mortality in the counties with the highest preexisting risk, but that those counties were correlated with low-income and low-education populations, rather than with any race. The commenters said that from 2010 to 2016, however, inequalities in exposure to $PM_{2.5}$ for people of color and low-income populations have increased even as overall levels have declined. The commenters said that while MATS may or may not have improved equality in exposures to $PM_{2.5}$, it is highly likely that the large reductions that it achieved have been critical to lessening the absolute harm of $PM_{2.5}$ exposures and therefore the severity of inequitable harms. They said this advantage to strengthening the standards for EGUs under CAA section 112 only underscores that revisions are necessary.

Commenters stated that it is important that—in addition to disproportionate impacts from coal-fired EGUs' HAP emissions viewed in isolation—cumulative metals emissions from various source types such as EGUs and mine waste dumps may disproportionately harm some populations, such as Native American tribes in the Southwest. The commenters said that the Navajo Nation has experienced high reported emissions of multiple metals and above-average exposures to multiple metals, including uranium, cadmium, lead, and arsenic, which may have partially resulted from mine wastes. The commenters said that further, zinc deficiencies may have an additive effect on oxidative stress and inflammation response, which calls for consideration of nutritional deficits among some groups when evaluating the impacts of EGU HAP emissions.

Commenters stated that the Southern Environmental Law Center, in comments submitted April 11, 2022, on the EPA's 2022 Proposal, included a technical analysis by Dr. Ranajit (Ron) Sahu. The commenters said that as set forth in Dr. Sahu's report, he, along with Dr. Andrew Grey, conducted air dispersion modeling of emissions, including $PM_{10}$, from Plant Barry and Winyah. $PM_{10}$ is the non-Hg metal HAP surrogate for the generating units at both plants. The commenters said that this modeling revealed that "the maximum impacts from the plant's emissions were predicted to be around 5 km or less distant from the plant, with potential impacts on those living near the plants." *Id*. at 2. They said thus, perhaps not surprisingly, the individuals living closest to these plants are also the individuals most exposed to the emissions of non-Hg metal HAP.

Commenters stated that stricter standards under MATS certainly would reduce some of the impacts from non-Hg metal HAP on the individuals most exposed to emissions from Barry, Winyah, and Wateree. The commenters said that for these comments, Dr. Sahu assessed the expected reduction in emissions of non-Hg metal HAP from Plant Barry Unit 5, and from all units at Winyah and Wateree, using the surrogate of fPM with fPM emissions based on (1) the EPA's proposed limit of 0.010 lb/MMBtu; (2) the Agency's proposed alternative fPM limit of 0.006 lb/MMBtu; and (3) a stricter limit of 0.0024 lb/MMBtu discussed above. The commenters said that for example, with respect to Plant Barry Unit 5, for 2022, using the heat input reported for 2022, fPM emissions under the current limit of 0.030 lb/MMBtu could have been up to 1,120,308 lb, or approximately 560.15 tons. Under the proposed limit of 0.010 lb/MMBtu, fPM for 2022 would be limited to 373,436 lb, or about 186.72 tons. The commenters said that under the EPA's alternative limit of 0.006 lb/MMBtu, and assuming the same 2022 heat input, fPM for Unit 5 would be limited to 224,062 lb, or about 112.03 tons. The commenters said that finally, under a stricter limit of 0.0024 lb/MMBtu, discussed above, fPM emissions in 2022 would have been limited to 89,625 lb, or 44.81 tons. This represents more than a twelve-fold decrease in the limit for fPM emissions as compared to the present 0.030 lb/MMBtu standard.

**Response 3:** The EPA acknowledges the commenter's support in its decision to strengthen the standards. When quantifying air pollution-attributable effects, The EPA selects endpoints for which there exists a causal or likely to-be-causal relationship between the pollutant of interest and the effect. Next, the EPA identifies epidemiologic studies that report risk estimates appropriate to use when calculating the number of adverse events attributable to the pollutant of interest. Sufficient evidence existed to quantify certain neurological effects. The EPA's approach for selecting and quantifying endpoints may be found in *Technical Support Document:*

*Estimating PM2.5- and Ozone-Attributable Health Effects* (U.S. EPA, 2023). Additionally, the EPA does not have data and methods to consider the potential for nutritional deficits to have additive health impacts from EGU HAP exposure.

**Comment 4:** Commenters stated that certain low-income and minority populations may face greater exposures to methylmercury from local deposition of EGU emissions than others do. The commenters said that the refined modeling exercise discussed above produces results that may be examined through a demographic lens by considering that, in 2010, EGUs with large Hg emissions frequently were located near low-income and minority communities.

Commenters stated that Congress's special concern for these communities may be inferred from the requirement for the EPA to study the threshold for Hg concentrations in fish tissue that may be consumed by "sensitive populations" without adverse effects to public health. The commenters said that Congress does not define the term "sensitive populations," but it is reasonable to interpret the phrase to include populations who face exposures to one or more HAP that affect the same physiological functions, whether from EGUs or other source categories, as well as cumulative exposures to individual pollutants through different pathways. The commenters said that it is also reasonable to include populations who are overburdened by other air or water pollution, environmental or social stressors, and vulnerabilities such as nutrient deficiencies that could exacerbate the health harms of HAP exposures. They said there is no reason to believe that Congress meant sensitivity only from intrinsic vulnerabilities (*e.g.,* existing health conditions, genome), when many other stressors (*e.g.,* other chemical exposures, discrimination, poverty, poor housing quality) and extrinsic vulnerabilities (*e.g.,* low socioeconomic status, lack of access to health care) may also render a person more susceptible to exposures to a HAP.

Commenters stated that in addition to the methylmercury subpopulation risks based on information known to the EPA in 2011, as discussed above, new research highlights the heightened risks to Native American communities in particular. The commenters said that the EPA's proposed removal of the lignite loophole and tightening of the standards for lignite plants would reduce Hg emissions at these plants and yield substantial health benefits for the Native American communities that disproportionately live near lignite-burning coal plants.

Commenters stated that the EPA's extension of the 2011 Mercury Risk Assessment as part of the 2023 Final A&N Review provides additional evidence for the risks to Native American Tribes. The commenters said that the EPA observed in the 2022 risk assessment that the Agency's estimates for fish consumption among Native American Tribes may be too low or missing in some areas, and that these populations' fish-consumption rates may be similar to the rates observed for other populations in those areas, such as low-income White and Black people in the Southeast.

Commenters stated that a 2023 study conducted by Harvard researchers documenting the sociodemographic disparities in exposure to Hg from lignite-burning coal plants found possible heightened Native American exposures to methylmercury through fish consumption near some of the largest Hg-emitting power plants in the U.S., in North Dakota and South Dakota. The commenters said that the authors determined that individuals consuming self-caught fish may be

exposed to levels of methylmercury exceeding the EPA reference dose. Regions containing the U.S. plants with the lowest reductions in Hg deposition from 2010 to 2020 overlap with higher-than-average high-frequency fish consumers, raising specific concern over elevated methylmercury exposures for Native American populations in the Dakotas who frequently consume seafood. The commenters said that in addition, the research reinforces prior findings that show a lack of distributional justice in power plant siting. Specifically, the "significantly greater proportions of low-income individuals" living within 5-km of active facilities in 2020, as compared to plants that retired since 2010, suggests that plant retirement decisions may be impacted by the relative wealth of the surrounding communities.

Commenters stated that the cumulative impacts of legacy Hg pollution, especially pronounced in urban settings, speak to the importance of reducing Hg pollution in order to correct inequality in health risk, which is disproportionately borne by marginalized communities. Urban rivers are often important food sources for lower-income urban populations; thus, urban anglers are at higher risk of exposure to contaminants via fish consumption, and Lawrence freshwaters like the Concord and Merrimack Rivers are affected by legacy Hg contamination (including from Superfund and Brownfield sites, in addition to the deposition from coal-fired EGU emissions) that persists in previously deposited and emitted pools. The commenters said that the cumulative effects of this Hg act as threat multipliers and put urban, under-resourced populations at risk for other health and environmental impacts, including exposure to other toxins.

Commenters stated that in addition, the EPA has observed that there may be benefits from regulating EGUs under CAA section 112 insofar as society places a premium on reductions of inequality in terms of health risks. This altruistic benefit "is particularly important as exposure to HAP is often disproportionately borne by underserved and underrepresented communities." (87 FR 7624; 7646). The commenters said that that individuals prefer equality in health risks over equality in income and are willing to accept greater additional risk overall in exchange for equality reveals the worth of these improvements. The commenters said that improvements in equity not only provide an altruistic benefit to society—an important, yet previously unmentioned, class of benefits—but also address risks to the most exposed individuals and to sensitive populations.

Commenters stated that as the EPA has acknowledged, consumption of Hg-contaminated fish and shellfish is the primary pathway by which Hg exposure occurs in the U.S. The commenters said that in the Southeast US, individuals living near coal-fired power plants often are people with low incomes and people of color; for these individuals, fishing can provide an inexpensive food source. Because of higher rates of fish consumption, however, these individuals are also disproportionately impacted by Hg emissions from coal-fired power plants. The commenters said that the EPA, in the 2011 RIA, assessed the impacts from power plant Hg emissions on demographic groups with significant potential risks of Hg exposure, including African Americans with low incomes living in the Southeast and with high rates of consumption. The commenters said that looking at the only subset of public health benefits attributable to reductions in Hg emissions that could be quantified at the time, *i.e.,* IQ loss in children, the EPA noted that "an African-American child in the Southeast born in 2016 to a mother consuming fish at the 90th percentile of published subsistence-like levels" would experience a substantial loss of

IQ points "as a result of in-utero [methylmercury] exposure from all sources in the absence of a Toxics Rule." (2011 MATS RIA at 4-3.)

Commenters urged the EPA to adopt a stricter Hg standard not only for low-rank coal units but also for not-low-rank coal units in order to reduce the impacts on individuals and communities who have been disproportionately burdened from exposure to Hg and other HAP. The commenters said that Dr. Sahu compared Hg emissions at Plant Barry, Winyah, and Wateree, based on the current standard for Hg of 1.2 lb/TBtu, with the expected reductions in emissions from a tighter standard of 0.15 lb/TBtu. Under the current limit, Plant Barry unit 5 would have been permitted to emit 44.81 pounds in 2022 based on the actual heat input for that year, although actual emissions reported were 15.62 pounds. Under the stricter limit of 0.15 lb/TBtu, emissions in 2022 would have been reduced to 5.60 pounds. They said at Wateree unit 1 for 2022, permitted emissions of Hg would have been 12.91 pounds under the current limit of 1.2 lb/TBtu.; actual reported Hg emissions for 2022 were 4.38 pounds; and Hg emissions under a limit of 0.15 lb/TBtu would have been limited to 1.61 pounds. The data show similar results for Winyah unit 2 for 2022: under the current limit, Winyah could emit 10.50 pounds of Hg; actual reported Hg emissions were 4.41 pounds; and under a stricter limit of 0.15 lb/TBtu, Hg emissions from this unit would have been limited to pounds.

Commenters stated that in the Southeast, the EPA's 2021 watershed-based risk assessment indicates that under the current standards low-income Black subsistence fishers face elevated risks of fatal heart attacks from power-plant methylmercury exposures.

**Response 4:** The EPA acknowledges support for standards finalized in this rule. The EPA did not propose a lower Hg limit for not-low-rank coal units. The EPA also acknowledges that certain populations may experience greater exposure to methylmercury and some of the methylmercury may be the result of deposition from EGUs. The risk assessments that the EPA undertakes are designed to account for vulnerable subpopulations. The EPA stands by its 2020 RTR which showed that emissions of HAP from coal- and oil-fired power plants have been reduced such that residual risk is at an acceptable level. Responses to similar comments on the risk findings of the 2020 RTR can be found in Chapter 10. The finalized standards are anticipated to further reduce mercury emissions.

**Comment 5:** Commenters stated that a disproportionate number of people of color and people with low incomes, compared to the states' overall demographics, live near Plant Barry in Alabama, and the Winyah and Wateree plants in South Carolina. Emissions from these power plants of acid gases—like the emissions of Hg and non-Hg metal HAP—also have disproportionate impacts on people of color, Black people, and people with low incomes. The commenters said that Dr. Sahu and Dr. Grey's air dispersion modeling last year for Plant Barry and the Winyah also looked at $SO_2$ emissions, an acid gas surrogate. They said that as with Hg emissions and non-Hg metal HAP, the maximum impact for $SO_2$ was "predicted to be around 5 km or less distant from the plant, with potential impacts on those living near the plants." (Sahu 2022 Technical Analysis at 2.)

Commenters stated that a stricter acid gas standard could alleviate some of the impacts that people of color and low-income communities disproportionately experience from exposure to

acid gas emissions from Plant Barry, Winyah, and Wateree. The commenters said that Dr. Sahu analyzed emissions of HCl under the current standard of 0.002 lb/MMBtu for Plant Barry Unit 5 in Alabama, and for each unit at Wateree and Winyah in South Carolina, in comparison to the use of a stricter standard for HCl of 0.0006 lb/MMBtu. For Plant Barry, using the year 2022 heat input, emissions of HCl were limited to 74,687 lb; under a stricter limit of 0.0006 lb/MMBtu, emissions of HCl would have been limited to 22,406 lb. For Wateree Unit 1 and Winyah Unit 4, the results were also significant: under the current HCl limit, emissions of HCl at Wateree were limited to 21,519 lb, while under the proposed limit of 0.0006 lb/MMBtu, emissions would be limited to 6,456 lb. The commenters said that finally, at Winyah Unit 4, under the current limit for HCl, emissions for 2022 were limited to 2,328 lb, whereas using the stricter limit for HCl of 0.0006 lb/MMBtu, emissions of HCl would have been limited to 698 lb.

**Response 5:** The Agency did not receive comments to change the outcome of the technology review proposing no changes for acid gas standards.

**Comment 6:** Commenters stated that lignite units carry a very low air toxics risk, which is well below acceptable standards. The commenters said that the EPA's risk analysis applies to sensitive populations and takes into account the current emission reductions at the current fPM and Hg limits. The commenters said that however, the proposed fPM measures come with substantial electricity costs that all communities must shoulder. The EPA must weigh the costs of imposing these emission reductions in areas supplied by cooperatives in which the end user will face higher electricity costs. The commenters said that nationally, low-income households spend a larger portion of their income on home energy costs (*e.g.,* electricity, natural gas, and other home heating fuels) than other households spend.

**Response 6:** The Agency conducted a review of the 2020 Technology Review pursuant to CAA section 112(d)(6), which focused on identifying and evaluating developments in practices, processes, and control technologies for the emission sources in the source category that occurred since the original MATS rule was promulgated. EPA's response to comments with respect to the revised fPM standard are presented in section IV.C of the preamble. EPA's response to comments with respect to the revised Hg limits are presented in section V.C of the preamble. With respect to the comment on electricity price impacts on end users, we note the RIA finds that rate impacts on average are well under 1% nationally.

CHAPTER 9

## 9. Statutory and Executive Order Reviews

## 9.1 Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

**Comment 1:** The commenters urged the EPA to convene an interagency process and complete a cumulative impact analysis of the reliability issues associated with its entire "power sector strategy" before finalizing this rule. The commenters stated convening an interagency process aligns with Executive Order 13563, signed by President Obama, reaffirmed in President Biden's Executive Order 14094, "Modernizing Regulatory Review."

The commenters said the EPA recently signed a memorandum of understanding (MOU) with the U.S. Department of Energy promising "interagency cooperation and consultation on electric sector resource adequacy and operational reliability." The commenters stated there is no information in the docket about how the agencies will or have worked together and with FERC, NERC, and other stakeholders toward this goal and no public meetings have been held to further the goals of the MOU.

The commenters further stated that as part of this interagency process, the EPA should complete a cumulative impacts analysis of the reliability impacts of its power sector strategy that is informed by direct expert consultation with FERC, NERC, RTOs, and other grid experts. The commenters stated as part of its plan to remake the power sector, EPA has promulgated or proposed six rulemakings, including the proposed MATS RTR at issue in these comments, the Clean Water Act Effluent Limitation Guideline proposal, the recently finalized Ozone Transport Rule, the proposed rulemaking to lower the NAAQS for PM, and most recently, the new GHG emissions guidelines for existing coal-fired electric generating units. The commenters said the EPA is also continuing to implement the 2015 Coal Combustion Residue rule and responding to facility requests to continue to operate certain surface impoundments under the Part A and Part B programs promulgated more recently. The commenters stated these decisions alone impact 55 GW of electric generating capacity in 19 states. They said because all these rules affect the power sector, coal generation, and reliability, the impact of one rule cannot be understood without understanding the impacts of all the others.

**Response 1:** In parallel with the development of various rules that cover pollution from fossil fuel-fired electric generating units, the EPA has consulted a wide range of stakeholders, including other Federal agencies, reliability experts, and grid operators. To deepen this coordination, on March 9, 2023, EPA and DOE issued a Joint Memorandum of Understanding on Interagency Communication and Consultation on Electric Reliability to provide a framework for interagency cooperation and consultation on electric sector resource adequacy and reliability. The MOU outlines activities to monitor and share information to support the continued reliability of the electric system, including regular outreach and consultation with FERC, NERC, and other reliability and electricity grid-focused entities. There have been numerous events and engagements as part of the MOU effort, which have helped enhance linkages within the EPA and deepen our relationship with DOE. Perhaps most importantly, the MOU framework has allowed

a more robust and focused engagement with important stakeholders who are critical to ensuring that the grid operate efficiently and reliably. This process is not linked to any one regulatory effort or final action, but supports EPA's efforts to better understand the various the diverse set of perspectives. However, this process does not substitute for EPA's public comment process as part of individual regulatory efforts. Each regulatory effort includes technical support information and data related to resource adequacy and reliability, as it relates to that action. EPA plans release additional information on the Reliability MOU develops.

The final rule covers a small number of EGUs, and as shown in section 3.5.4 of the RIA for the final rule, the EPA does not project incremental changes in operational capacity to occur in response to the final rule. Because the EPA projects no incremental changes in existing operational capacity to occur in response to the final rule, the EPA does not anticipate this rule will have any implications for resource adequacy (see Resource Adequacy Analysis Technical Support Document, available in the docket). As EPA develops regulations, it reflects the cost of final actions and rules in the baseline. As such, the public has the ability to understand the incremental and cumulative impacts of various actions over time. For example, this action includes the costs and requirements of previously finalized efforts like the Final GNP and CCR actions. As future actions are finalized, those will include the requirements of this final action. While the EPA will continue to evaluate and isolate the potential impacts of final actions individually, the EPA also provides technical support information and data where relevant and as they relate to other regulations and the potential cumulative impacts.

For example, the EPA analyzed projected resource adequacy impacts of several recently finalized EPA rulemakings: the LDV, HDV and MDV (collectively "Vehicle Rules), Final 111 EGU Rules, ELG and MATS (collectively "Power Sector Rules") and found that, whether alone or collectively, these rules are unlikely to adversely affect resource adequacy. For further discussion, see Resource Adequacy Analysis: Vehicle Rules, Final 111 EGU Rules, ELG and MATS Technical Memo, available in the docket. Additionally, the EPA estimated the collective impacts of the vehicle rules, final 111 EGU rules, MATS and ELG. For further discussion of this modeling, see IPM Sensitivity Runs Memo, available in the docket.

## CHAPTER 10

### 10. CAA Section 112(f) Residual Risk, 2020 petition for reconsideration

**Comment 1:** Commenters supported the Agency's findings that the 2020 Residual Risk Review was sound, and the commenters supported the EPA's proposed determination that the acid gas standards for coal- and oil-fired EGUs and IGCC units do not need revisions. Commenters said that the 2020 RTR findings are consistent with risk analyses completed by electric utility researchers in a pair of June 2018 reports that concluded that inhalation and multi-pathway health risks from coal-fired EGUs were well within the EPA's established acceptable risk thresholds and commenters provided links to the 2018 reports. Commenters said neither the residual risk review nor technology review justify revising the MATS. Commenters cited, agreed with, and supported the EPA's finding in the 2020 RTR that current HAP emissions from EGUs provide an ample margin of safety for health impacts and impart no adverse environmental impacts.

Commenters said that the EPA must revise MATS to protect human health near the Colstrip Plant and across the country because these emissions cause cancer and serious health impacts with disproportionate impacts on disadvantaged and environmental justice communities. Commenters said that the EPA should consider the incremental benefits of reducing HAP emissions below the current acceptable risk and health thresholds like the EPA did under the Benzene NESHAP. Commenters said it is consistent with cost-benefit analysis to weigh incremental benefits of Hg and non-Hg metal emission reductions under CAA section 112(f)(2), and commenters said the EPA should assess the risks posed by lead (Pb) emissions considering the Centers for Disease Control (CDC) has found no safe level of lead exposure in children's blood. Commenters said the EPA should consider multipathway and cumulative exposure under CAA section 112(f)(2) because the EPA has not considered how below-threshold risks may combine with other exposures to form a cumulative burden that potentially exceeds the threshold, particularly in "hot spot" communities like those neighboring the Colstrip Plant in Montana.

Commenters said that the EPA's determination in 2020 to impose no standards under CAA section 112(f)(2) is relevant to the proposal because evidence of risks has grown since 2020, and the new evidence should be considered under CAA section 112(f)(2).

Commenters said that in a future rulemaking, the EPA should reconsider its 2020 determination that risks remaining after implementation of MATS provide an ample margin of safety. Commenters cited their petition for reconsideration, associated risk analyses (including new data), and held that the EPA's 2020 determination failed to evaluate all of the risks posed by HAP emissions from coal- and oil-fired EGUs.

Commenters also presented the results of new research on sociodemographic disparities on exposure to Hg emissions from EGUs and recommended that the EPA reconsider its residual risk analysis in the 2020 Final Action (85 FR 31286). Commenters said that recent methylmercury exposure data could support strengthening the Hg standard for lignite units and cited the

preamble to the Benzene standard (54 FR 38044) indicating that the EPA has the authority to consider effects on the most exposed individuals and on the general public.

Commenters said that the 2020 Residual Risk Review indicate that no EGU emissions result in exceedances of the 2001 methylmercury Oral Reference Dose (RfD), but these commenters supported the proposal's recognition that human health effects can occur at exposures below the 2001 RfD. Commenters stated that this 2001 methylmercury RfD value does not reflect consideration of recent analyses and studies, including those addressing various neurological (*e.g.*, IQ) and cardiovascular endpoints. Such a consideration of these and other studies would likely lead to a more protective RfD value. Commenters cited a recent study that concludes that EGU-related Hg deposition plausibly can result in exposures that exceed the RfD for the most highly exposed individuals. The commenters said that the EPA should carefully consider these new findings in areas impacted by emissions from lignite-fired EGUs and urged the EPA to resume efforts to update the methylmercury RfD.

Commenters said incremental reductions in emissions of Hg and acid gases (and associated reductions in risk) are worth pursuing. Commenters cited recent studies that confirmed the EPA's prior risk assessments underestimated risks and cited multiple risk-related objections presented in their petition for reconsideration of the 2020 RTR. Commenters said it was not possible to raise these risk-related issues during the public comment period and said that the EPA should initiate a reconsideration proceeding for the 2020 RTR.

**Response 1:** Because we did not reopen the 2020 Residual Risk Review, many of these comments fall outside the scope of this rulemaking. We note, however, that the EPA acknowledges support for the 2023 Proposal and the findings of the 2020 Residual Risk Review. The EPA also acknowledges that it received a petition for reconsideration from environmental organizations that, in relevant part, sought the EPA's reconsideration of certain aspects of the 2020 Residual Risk Review, which the EPA continues to review and will respond to in a separate action.[10]

Regarding multipathway and cumulative assessments, most or all receptors in these assessments receive exposures to multiple pollutants rather than a single pollutant, we estimate the aggregate health risks associated with exposure to all the HAP from a particular source category.

Regarding health impacts in vulnerable groups, EPA agrees with the points made by the commenters, including the presence of specific subsistence-fisher populations in specific regions of the country potentially impacted by U.S. EGU-sourced Hg (*e.g.,* tribal populations in the Midwest, people of color in the Southeast, and other populations in the vicinity of U.S. EGUs). We acknowledge that population subgroups, may have a potential for risk that is greater than the general population due to greater relative exposure and/or greater susceptibility to the toxicant. The assessments we undertake to estimate risk account for this potential vulnerability. With respect to non-cancer toxicants, the assessments rely on the EPA's hazard identification and

---

[10] See Docket ID No. EPA–HQ–OAR–2018–0794– 4565 at www.regulations.gov.

dose-response values that have been developed to be protective for all subgroups of the general population, including children.

The EPA thanks one commenter for their recommendation for future rulemakings, EPA will continue to operate under the authority of the CAA to protect public health.

Regarding the findings of Dai et al., 2023 (Harvard paper), which was cited by several commenters, EPA acknowledges the merits of this screening-level assessment, which corroborates EPA's screening results with both identifying the same areas of potential concern. In the 2020 Residual Risk Review, using the same emissions data, the EPA performed a refined site-specific analysis on this most impacted area in North Dakota at a much finer resolution than the screening analysis reported by Dai et al., (2023). EPA's deposition calculation (4-5%) more accurately reflects the local US EGU deposition at this site than Dai et al.'s (8%). Given the low risk, applying the 8% deposition figure would not change the risk conclusions for this site. EPA's refined site-specific analysis provides the most accurate estimate of the highest risk potential from nearby US EGU emissions. By using these location-specific data (including fish tissue methylmercury data, Hg deposition and the assessment of the potential for activity by specific subsistence fisher populations), the risk assessment was based on a relatively high degree of spatial resolution in characterizing the existence of significant exposure and risk to U.S. EGU-sourced Hg. Our multipathway assessments follow Scientific Advisory Board (SAB)-approved methods and Dai et al., 2023 does not identify any reason why we should deviate from our standard practices at this time.

The EPA is aware of new scientific research on sociodemographic disparities on exposure to Hg emissions from EGUs. The EPA's multipathway assessments follow Scientific Advisory Board (SAB)-approved methods and the new research cited by commenters does not identify any reason why the EPA should deviate from our standard practices at this time. The EPA is also aware that new scientific data have become available since the 2001 IRIS assessment for methylmercury was completed, including both experimental studies and epidemiological evaluations of exposed human populations. However, it is premature to estimate what, if any, revisions to the IRIS assessment for Hg may be needed until a comprehensive evaluation is conducted and such an evaluation cannot be completed at this time. More information about the IRIS process is available on the IRIS website.[11]

The EPA acknowledges the potential for Hg emissions to impact vulnerable communities and natural resources. Commenters noted significant improvements in Hg levels and attributed this to MATS. The proposed standards are anticipated to further reduce Hg emissions.

**Comment 2:** Commenters said that these low risks indicate that the EPA should not impose almost $2 billion of cost when there is no benefit, particularly in a sector that is rapidly reducing emissions. Commenters said that the sector will be retiring most, if not all, affected sources in a little over a decade, cited *Michigan v. EPA*, and said that the Court's holdings that risk benefits should be weighed against costs are relevant to the proposal. Commenters said that decisions by

---

[11] https://iris.epa.gov/ChemicalLanding/&substance_nmbr=73#status

affected units to achieve significant compliance margins do not necessitate changes to limits and said the proposal does not offer explanation as to why compliance margins would drive emissions standards. Other commenters cited numerous ongoing rulemakings that will apply to electric utility operations and said the EPA's reconsideration of the 2020 finding (that the remaining residual risks under CAA section 112(f)(2) are acceptable) is poorly timed. Commenters from North Dakota said that the EPA's risk analysis indicates that the level of risk presented by North Dakota lignite-powered plants is an order of magnitude lower than the highest risk from any coal-fired plant and that maximum risks are not associated with Hg. These commenters said that the proposal fails to explain the inconsistency between the EPA's risk analysis under CAA section 112(f)(2), which the commenters said shows very low risk, and imposing more stringent controls on lignite-fired units. Commenters also noted the significant differences between the maximum risks at oil-fired plants and the maximum risks at coal-fired plants and asked the EPA to consider whether oil and coal plants should be regulated separately in light of the different levels of risk presented.

Commenters said that the proposal's 2023 RTR contradicts the EPA's 2020 RTR and said the Agency's basis for revising the PM limit is beyond the scope of CAA section 112 requirements. Commenters agreed with the EPA's conclusion that further reductions were not required under CAA section 112(f)(2) because the current standards provide an ample margin of safety. Commenters said the EPA's determination under CAA section 112(f)(2) calls into question the basis for the proposal to increase EGU operating costs. Commenters said that the steep decline in EGU HAP emissions will continue under the current standards as the sector continues to retire or reduce utilization of existing coal-fired capacity.

Commenters said that even though the EPA is not required to consider risk reductions under CAA section 112(d)(6), the potential to reduce emissions of a wide range of highly toxic HAP underscores the need to strengthen the standards.

Commenters agreed with the EPA's "two-pronged" interpretation that CAA section 112(d)(6) imposes technological obligations that are distinct from risk mandates under CAA section 112(f)(2). Commenters said that if the criteria under CAA section 112(d)(6) are met, the EPA must update the standards to reflect new developments, without regard for risk assessments under CAA section 112(f)(2). Commenters compared the periodic technology reviews under CAA section 112(d)(6) versus the one-time risk-assessment under CAA section 112(f)(2) and said that an interpretation that risk assessments under CAA section 112(f)(2) can govern determinations under CAA section112(d)(6) improperly collapses these two expressly separate regulatory tracks.

**Response 2:** The EPA disagrees with some commenters that given the low risks, the EPA should not impose new standards. As described in the 2023 Proposal preamble (88 FR 24866), and agreed upon by other commenters, Congress intentionally created a two-pronged structure for updating standards for toxic air pollutants that requires EPA to continue assessing opportunities to strengthen the standards under CAA section 112(d)(6) even after residual risks have been addressed under CAA section 112(f)(2). Under this structure, the EPA is obligated to update standards where either the EPA finds it is necessary to provide an ample margin of safety to

protect human health or where the EPA finds it is necessary taking into account developments in practice, processes, and control technologies.

The EPA acknowledges the number of power sector rulemakings affecting electric utilities at this time as well as a large number of retirements within the next decade. However, the final emission standards are consistent with CAA section 112 requirements, and are further addressed in the preamble.

Comments regarding costs considerations following from the *Michigan v. EPA* decision are discussed in section 8.4 of this document.

### 10.1 Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

**Comment 1:** The commenters stated that the EPA's proposal fails to comply with Executive Order 13211, "Actions that Significantly Affect Energy Supply, Distribution, or Use." The commenters said numerous experts have informed the EPA that the cumulative impacts of the Agency's "power sector strategy" will have an adverse impact on domestic energy production, supply, costs, and use. The commenters said that the EPA therefore must conduct a more in-depth analysis, in consultation with grid experts, of those potential effects under Executive Order 13211. The commenters argued that the Agency cannot acknowledge the interrelated nature of the "power sector strategy" rulemakings and at the same time pretend that there is no impact to the supply, distribution, and use of energy.

**Response 1:** Section 3.3 of the RIA summarizes all major rules included in the baseline of this final rule. The inclusion of any potential future rules in the baseline for this final rule would not be informative. EPA notes that future rulemakings will include analysis of this final rule in the baseline.

# CHAPTER 11

## 11. Other Topics

**Comment 1:** Commenters stated that the EPA failed to publish the proposed regulatory text in the Federal Register (FR) notice for the 2023 Proposal and nowhere in the FR notice did the Agency mention the proposed regulatory text or note that it was available in the docket. They stated that locating the proposed regulatory text was difficult for the following reasons: (i) the docket contained nearly 570 documents (559 of which are in the Supporting and Related Materials category) as of June 23, 2023; (ii) the proposed regulatory text document was titled, "MATS RTR Rule Text Redline Strikeout document," and thus would not appear among the search results if searching via keywords "regulatory text"; and (iii) even a search of "redline" returns 45 documents that must be reviewed to determine whether they contain the final version of the redlined regulatory text. The commenters said the redline is available only on Regulations.gov and is buried as an attachment to a document obscurely titled "Email correspondence confirming EPA OAQPS made edits in response to OMB's Passback no. 1 of the RIA for the MATS RTR (2060-AV53)." They argued that the public cannot meaningfully comment on this redline-even if one is persistent enough to find it-because [the public] cannot be certain the redline reflects the rule being formally proposed.

Commenters stated that by posting the proposed regulatory text as a separate document, the Agency runs the risk not only of stakeholders failing to find it in the docket but also of creating discrepancies between the description of the proposal in the FR and the proposed regulatory text itself. For instance, as to the LEE option for fPM, total non-Hg metals, and individual HAP metals, the FR notice indicates that the option will be removed "no later than 3 years after the promulgation date"; however, the proposed regulatory text (final version) indicates that the option will be available up to 3 years after the effective date of the final rule [*see* 88 FR 24887; Redline Final at PDF p. 100]. The commenters said such discrepancies prevent interested members of the public, potentially affected EGUs, and other stakeholders from receiving adequate notice of the EPA's proposed action and impair their ability to provide informed comments. They said the EPA also runs the risk of running afoul of its statutory duty under the APA to provide the public with adequate notice, particularly if the description of the proposal in the FR notice fails to accurately capture "either the terms or substance of the proposed rule or description of the subjects and issues involved." To ensure that the public is afforded a meaningful opportunity to comment on proposed rules, the minimum 60-day comment period should not run until the public has received fair and adequate notice of the regulatory language, which is best accomplished by publishing the proposed regulatory text in the FR [5 U.S.C. § 553(b)].

The commenters requested that the EPA publish the proposed regulatory text with the Proposal in the FR and that for future rulemakings, the Agency return to its longstanding practice of including the proposed regulatory text in the FR notice for a proposed rule. Such practice would provide clarity around the proposed regulatory action and ensure that all members of the public have adequate notice and an opportunity to comment on the proposed regulatory language.

The commenters stated that the EPA also did not post the RIA for the Proposal until over two weeks into the public comment period (*i.e.,* after over 25% of the public comment period had already run) (EPA-HQ-OAR-2018-0794-5837). They said that given that the CAA requires EPA to consider the costs of its Proposal, (42 U.S.C. § 7412(d)(2)) the Agency's failure to promptly publish the RIA further constrains the public's ability to meaningfully comment on a central element of the Proposal.

**Response 1:** The 2023 Proposal met all APA and CAA notice-and-comment requirements. Nothing in the APA or CAA requires EPA to publish proposed regulatory text in the Federal Register. The CAA section 307(d)(3) requirement to publish a "notice of proposed rulemaking" is not a requirement to publish proposed rule text. CAA section 307(d)(3) specifies the required elements of a "notice of proposed rulemaking," and "proposed rule text" is not a required element. The APA does not require publication of proposed rule text in the Federal Register either. Section 553(b)(3) of the APA provides that a notice of proposed rulemaking shall include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Thus, the APA clearly provides flexibility to describe the "subjects and issues involved" as an alternative to inclusion of the "terms or substance" of the proposed rule. See also *Rybachek v. U.S. E.P.A.*, 904 F.2d 1276, 1287 (9ᵗʰ Cir. 1990) (EPA's failure to propose in advance the actual wording of a regulation does not make the regulation invalid where EPA's discussion of the regulatory provisions "clearly describe[s] 'the subjects and issues involved.'").

In addition, EPA stated in the 2023 Proposal that a memorandum showing the rule edits that would be necessary to incorporate the proposed changes to 40 CFR part 63, subpart UUUUU was available in the docket and would be posted on EPA's MATS website. See 88 FR 24858 (April 24, 2023). Although in the past the EPA has at times published proposed amendatory regulatory text, the EPA's practice has varied. See, *e.g.,* Hazardous Air Pollutants: Proposed Regulations Governing Constructed, Reconstructed or Modified Major Sources, 59 FR 15504 (April 1, 1994) ("The proposed regulatory text is not included in the Federal Register notice, but is available in Docket No. A-91-64 or by request from the EPA contact persons designated earlier in this note. The proposed regulatory language is also available on the Technology Transfer Network (TTN), of EPA's electronic bulletin boards."); Federal Standards for Marine Tank Vessel Loading and Unloading Operations and National Emission Standards for Hazardous Air Pollutants for Marine Tank Vessel Loading and Unloading Operations, 59 FR 25004 (May 13, 1994) ("The proposed regulatory text and other materials related to this rulemaking are available for review in the docket."). Even when we do include the proposed text in the Federal Register, we often include a redline version of proposed regulations in the docket for rulemakings to assist the public in understanding the proposed regulatory changes. In our experience, stakeholders find the redline version far more useful than the proposed amendatory language in the format required by the Office of the Federal Register. Although appropriate for the task of revising the CFR, this language can be difficult to assess without the accompanying full regulatory text. Given this, and given that we rarely receive comments on the proposed amendatory language or on proposed regulatory language at all, we determined that for rulemakings such as these, it would be more efficient to take the approach here of making both easily accessible but not including the proposed amendatory text in the notice.

The final RIA experienced delays in posting in the docket, however the final OMB passback version, which was the same as the final RIA, was available.

**Comment 2:** Commenters stated that the EPA's actions in the present rulemaking have no bearing on its March 2023 reaffirmation that it is "appropriate and necessary" to regulate coal- and oil-fired EGUs under CAA section 112. They stated that the threshold determination, first made in the year 2000 and reaffirmed in 2012, 2016, and 2023, cannot now be challenged and has always been legally distinct from—and, under the statutory design, was to be temporally removed from—any revisions that the Agency makes to the original standards.

**Response 2:** The commenter is correct that the appropriate and necessary determination is a distinct action that cannot be challenged under this rulemaking.

**Comment 3:** Commenters said that given what they described as the inordinately long delay to reinstate the A&N finding for the MATS, the EPA must finalize this proposal with the most stringent provisions that afford more public health protection, no later than the end of 2023. They argued that any delay in implementing stronger limits on Hg and other hazardous air pollution means accruing risks of health harms to babies and fetuses that could follow them into adulthood.

**Response 3:** The EPA is finalizing the proposed rule as expeditiously as possible.

**Comment 4:** Commenters stated that a cycle time equal to or less than 15 minutes is currently required for CEMS in various places in the proposed rule:

- Table A-1 - Required Certification Tests and Performance Specifications for Hg CEMS (page 25140),
- Table A-2 - Minimum Required Certification Tests and Performance Specifications for Other Monitoring Systems (page 25141),
- §63.10010: Monitoring, installation, operation, and maintenance requirements (pages 25110-25113).

The commenters said they strongly recommend that these references to 15 minute cycle times be eliminated since they are not required for health effects or regulations and reference methods require sampling times of about four hours (4 dscm) at these low concentrations. They said in addition, the proposed cycle time is not consistent with PS12 A or Cement MACT rules.

**Response 4:** The Agency acknowledges the commenter's suggestions but notes that while revised non-Hg metals emission limits are included in the rule, compliance is to be determined based on a revised fPM emission limit using PM CEMS. Moreover, as fPM correlation testing will now be based on a minimum mass sample collection – which is expected to reduce sampling time duration. As mentioned previously, should an EGU owner or operator desire to use a continuous monitoring method to determine compliance with individual or total non-Hg metals, she or he may request approval from the Administrator to use an alternative test method under the provisions of 40 CFR part 63.7(f).

**Comment 5:** Commenters said that the EPA did not provide all available information to reproduce their analysis. They said in the proposed rulemaking, the Agency has omitted critical information from the docket that would allow a complete evaluation of the methodology used to set the standard. They said examples of this information include the following:

- Computer code associated with data processing and analysis – The commenters said that unlike the initial MATS rulemaking, in which the Agency included all associated test data and statistical analysis in various spreadsheets, the proposed rulemaking utilized Python code to process underlying datafiles for the purpose of setting the standard. They stated that the Agency has not provided a copy of the raw code, a description of code functionality, or any associated input or output files.

- Spreadsheet summarizing statistical analysis – The commenters said the EPA may also have additional spreadsheets that provide the detailed statistical analysis used to determine the proposed standards. They said that while the data itself is summarized in a spreadsheet and the analysis is summarized in a PDF memo, the spreadsheet showing the detailed calculations has not been provided.

The commenters said they are aware of several requests to the EPA to obtain the computer code and analysis spreadsheet that were made early in the comment period. They asserted that the Agency did not respond, or the response was "the data has been provided," which they said suggested that it is up to commenters to analyze the data in order to reproduce the results. The commenters said notwithstanding there may be issues obtaining some of the data itself, the EPA should provide all supporting calculations that enable the regulated community to review the methodology in detail as providing only the raw data and final results does not provide sufficient transparency.

**Response 5:** The 2023 Technical Memo (Docket ID No. EPA-HQ-OAR-2018-0794-5789) contains all necessary information to recreate the PM analysis. The Python code read in the 2017, 2019, and 2021 fPM compliance spreadsheet (Docket ID No. EPA-HQ-OAR-2018-0794-5561) and quarterly 30-day rolling average PM CEMS data files and calculated each quarter's 99th percentile. These calculations, as well as summary statistics, can be calculated in the Excel files provided in the docket and can be verified with the Agency's results in Appendixes B and C in the 2023 Technical Memo. It is important to note that the 2017, 2019, and 2021 fPM compliance spreadsheet contains information for EGUs not affected by this rulemaking. This file was created by merging three independent spreadsheets representing fPM data pulls over the past several years. The 2017 information was pulled in 2018, the 2019 data was pulled in 2021, and the 2021 information was pulled in 2023. Information was collected for the fleet operating at that moment in time, and often to inform EPA on the power sector broadly, and in some cases EGUs have converted to gas or retired and not relevant for this rulemaking.

The code used the lowest demonstrated fPM rate and PM upgrade assumptions from Table 5 of the 2023 Technical Memo to assign PM upgrades for each EGU for each potential standard. Python code for the 2023 Proposal, in addition as the final, was not provided since it contained deliberative and internal information. The Agency recognizes the importance of transparent and accessible analytics supporting the rule. The revised PM analysis is summarized in the 2024

166

Technical Memo entitled "2024 Update to the 2023 Proposed Technology Review for the Coal-and Oil-Fired EGU Source Category." In addition, an attachment to this docket entry is Python code summarizing and plotting the additional fPM compliance data the Agency reviewed since proposal. An Excel spreadsheet is also an attachment to this docket entry, which more clearly and concisely documents PM control assumptions for each EGU for each fPM limit assessed.

**Comment 6:** Commenters stated that they recommend that the EPA further strengthen the MATS by revisiting recent actions addressing EBCR burning EGUs. They asserted that in its current proposal, the Agency does not address EGUs burning EBCR and said in its 2020 rulemaking (EPA–HQ–OAR–2018–0794; FRL–10007–26– OAR) the EPA established a subcategory of existing EBCR-fired EGUs for acid gas HAP and surrogate $SO_2$ limits under MATS, with a surrogate $SO_2$ compliance limit of 0.6 lb/MMBtu.

Commenters said that according to the CAA, the MACT "floor" is based upon:

> "The average emission limitation achieved by the best performing five sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory, for categories or subcategories with fewer than 30 sources."

Commenters said that national parks in West Virginia and Virginia have been historically exposed to excessive levels of sulfur deposition, resulting in removal of essential nutrients from soils and associated reduced tree and herbaceous species growth and survival. Commenters said sulfur deposition and acid gas emissions have decreased over the past 40 years, but current deposition rates are still having adverse effects on ecosystems. Commenters said that reducing the SO2 limit under MATS would likely result in reductions of all acid gases, including HF.

The commenters stated that at the time of its 2020 rulemaking, the EPA calculated the current average monthly $SO_2$ lb/MMBtu emission rate for each EBCR-burning EGU for the period of January 2015 through June 2018. They said that because no HCl emissions data had been submitted for the currently-operating EGUs, and SO2 lb/MWh emissions data were available for only two of the EGUs, the EPA determined that the MACT beyond-the-floor value of 0.60 lb $SO_2$/MMBtu was appropriate, with an effective date of April 15, 2020. The commenters said since then, $SO_2$ emissions data has become available in CAMD and they provided a table with $SO_2$ emissions data from CAMD for six EBCR-fired EGUs – Grant Town Power Plant #1A, Grant Town Power Plant #1B, Scrubgrass Generating Plant #1*, Scrubgrass Generating Plant #2*, Colver Green Energy, and Ebensburg Power Company [The table included a footnote which stated that the Scrubgrass EGUs frequently exceeded the 0.6 lb $SO_2$/MMBtu monthly limit. To determine the performance capability of the $SO_2$ emission controls, they reduced any monthly average exceeding the 0.6 lb/MMBtu standard down to the standard limit when calculating the average emission rates.]

The commenters said that these EBCR-fired units are of special interest to them because of their proximity to Shenandoah National Park, a Class I area (they provided a map of EBCR facilities in close proximity to Shenandoah National Park). They said that the combination of emissions and locations of these facilities results in their relatively high impacts at Shenandoah National Park. The commenters said that for example, their review of area of influence analyses generated

by the Visibility Improvement State and Tribal Association of the Southeast (VISTAS) regional planning organization indicates that out of over 63,000 facilities included in the assessment, the Grant Town facility ranks #15 for sulfate impacts at the park; Colver ranked #43, Ebensburg #60, and Scrubgrass ranked #75.

The commenters said four of the six EBCR-fired EGUs achieved continuous compliance with the 0.6 lb $SO_2$/MMBtu surrogate limit on a monthly basis (and they provided an email address for the EPA to contact them for the source EBCR emissions data and associated charts). They said that according to CAMD, in 2022 these six EBCR-fired EGUs had a heat input of 28,826,617 MMBtu and emitted 7,728 tons of $SO_2$. The commenters said that if the fleetwide average $SO_2$ emission rate were reduced to 0.50 lb/MMBtu, the reduction in annual $SO_2$ emissions would be over 520 tons annually.

The commenters said that of the six EBCR-fired EGUs, Ebensburg and Scrubgrass may have difficulty in complying with a lower (0.5 lb $SO_2$/MMBtu) limit. For example, the Scrubgrass EGUs frequently exceeded the 0.6 lb $SO_2$ monthly limit (as shown in the chart below). Because of this, they said they investigated addition of DSI, SDA, and wet FGD to the units at these facilities. The commenters provided tables of their results are in two tables (Table 4. Estimated Scrubgrass Power Plant $SO_2$ Control Costs and Table 5. Estimated Ebensburg Power Plant $SO_2$ Control Cost). They said that in order to determine the performance capability of add-on $SO_2$ emission controls for these units, their analyses reduced any monthly average exceeding 0.6 lb/MMBtu down to the 0.6 lb/MMBtu limit when calculating the average emission rates.

The commenters said that to estimate costs of adding DSI, they applied the 2022 methodology developed by Sargent & Lundy for EPA's Retrofit Cost Analyzer (but did not include Owners' Costs or AFUDC). Even though DSI with milled Trona and a downstream baghouse is capable of achieving 90% $SO_2$ control, their analyses assumed the lowest control efficiency recommended (70%) to minimize costs. The estimated controls were under-$5,000/ton to control $SO_2$ which is very cost-effective and should easily allow compliance with the MATS. The commenters concluded that it is likely that DSI could achieve greater emission reductions than assumed in the NPS analysis, indicating that DSI may be an even more cost-effective emission control strategy for the EBCR.

The commenters said that their analyses also used the CCM workbook to estimate costs of adding SDA and wet FGD. The cost effectiveness of adding wet FGD to such small boilers was marginal at Ebensburg at just over $10,000/ton and prohibitive at Scrubgrass at over $17,000/ton. But said on the other hand, the cost effectiveness of SDA was acceptable at Ebensburg and marginal at Scrubgrass, compared to the $11,000/ton (2016$) cost threshold EPA used in its recent "Good Neighbor Rule" (when converted to 2021$, the Good Neighbor cost threshold would be over $14,400).

The commenters concluded that emissions from EBCR-fired units produce relatively high impacts at Shenandoah National Park and they recommended that the EPA revisit its recent actions regarding EBCR and consider a lower $SO_2$ surrogate limit. They said for example, if the surrogate limit were reduced to 0.50 lb $SO_2$/MMBtu, $SO_2$ emissions could be reduced by over

168

520 tons (7%) annually and if DSI were added to the Ebensburg and Scrubgrass units to comply with a lower limit, even greater $SO_2$ reductions could be achieved.

**Response 6:** As noted by the commenters, the 2023 Proposal did not address the acid gas standard for EBCR-fired EGUs. As such, these comments are outside the scope of the proposed action and no response is necessary.

**Comment 7:** Commenters stated that the federal government has long known that burning coal causes dangerous climate change that imperils the health and wellbeing of American children and future generations. They said that the environmental consequences of burning coal are well documented and are contributing to the catastrophic heat, drought, and wildfires terrorizing the West coast and hurricanes, flooding and tornadoes horrifying the East coast. The commenters said that the local pollution to air and water from coal combustion also harms people's health and threatens aquatic ecosystems and land, including agriculture that depends on access to clean water. The commenters stated that to reduce hazardous pollution from coalfired power plants, protecting our planet and improving public health for all and ensure historic protections for communities across the nation, especially for our children and our vulnerable populations, the EPA needs to set standards that end coal-fired plants, not strengthen or update the standards for coal-fired power plants to continue operating.

Commenters stated that there is simply no legal, scientific, or economic basis to continue burning coal, as was proven in the recent children's constitutional climate trial, *Held v. Montana* in Helena Montana, June 12-20, where leading scientists testified that coal endangers children's health and powering every state in the nation on 100% clean renewable energy is not only technically feasible right now, but is economically beneficial and will save states and consumers billions of dollars in energy bills. See Expert Report of Dr. Jacobson and Trial Testimony in Held v. Montana. They said that coal emits more $CO_2$ per unit of energy produced than other fuels—in 2022, coal provided approximately 10% of energy consumed in the U.S., yet was responsible for 19% of energy-related $CO_2$ emissions (U.S. EIA, *Monthly Energy Review, Tables 1.3 and 11.1* (Mar. 2023)).

Commenters stated that scientists, policymakers, and federal officials all the way up to the White House have known for decades that [the U.S.] needed to stop extracting and burning coal. The commenters said that an EPA report in 1983 during the Reagan administration found that coal combustion should be eliminated by the year 2000 in order to avoid dangerous temperature increases from climate change (US EPA, *Can We Delay a Greenhouse Warming?* (Washington, DC, Sept. 1983), https://nepis.epa.gov/Exe/ZyPDF.cgi/9101HEAX.PDF?Dockey=9101HEAX.PDF). The commenters said that the EPA is the sole federal agency with express statutory authority and duty to protect the airshed from pollution that harms children and how children and future generations are affected by your methods and actions should be your most important lens, as they are the most vulnerable, the politically powerless, and the least capable of protecting themselves. The commenters argued that children require special protection under the law.

Commenters stated that excess accumulation of GHGs in [the] atmosphere results in an Earth energy imbalance and thus an accumulation of heat in [the]Climate system. They stated that the

best available science informs that Earth's energy balance can only be restored by returning the atmospheric $CO_2$ concentration to below 350 ppm by 2100. The commenters said that experts have opined that it is economically and technically feasible to achieve the science-based GHG emission reduction target of close to 100% by 2050, while simultaneously enhancing sequestration capacity of sinks to draw down historical cumulative $CO_2$ emissions, placing the U.S. on an emissions trajectory consistent with returning atmospheric $CO_2$ to below 350 ppm by 2100, which would bring long-term heating of the Earth back down to approximately 1.0°C above preindustrial temperatures, stabilizing the climate.

Commenters stated that the current increased average temperatures of 1°C and greater (now at ~1.2°C) are already dangerous according to the IPCC (IPCC Sixth Assessment Report (AR6) (2023)). They argued that basing policies and decisions that align with temperature targets of 1.5°C is catastrophic for our children and posterity (IPCC, Overarching Frequently Asked Questions: FAQ 3). The commenters said that the IPCC special report on Global Warming of 1.5°C (2018) stated that allowing a temperature rise of 1.5°C "is not considered 'safe' for most nations, communities, ecosystems and sectors and poses significant risks to natural and human systems as compared to the current warming of 1°C (high confidence)." (M.R. Allen et al. (2022)). The 2023 IPCC Summary for Policymakers for the Synthesis Report (AR6) stated: "Risks and projected adverse impacts and related losses and damages from climate change will escalate with every increment of global warming (very high confidence). They are higher for global warming of 1.5°C than at present, and even higher at 2°C (high confidence)" (IPCC Sixth Assessment Report (AR6) (2023)). The commenters said that medical experts have recently recognized that "[t]he science is unequivocal; a global increase of 1.5°C above the pre-industrial average and the continued loss of biodiversity risk catastrophic harm to health that will be impossible to reverse." (Lukoye Atwoli et al. (2021)). The commenters concluded that as such, 1.5°C should not be used to guide U.S. policy that is required to be based on best available science and the EPA should not be advancing policies that knowingly make the climate crisis worse, and potentially unsolvable. (The commenters provided several references.)

**Response 7:** The EPA acknowledges and thanks the commenters for providing these comments. In this action, the EPA is fulfilling its statutory duty under CAA section 112 to set standards for emissions of HAP that "require the maximum degree of reduction in emissions of the hazardous air pollutants . . . (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable." 42 U.S.C. 7412(d)(2). On May 23, 2023, the EPA proposed actions addressing greenhouse gas emissions from fossil fuel-fired EGUs. See 88 FR 33240.

**Comment 8:** The commenters stated that the Agency's decision to re-evaluate MATS, is timely and appropriate as Hg and Hg-containing compounds, particularly methylmercury, are highly neurotoxic. They said exposure causes permanent damage to various organs and developing brain is particularly susceptible and that the elimination of Hg emissions is the most effective means to reduce this threat. The commenter exhorted the Agency to promulgate a rule that reduces Hg emissions by EGUs to the lowest possible amount using MACT systems. In addition, this must be done in a manner that does not create EGUs that are expected to have operational

life-times that extend into the indefinite future while they continue to emit GHGs, most notably $CO_2$.

The commenters urged the Agency to move more rapidly to enact this rule. They said that every day of delay causes more damage to the health of Americans. They argued that a partial solution to this dilemma has been created by the Agency by its near-simultaneous announcement of New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule. They commenters stated that prompt promulgation of both rules should assure better protection of the health of Americans, particularly vulnerable populations that include children, the elderly and those with chronic diseases, while simultaneously combating the climate emergency.

The commenters said that although the first well-documented cases of methylmercury poisoning did not occur until the 1800s, the condition was demonstrated most clearly by the studies of children exposed to this neurotoxin in what became known as Minamata Disease. (Barrett JR. *An uneven path forward: the history of methylmercury toxicity research*. 2010. National Institute of Environmental Health Sciences.; Ui J. Chapter 4 Minamata Disease. In: Ui J, editor. *Industrial Pollution in Japan*. Tokyo, Japan: United Nations University Press; 1992.) The commenters said that the Minimata outbreak was caused by methylmercury discharges into Minamata Bay in Japan and eventually there were approximately 3,000 cases with just over 1,700 deaths from this disaster (Japan-guide.com. *Minamata Disease Related sites*, http://www.japan-guide.com/e/e4527.html. 2011). They said that the methylmercury poisoning is manifested by poor coordination (ataxia), loss of sensation and muscle strength in the hands and feet due to peripheral nerve damage, loss of vision, impaired hearing and speech. In utero exposure may result in microcephaly due to an underdeveloped brain and a clinical syndrome similar to cerebral palsy. A second, serious outbreak of methylmercury poisoning occurred in Iraq in the 1970s.

The commenters said that inhabitants of the Faroe Islands and the Seychelles are another well-studied population, and they said these inhabitants were exposed to methylmercury in their diets that consist of marine animals with high methylmercury levels. The commenters said that the investigative teams that studied these populations used a variety of neurophysiological and other tests (Lockwood AH. *The Silent Epidemic: Coal and the Hidden Threat to Health*. Cambridge, MA: The MIT Press; 2012.). They said the investigators who performed these tests concluded that these inhabitants had sustained neurological damage due to methylmercury at blood concentrations thought to be safe at the time and this necessitated a revision of Hg exposure standards.

The commenters stated that Hg enters the environment by natural mechanisms, such as volcanic eruptions, and the results of human activity and that much of this anthropogenic Hg arises as the result of burning coal to generate electricity. They said that coals of all types contain small amounts of Hg and when coal is burned the Hg is volatilized and discharged in flue gases and as particles. The commenters said that the magnitude of the problem can be approached, in part, via

171

the Toxics Release Inventory (TRI) that tabulates air emissions of Hg. The 2021 TRI lists a total 35,580 pounds of Hg and Hg-containing compounds released into the air by mandated reporters.

The commenters stated that in the environment, Hg-containing particles form the nidus for the condensation of water vapor to form rain and Hg-containing rainfall enters waterways where it is methylated by the action of bacteria. They said that these methylation reactions are favored in water that is acidic and contains large amounts of dissolved organic material, such as the waterways found in the Santee River basin of the Atlantic coastal plain. (Hughes WB, et al. *Water Quality in the Santee River Basin and Coastal Drainages, North and South Carolina, 1995-98: U.S. Geologic Survey Circular 1206*. U.S. Geological Survey, 2000).

The commenters stated that U.S.-attributable methylmercury is highest in the eastern portion of the country due to proximity of coal-fired power plants. They said this poses risk to children, pregnant women and women who may become pregnant and in this part of the country risks are highest among those who rely on self-caught fish as a significant fraction of dietary protein (EPA. *Revised Technical Support Document: National-scale assessment of mercury risk to populations with high consumption of self-caught freshwater fish in support of the appropriate and necessary finding for coal-and oil-fired electric generating units*. 2011. EPA-452/R-11-009.). The commenters said that methylmercury is both persistent and bioaccumulative reaching the highest concentrations in marine mammals, piscivorous birds and large predatory fish (Driscoll CT, et al. *Mercury Contamination in Forest and Freshwater Ecosystems in the Northeastern United States*. BioScience 2007;57(1):17-28.). The commenter said that this bioaccumulation may lead to concentrations in apex predators that are as much as a million-fold higher than in the water of origin and it follows that consumption of large predatory fish and marine mammals that are at the top of the food chain can lead to methylmercury levels in humans and damage to the vulnerable nervous system. The commenter said that eating large predatory fish is the leading source of methylmercury exposure in Americans. They said that to aid the public in making informed decisions concerning the consumption of fish from lakes and streams, many state and tribal governmental agencies publish advisories describing Hg and PCB exposure risks associated with fish caught in specific bodies of water. For example, the state of Ohio 2022 table of advisories is 16 pages long - most of these advisories are warnings about Hg (*2022 Ohio Sport Fish Consumption Advisory*. 2023). The commenters said that in addition, the EPA and the FDA have published fish consumption advice designed to minimize methylmercury exposure from commercially available sources that is particularly applicable to children and for women who are of child-bearing age (EPA, FDA. *Advice About Eating Fish*. 2023).

The commenters stated that wildfires have become more common, more extensive and hotter as the climate emergency has worsened and substantial amounts of Hg in various chemical forms is present in forests in the organic matter on the forest floor and in subsurface soils. They said that this Hg arises from natural sources, such as volcanoes, and anthropogenic sources, chiefly from the combustion of coal and depending on the characteristics of the fire, this Hg is released into the atmosphere, released into runoff from the burned area or both (Sever M. *Big wildfires mobilize mercury. What are the risks to surface water?* Proc Natl Acad Sci USA 2021;118(27):e2110558118). The commenter said thus, after a fire, the Hg that had been sequestered in forests has the potential increase Hg exposures by direct or indirect mechanisms and this re-release of Hg will become an increasingly important source of this toxicant in the

future as wildfires become more problematic as the result of climate change. The commenter said that the importance of this source of Hg and its impact on human health will depend increasingly on the success or failure of efforts to combat the climate crisis and to control emissions by EGUs.

The commenters stated that the authors of a 2005 report used data available at the time to model the financial impact of Hg damage to the brain on Americans (Trasande L, et al. *Public health and economic consequences of methyl mercury toxicity to the developing brain*. Environ Health Perspect 2005;113(5):590-596.; Trasande L, et al. *Mental retardation and prenatal methylmercury toxicity*. Am J Ind Med 2006;49(3):153-158). They concluded that at that time there were between 300,000 and 600,000 children who were born each year with blood Hg levels that were high enough to produce impairment on neurodevelopmental and neuropsychological tests. The commenter noted that the report said reduction in the intelligence of these children was estimated to create an economic cost to society of approximately $8.7 billion per year (range $2.2 billion to $43.8 billion in 2000 dollars). The commenter said that when one considers the impact on society, Hg leads to placing more children in the ranks of those who are intellectually compromised, and a similar number are removed from the ranks of individuals who are intellectually gifted. The commenters said unfortunately, Hg damage to the brain is not a one-time cost – Hg-related impairments last for the life of the individual.

The commenters stated that the FDA website does not list any drugs that are approved for the treatment of methylmercury poisoning and any treatment would be directed at symptoms, such as seizures. They said however, chelation therapy may be indicated for individual patients with acute poisoning. They concluded that this decision must be individualized weighing risks versus potential benefit and is not an appropriate solution to large scale exposure.

**Response 8:** The comment supports the conclusions in the proposed rule that the EPA is finalizing. For this reason, the comment requires no response.

**Comment 9:** The commenters said that the EPA cannot publish alternative emission limits without first issuing for public comment additional proposed standards and their basis. They said that the rulemaking procedures at section 307(d) of the CAA specifically require that a proposed rulemaking must "include a summary of-(A) the factual data on which the proposed rule is based; (B) the methodology used in obtaining the data and in analyzing the data; and (C) the major legal interpretations and policy considerations underlying the proposed rule" and "All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule." (42 U.S.C. § 7607(d)(3)). They said that furthermore, any final "promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation." (42 U.S.C. § 7607(d)(6)(C)). The commenters said that relatedly, the EPA has "an initial burden of promulgating and explaining a non-arbitrary, non-capricious rule" including an obligation to "explain how the standard proposed is achievable under the range of relevant conditions which may affect the emissions to be regulated." (*National Lime Ass'n v. EPA*, 627 F.2d 416, 433 (D.C. Cir. 1980) (in the context of a new source performance standard rulemaking procedure subject to 42 U.S.C. § 7607(d)). The commenters said; accordingly, the EPA cannot finalize any emission standard other than those analyzed in the Proposed Rule absent a new

proposed rule providing the opportunity for public comment on the necessity, appropriateness, feasibility, and cost effectiveness of any such newly proposed limits. They said to do otherwise would be unlawful and arbitrary.

**Response 9:** The changes the EPA is finalizing are substantially similar to those the EPA proposed and provide notice and the opportunity to comment on consistent with the EPA's obligations under CAA section 307(d). Further, it is well established that EPA is not required "to select a final rule from among the precise proposals under consideration during the comment period. Rather, incremental changes are permissible so long as the final rule is a 'logical outgrowth' of the proposals highlighted and discussed during the notice and comment period." *Sierra Club v. Costle*, 657 F.2d 298, 352 (D.C. Cir. 1981).

**Comment 10:** Commenters stated that it was arbitrary for EPA to deny the request for comment extension for the Proposed Rule to account for the interplay and effect of these two related rulemakings on each other. The commenters said that the EPA published the proposed GHG NSPS halfway through the comment period for this 2023 Proposal, and this newly proposed GHG NSPS fundamentally changed the technical and cost analysis with respect to the 2023 Proposal, because if both rulemakings are finalized, sources will have to assess how this different control requirements required by each rulemaking interact with and affect each other rather than simply analyzing the 2023 Proposal requirements by themselves as was required during the first portion of the public comment period.

**Response 10:** The Agency acknowledges it received requests for a comment period extension that were denied. Comment period extension requests for the GHG NSPS were accepted, and the comment period was extended by an additional 15 days and closed on August 8, 2023.

# CHAPTER 12

## 12. General

**Comment 1:** Commenters said that the EPA's proposal would strengthen limits on PM pollution from power plants (as a surrogate pollutant for toxic pollutants), require continuous emissions monitors for PM, and tighten Hg limits for power plants that burn lignite coal. The commenters said that requiring that all plants monitor these fPM emissions with CEMS will ensure that the goals of these measures are met. They said that as proposed, by 2035 the new standard would cut pollution and protect people from:

- 82 pounds of Hg;
- 800 tons of $PM_{2.5}$;
- 8,800 tons of $SO_2$;
- 8,700 tons of $NO_x$; and
- 5 million tons of $CO_2$

The commenters stated that cleaning up Hg and other air toxics is projected to lead to $170 to $220 million in annualized health benefits and a further $170 million in annualized climate co-benefits. They said that strengthening the standards is cost-reasonable, technically feasible, legally required, and necessary to adequately protect public health and welfare.

The commenters said that strengthening the MATS to further reduce toxic emissions from coal- and oil-fired power plants is consistent with the EPA's role as a signatory to the Chesapeake Bay Agreement and Congress's clear directive in section 117(g) of the Clean Water Act.

**Response 1:** The comment supports the conclusions in the proposed rule that the EPA is finalizing. For this reason, the comment requires no response.

**Comment 2:** The commenters stated that American Indians and Alaska Native Villagers are reliant on natural food supplies including fish, game, and native plants and that nutritious foods are crucial components to the ecosystems that have sustained life for thousands of years. They said that Hg contamination of Tribal environments including fish, shellfish and other essential food supplies injects this potent neurotoxin into our vulnerable population. They said they support the proposed reduction of allowable Hg emissions from lignite-burning EGUs and enhanced emissions monitoring from all coal-fired and oil-fired EGUs.

**Response 2:** The comment supports the conclusions in the proposed rule that the EPA is finalizing. For this reason, the comment requires no response.

**Comment 3:** The commenters stated that as noted in the Fact Sheet accompanying the proposed regulation, "…the proposed rule is one part of a broader suite of actions that Administrator Regan announced in March 2022 to protect communities across the nation from the various health and environmental impacts of power plant pollution." They said that in addition to Hg and other air toxins from coal-fired and oil-fired EGUs, this industrial sector is a primary source of GHGs. The commenters said that the acute and continuous impacts of climate change on Native

Americans and Alaska Native Villagers are well documented but unfortunately, new consequences of this global crisis continue to be revealed. They said that for multiple reasons including vulnerability and geographic constraints Tribal communities are disproportionately suffering from these changes. The commenters said that the U.S. Fourth National Climate Assessment (NCA4 - *USGCRP, 2018: Impacts, Risks, and Adaptation in the United States*) noted, in part, that "Climate change increasingly threatens indigenous communities' livelihoods, economies, health, and cultural identities by disrupting interconnected social, physical, and ecological systems." A more focused examination of Tribal needs to address the impacts of climate change is presented in 2021 publication The Status of Tribes and Climate Change (*The Status of Tribes and Climate Change (STACC)*, Institute for Tribal Environmental Professionals, 2021).

The commenters said they have a long history of information sharing with the EPA and advocacy for reducing emissions of GHGs including *Status of Tribal Air Report* (National Tribal Air Association 2022) report which documents climate change impacts on Tribal lands and people. They said that the ravages of climate change continue to be of the utmost concern, and they support this proposed regulation as one part of the efforts to reduce reliance on coal-fired and oil-fired EGUs.

**Response 3:** The comment supports the conclusions in the proposed rule that the EPA is finalizing. For this reason, the comment requires no response.